

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,    Case Number 00-6088-CR-UUB

        PLAINTIFF,

V.

MARCO MINUTO,

        DEFENDANT

_____/

**MOTION FOR CONFLICT OF INTEREST HEARING AND TO DETERMINE THE STATUS OF MURRAY RICHMAN AS ATTORNEY OF RECORD FOR MARCO MINUTO**

    Comes now the United States, and hereby flies this Motion For a Conflict of Interest Hearing and to Determine the Status of Murray Richman as Attorney of Record for Defendant Marco Minuto and in support therefor states as follows:

**I SUMMARY**

    1. On December 15, 2000, Magistrate Judge Stephen Brown issued an order for the arrest of the defendant Marco Minuto for violating the conditions of his pre-trial based on evidence that Minuto was engaging in a continuing course of criminal conduct. As set forth, below, this criminal conduct was undertaken, in part, from the law offices of Murray Richman, whose offices Minuto claimed he was visiting five days a week in preparation for his defense in this case. Thus, Minuto was using the pre-

text of meetings with his attorney to facilitate the commission of criminal acts.

   2.   At a minimum Murray Richman, Minuto's attorney, is a potential witness in these criminal acts. It is also possible that Mr. Richman knowingly facilitated Minuto's repeated criminal conduct that violated the conditions of Minuto's bond. Such conduct could be a violation of a court order punishable by contempt of court, 18 U.S.C. §§ 2, 371, 401, 3148, as well as exposing Mr. Richman to potential criminal liability for the underlying criminal conduct of his client. This matter is now under investigation.

   3.   Obviously, Minuto would have information concerning whether or not his lawyer knowingly facilitated his (Minuto) violations of his conditions of release. Thus, at a minimum a potential conflict of interest exists between Minuto and his attorney. United States v. McClain, 823 F. 2d 1457, 1462-1464 (11th Cir. 1987).

   4.   Consequently, the United States is filing this motion to request that a hearing be held in order to determine whether, consistent with the Sixth Amendment to the United States Constitution, Murray Richman may continue to represent the defendant Marco Minuto.

## II FACTS SURROUNDING MINUTO'S BOND VIOLATIONS AND HIS ATTORNEY MURRAY RICHMAN

1.  On April 4, 2000, Defendant Marco Minuto, and eight others were indicted by a Grand Jury in the Southern District of Florida. United States v. Minuto et al., Case Number, 00-6088-CR-Ungaro-Benages. The indictment charged Minuto and eight others with operating a racketeering enterprise in violation of 18 U.S.C § 1962. The indictment specified that Minuto was a fully inducted, or "made member" of the Luchese organized crime family. The indictment charged that, inter alia, Minuto directed other defendants to collect debts by acts and threats of violence. This case is specially set for trial on February 26, 2001.

2.  On May 3, 2000, Minuto was arrested by agents from the Federal Bureau of Investigation (FBI) at his residence located at 18 Willow Hill, Upper Saddle River, New Jersey.

3.  On May 4, 2000, Minuto appeared before a United States Magistrate in the District of New Jersey. Minuto was released on a $750,000 property bond. Minuto was ordered released under house arrest and placed under electronic monitoring by pre-trial services. The Court specified that Minuto could leave his residence only to visit his attorney, attend court appearances, or attend medical appointments. The order further specified that Minuto was prohibited from violating any local, state or federal law while on bail status. These same conditions were

imposed by Magistrate Judge Stephen Brown on June 1, 2000 when Minuto had his initial appearance in the Southern District of Florida (Docket Entry 64). Minuto received authorization to travel to the offices of Murray Richman, his attorney, five days a week. Minuto did not receive authorization to meet with other persons before or after his meetings with his attorney.

4. As more particularly set forth below, the evidence demonstrates that Defendant Minuto has violated the conditions of his bond by regularly conducting criminal activity and failing to abide by his conditions of house arrest. This evidence is based, inter alia, on a series of court authorized electronic surveillance orders issued from June 1, 2000 to October 13, 2000.

5. The aforementioned court orders were issued based on affidavits presenting evidence establishing probable cause to believe that Minuto, along with Lukov, and others were using the subject telephones to commit crimes in violation, inter alia of 18 U.S.C §§ 2, 371, 1341, 1343, 1951, 1956, and 1957 in connection with a scheme to defraud New York State of taxes due on gasoline and to monopolize the distribution of "bootleg" gasoline in the New York metropolitan area.

6. The criminal scheme operated by Minuto and others was designed to avoid state excise taxes on gasoline and to generate millions of dollars a year in illegal income. The scheme was operated jointly by members of La Cosa Nostra ("LCN") and members

of Russian Organized Crime ("ROC"). LCN members collect a "mob tax" from the members and affiliates of ROC, who were responsible for the transportation and distribution of the bootleg gasoline. The "mob tax" was paid in return for the LCN's services in protecting the gasoline bootleggers from extortion by LCN and other racketeers and also for LCN's services in resolving disputes that arose in connection with the bootleg gasoline business. In this case, "bootlegging" refers to the practice of importing gasoline into New York from New Jersey without paying New York tax on the gasoline. The wholesale gasoline tax currently imposed by New York State is approximately 50 cents per gallon. By contrast, the corresponding tax imposed by New Jersey is approximately 30 cent per gallon. Because of the differential between New York and New Jersey state gasoline taxes, a bootleg distributor who imports gasoline from New Jersey without paying New York taxes earns approximately 20 cents per gallon in illegal proceeds. According to New York State tax investigators, New York fails to collect millions of dollars every year in lost tax revenue as a result of such bootlegging schemes.

7. The evidence set forth in the initial affidavit in support of the electronic surveillance order included a recorded conversation between Minuto and a cooperating witness that occurred on March 9, 1999. In the course of the conversation, Minuto explained that he "was in the gas business" and claimed

that if the cooperating witness were to "get a couple of gas stations," Minuto would show him "how to make some fucking serious money." Minuto explained that he makes money in the gas business because "you got a fuckin' margins of ah, let's say twenty cents. You make them say, three, four, you working on fifteen cents." Minuto then stated:

> "Fifteen cents, you know what you're talking about, you're talking about fourteen hundred dollars a load (UI) you know, you do two, three loads a day, you know...and when you talk he's talking (UI). And it's, and we did it in New York. We did it with the Russians, and we did it...Diesel brand, in New York..."

During this conversation, another participant stated to Minuto, "You've got Alex in New York." In light of the evidence set forth below, the reference to "Alex" probably refers to Alex Lukov.

8. The investigation in New York determined that Lukov operated a bootleg gas scheme under the protection of Marco Minuto, who used his position as a soldier in the Luchese crime family to protect the illegal operations of Lukov and resolve disputes arising from the illegal scheme. Lukov used Whirled-Wide, a company owned Joseph Cassese, a co-conspirator, as a "front" company to purchase gasoline in New Jersey with the intention of reselling the gasoline in New York. The illegal profits from the scheme were shared with both Minuto and John Romeo. Romeo is an associate of the Luchese Crime family.

9. As set forth below, the Court ordered electronic surveillance, coupled with the physical surveillance, revealed that Minuto regularly violated the conditions of his bond by engaging in a continuing course of criminal conduct and failing to comply with the provisions of his house arrest.

10. On June 13, 2000, a court authorized intercepted telephone call occurred between Alex Lukov and John Romeo, the Luchese family associate. Romeo stated that Lukov pays "Marco" $3,000 a week, but only pays Romeo $600 a week. Lukov responded that Romeo was exaggerating Lukov's payments to "Marco" and understating Lukov's payments to Romeo. In context, "Marco" refers to Marco Minuto and the conversation refers to payments that Lukov made to Romeo and Minuto in return for their protection of Lukov's bootleg gasoline operation. This conclusion is corroborated by additional telephone intercepts and physical surveillances as set forth below.

11. On July 19, 2000, a court authorized intercepted telephone call occurred between Alex Lukov and John Romeo. Lukov stated to Romeo that "he can't get out of the house" because he has a "bracelet on" after he got "pinched" in an investigation in Florida. Lukov further stated "there's a rat." Romeo then stated "Well, it got nothing to do with nothing that we got, right?" Lukov responded that it did not. The circumstances of the intercept indicate that Minuto was the subject of the

telephone call.

12. On July 19, 2000, Alex Lukov and Joseph Cassese, participants in the conspiracy, were observed by FBI agents meeting at the Plaza Diner in Fort Lee, New Jersey and were then observed in the vicinity of Minuto's house, which is located at 18 Willow Hill, Upper Saddle River, New Jersey.

13. On August 10, 2000, a physical surveillance was conducted by agents from the New York FBI office. At approximately 10:57 a.m., in front of the law offices of Minuto's lawyer Murray Richman located at 2027 Williamsbridge Road, Bronx, New York, Marco Minuto was greeted and hugged by Joe Cassesse, a participant in the conspiracy.

14. At approximately 10:58 a.m., Minuto and Cassesse proceed to 2059 Williamsbridge Road, a Liberty Donuts and entered that establishment. At approximately 11:18 a.m., Minuto and Cassesse left Liberty Donuts. Minuto then entered the Liberty building, 2027 Williamsbridge Road, where his lawyer Murray Richman is located. Cassesse entered his vehicle and departed the area. This meeting violated the conditions of Minuto's house arrest in that this meeting did not involve Minuto's lawyer. Rather, defendant Minuto used the pretext of a meeting with his attorney to meet with Joe Cassesse, a participant in the scheme to avoid paying the state excise tax.

15. On August 11, 2000, a court authorized intercepted

conversation occurred between Alex Lukov and Marco Minuto. Minuto told Lukov that Lukov is not "doing the right thing." Lukov and Minuto then scheduled a meeting for Monday, August 14, 2000. In context, this conversation likely involves a dispute relating to bootleg gasoline. As shown in the next paragraph, the evidence demonstrates that this meeting occurred at the building where the law office of Murray Richman, Marco Minuto's lawyer, is located.

16. On August 14, 2000, a physical surveillance was conducted by agents from the New York FBI office. At 11:54 a.m., Giovini Lubrano, another co-conspirator, and Alex Lukov were observed entering 2027 Williamsbridge Road, the building where the law office of Murray Richman, defendant Minuto's attorney, is located. At 12:08 p.m., Lubrano and Lukov were observed leaving the same building. At 12:41 p.m., Lubrano again entered 2027 Williamsbridge Road. At 12:50 p.m., Marco Minuto and Lubrano exited 2027 Williamsbridge Road. Thus, Minuto, Lubrano and Lukov were all together for a period of time inside the building where the law office of Minuto's attorney is located. This provides further evidence that Minuto uses the pretext of meeting with his lawyer to participate in a meeting with Lukov concerning on-going criminal activity.

17. On August 16, 2000, a court authorized intercepted telephone call occurred between Alex Lukov and Marco Minuto.

Minuto told Lukov that he had to pay "that guy." Lukov then explained that the reason he had not paid was because "they sold 82 octane" and "Consumer Affairs" came down and closed four stations. According to FBI agents in New York, "that guy" refers to Joe Cassese, a fellow co-conspirator. In context, Minuto is instructing Lukov to pay Cassese for bootleg gasoline purchased by Lukov and then resold.

18. Significantly, the preceding call was received by Marco Minuto at the law offices of Murray Richman, Esq., who represents Minuto in connection with Minuto's outstanding indictment in this case. At the end of this conversation, Minuto instructed Lukov to meet him on Friday at the same place where Minuto was located at the time of the conversation, i.e., Richmans's law office. Minuto was using his attorney's office to evade his bond restrictions and to continue to conduct criminal activity, in violation of 18 U.S.C. § 3147.

19. On August 18, 2000, a court authorized intercepted telephone call occurred between Alex Lukov and Marco Minuto. Lukov stated that he wanted to push back the Monday meeting until 11:30 a.m., at the same place. Lukov then stated that he had spoken to "Joe" and "took care of it with him." According to FBI Agents in New York, Lukov was arranging a meeting with Minuto to discuss Lukov's failure to pay Cassese for low octane gasoline that was resold.

20. On August 18, 2000, a physical surveillance was conducted by Agents from the New York FBI office. At 9:19 a.m., Marco Minuto entered 2027 Williamsbridge Road, Bronx, New York, the location of his attorney Murray Richman, Esq. At 10:25 a.m., Minuto left 2027 Williamsbridge and entered Liberty Donut shop. At 10:26 a.m., Minuto left the donut shop and departed in a silver Mercedes Benz. Minuto was not accompanied by his attorney or any other person. At 10:43 a.m., Minuto parked on Hughes Avenue in the vicinity of Crescent Avenue, Bronx, New York. The vehicle was on the west side of Hughes Avenue north of Crescent Avenue in front of the Arthur Avenue Retail Market. Minuto got out of the vehicle and was lost from view. Minuto was not accompanied by his attorney. Minuto was next observed by the surveillance agents departing, by himself, at 11:07 a.m., in the silver Mercedes Benz. At 11:16 a.m., Minuto arrived back alone and entered 2027 Williamsbridge Road, the building where his lawyer is located. Minuto was observed carrying a white plastic shopping bag.

21. On August 18, 2000, at approximately 12:36 p.m., Minuto, unaccompanied by any person, left the building where his attorney is located. At 12:42 p.m., Minuto was observed exiting from the Pasta Pasta restaurant, adjacent to 2027 Williamsbridge Road. He then entered 2027 Williamsbridge Road. At 1:09 p.m., Minuto departed by himself in silver Mercedes Benz. At 1:20

p.m., Minuto parked in front of the Arthur Avenue Retail Market on Hughes Avenue. At 1:23 p.m., Minuto was observed on the sidewalk in front of Café Al Marcato, Hughes Avenue. Minuto then departed in the silver Mercedes Benz. At 1:25 p.m., Minuto entered Danny's Pork Store, 626 187th Street, Bronx. At 1:33 p.m., Minuto departed Danny's Pork Store. These physical surveillances reveal that Minuto was in violation of the Court's order of house arrest.

22. On August 21, 2000, a physical surveillance was conducted by Agents from the New York FBI office. At 11:30 a.m., Alex Lukov was observed entering 2027 Williamsbridge Road, the building where the office of Minuto's attorney Murray Richman is located. At 12:28 p.m., Marco Minuto and an unknown male were observed leaving 2027 Williamsbridge Road. Surveillance on Minuto was terminated after this observation. This again demonstrates that Minuto is using a meeting with his attorney as a pretext to meet with his fellow conspirator Lukov.

23. On August 28, 2000, a court authorized intercepted telephone call occurred between Alex Lukov and Marco Minuto. Minuto stated that he did not see anything last week or the week before. In this portion of the conversation, Minuto was complaining to Lukov about Lukov's failure to make weekly protection payments to Minuto. Lukov responded that he is "still standing" and stated that not one of his trucks is moving. Lukov

then stated that he was trying to talk to a person in the Bronx named "John" about doing some business. According to FBI agents in New York, in this portion of the conversation, Lukov was attempting to explain that he was unable to pay Minuto because of problems he was having with his business.

24. On September 5, 2000, a court authorized intercepted telephone call occurred between Alex Lukov and Marco Minuto. Minuto stated that he wanted to see Lukov that day and told Lukov that he had to "take care of the guy." Lukov responded that he would take care of the "guy" as soon as "the guy" took care of him.

25. On September 17, 2000, at 7:51 p.m, a court authorized intercepted telephone occurred between Alex Lukov and Marco Minuto. Minuto stated that he was at Regine's on Hempstead Turnpike, and told Lukov to meet him there. This demonstrates that Minuto was violating his order of house arrest in order to further his participation in criminal activity.

26. On September 17, 2000, at 7:59 p.m., a court authorized intercepted telephone call occurred between Alex Lukov and Marco Minuto. Minuto stated that he wanted to show Lukov "the place" but stated that he could not stay long because of his "situation" (the order of house arrest). This conversation relates to a planned meeting for the purpose of discussing Lukov's bootleg gasoline operation.

27. Following the telephone call described above, on September 17, 2000, FBI agents observed Alex Lukov and Marco Minuto meeting in a bar called Regines, located in East Medow, New York as had been planned and discussed by Minuto and his co-conspirator Lukov. This meeting violated the conditions of Minuto's house arrest, of which Minuto was aware.

28. On September 21, 2000 at 10:29 a.m., FBI agents observed Marco Minuto and Alex Lukov together entering 2027 Williamsbridge Road (Liberty Building) the location of the law office of Murray Richman.

29. On October 21, 2000, FBI surveillance agents photographed Marco Minuto and Alex Lukov and another person walking together in a manner indicative of an ongoing conversation. This occurred immediately outside of the law office of Murray Richman and demonstrates Minuto's calculated and continuing decision to use his meetings with Murray Richman as a cover for his continuing criminal activities.

III **MEMORANDUM**

It is well settled that where any attorney may himself have criminal liability, either in a pending matter or otherwise, a conflict of interest may exist. United States v. McClain, 823 F.2d 1457, 1462-1464 (11th Cir. 1987). In some cases, a defendant may waive the conflict, but in order to do so the Court must determine that defendant fully realizes the consequences to

his defense that continuing with counsel laboring under the onus of a conflict could have.  In addition, the Court must inform the defendant that he has the right to obtain other counsel. United States v. Petz, 764 F.2d 1390, 1392-93 (11th Cir. 1985); United States v. Garcia, 517 F.2d 272, 278 (5th Cir. 1985),

Significantly, the Court may decide to reject a defendant's waiver of the conflict of interest.  The Court in Wheat v. United States, 486 U.S. 153 (1988) made this point abundantly clear when it ruled, in the context of joint representation, that:

> Thus, where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented.

Id. at 162.

The Court further recognized the difficulty that this can impose on district courts:

> Unfortunately for all concerned, a district court must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly.

Id.

The facts before the Court are subject to various interpretations.  It is possible, for example, that Minuto's attorney was fully complicit in his client's efforts to evade the restrictions of his bond so that he could continue to conduct the criminal activities of the Luchese organized crime family.

In any event, the facts set forth above demonstrate that at a minimum a potential conflict of interest exists between the interest of Marco Minuto and the interest of his attorney Murray Richman. Therefore, a hearing should be held to determine the status of Minuto's attorney. The United States requests that this hearing be held as soon as practical in light of the February 26, 2000 trial date.

WHEREFORE, the United States moves that the Court order a hearing to be held to determine the status of Murray Richman as counsel for defendant Marco Minuto.

Respectfully submitted,
GUY A. LEWIS
UNITED STATES ATTORNEY

BY: MICHAEL J. DITTOE
Assistant United States Attorney
Court ID #A5500209
500 E. Broward Blvd., Ste. 700
Ft. Lauderdale, FL 33394-3002
Tel: (954) 356-7392
Fax: (954) 356-7230

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on the below listed attorneys of record for the parties in this case either by pre-paid United States mail or by pre-paid Federal Express shipment this Second day of January, 2001.

MICHEL J. DITTOE
ASSISTANT UNITED STATES ATTORNEY

Murray Richman, Esq.
2027 Williamsbridge Road
Bronx, NY 10461

Jeffrey Weiner, Esq.
Two Datran Center, Suite 1910
9130 S Dadeland Blvd.
Miami, FL 33156

Bruce Zimet, Esq.
One Financial Plaza
Suite 2612
Ft. Lauderdale, FL 33394

William J. Hunt, Esq.
Suite 200
155 Polifly Road
Hackensack, NJ 07061

Martin Raskin, Esq.
Grove Forest Plaza
2937 SW 27th Ave.
Suite 206
Miami, FL 33133

Simon Steckel, Esq.
Suite 3260
701 Brickell Avenue
Miami, FL 33131

```
Antonio E. Marin, Esq.
Suite 303
2100 Coral Way
Miami, FL 33145

Hosey Hernadez, Esq.
Suite 602
2701 S. Bayshore Drive
Coconut Grove, FL 33133
```