UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-CR-6088-UNGARO-BENAGES

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARCO MINUTO,

Defendant.



**MARCO MINUTO'S MOTION FOR PRODUCTION OF IMPEACHMENT AND "BAD ACTS" MATERIALS PERTAINING TO ALL COOPERATING WITNESS, INCLUDING DAVID ALWAIS**

The government's case against Mr. Minuto is based in large part on the testimony of cooperating government witnesses. Among them is David Alwais. During a pretrial detention hearing held on December 20, 1996 before Judge Snow in the case of United States v. David Alwais, Case No. 96-6205-Cr-Roettger (Southern District of Florida), the government argued that Mr. Alwais should be detained because he posed a threat to the safety of the community. [Exhibit A]. According to the government, Mr. Alwais and his uncle Sidney Alwais ran a loansharking business in which they relied on the use of force to collect debts. Id. at 9-12. During the detention hearing, the government argued that the FBI had obtained over 500 taped conversations, id. at 9, some of which involved David Alwais threatening to kill people, id. at 14, 18, or threatening to perform heinous acts to their private body parts. Id. at 10. The government submitted transcripts of the



BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD, SUITE 1300, MIAMI, FL 33131• (305) 371-6421

conversations to the Court and argued that the transcripts were only a sampling of all the tapes and transcripts in the government's possession involving David Alwais.

Also during the detention hearing, the government argued that David Alwais had obstructed justice by telling people to lie if called to testify before the grand jury. FBI S/A Elizabeth Robert testified during the detention hearing as follows:

Q: And who was approached and told to curb their testimony [before the grand jury]?

A: The six individuals mentioned in the indictment.

Q: They were all approached and told to curb their testimony?

A: Yes sir.

Q: Who approached them?

A: Sidney and David Alwais.

Id. at 45. In arguing that David Alwais was a threat to the safety of the community, the prosecutor argued that Mr. Alwais had threatened and intimidated people to influence their testimony. Id. at 96-97. According to the government, David Alwais obstructed justice and was the type of person who would threaten, injury, and intimidate prospective witnesses. Id.

Pursuant to Kyles v. Whitley, 514 U.S. 419 (1995), United States v. Bagley, 473 U.S. 667 (1985), United States v. Agurs, 427 U.S. 97 (1976), United States v. Giglio, 405 U.S. 150 (1972), Brady v. Maryland, 373 U.S. 83 (1963), Napue v. Illinois, 360 U.S. 264 (1959), and Federal Rule of Criminal Procedure 16, Mr. Minuto requests that this Court direct the government to disclose the following impeachment material pertaining to

cooperating government witness David Alwais:

> (1) A copy of every tape recording with its corresponding transcript in which David Alwais is speaking about harming people or damaging property, or in which any person is speaking about David Alwais harming people or damaging property.
>
> (2) All reports outlining how David Alwais obstructed justice, intimidated or threatened witnesses, or told witnesses to lie if called to testify before the grand jury.

This information is in the government's exclusive possession. The reports, tapes, and transcripts were not filed with the Court in Mr. Alwais's case and are not part of any public record. The only way for Mr. Minuto to obtain these materials is if the government produces them. So far, no such production has taken place.

Under Brady, the government must disclose evidence that is favorable to the accused and material either to guilt or punishment. Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667, 674 (1985). Impeachment evidence falls within the Brady rule. Id. at 676. Accord United States v. Quinn, 123 F.3d 1415, 1421 (11th Cir. 1998) (citing Giglio v. United States, 405 U.S. 150, 154 91972)). Additionally, the Confrontation Clause provides a defendant in a criminal case with the right to conduct a meaningful cross-examination of the government's witnesses. See Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987) ("The Confrontation Clause provides . . . the right to conduct cross-examination").

According to the government, there is substantial evidence that David Alwais threatened to kill or seriously harm people who owed him money. In the process, David Alwais obstructed justice and told people to lie if called before a grand jury. The government contends that Alwais was involved in the RICO/loansharking operation while

he was on supervised release in an unrelated federal criminal case.

David Alwais's sentencing exposure is significant. His motive to curry favor with the government is equally significant. Mr. Minuto's jury is entitled to know the true David Alwais – or at least the David Alwais the government portrayed to Judge Snow on December 20, 1996. Additionally, Mr. Minuto is entitled to disclosure of all bad acts committed by all of the government's cooperating witnesses.

The fact that a government witness has committed other crimes, is under investigation for committing other crimes, or is "suspected" of wrongdoing for which the witness has not been prosecuted reflects on the witness's bias and his motive to testify for the government. See United State v. Phibbs, 999 F.2d 1053, 1089 (6th Cir. 1993), cert. denied, 114 S. Ct. 1070 (1994). The District Court in Massachusetts has specifically recognized that "bad acts" committed by government witnesses prior to the execution of cooperation plea agreements are relevant to prove the scope of the immunity (and thus the benefit) conferred by the government on those witnesses to induce them to cooperate. United States v. Owens, 933 F. Supp. 76 (D.Mass. 1996). As the Owens Court explained,

> That means, it seems to me, that within the scope of the statute of limitations all prior bad acts must be disclosed and if we're dealing with a witness who has received either immunity or any sort of promise, inducement, or reward, the prior bad acts which must be revealed must be within the scope of the statute of limitations read backward from the time the witness received the promise, inducement, or reward.

Id. at 87.

Mr. Minuto requests that this Court direct the government to disclose the information described above. This information is highly impeaching of David Alwais and is admissible to show Alwais's bias and motive to testify for the government. It is also admissible to

show the true benefit that Alwais will receive by cooperating with the government.

Mr. Minuto's right to confront the witnesses against him includes the right to show that a witness such as Alwais is biased or that his testimony is motivated by promises, inducements, offers of leniency, or otherwise. United States v. Ritchie, 480 U.S. at 51-52 (the right to cross-examine includes the right to show that witness is biased). Evidence of a witness's bias in favor of the government, or a witness's motive to curry favors with the prosecution, "can make the difference between conviction and acquittal." Id. at 52, citing Napue v. Illinois, 360 U.S. 264, 269 (1959). Mr. Minuto's right of cross-examination "is especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government." United States v. Onori, 535 F.2d 938, 945 (5th Cir. 1976); see also United States v. Mayans, 17 F.3d 1174, 1184 (9th Cir. 1994) (quoting Onori). Accordingly, Mr. Minuto respectfully requests that this Court direct the government to provide the information requested pertaining to ALL cooperating witness including David Alwais.

Respectfully submitted,

**BLACK, SREBNICK & KORNSPAN, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

By: [signature]
**HOWARD M. SREBNICK, ESQ**
Florida Bar Number 919063
Attorney for Marco Minuto

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on 6/1, 2001 a true and correct copy of the foregoing was furnished by mail to:

Michael J. Dittoe, Esq.
Assistant United States Attorney
500 East Broward Boulevard
7th Floor
Fort Lauderdale, Florida 33394-3002

Bruce A. Zimet, Esq.
Counsel for Nicolo Mariani
One Financial Plaza
Suite 2612
Fort Lauderdale, Florida 33394

William J. Hunt, Esq.
Counsel for Joseph Minuto
William J. Hunt & Associates
155 Polifly Road
Suite 200
Hackensack, New Jersey 07601

Kerry A. Lawrence, Esq.
Counsel for Chris Greco
Briccetti, Calhoun & Lawrence, LLP
81 Main Street
Suite 450
White Plaines, New York 10601

By: ______________________
**HOWARD M. SREBNICK, ESQ.**
Attorney for Marco Minuto

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA .

ATTACHMENT / EXHIBIT A

| | |
|---|---|
| THE UNITED STATES OF AMERICA, PLAINTIFF, | CASE NUMBER 96-6205-CR-ROETTGER |
| VS. | |
| DAVID ALWAIS, AND SIDNEY ALWAIS, DEFENDANTS. | THIS VOLUME: PAGES 1 - 105 |

(TRANSCRIPT BY TAPE)

TRANSCRIPT OF PRETRIAL DETENTION HEARING HAD BEFORE THE HONORABLE LURANA S. SNOW, IN FORT LAUDERDALE, BROWARD COUNTY, FLORIDA, ON DECEMBER 20, 1996, IN THE ABOVE-STYLED MATTER.

APPEARANCES:

FOR THE GOVERNMENT: LOTHAR GENGE, A.U.S.A.

FOR DEFENDANT DAVID ALWAIS: FRED SCHWARTZ, ESQ.

FOR DEFENDANT SIDNEY ALWAIS: FRANK ANTHONY RUBINO, ESQ.

CARL SCHANZLEH
OFFICIAL COURT REPORTER
U. S. COURTHOUSE
299 E. BROWARD BLVD., 202B
FORT LAUDERDALE, FLORIDA 33301
954 769-5488

## TABLE OF CONTENTS


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ESLIZABETH ROBERT ..................... | | 32 | | |
| ELIZABETH ROBERT ...................... | | 47 | 65 | |


## INDEX TO EXHIBITS


| EXHIBITS | MARKED FOR IDENTIFICATION | | RECEIVED IN EVIDENCE | |
|---|---|---|---|---|
| DESCRIPTION | PAGE | LINE | PAGE | LINE |

(FORT LAUDERDALE, BROWARD COUNTY, FLORIDA; DECEMBER 20, 1996, IN OPEN COURT.)

THE CLERK: CALLING CASE NUMBER 96-6205-CRIMINAL-ROETTGER, UNITED STATES OF AMERICA VERSUS DAVID ALWAIS.

MR. GENGE: GOOD MORNING, YOUR HONOR, LOTHAR GENGE FOR THE GOVERNMENT.

MR. SCHWARTZ: GOOD MORNING, YOUR HONOR.

MR. RUBINO: GOOD MORNING, YOUR HONOR, FRANK ANTHONY RUBINO REPRESENTING SIDNEY ALWAIS.

MR. SCHWARTZ: GOOD MORNING, YOUR HONOR, FRED SCHWARTZ REPRESENTING DAVID ALWAIS.

THE COURT: ALL RIGHT. WE ARE HERE THIS MORNING FOR A PRETRIAL DETENTION HEARING.

MR. GENGE, ARE YOU READY TO PROCEED?

MR. GENGE: YES, YOUR HONOR.

THE COURT: IF YOU WOULD, MR. GENGE, FOR MY PURPOSES WHEN YOU START YOUR PROFFER IF YOU COULD TELL ME AGAIN WHICH COUNTS EACH OF THESE DEFENDANTS IS CHARGED IN. YOU DON'T HAVE TO GO THROUGH THE CHARGES BUT JUST TELL ME WHICH COUNT.

MR. GENGE: SIDNEY ALWAIS IS CHARGED IN COUNTS ONE, TWO, THREE, FOUR THROUGH NINE, 10 THROUGH 15, 17 AND 20.

DAVID ALWAIS IS CHARGED IN COUNTS ONE, TWO, THREE,



FOUR THROUGH NINE, 10 THROUGH 15, AND COUNT 17.

THE COURT: FOR THE RECORD, I HAVE REVIEWED THE TAPE AND THE TRANSCRIPTS THAT WERE PROVIDED YESTERDAY, AND I ASSUME DEFENSE COUNSEL HAS HAD A CHANCE TO DO THAT AS WELL.

MR. SCHWARTZ: WE DIDN'T HEAR THE TAPE, BECAUSE THE ONLY TAPE THEY HAD WAS ONE THEY PROVIDED TO YOU. THEY DID PROVIDE US WITH A TRANSCRIPT AND I HAVE READ THEM. THE TRANSCRIPT (INAUDIBLE)

THE COURT: ALL RIGHT.

MR. GENGE: YOUR HONOR, BY WAY OF BACKGROUND BRIEFLY.

THIS INVESTIGATION STARTED APPROXIMATELY TWO YEARS AGO. IT WAS AN FBI INVESTIGATION AND IT BEGAN, AS FAR AS SOUTH FLORIDA IS CONCERNED, WHEN THE FBI, LET'S SAY, RECRUITED AN INDIVIDUAL BY THE NAME OF LUIS MAIONE, M-A-I-O-N-E. HE IS REFERRED TO IN THE INDICTMENT. HE IS A COOPERATING WITNESS. AND MR. MAIONE AGREED TO COOPERATE, AS I SAY, WITH THE FBI IN THIS AND IN OTHER MATTERS.

MR. MAIONE IS A LIFE-LONG ASSOCIATE OR ACQUAINTANCE OF JOHN GODDY, THE FORMER HEAD, AND ACTUALLY PRESENTLY STILL THE (INAUDIBLE) HEAD OF THE GAMBINO ORGANIZED CRIME FAMILY. HE IS ALSO A LIFE-LONG ASSOCIATE AND ACQUAINTANCE OF NICHOLAS COROZZO, THE LEAD DEFENDANT IN THIS CASE, AS WELL AS OTHER HIGH RANKING MAFIA INDIVIDUALS.

I THINK FOR PURPOSES OF THIS HEARING, YOUR HONOR,



I WOULD ASK YOU TO TAKE JUDICIAL NOTICE OF THE FACT THAT THE GAMBINO LCN FAMILY, OF COURSE, HISTORICALLY IS ONE OF THE FIVE NEW YORK LCN FAMILIES. OVER THE LAST DECADE IT HAS BEEN AND CONTINUES TO BE THE LARGEST OF THE ORGANIZED CRIME FAMILIES. IT IS THE MOST NOTORIOUS, THE MOST VIOLENT OF THE FAMILIES.

I WOULD JUST --

MR. SCHWARTZ: I WOULD OBJECT (INAUDIBLE) STATE WITH THE FACTS NOW BEING PROFFERED BY MR. GANGE. (INAUDIBLE)

THE COURT: IT DOESN'T -- PARDON ME?

MR. SCHWARTZ: UNLESS YOU ARE GOING TO TAKE JUDICIAL NOTICE OF THE (INAUDIBLE) GODFATHER OR THE LAST (INAUDIBLE).

THE COURT: I CAN'T TAKE JUDICIAL NOTICE OF THAT UNLESS THEY CHANGED THE RULES. IT IS NOT LIKE THE CALENDAR OR SOMETHING OR A GEOGRAPHIC FACT.

MR. GENGE: WELL, WE COULD, OF COURSE, REFER THE COURT TO THE TESTIMONY, FOR EXAMPLE, OF SAMMY DEVO GAVANO AT THE TRIAL IN NEW YORK, IT WAS IN '92 IN THE EASTERN DISTRICT WHERE --

THE COURT: MR. GENGE, I KNOW WHO THE GAMBINOS ARE.

MR. GENGE: WELL, THE HISTORY -- OKAY.

THE COURT: AND I HAVE READ ALL KINDS OF BOOK LIKE



EVERYONE ELSE IN THE COURTROOM I'M SURE.

MR. GENGE: I THINK THE COURT KNOWS SO THAT THIS FAMILY IS PARTICULARLY INVOLVED IN LOAN SHARKING, EXTORTION, GAMBLING, AND MURDER, AND THINGS OF THAT NATURE.

THE COURT: WHY DON'T WE TALK ABOUT THIS CASE.

MR. GENGE: ALL RIGHT.

THE EVIDENCE IN THIS CASE, YOUR HONOR, WILL SHOW THAT ONE ANTHONY RUGGIANO, WHO IS AN ASSOCIATE OF NICHOLAS CORONZZO, AND THE GAMBINO FAMILY INTRODUCED THE COOPERATING WITNESS TO THE ALWAISES AND THEIR LOAN SHARKING OPERATION WHICH THEY WERE RUNNING OUT OF A STORE, OR STOREFRONT LOCATED AT 141 EAST HILLSBORO BOULEVARD IN DEERFIELD BEACH THIS WAS THE EASY CHECK CASHING OPERATION.

ALTHOUGH THE EVIDENCE WOULD SHOW THAT ALTHOUGH T STOREFRONT OR THE PRINCIPAL OPERATIVES THERE APPEARED TO B THE ALWAISES, IN FACT THIS LOAN SHARKING OPERATION WAS FINANCED, BANKROLLED AND SUPPORTED BY NICKY COROZZO AND TH GAMBINO LCN FAMILY IN NEW YORK.

THE GAMBINO FAMILY AND MR. COROZZO PROVIDED NOT ONLY THE FUNDS TO MAKE AND TO FINANCE THESE EXTORTIONATE LOANS, BUT ALSO THE MUSCLE TO COLLECT THOSE LOANS.

THE COMPLAINING WITNESS WITH THE APPROVAL OF MR. COROZZO THEN ASSUMED THIS ROLE OF A COLLECTOR FOR THE ALWAISES. AND THE COMPLAINING WITNESS, IN FACT, WAS ASKE OR TOOK THIS ROLE TO REPLACE ANOTHER ONE OF THE DEFENDANT

INDICTED IN THIS CASE, ANOTHER GAMBINO ASSOCIATE KNOWN AS JOHN ROZADDO, ALSO KNOWN AS ROBERT ENGLE.

ROBERT ENGLE, AS I SAY, THE EVIDENCE WOULD SHOW, HAD SERVED AS THE PREDECESSOR, STRONG MAN, SO TO SPEAK, AND COLLECTOR FOR THE ALWAISES SINCE MARCH OF 1994 WHEN HE HAD BEEN INTRODUCED TO THE ALWAISES BY NICKY COROZZO, AND THE ALWAISES HAVE BEEN TOLD TO USE ROBERT ENGLE, ALSO KNOWN AS JOHN ROZADDO FOR THEIR COLLECTIONS.

HOWEVER, MR. ENGLE OR ROZADDO ALSO HAD A COCAINE HABIT, BECAME SOMEWHAT DIFFICULT, AND WHAT HAVE YOU, IRRESPONSIBLE, AND THAT'S WHY THE COMPLAINING WITNESS SORT OF TOOK HIS PLACE. AND MR. ENGLE APPARENTLY TOOK -- WENT BACK TO NEW YORK AND HE IS PRESENTLY -- OF COURSE, WE HAVE A WARRANT FOR HIS ARREST. WE DO NOT KNOW HIS PRESENT WHEREABOUTS.

ONCE THE COMPLAINING WITNESS, OR COOPERATING WITNESS BEGAN TO DEAL WITH THE ALWAISES, OF COURSE, THERE WERE A NUMBER OF CONCENTUALLY RECORDINGS BETWEEN THE COOPERATING WITNESS AND THE ALWAISES. THE COOPERATING WITNESS RECEIVED FROM SID AND DAVID THE NAMES OF VARIOUS VICTIMS, A NUMBER OF VICTIMS THAT HE SHOULD CONTACT FOR THESE -- FOR THEIR INTEREST PAYMENTS AND PRINCIPAL PAYMENTS.

THE EVIDENCE WILL SHOW THAT THERE WERE A SUBSTANTIAL NUMBER OF SUCH VICTIMS, AT LEAST 30 TO 40 OR SO. ONLY SIX OF THOSE ARE IDENTIFIED AND NAMED IN THE



INDICTMENT.

THE EVIDENCE WILL SHOW THAT THE ALWAISES ON BEHALF OF THE GAMBINO FAMILY CHARGED THESE VICTIMS ANYWHERE FROM TWO TO FIVE PERCENT A WEEK FOR INTEREST. THAT COMES UP TO 260 PERCENT A YEAR. I NOTE -- WE DO NAME, AS I SAY, SIX OF THE VICTIMS IN THE INDICTMENT.

AND, FOR EXAMPLE, WITH RESPECT TO JUST ONE OF THE VICTIMS, YOUR HONOR, TO SHOW THE NATURE OF THESE TRANSACTIONS, THE EVIDENCE WILL SHOW THAT THIS VICTIM WAS A FORMER ATTORNEY. IN FACT, HE WAS A SPECIAL ASSISTANT, U. S. ATTORNEY IN THIS DISTRICT, BUT THE INTEREST PAYMENTS THAT HE WAS ASKED TO MAKE BECAME SO ONEROUS AND HE WAS AFRAID, OF COURSE, OF NOT MEETING THOSE INTEREST PAYMENTS THAT THIS ATTORNEY WENT SO FAR OR WAS PUSHED TO THE POINT OF STEALING FROM HIS CLIENTS TRUST ACCOUNTS RESULTING ULTIMATELY IN HIS DISBARMENT AND HIS BEING PROSECUTED FOR GRAND LARCENY BY THE STATE OF FLORIDA.

NOW, IN ADDITION TO THESE CONSENSUAL RECORDINGS, AND, AS I SAY, THE EVIDENCE WILL SHOW THAT THE COOPERATING WITNESS NOW WAS COLLECTING THESE INTEREST PAYMENTS, OR BIG PAYMENTS, TWO TO FIVE PERCENT ON BEHALF OF THE ALWAISES AND NICKY COROZZO. WE OBTAINED -- THE FBI OBTAINED COURT AUTHORIZED -- COURT AUTHORIZATION TO INTERCEPT TELEPHONIC CONVERSATIONS OF THE ALWAISES AND, OF COURSE, THE OTHER DEFENDANTS.



JUDGE, I THINK THE INITIAL ORDER WAS SIGNED BY JUDGE ZLOCH OF THIS DISTRICT. THAT WAS ON THE CELLULAR PHONE, AS WELL AS ON THREE OF THE TELEPHONE LINES AT THE EASY CHECK CASHING STORE. JUDGE ROETTGER, CHIEF JUDGE ROETTGER, ALSO SIGNED AN ADDITIONAL WIRETAP ORDER FOR ANOTHER PHONE.

DURING THE COURSE OF THE INVESTIGATION THE FBI RECORDED APPROXIMATELY 500 TAPED CONVERSATIONS. SOME OF THOSE WE HAVE SUBMITTED TO THE COURT LAST EVENING AND WE HAVE, OF COURSE, THE TRANSCRIPTS AS A SAMPLING OF SOME OF THE DISCUSSIONS THAT TOOK PLACE.

DISCUSSIONS NOT ONLY IN REFERENCE TO THE LOAN SHARK VICTIMS THEMSELVES, BUT THE MANNER AND MEANS BY WHICH THE DEFENDANTS AND THEIR AGENTS IN THE GAMBINO FAMILY WOULD GO ABOUT TO COLLECT AND MAKE SURE THAT THEY COLLECTED THEIR PAYMENTS. AND I THINK AS THE EVIDENCE WILL SHOW, AS WE ALREADY GET A FEELING FROM THESE TRANSCRIPTS THAT THE TRADEMARK OF THIS ORGANIZATION ESSENTIALLY WAS VIOLENCE, THE THREAT AND USE OF VIOLENCE TO MAKE THESE COLLECTIONS.

FOR EXAMPLE, IN ONE OF THE CONVERSATIONS, I BELIEVE THAT -- IT'S THE SECOND CONVERSATION IN THE SAMPLING THAT WE SUBMITTED TO YOU, THIS WAS THE JULY 20TH, 1996 CONVERSATION, IT IS BETWEEN SAL PECCHIO, WHO IS ONE OF THESE -- ANOTHER ONE OF THESE COLLECTORS, AND SIDNEY AND DAVID ALWAIS.



IN THIS CONVERSATION MR. PECCHIO REFERS TO SOME OF HIS DEALINGS WITH ONE OF THE VICTIMS. THIS WAS MYLES MCGRAPH. AND MR. PECCHIO DESCRIBES OR EXPLAINS HOW HE TOLD THE VICTIM THAT HE WAS PREPARED TO WIDEN A CERTAIN PART OF THE VICTIM'S ANATOMY SO THAT A TRUCK COULD BE DRIVEN THROUGH IT. MORE SPECIFICALLY, I THINK IF YOU LOOK AT THE BOTTOM O: THAT TRANSCRIPT, THE PAGE ONE WE HAVE PA, THAT'S DAVID ALWAIS, OF COURSE, "HE IS GETTING CUTE, HAW?"

AND THEN WE HAVE SAL PECCHIO, "YEAH. YEAH. I CALLED. I JUST GOT OFF THE PHONE WITH HIM. I SAYS I WILL RIP YOUR OBSCENITY HEAD OFF. IF YOU EVER COME WHILE I'M NC HERE AGAIN I WILL DESTROY YOU. YOU MADE A COMMITMENT TO MF OF BRINGING ME CASH AND NOW YOU GOING MAKE ME HAND THESE PEOPLE CHECKS AND I'M GOING TO LOOK LIKE I'M, DASH, I WILL RIP YOU, AN OBSCENITY, ET CETERA, SO FAR OPEN THAT YOU WIL FIT A TRUCK IN THERE. YOU, OBSCENITY."

SO THIS AGAIN -- AND AS YOUR HONOR HAS SEEN, AND THESE ARE JUST A SAMPLING OF THE TYPES OF CONVERSATIONS INDICATIVE OF THE MANNER AND MEANS THAT THESE INDIVIDUALS USED TO MAKE THESE COLLECTIONS.

NOW, IN ADDITION TO EXPLAIN THE SERVICES OF THE COOPERATING WITNESS TO MAKE LOAN SHARK COLLECTIONS, DEFENDANT SIDNEY ALWAIS ALSO SOUGHT TO RECRUIT HIM IN ORD: TO RETALIATE, OR TO SOLICIT THE SERVICES, TO HAVE THE COMPLAINING OR COOPERATING WITNESS BURN DOWN THE BUSINESS

PREMISES OF THE CLEAR COPY STORE LOCATED AT 211 SOUTH FEDERAL HIGHWAY IN BOYNTON BEACH, FLORIDA. THOSE WERE BUSINESS PREMISES OWNED AND OPERATED BY HIS IN-LAWS.

THE EVIDENCE WILL SHOW, AND IT IS OVERHEARD BY THE FBI AND IT IS ON TAPES, I DON'T THINK WE HAVE THAT -- YOU HAVEN'T SEEN THAT TRANSCRIPT, IN WHICH MR. ALWAIS EXPLAINS TO THE COOPERATING WITNESS EXACTLY WHY HE WANTS THESE PREMISES BURNED DOWN.

AND AS HE EXPLAINS IT ON THE RECORDED CONVERSATION, WHAT HAPPENED HERE WAS THAT HIS SON, DAVID, BACK IN 1988 WAS ARRESTED AND CHARGED IN A FEDERAL CASE BEFORE JUDGE ZLOCH. IT WAS THE CASE BROUGHT BY THE SECRET SERVICE. AND IT APPEARS THAT IN THAT PARTICULAR CASE -- MR. SIDNEY ALWAIS' NEPHEW GAVE TESTIMONY, OR WAS PREPARED TO GIVE TESTIMONY AGAINST DAVID. NOW, THAT'S THE CASE THAT, AS I SAY IT IS REFERRED TO IN THE INDICTMENT ALSO. IT IS IDENTIFIED AS A 1988 CASE THAT WAS BEFORE JUDGE ZLOCH.

SIDNEY ALWAIS EXPLAINS ON THE TAPES THAT HE PROVIDED ANGLE, ALSO KNOWN AS ROZADDO, 4,000 IN CASH UP FRONT TO BURN DOWN THE PLACE. SIDNEY ALWAIS EXPLAINS THAT HE WAITED A NUMBER OF YEARS TO RETALIATE AGAINST HIS IN-LAWS.

THE COURT: I AM LOST.

MR. GENGE: EXCUSE ME?

THE COURT: I AM LOST.



WHAT IS THE RELATIONSHIP BETWEEN THE NEPHEW AND THE IN-LAWS?

MR. GENGE: THE NEPHEW TESTIFIED -- THE NEPHEW TESTIFIED OR AGREED TO TESTIFY --

THE COURT: RIGHT.

MR. GENGE: -- AGAINST DAVID --

THE COURT: RIGHT.

MR. GENGE: -- IN THE CASE BEFORE JUDGE ZLOCH. SO HE WAS GOING TO BURN DOWN THE PREMISES OWNED BY HIS BROTHER-IN-LAW.

THE COURT: ALL RIGHT. SO THE BROTHER-IN-LAW IS THE FATHER OF THE PERSON WHO WAS GOING TO TESTIFY?

MR. GENGE: RIGHT.

THE COURT: OKAY.

MR. GENGE: WAS GOING TO TESTIFY. I BELIEVE IT WAS -- HE WAS GOING TO TESTIFY AND AS A RESULT IN THAT CASE DAVID ALWAIS THEN TOOK -- PLED GUILTY BEFORE JUDGE ZLOCH, AND I BELIEVE HE RECEIVED A THREE YEAR PRISON SENTENCE.

OF COURSE, IT IS INTERESTING TO NOTE THAT THESE VERY CRIMES THAT HE IS CHARGED OF AND THAT HE DISCUSSES IN THESE TAPES OCCURRED WHILE HE IS ON FEDERAL PROBATION ON JUDGE ZLOCH'S CASE.

BUT, IN ANY EVENT, SIDNEY ALWAIS THEN EXPLAINS THE BACKGROUND TO THE COOPERATING WITNESS, AND THEN ASKS THE COOPERATING WITNESS, "NOW, ARE YOU PREPARED -- WOULD YOU



BURN DOWN THE PLACE FOR ME, BECAUSE IT TURNS OUT THAT ROBERT ENGLE, HE THREW SOME GASOLINE ON THE ROOF, HE THREW SOME GASOLINE "-- THIS IS IN THE -- SOMEWHERE IN THE ELECTRICAL AREA OF THAT STORE. THERE WAS A FIRE, IT WAS I BELIEVE AT 3:18 A.M. ON APRIL 25TH, 1995. BUT THE PLACE HADN'T BURNED DOWN SUFFICIENTLY FOR MR. ALWAIS' PURPOSES.

SO NOW HE WANTED TO RECRUIT THE COOPERATING WITNESS TO BURN THE PLACE DOWN TO THE GROUND ENTIRELY TO RETALIATE AND GET EVEN AGAINST A WITNESS FOR TESTIFYING OR AGREEING TO TESTIFY IN FEDERAL PROCEEDINGS BEFORE JUDGE ZLOCH.

THE COOPERATING WITNESS DID GO TO THE PREMISES AND SORT OF SURVEILLED IT, AND THEN WE HAVE ANOTHER CONVERSATION WHICH THEY DISCUSSED THE ALARM DEVICES AND SECURITY DEVICES AND SO FORTH JUST HOW THE COOPERATING WITNESS SHOULD GO ABOUT SETTING THIS PLACE ON FIRE.

THE COURT: ARE THESE OVERT ACTS IN THE RICO --

MR. GENGE: YES, IT IS CHARGED IN COUNT 20 IN THE INDICTMENT.

THE COURT: BUT IT IS NOT AN OVERT ACT IN THE RICO CONSPIRACY.

MR. GENGE: IT'S A PREDICATE. WE CHARGED THAT AS A PREDICATE.

THE COURT: I HAVEN'T MEMORIZED THIS INDICTMENT. DID YOU JUST INCORPORATE COUNT 20 AS A PREDICATE



WITHOUT LISTING IT AS AN OVERT ACT?

MR. GENGE: YES.

THE COURT: OKAY.

MR. GENGE: (INAUDIBLE)

NOW, THE EVIDENCE WILL NEXT SHOW THAT IN OR ABOUT JULY OF THIS YEAR THE COOPERATING WITNESS LEFT SOUTH FLORIDA FOR PARTS UNKNOWN. AND AT THAT POINT THE ALWAISES AND THEIR ASSOCIATES (INAUDIBLE) OR THEY WERE OF THE OPINION OR VIEW THAT THE COOPERATING WITNESS HAD ABSCONDED WITH SEVERAL THOUSANDS, 10 OR $20,000 WORTH OF THEIR COLLECTION MONEY THAT WAS -- THAT SHOULD HAVE BEEN TURNED OVER TO THE ALWAISES.

SO THEN THEY BEGAN TO DISCUSS PLANS TO LOCATE, ATTEMPT TO FIND LUIS MAIONE IN ORDER TO BRING HIM BACK AND/OR TO HAVE HIM MURDERED. FORTUNATELY FOR LUIS MAIONE'S SAKE, OF COURSE, THESE DISCUSSIONS WERE OVERHEARD BY THE AS A RESULT OF THIS COURT'S AUTHORIZED WIRETAP.

THE COURT: ARE THOSE IN THE TRANSCRIPTS THAT I HAVE?

MR. GENGE: YES. I THINK YOU HAVE MOST OF THEM, YOUR HONOR. THIS IS A SAMPLING.

THE COURT: I WAS GOING TO SAY I HAD A LITTLE DIFFICULTY SEEING ANYTHING IN TERMS OF SPECIFIC PLANS IN THERE.

MR. GENGE: ALL RIGHT.

THE COURT: THERE WERE SOME GENERAL COMMENTS.

MR. GENGE: YES. WELL, FOR EXAMPLE, IN ONE OF THE TAPES, THIS WAS A JULY 22ND, 1996 CONVERSATION, DAVID FURMAN WHO IS AN EMPLOYEE OF THE ALWAISES AT THIS STORE STATES, AMONG OTHER THINGS, "THIS GUY," REFERRING TO LOOK WEE --

MR. SCHWARTZ: MAY I (INAUDIBLE)

MR. GENGE: I'M SORRY. THIS IS ONE THAT IS NOT -- I DON'T THINK YOU HAVE IT. IT IS A JULY 22ND, 1966 CONVERSATION. IT IS DAVID FURMAN. SINCE HE ISN'T HERE TODAY -- BUT THIS WILL BE INTRODUCED AT THE TRIAL. IN WHICH MR. FURMAN, THE EMPLOYEE OF THE TWO DEFENDANTS, SAYS AMONG OTHER THINGS, "THIS GUY," REFERRING TO LOUIE MAIONE, "WHEN ALL IS SAID AND DONE WILL BE FLOATING DOWN THE RIVER," CLOSE QUOTE.

THE COURT: WHO HE IS SAYING THIS TO?

MR. GENGE: TO HIS WIFE -- AN UNKNOWN FEMALE AT THIS POINT.

THE NEXT CONVERSATION I THINK THAT YOU DO HAVE IN YOUR PACKAGE IS THIS JULY 29TH OF '96. DAVID ALWAIS AND SAL PECCHIO DISCUSS SENDING SOME GAMBINO ASSOCIATES TO SYRACUSE, NEW YORK, BECAUSE AT THAT POINT THEY BELIEVED THAT LUIS MAIONE HAD GONE TO SYRACUSE, NEW YORK, TO LOCATE HIM.

THEN IN THE JULY 30TH --

THE COURT: WAIT. I WANT TO FIND WHAT YOU ARE REFERRING TO.



MR. GENGE: OKAY.

THE COURT: JULY WHAT?

MR. GENGE: THIS WOULD BE JULY 29TH, I BELIEVE.

THE COURT: THE FIRST ONE I HAVE IS DECEMBER SOMETHING.

MR. GENGE: YOU HAVE --

MR. SCHWARTZ: THE TRANSCRIPTION DATE.

THE COURT: OH.

MR. SCHWARTZ: (INAUDIBLE)

THE COURT: I SEE.

MR. GENGE: DO YOU HAVE THAT ONE, YOUR HONOR? I'M NOT SURE IF YOU DO.

THE COURT: NO.

MR. GENGE: OKAY. WELL, IN THAT CONVERSATION, AS I SAY, THEY SIMPLY DISCUSS SENDING GAMBINO ASSOCIATES TO SYRACUSE, NEW YORK, TO TRY TO LOCATE THE COOPERATING WITNESS.

THEN IN THE JULY 30TH, '96 CONVERSATION AGAIN BETWEEN DAVID ALWAIS AND SAL PECCHIO, DAVID REPORTS THAT HE HAS ASKED ANOTHER PERSON, ONE NEAL TO SET UP LOUIS, MEANING TO HAVE HIM COME TO A LOCATION, AND SO FORTH. AND DAVID HAD --

MR. SCHWARTZ: YOUR HONOR, I WILL OBJECT.

YESTERDAY MR. GENGE I THOUGHT BECAUSE HE WANTED THIS PROCEEDING TO PROCEED FAIRLY SAID HE WAS GOING TO GIVE



US TRANSCRIPTS OF CONVERSATIONS AND TAPES. BUT WE GOT THE TRANSCRIPTS, BUT NOW HE IS REFERRING TO CONVERSATIONS THAT AREN'T IN MY TRANSCRIPTS. I'M SURE THEY ARE NOT IN YOUR TRANSCRIPTS, JUDGE.

MR. GENGE: WELL, YOUR HONOR, I BELIEVE I AM PROCEEDING BY WAY OF PROFFER AND --

THE COURT: WELL, HE CAN STATE HIS PROFFER AND YOU CAN EXAMINE THE AGENT ON THIS. IT IS NOT VERY HELPFUL TO ME IF I AM GETTING SUMMARIES OF TRANSCRIPTS THAT I DON'T HAVE EITHER. SO OBVIOUSLY THE WEIGHT IS GOING TO BE LESS.

MR. SCHWARTZ: WELL, MY OBJECTION IS MORE FUNDAMENTAL, JUDGE.

ABOUT FOUR OR FIVE YEARS AGO WE HAD AN AGENT TESTIFY ON THAT VERY WITNESS STAND THAT MY CLIENT SAID SOMETHING IN A TAPE -- I'M SORRY, IT WAS A POLICE OFFICER NOT AN AGENT, BEFORE YOUR HONOR. AND BASED ON THAT YOUR HONOR PRETRIAL DETAINED MY CLIENT, AND MY CLIENT STAYED IN JAIL FOR EIGHT MONTHS BEFORE YOUR HONOR ULTIMATELY DISMISSED THAT (INAUDIBLE) INDICTMENT OR RECOMMENDED --

THE COURT: I DIDN'T DISMISS ANY.

MR. SCHWARTZ: OR RECOMMEND A DISMISSAL.

AND ONE OF THE THINGS AT A SUBSEQUENT BOND HEARING THAT YOUR HONOR HELD SUA SPONTE WAS TO ASK THAT POLICE OFFICER FOR THAT PARTICULAR TAPE. AND IT TURNED OUT THAT THAT TAPE NEVER SAID WHAT THAT OFFICER SAID IT SAID. SO I



HAD A CLIENT SIT PRETRIAL DETAINED FOR EIGHT MONTHS ON A TAPE --

THE COURT: WELL, I CAN SHORT CIRCUIT THIS, I THINK.

IS THIS CONVERSATION TRANSCRIBED?

MR. GENGE: I BELIEVE IT IS.

THE COURT: BECAUSE IF IT IS --

MR. GENGE: IF NOT WE CAN MAKE THE TAPE AVAILABL

THE COURT: WELL, SINCE THE TIME THAT MR. SCHWAR IS TALKING ABOUT NOW THE JENCKS ACT IS NOW APPLICABLE. SC IF YOU GOING TO REFER TO IT, IT IS GOING TO HAVE TO GO OVE ANYWAY.

MR. GENGE: SURE. NO PROBLEM.

AGAIN, WE HAVE 500 TAPES, YOUR HONOR, AND THAT' WHY -- THIS WAS JUST INTENDED AS A SAMPLING. BUT, ANYWAY

THE COURT: WELL, IT WOULD BE MORE HELPFUL IF Y WERE GOING TO GIVE THE COURT A SAMPLING THAT THAT'S WHAT PROFFER TALKS ABOUT.

MR. GENGE: OKAY.

THE COURT: I MEAN, IT WOULD BE A LITTLE MORE ASSISTANCE. I DID READ IT AS YOU KNOW.

MR. GENGE: BUT IN THAT CONVERSATION DAVID STA ON THE TAPE THAT HE HAD TOLD NEAL, "IF HE DID NOT SET HI UP," MEANING THE COOPERATING WITNESS, "HE, NEAL, WOULD E UP IN THE TRUNK WITH HIM," CLOSE QUOTES.

ON AUGUST 3RD, 1996, NOW RALPH DAVINO, ONE OF THE OTHER DEFENDANTS IN THIS CASE, SIDNEY AND DAVID ALWAIS DISCUSS FURTHER PLANS TO LOCATE THE COOPERATING WITNESS.

ON AUGUST 12TH, IN A CONVERSATION BETWEEN SAL PECCHIO, SIDNEY, AND DAVID ALWAIS, SIDNEY SAYS, QUOTE, "THIS GUY HAS GET GOT TO GET WHACKED."

THE COURT: WAIT A MINUTE. LET ME FIND THAT ONE AND SEE IF I'VE GOT IT.

MR. GENGE: DO YOU HAVE THAT ONE?

THE COURT: AUGUST 12TH, WHAT PAGE?

MR. SCHWARTZ: (INAUDIBLE).

MR. GENGE: DO WE HAVE IT IN THIS TRANSCRIPT?

MR. SCHWARTZ: YOUR HONOR, I READ THE AUGUST 12TH TRANSCRIPT AND I DON'T SEE, "THIS GUY HAS GOT TO GET WHACKED," ANYWHERE IN THAT TRANSCRIPT AND THAT'S WHY I OBJECT TO THIS.

MR. GENGE: YOUR HONOR, WE CAN MAKE THAT AVAILABLE, THAT TRANSCRIPT, THAT PORTION OF IT.

NOW, BY THIS POINT IN TIME IN -- ON OR ABOUT AUGUST 12TH OR 13TH THE DEFENDANTS AND THEIR GAMBINO ASSOCIATES BELIEVE THAT THEY HAD TRACKED THE COOPERATING WITNESS TO ATLANTA, GEORGIA.

AND IN AN AUGUST 13TH CONVERSATION IN WHICH DAVID ALWAIS SPEAKS WITH DAVID FURMAN, DAVID ALWAIS STATES THAT HE, HIMSELF, WAS GOING TO ATLANTA TO, QUOTE, "TO KILL THIS



BLEEP," CLOSE QUOTE.

ON AUGUST 13TH, 1996, IN ANOTHER CONVERSATION BETWEEN SAL PECCHIO AND SIDNEY ALWAIS, SAL SAYS, "HE SPOKE WITH NEW YORK. THEY WILL TRY TO GRAB THIS GUY SINCE HE WASN'T COMING IN," TO WHICH SIDNEY RESPONSE, "IT WAS IMPORTANT TO GET RID OF LOUIE."

ON AUGUST 27TH, 1996, SIDNEY AND DAVID SPEAK, AND DURING THE CONVERSATION THEY STATE, "THAT IF THIS GUY, LOUIS, COMES TO THE STORE DAVID AND I ARE GOING TO GO TO BLEEP WORK ON THIS GUY WITH BATS," REFERRING TO BASEBALL BATS.

NOW, IN FACT, WHEN THE FBI CONDUCTED THE SEARCH OF THE PREMISES OF EASY CHECK CASHING ON AUGUST 29TH, THEY DID FIND BASEBALL BATS AT THE STORE. THEY DIDN'T FIND ANY BASEBALL GLOVES OR OTHER PARAPHERNALIA TO SUGGEST THAT THE DEFENDANTS WERE GOING TO USE THESE BATS TO PLAY IN A LITTLE LEAGUE SOFT BALL GAME.

AGAIN, YOUR HONOR, WE ARE PREPARED TO OFFER TO THE COURT AND FOR THIS HEARING ANY OF THE OTHER RECORDED CONVERSATIONS THAT WERE INTERCEPTED.

THE COURT: I AM ONLY CONCERNED ABOUT THE ONES THAT YOU SPECIFICALLY REFERRED TO.

MR. GENGE: NOW, IF WE LOOK AT THE FACTORS TO BE CONSIDERED FOR PURPOSES OF THIS HEARING, I AM REFERRING TO 18, USC, 3142, I THINK IT IS PARAGRAPH -- SUBPARAGRAPH G.



FIRST WE HAVE TO LOOK AT THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CHARGED, INCLUDING WHETHER THE OFFENSE IS A CRIME OF VIOLENCE OR NARCOTICS, DRUGS.

NOW, IN THIS CASE, YOUR HONOR, AS I SAY, THE GOVERNMENT'S EVIDENCE AT THIS TRIAL, WHICH IS GOING TO CONSIST NOT ONLY OF THE VICTIMS' TESTIMONY BUT THE ACTUAL RECORDED WORDS OF THE DEFENDANTS THEMSELVES IN WHICH THEY CONFIRM OR EXPLAIN WHAT THEY TOLD THESE WITNESSES IS REPLETE WITH VIOLENCE, WITH THREATS OF VIOLENCE.

YOU DON'T JUST OPEN A CERTAIN PART OF A PERSON'S ANATOMY TO THAT KIND OF EXTENT AND YOU ARE NOT TALKING ABOUT VIOLENCE. AS I SAY, THE EVIDENCE WILL SHOW THAT HERE WE HAVE AN ATTORNEY, A SPECIAL ASSISTANT U. S. ATTORNEY, WHO AS A RESULT OF THESE THREATS GOES AND STEALS FROM HIS CLIENT'S TRUST ACCOUNTS RATHER THAN NOT MAKE THESE TYPES OF PAYMENTS.

THE WEIGHT OF THE EVIDENCE.

THE COURT: IS THAT INDIVIDUAL NAMED IN THE INDICTMENT?

MR. GENGE: HE IS ONE OF THE INDIVIDUALS NAMED IN THE INDICTMENT, YES, YOUR HONOR.

THE NEXT FACTOR WE HAVE IS THE WEIGHT OF THE EVIDENCE AGAINST EACH OF THE DEFENDANTS.

WELL, AGAIN, I THINK THAT THE WORDS ALMOST CONVICT -- IN FACT CONVICT THEM. THEIR OWN WORDS CONVICT THEM.



IN ADDITION TO THAT, AS PART OF THE -- THE SEARCH BESIDES THE BATS THAT WERE FOUND THE FBI, OF COURSE, FOUND -- DID FIND VARIOUS RECORDS OF THEIR LOAN SHARKING OPERATIONS, THESE BOOKS AND SO FORTH.

AND IN THESE BOOKS THE VICTIMS IDENTIFIED NOT BY NAME BUT BY INITIALS. AND IN THESE BOOKS WE HAVE THE WEEKL PRINCIPAL AMOUNTS, THE WEEKLY INTEREST PAYMENTS, OR BIG PAYMENTS FROM TWO OR FIVE PERCENT. WE HAVE A RUNNING ACCOUNT OF ALL OF THE TOTAL INTEREST PAYMENTS THAT SOME OF THESE PEOPLE HAVE MADE.

ONE INDIVIDUAL ALONE, YOUR HONOR, I THINK THE EVIDENCE WILL SHOW OVER $100,000 IN INTEREST PAYMENTS IN TH COURSE OF APPROXIMATELY A YEAR. THAT WILL BE THE TYPE OF EVIDENCE. AND, AS I SAY, IN ADDITION TO THAT THE TAPES --

THE COURT: ON A --

MR. GENGE: -- THE TESTIMONY AND SO FORTH.

THE COURT: ON A LOAN OF HOW MUCH, MR. GENGE?

MR. GENGE: I THINK THE TOTAL LOAN TO THAT INDIVIDUAL WAS APPROXIMATELY $120,000.

NOW, NEXT WE TURN TO THE HISTORY AND CHARACTERISTICS OF THE PARTICULAR DEFENDANT. AND, OF COURSE --

THE COURT: LET ME ASK ANOTHER QUESTION.

YOU HAVE SIX INDIVIDUALS WHO ARE NAMED IN THE INDICTMENT. BASED UPON MY UNDERSTANDING OF THE POLICY OF

INCLUDING NAMES I PRESUME THAT THOSE PEOPLE ARE AVAILABLE TO TESTIFY, IS THAT ACCURATE?

MR. GENGE: WELL, THEY WILL BE IF THESE DEFENDANTS AREN'T RELEASED, YOUR HONOR.

MR. SCHWARTZ: OBJECT, YOUR HONOR.

THE COURT: SUSTAINED.

DO THE RECORDS WHICH REFLECT INITIALS MATCH UP WITH YOUR WITNESSES?

MR. GENGE: YES, YOUR HONOR.

THE COURT: THEY ARE IN THIS BOOK --

MR. GENGE: THEY ARE CONSISTENT WITH THE WITNESS' TESTIMONY AND RECOLLECTIONS.

THE COURT: AND THE CONVERSATION THAT YOU QUOTED, I THINK IT WAS -- LET'S SEE. PECCHIO.

MR. GENGE: REFERRING TO PART OF THE ANATOMY? THAT WAS ONE OF THE VICTIMS LISTED IN THE --

THE COURT: RIGHT. DOES THAT WITNESS CONFIRM THAT THAT WAS IN FACT SAID TO HIM?

MR. GENGE: YES. AND THAT WAS THE VICTIM THAT HAD THE $120,000 LOAN.

THE COURT: ALL RIGHT.

MR. GENGE: MYLES MCGRAPH, YOUR HONOR.

THE COURT: AND DOES THAT PERSON SAY THIS IS IN FACT WAS WHAT MR. PECCHIO SAID TO HIM?

MR. GENGE: I DON'T RECALL HIS EXACT TESTIMONY



BEFORE THE GRAND JURY, YOUR HONOR, BUT HE CONFIRMS (INAUDIBLE)

MR. SCHWARTZ: THAT'S A CONTRADICTORY STATEMENT BY MR. GENGE THAT HE DOESN'T RECALL BUT HE CONFIRMS.

MR. GENGE: HE CONFIRMS THAT HE WAS A VICTIM OF THIS LOAN SHARKING OPERATION.

THE COURT: AND YOU DON'T REMEMBER WHETHER HE WAS SPECIFICALLY ASKED ABOUT THIS PARTICULAR THREAT.

MR. GENGE: RIGHT.

THE COURT: ALL RIGHT.

MR. GENGE: NOW, NEXT, OF COURSE, WE LOOK AT THE CHARACTERISTICS OF THE INDIVIDUALS AND, OF COURSE, WHETHER AMONG OTHER THINGS AT THE TIME OF THE CURRENT OFFENSE OR ARREST THE PERSON WAS ON PROBATION OR PAROLE OR RELEASED ON ANY OTHER CHARGES.

NOW, OF COURSE, IN THE CASE OF DAVID ALWAIS, I THINK AS IS REFLECTED IN THE PRESENTENCE REPORT, THIS MAN HAS -- THIS IS HIS THIRD ARREST, THIRD FELONY CHARGE WITHIN THE LAST 10 YEARS, AND HE WAS ON -- AS THE RECORDS OF THIS COURT REFLECT HE WAS ON FEDERAL PROBATION FROM THE --

THE COURT: SUPERVISED RELEASE.

MR. GENGE: -- CASE BEFORE JUDGE ZLOCH.

THE COURT: I THINK IT WAS SUPERVISED RELEASE.

MR. GENGE: WAS IT?

THE COURT: YES.



MR. GENGE: ALL RIGHT.

AND THEN, OF COURSE, FINALLY THE NATURE AND THE SERIOUSNESS OF THE DANGER TO ANY PERSON OF THE COMMUNITY THAT WOULD BE POSED BY THE PERSON'S RELEASE.

IN TERMS OF THE DANGER TO OUR WITNESSES AND OTHER PEOPLE IN THE COMMUNITY. I THINK THE COURT, OF COURSE, HAS TO CONSIDER -- OR WE WOULD PROFFER THAT THESE STATEMENTS, THE RECORDED CONVERSATIONS MADE THE ALWAISES THEMSELVES, THE THREATS AND SO FORTH. THIS ISN'T JUST IDLE CHAT SO TO SPEAK. THIS HAS TO BE SEEN -- I THINK THE EVIDENCE WE WOULD POINT OUT SHOULD BE VIEWED IN THE CONTEXT THAT THESE ARE CONVERSATIONS BETWEEN ASSOCIATES, MEMBERS, AND EVEN SOME OF THE HIGHEST RANKING MEMBERS OF THE GAMBINO FAMILY.

I MEAN, WHERE YOU -- YOU USE THIS KIND OF LANGUAGE TO (INAUDIBLE) YOU MAKE THESE TYPES OF REQUESTS, YOU ARE NOT -- YOU ARE PLAYING IN A VERY SERIOUS GAME.

WITH RESPECT TO SIDNEY ALWAIS, OF COURSE, WE HAVE ALREADY, WE HAVE CONDUCT INVOLVING EXACT THREATS OF RETALIATION AGAINST A WITNESS, MEANING THE BURNING OF -- AGAINST ANOTHER PERSON, THE BURNING DOWN OF HIS BUSINESS PREMISES BECAUSE OF THE TESTIMONY OF HIS SON IN THIS CASE.

ALSO, ALTHOUGH IT IS NOT CHARGED IN THE INDICTMENT, I THINK THE EVIDENCE AT THE TRIAL WOULD SHOW THAT SIDNEY ALWAIS ONCE HE BECAME AWARE OF THE GRAND JURY INVESTIGATION AS A RESULT OF THE SEARCH OF THE PREMISES --



THE COURT: WHEN WAS THAT?

MR. GENGE: AUGUST 29TH OF THIS YEAR, YOUR HONOR.

THAT HE ATTEMPTED TO AND DID IN FACT SPEAK WITH CERTAIN WITNESSES BEFORE THE GRAND JURY. AND THAT HE ENDEAVORED TO HAVE CERTAIN OF THESE WITNESSES GIVE FALSE STATEMENTS AND TESTIMONY TO THE FBI.

AS I RECALL, I THINK THE EVIDENCE WILL SHOW WITH RESPECT TO ONE OF THESE WITNESSES, HIS INITIAL VERSION TO THE FBI WAS A NINE VERSION, AND THEN HE LATER ON HIS OWN RECANTED AND EXPLAINED, AND ACCORDING TO HIM, AND ALL THE EVIDENCE WE HAVE THEN, TESTIFIED TRUTHFULLY BEFORE THE GRAN JURY. BUT INITIALLY HE WAS (INAUDIBLE) MR. ALWAIS TO GIVE FALSE TESTIMONY TO THE GRAND JURY UNDER OATH.

SO I THINK, YOUR HONOR, IN TERMS OF JUST BY WAY ( CONCLUSION I THINK --

THE COURT: THERE ARE ANY TAPES WHICH DEAL SPECIFICALLY WITH COUNT 20?

MR. GENGE: THERE ARE -- WHAT WE HAVE IS, WE HAVE -- THE FIRST CONVERSATION, AS I RECALL, IS OVER -- TH HAD A TAPE ON HIM CONSENSUAL AND/OR A TRANSMITTER. AND TH TRANS -- I THINK THE TAPE RAN OUT AT THIS POINT BUT THE AGENTS -- THERE WERE TWO AGENTS PRESENT THAT OVERHEARD THE ENTIRE CONVERSATION AND WOULD BE PREPARED TO TESTIFY TO TH EFFECT.

THE SECOND CONVERSATION IS RECORDED IN ITS

ENTIRETY. THAT TOOK PLACE IN A CAR, AS I RECALL IT

(INAUDIBLE)

MR. GENGE: IN THE COOPERATING WITNESS' CAR WITH SIDNEY ALWAIS, AND THAT'S WHEN THE COOPERATING WITNESS CAME BACK AND HAD -- IN FACT, THE COOPERATING WITNESSES HAD GOTTEN THE NAMES OF THE VARIOUS PEOPLE THERE AT THE STORE, AND SIDNEY ALWAIS EXPLAINED WHO THEY ALL WERE. THEY DISCUSS THE VARIOUS LOCATIONS.

AS I SAY, THEY DISCUSS ON THE TAPE WHERE THE SECURITY DEVICES WOULD BE, HOW THEY COULD GET AROUND THEM. AND I THINK THE COOPERATING WITNESS POINTS OUT THAT THEY MAY BE -- I THINK IN THE NEIGHBORHOOD OR THEREABOUTS A HEALTH FACILITY.

A MAN: THERE IS A MEDICAL CENTER IN THE STRIP CENTER. THE CENTER IS A STRIP SHOPPING CENTER.

MR. GENGE: THEY DISCUSS THE COOPERATING WITNESS WAS CONCERNED IF THE BUILDING WAS BURNED DOWN AT NIGHT WHAT, IF ANY, DANGER WOULD THIS POSE POSSIBLY TO RESIDENTS OR INDIVIDUALS IN THAT HEALTH CENTER.

AND I THINK MR. -- AS I RECALL, SIDNEY ALWAIS SAYS, "NO, THERE IS NOBODY IN THERE PHYSICALLY AT NIGHT, YOU KNOW, WHILE YOU BURN THE PLACE DOWN."

OBVIOUSLY IT WAS -- WE STOPPED IT AT THAT POINT. AND FOR THAT REASON AND ANY NUMBER OF OTHER REASONS, INCLUDING THE POSSIBLE DANGERS TO THE COOPERATING WITNESS



AND THINGS LIKE THAT, THAT IS WHY THE FBI EXECUTED THE SEARCH WARRANT.

IN FACT, THEY WENT DOWN -- THE SWAT TEAM WENT DOWN ON AUGUST 29TH, BECAUSE THERE WAS SOME -- THERE HAD BEEN SOME DISCUSSIONS ABOUT THE COOPERATING WITNESS RETURNING FROM ATLANTA OR SYRACUSE, WHEREVER HE WAS, ON OR ABOUT AUGUST 29TH TO TRY TO WORK THINGS OUT, SO TO SPEAK, AND -- BUT THAT'S ONE OF THE REASONS WHY THE FBI MADE THAT SEARCH AT THAT TIME.

SO WE HAVE THE FBI AGENT -- THE AGENT WOULD BE PRESENT FOR CROSS-EXAMINATION, YOUR HONOR.

THE COURT: ALL RIGHT. WHY DON'T I TAKE A COUPLE OF MINUTES. I MAY HAVE NOT HAVE GOTTEN THEM ALL DOWN, BUT IT APPEARS THAT -- THE TRANSCRIPTS THAT YOU RELIED ON THAT WE DON'T HAVE AT THIS POINT ARE JULY 29TH, JULY 30TH, AUGUST 12TH, AND AUGUST 13TH. DID I LEAVE ANY OUT?

ARE THOSE AVAILABLE?

A MAN: I DON'T THINK THEY WOULD BE AVAILABLE (INAUDIBLE) MIAMI OFFICE OF THE FBI, BUT LEGALLY THERE WAS A 10-DAY REPORT THAT WOULD HAVE AN OUTSIDE VERSION OF THOSE CONVERSATIONS.

THE COURT: ALL RIGHT. WELL, I MEAN, SINCE WE HAVE AN OBJECTION AND THE JENCKS ACT IS APPLICABLE WE NEED TO HAVE THOSE IF YOU WANT ME TO CONSIDER THEM. I ASSUME -- BASED ON THE OBJECTION -- WELL, I KNOW THERE HAS BEEN A



DEMAND FOR THEM.

MR. GENGE: OKAY.

THE COURT: AND I THINK THEY CONSTITUTE JENCKS.

ARE THE 10-DAY REPORTS HERE, HERE IN THIS COURTROOM?

A MAN: NO, THEY ARE NOT IN THIS COURTROOM.

MR. GENGE: WE HAVE COPIES.

THE COURT: WHERE ARE THEY?

(INAUDIBLE)

MR. SCHWARTZ: NOT TO BE AN OBSTRUCTIONIST, JUDGE, ALTHOUGH I HAVE BEEN ACCUSED OF IT, I DON'T KNOW THAT THE 10-DAY REPORTS ARE APPROPRIATE. THEY ARE SUMMARIES OF SUMMARIES. I WOULD ASK THAT IF THE TRANSCRIPTS EXIST AND THEY ARE GOING TO RELY ON THEM THAT THEY BE PRODUCED.

THE COURT: I THINK WE CAN AT LEAST GET THROUGH THE HEARING AT THIS POINT WITH THE 10-DAY REPORTS. IF WE HAVE TO SUPPLEMENT WITH THE ACTUAL TRANSCRIPTS, THE AGENT HAS HEARD THE -- THE TRANSCRIPTS ARE NOT STATEMENTS OF THE AGENT OR ANYTHING ON WHICH HE HAS RELIED, AND DEPENDING ON WHAT THE REPORTS SAY I THINK WE CAN PROBABLY GO FORWARD WITH THOSE.

I HAVE A REGULAR CALENDAR, AND I ASSUME YOU CAN PROBABLY GET A HOLD OF THOSE IN ABOUT 10 OR 15 MINUTES. SO MY INCLINATION IS TO JUST GET STARTED WITH WHAT I'VE GOT.

I THINK IT WOULD BE HELPFUL TO ME TO SEE THE



REPORTS AS WELL --

MR. GENGE: SURE.

THE COURT: -- BECAUSE SHOULD THIS RESULT IN A DETENTION ORDER THAT'S SOMETHING THAT I WOULD RELY ON. SO YOU THINK -- WELL, WE WILL JUST RECESS UNTIL YOU ARE ABLE T GET THOSE, AND THEN WE WILL PICK UP WITH CROSS-EXAMINATION OF THE AGENT.

MR. SCHWARTZ: THANK YOU, YOUR HONOR.

[WHEREUPON, THERE WAS A BRIEF RECESS]

THE COURT: MR. GENGE, WHERE IS YOUR AGENT?

MR. GENGE: YES, YOUR HONOR.

I THINK (INAUDIBLE) WE ARE IN THE PROCESS OF GETTING THOSE TRANSCRIPTS (INAUDIBLE) TRY TO GET SOME OF T TAPES (INAUDIBLE) HEAR THE TAPES THEMSELVES.

MR. SCHWARTZ: NO, I WASN'T COMPLAINING ABOUT NO HAVING THE TAPE. I THOUGHT I HAD ALL THE TRANSCRIPTS YOU REFERRED TO AND THAT'S WHAT SURPRISED ME.

MR. GENGE: ALL RIGHT.

THE COURT: IF HE IS GOING TO CROSS-EXAMINE AN AGENT I KIND OF NEED SOMEBODY. DO YOU KNOW WHERE THIS PERSON IS?

MR. SCHWARTZ: I HAVE CROSS-EXAMINED EMPTY CHAI BEFORE, JUDGE, OR AT LEAST IT SEEMED THAT WAY.

MR. GENGE: YOUR HONOR, THE AGENT THAT WE WILL CALL IS LIZ ROBERT. SHE IS NOT THE LEAD CASE AGENT BUT S

IS FAMILIAR WITH THE CASE, PARTICIPATED IN A NUMBER OF THE (INAUDIBLE)

THE COURT: AS LONG AS SHE IS FAMILIAR WITH THE TAPE RECORDINGS ON WHICH YOU ARE RELYING ON THAT'S FINE.

IS AGENT ROBERT HERE?

MA'AM, IF YOU WOULD STEP UP HERE, PLEASE.

RAISE YOUR RIGHT HAND.

DO YOU SOLEMNLY SWEAR THE TESTIMONY THAT YOU ARE ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

THE WITNESS: I DO.

THE COURT: PLEASE BE SEATED.

STATE YOUR NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

THE WITNESS: ELIZABETH ROBERT, R-O-B-E-R-T.

THE COURT: AND YOU ARE EMPLOYED HOW, MA'AM?

THE WITNESS: AS A SPECIAL AGENT WITH THE FBI.

THE COURT: ALL RIGHT. AND DID YOU HEAR MR. GENGE'S PROFFER IN SUPPORT OF THE GOVERNMENT'S REQUEST FOR PRETRIAL DETENTION?

THE WITNESS: YES, I DID.

THE COURT: ARE YOU PREPARED TO ADOPT THAT PROFFER AS YOUR TESTIMONY?

THE WITNESS: YES, MA'AM.

THE COURT: DO YOU HAVE ANY ADDITIONS, CORRECTIONS



OR CHANGES THAT YOU WISH TO MAKE IN THE PROFFER?

THE WITNESS: NO.

THE COURT: ALL RIGHT.

MR. SCHWARTZ, YOU MAY CROSS-EXAMINE.

**ELIZABETH ROBERT,**

BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

**CROSS EXAMINATION**

BY MR. SCHWARTZ:

Q. MISS ROBERT -- IS IT ROBERT OR ROBERTS?

A. ROBERT.

Q. ROBERT?

A. YES.

Q. HOW LONG HAVE YOU BEEN EMPLOYED BY THE FBI?

A. ALMOST SEVEN YEARS.

Q. AND IS THIS YOUR FIRST OFFICE?

A. YES, SIR.

Q. AND ARE YOU THE CASE AGENT ON THE CASE?

A. NO, SIR.

Q. WHO IS THE CASE AGENT?

A. THERE IS AN AGENT BY THE NAME OF HOWEY GROVER WHO IS ONE OF THE CASE AGENTS, AND TERRY HYSHAMEL.

Q. AND ARE THEY HERE TODAY?

A. YES, SIR.

Q. AND DO YOU KNOW WHY YOU ARE THE WITNESS INSTEAD OF THE CASE AGENT?



A. BECAUSE I PARTICIPATED IN SEVERAL OF THE SURVEILLANCES. I BASICALLY SAT ON THE WIRETAP AND LISTENED TO MOST OF THESE CONVERSATIONS, AS WELL AS I TOOK THE INVENTORY OF THE SEARCH THAT WAS CONDUCTED ON THE PREMISES OF EASY CHECKING. SO I WAS FAMILIAR WITH A LOT OF DIFFERENT ASPECTS OF THE CASE THAT THEY WEREN'T HANDS ON INVOLVED WITH.

Q. OKAY. WHY DON'T YOU SIT BACK AND RELAX AND --

A. I'M FINE.

Q. -- WE WILL CHAT A LITTLE BIT.

THE CASE, MR. GENGE SAID, STARTED TWO YEARS AGO?

A. YES, SIR.

Q. AND DID IT START HERE IN SOUTH FLORIDA TWO YEARS AGO?

A. IT HAS BEEN WORKED JOINTLY WITH NEW YORK.

Q. BUT WHEN DID IT START IN SOUTH FLORIDA?

A. APPROXIMATELY TWO YEARS AGO.

Q. OKAY. AND HE SAID -- MY IMPRESSION FROM MR. GENGE'S PROFFER WAS THAT THIS COOPERATING INDIVIDUAL OR COOPERATING WITNESS OR COMPLAINING WITNESS, I THINK HE HAS BEEN REFERRED TO AS ALL THREE BY MR. GENGE, LUIS MAIONE?

A. CORRECT.

Q. IS THAT THE PRONUNCIATION OF HIS NAME?

A. CORRECT.

Q. THAT HE STARTED COOPERATING TWO YEARS AGO WHEN THE CASE STARTED, AM I RIGHT IN THAT?

A. CORRECT.



Q. SO HE HAS BEEN COOPERATING SINCE APPROXIMATELY DECEMBER OR JANUARY OF 1990 -- DECEMBER 1994, JANUARY OF '95?

A. I WOULD SAY MID-'94 THROUGH THE BEGINNING OF '95, SOMETIME DURING THAT PERIOD.

Q. OKAY. AND HE HAD -- HE WORE A BODY WIRE ON OCCASIONS, IS THAT RIGHT?

A. YES, SIR, WHEN WE FELT -- WHEN HE FELT BASICALLY THAT HE WOULDN'T BE IN DANGER IF HE WAS CAUGHT WITH IT. THERE WERE SEVERAL TIMES WHEN HE WASN'T ABLE TO WEAR ONE DUE TO THE INDIVIDUALS THAT WERE GOING TO BE PRESENT DURING A MEETING, OR SO FORTH, AND ALWAYS THAT THERE IS A FEAR THAT A COOPERATING WITNESS WILL BE PAT DOWN DURING ONE OF THESE MEETINGS.

Q. BUT HE WASN'T AFRAID TO WEAR ONE WITH SID OR DAVID, IS THAT CORRECT?

A. AT TIMES HE WAS. IT DEPENDED ON THE CIRCUMSTANCES. IF HE WAS GOING TO BE ALONE WITH THEM OR IF THERE WAS GOING TO BE OTHER PEOPLE PRESENT THAT HE FELT MAY PAT HIM DOWN.

Q. LET ME REPHRASE IT THEN.

HE WASN'T AFRAID TO -- HE WASN'T AFRAID OF WEARING A WIRE WHEN HE WAS WITH SID OR DAVID ALONE.

MR. GENGE: OBJECTION, YOUR HONOR.

COULD WE FIX A PERIOD OF TIME (INAUDIBLE)

THE COURT: I THINK THAT WAS AT ANY TIME, BUT --

BY MR. SCHWARTZ:

Q. AT ANY TIME WHEN HE WAS WITH SID OR DAVID ALONE HE WASN'T AFRAID OF WEARING A WIRE, IS THAT CORRECT?

A. I'M NOT CERTAIN OF THAT.

Q. OKAY. WERE YOU AWARE THAT THIS GENTLEMAN MAIONE -- HOW DO YOU PRONOUNCE HIS NAME?

A. MAIONE.

Q. MAIONE.

A. YES, SIR.

Q. -- ATTEMPTED TO GET MR. SIDNEY ALWAIS INVOLVED IN VARIOUS INVESTMENT SCHEMES?

A. I DON'T KNOW THE DETAILS OF THAT, SIR.

Q. DID HE WEAR A WIRE WHEN HE, FOR INSTANCE, WAS TAKING $25,000 FROM SID ALWAIS TO INVEST IN A SCHEME TO PUT PHONE CARDS INTO PUBLIX SUPERMARKETS?

A. I WAS AWARE THERE WAS A PHONE CARD DEAL, AND I'M AWARE THAT NICKY COROZZO OVERSEEING THAT.

Q. (INAUDIBLE) NICKY COROZZO -- OKAY.

BUT DID HE WEAR A WIRE WHEN HE HAD -- WHEN HE GOT THE MONEY FROM SIDNEY TO INVEST IN THE PHONE CARD DEAL?

A. I AM NOT CERTAIN EVER THAT.

Q. I SAID 25. IT WAS $10,000.

A. THERE WAS -- THERE ARE SEPARATE OCCASIONS WHEN HE WORE A WIRE, AND OTHER TIMES WHEN HE DIDN'T FEEL COMFORTABLE WEARING A WIRE THAT DAY HE MAY HAVE WORN A TRANSMITTER AND --



Q. AND WAS HE WEARING A WIRE WHEN HE WAS TELLING SIDNEY ALWAIS THAT HE NEEDED MONEY TO GIVE TO PUBLIX OFFICIALS, FOR INSTANCE, TO -- FOR THE CHECK -- FOR THE PHONE CARD SCHEME, OR FOR PUTTING WINE INTO PUBLIX STORES?

A. I'M NOT CERTAIN ON WHAT OCCASIONS HE HAD EITHER A WIRE ON. HE MAY HAVE HAD A TRANSMITTER ON. IF HE HAD NEITHER ONE THEN HE WAS DEBRIEFED IMMEDIATELY FOLLOWING THE MEETING THAT HE HAD WITH MR. ALWAIS.

Q. SO YOU ARE AWARE THAT HE OBTAINED FROM MR. ALWAIS APPROXIMATELY $80,000 OR $90,000 FOR THESE VARIOUS INVESTMENTS.

A. I'M AWARE THAT HE DID OBTAIN MONEY FROM MR. ALWAIS FOR SEVERAL INVESTMENTS, YES.

Q. HOW MUCH MONEY ARE YOU AWARE THAT HE OBTAINED?

A. I'M NOT CERTAIN EVER THE EXACT AMOUNT.

Q. WOULD THE FIGURE OF 80 OR $90,000 BE A SURPRISING FIGURE TO YOU OR WOULD THAT BE THE APPROXIMATE FIGURE THAT YOU'RE AWARE OF?

A. IT WOULDN'T BE SURPRISING.

Q. AND, OF COURSE, ALL OF THAT MONEY WAS TURNED OVER TO THE FBI IN VOUCHERS?

A. IF IT WAS TURNED OVER -- IF MR. ALWAIS DID NOT EXPECT SOME MONEY BACK FROM IT, ALL MONEY WOULD HAVE BEEN TURNED OVER TO THE FBI.

Q. WAS THE MONEY THAT SID ALWAIS GAVE TO LOUIE FOR THESE



INVESTMENTS TURNED OVER TO THE FBI IN A VOUCHER?

A. I'M NOT CERTAIN HOW MUCH OF THAT WAS TURNED OVER TO THE FBI.

Q. HOW MUCH MONEY DID LOUIE TURN OVER TO THE FBI TO VOUCHER?

A. HE TURNED OVER MONEY ON SEVERAL OCCASIONS FOR DIFFERENT DEALS THAT MR. ALWAIS WANTED TO PARTICIPATE IN.

Q. HOW MUCH MONEY DID HE TURN OVER TO THE FBI TO VOUCHER?

A. I'M NOT CERTAIN OF THAT AMOUNT, SIR.

Q. CAN YOU GIVE US A BALL PARK FIGURE?

MR. GENGE: OBJECTION, YOUR HONOR. RELEVANCY AND ALSO --

THE COURT: WELL, I'M GOING TO SUSTAIN THE OBJECTION ON THE GROUND SHE HAS ALREADY SAID SHE CAN'T ANSWER THE QUESTION.

MR. SCHWARTZ: I'M TALKING A BALL PARK FIGURE, JUDGE.

BY MR. SCHWARTZ:

Q. WAS IT 10,000 OR 100,000?

A. I DID NOT HANDLE THAT, YOUR HONOR.

Q. WHO DID?

MR. GENGE: OBJECTION. (INAUDIBLE)

MR. SCHWARTZ: WE HAVE A RIGHT TO CALL WITNESSES ALSO AT THIS HEARING AND -- MR. GENGE IN HIS PROFFER, WHICH THIS LADY ADOPTED AS HER OWN UNDER OATH, SAID THEY WERE



LOOKING FOR LOUIE BECAUSE HE HAD 10 OR $20,000 OF THEIR MONEY -- OF THEIR LOAN SHARK COLLECTION MONEY.

WE NOW FIND THAT THAT IS NOT NECESSARILY THE CASE. THE CASE IS, THEY WERE LOOKING FOR LOUIE BECAUSE HE SCAMMED SIDNEY ALWAIS OUT OF $80,000 AND THEY WANTED TO COLLECT THEIR MONEY BACK. THEY DIDN'T WANT TO KILL HIM. THEY WANTED TO GET THEIR $80,000 BACK.

IF I CAN'T DEVELOP IT THROUGH THIS WITNESS THEN I WANT TO CALL ONE OF THE OTHER AGENTS AND DEVELOP IT THROUGH THAT WITNESS, BECAUSE THERE WASN'T A --

THE COURT: ALL RIGHT. OVERRULED.

I WILL LET HER ANSWER THE QUESTION IF SHE KNOWS WHO HANDLE THE MONEY.

MR. SCHWARTZ: THANK YOU.

THE WITNESS: I'M NOT CERTAIN WHO HANDLED THE MONEY, BUT I PERSONALLY DID NOT.

BY MR. SCHWARTZ:

Q. YOU DON'T KNOW WHICH AGENT IN THIS CASE TOOK AND VOUCHERED THE MONEY THAT LOUIE TURNED INTO THE FBI.

MR. GENGE: ASKED AND ANSWERED, YOUR HONOR.

THE COURT: SUSTAINED.

WAS IT ONE OF THE CASE AGENT, IF YOU KNOW?

THE WITNESS: I BELIEVE SO.

MR. SCHWARTZ: I HAVE TWO CHOICES, JUDGE. THANK YOU.

BY MR. SCHWARTZ:

Q. WERE YOU AWARE THAT THE REASON SIDNEY AND DAVID WERE TRYING TO FIND LOUIE WAS TO GET BACK THE MONEY THAT HE DEFRAUDED THEM ON?

A. THEY NEVER MADE THAT INDICATION OVER THE WIRE THAT I LISTENED TO. THEY MADE STATEMENTS THAT THEY WANTED TO HARM HIM, KILL HIM, DO WHATEVER IT TOOK TO PREVENT HIM FROM TESTIFYING OR TURNING GOVERNMENT WITNESS.

Q. THAT'S WHAT THEY SAID.

A. YES.

Q. OKAY. AS A MATTER OF FACT, SAL SAID TO DAVID, "YOUR FATHER WANTS TO KILL THIS GUY," RIGHT?

A. WORDS TO THAT EFFECT.

Q. DO YOU EVER WATCH THE COSBY SHOW?

MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: SUSTAINED.

BY MR. SCHWARTZ:

Q. DID YOU EVER HEAR BILL COSBY SAY TO HIS SON ON THE SHOW, "I BROUGHT YOU INTO THERE WORLD AND I CAN TAKE YOU OUT OF THIS WORLD." DID YOU HEAR THAT?

MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: SUSTAINED. THAT'S ARGUMENTATIVE, MR. SCHWARTZ.

BY MR. SCHWARTZ:

Q. YOU HEARD MR. GENGE'S PROFFER THAT SAL PECCHIO --



REFERRING TO THE TAPE ON JULY 20TH, SAL PECCHIO TOLD -- I GUESS IT WAS SIDNEY OR DAVID -- LET ME PULL OUT THE TAPE AND SEE FOR SURE.

SAL PECCHIO TOLD --

MR. GENGE: YOUR HONOR, THE WITNESS DOESN'T HAVE A COPY OF THE TRANSCRIPT. IT MIGHT BE HELPFUL --

MR. SCHWARTZ: MAY I?

BY MR. SCHWARTZ:

Q. LET ME REFER YOU TO THE TAPE OF JULY 20TH, 1994, THE SECOND PAGE.

A. YES, SIR.

Q. THE TOP OF THE PAGE.

DID YOU MONITOR THIS CONVERSATION?

A. I AM NOT CERTAIN IF I MONITORED IT WHEN IT WAS OCCURRING, BUT I HAVE HEARD THIS CONVERSATION.

Q. OKAY. AND YOU HEAR SAL BOASTING TO DAVID ALWAIS, "YEAH, I CALLED HIM. I JUST GOT OFF THE PHONE WITH HIM. I SAID I'M GOING TO RIP YOUR "-- EXCUSE ME, JUDGE, "FUCKING HEAD OFF. IF YOU EVER COME WHILE I'M NOT HERE AGAIN I WILL DESTROY YOU. YOU MADE A COMMITMENT TO ME."

HE GOES DOWN FURTHER. "I'LL RIP YOUR FUCKING ASSHOLE IF YOU GO -- SO FAR OVER YOU CAN FIT A TRUCK IN THERE YOU MOTHER FUCKER."

YOU HEARD HIM SAY THAT?

A. YES, SIR.



MR. SCHWARTZ: FORGIVE ME, YOUR HONOR, FOR USING THOSE WORDS, BUT I'M SURE MOST OF THE PEOPLE IN COURT HAVE HEARD THOSE WORDS BEFORE.

BY MR. SCHWARTZ:

Q. DO YOU KNOW IF HE EVER SAID THAT TO MYLES (INAUDIBLE).

A. I DON'T KNOW SPECIFICALLY WHAT MYLES MCGRAPH RECALLED OF THREATS MADE TO HIM, BUT HE WAS OBVIOUSLY SCARED OF THIS INDIVIDUAL AND SCARED OF THESE PEOPLE AND FELT THAT HE HAD TO PAY THEM BACK, AND HE WAS CERTAIN THAT THEY WOULD CAUSE BODILY HARM TO HIM.

Q. WOULD IT SURPRISE YOU IF MYLES MCGRAPH TOLD TWO INVESTIGATORS FROM MY OFFICE THAT HE WAS NEVER THREATENED BY THESE PEOPLE?

A. YES, I WOULD BE SURPRISED.

Q. AND MR. GENGE DIDN'T READ PART OF THAT CONVERSATION A FEW LINES FURTHER DOWN.

WOULD YOU READ TO US FROM THE -- AFTER A BLANK SPACE ON THAT PAGE WHERE SAL PECCHIO SAYS, "ENOUGH OF YOUR WHATEVER? ENOUGH OF YOUR SHIT," EXCUSE ME. WOULD YOU READ THAT?

A. UNTIL WHAT PORTION?

Q. THAT WHOLE PARAGRAPH.

A. YES, SIR.

MR. PECCHIO SAID, "ENOUGH OF YOUR SHIT. I SAID YOU KNOW, YOU KNOW, I GOT TO SLAP YOU NOW JUST FOR THIS,



RIGHT? I GOT TO SLAP YOU.

"PLEASE, SAL, DON'T DO THAT TO ME. PLEASE. THAT WOULD BE SO EMBARRASSING. I SAID I'LL DO IT. HOW DO YOU THINK I FEEL? I'M -- YOU'RE EMBARRASSING ME HERE. YOU'RE EMBARRASSING ME HERE, YOU MOTHER F'ER. SO HE DROPPED OFF $625 IN CHECKS."

Q. OKAY. SO THE HEINOUS ACTIONS THAT HE WAS GOING TO TAKE TO THE BODY OF MR. MCGRAPH, WHICH HE WAS BOASTING ABOUT, OR TALKING ABOUT IN THE BEGINNING PARAGRAPH REALLY CAME DOWN TO HE WAS GOING TO SLAP HIS FACE TO HUMILIATE HIM OR EMBARRASS HIM, IS THAT RIGHT?

MR. GENGE: OBJECTION, YOUR HONOR. (INAUDIBLE)

THE COURT: OVERRULED.

SHE IS CAPABLE OF ANSWERING THAT.

THE WITNESS: IT WAS FOR THE LEVEL THAT HE HAD DONE. MR. MCGRAPH WAS GOING TO PAY. HE HAD JUST PAID IN A CHECK. AND, SO IT DIDN'T -- IT WASN'T TO THE POINT THAT HE'S GOING TO KILL HIM FOR THIS. HE'S GOING TO GIVE HIM A SLAP BECAUSE THAT'S WHAT HE DESERVES FOR THE DISRESPECT HE'S GIVEN.

BY MR. SCHWARTZ:

Q. HE SLAPPED HIS FACE.

A. YES.

Q. NOT OPERATE ON HIS RECTAL AREA, IS THAT CORRECT?

A. NOT ON THIS OCCASION BECAUSE HE'S PAYING. EVERYTHING

IS OKAY AS LONG HE PAYS.

Q. HE WAS JUST PAY THE WHOLE FINE, WASN'T HE?

A. HE WAS LATE AT TIMES, AND THAT'S WHEN HE WOULD GET THE THREAT.

Q. ARE YOU FAMILIAR WITH THE INDICTMENT IN THIS CASE?

A. YES, SIR.

Q. YOU HAVE REVIEWED IT?

A. I HAVE READ IT ONCE BEFORE.

Q. THERE ARE NO ALLEGATIONS THERE THAT ANYBODY WAS KILLED, ARE THERE?

MR. GENGE: OBJECTION, YOUR HONOR.

THE INDICTMENT, WE ARE ASKING THE WITNESS FOR HER INTERPRETATION OF THE INDICTMENT? THE INDICTMENT SPEAKS FOR ITSELF.

THE COURT: ALL RIGHT. SUSTAINED AS TO THE INDICTMENT.

BY MR. SCHWARTZ:

Q. DID ANY WITNESS IN THE GRAND JURY TESTIFY THAT DAVID OR SID ALWAIS KILLED ANYONE?

MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: ALL RIGHT. MR. SCHWARTZ, PHRASE THE QUESTION IN TERMS OF EVIDENCE THAT THEY GATHERED DURING THE COURSE OF THEIR INVESTIGATION SO WE DON'T GET INTO A 6(E) ISSUE.

MR. SCHWARTZ: WELL, YOUR HONOR CAN WAIVE 6(E) FOR



THE PURPOSE OF THIS PROCEEDING.

THE COURT: I CAN, BUT I DON'T WANT TO GET INTO THAT IF I DON'T HAVE TO.

MR. SCHWARTZ: OKAY.

BY MR. SCHWARTZ:

Q. OF THE SIX PEOPLE WHO ARE THE PEOPLE INVOLVED IN THE EXTORTIONATE LOANS REFERRED TO IN THE INDICTMENT, WERE ANY OF THEM SHOT?

A. NO, SIR.

Q. WERE ANY OF THEM HOSPITALIZED BY SID OR DAVID ALWAIS OR ANYBODY ON THEIR BEHALF?

A. NO, THEY WERE JUST THREATENED TO BE HOSPITALIZED.

Q. WERE ANY OF THEIR LEGS BROKEN?

A. NO.

Q. WERE ANY OF THEIR ARMS BROKEN?

A. NO.

Q. WERE ANY OF THEM PUT IN THE TRUNK OF THE CAR AND KIDNAPPED OR ANYTHING OF THAT SORT?

A. THEY HAD ALL MADE THEIR PAYMENTS.

Q. SO NONE OF THESE PEOPLE HAD ANY VIOLENCE DONE TO THEM EXCEPT MAYBE SOME -- MCGRAPH MIGHT HAVE BEEN SLAPPED IN THE FACE, IS THAT CORRECT?

A. CORRECT.

Q. YOU WERE INVOLVED IN THE SEARCH OF THE EASY CHECK CASHING STORE ON AUGUST 29TH, 1996, IS THAT CORRECT?



A. YES, SIR. I MAINTAINED THE INVENTORY OF THE ITEMS SEIZED.

Q. OKAY. AFTER THE STORE WAS SEARCHED WAS ANY WITNESS INJURED --

A. NO.

Q. -- TO YOUR KNOWLEDGE?

A. ATTEMPTS WERE CONTINUING TO BE MADE TO LOCATE LOUIE MAIONE, AND WE HAD THAT INFORMATION FROM THE WIRETAPS AND VICTIMS. THE LOAN SHARK VICTIMS WERE APPROACHED AND TOLD TO CURB THEIR TESTIMONY IF THEY WERE APPROACHED BY THE GOVERNMENT.

Q. AND WHO WAS APPROACHED AND TOLD THE CURB THEIR TESTIMONY?

A. THE SIX INDIVIDUALS MENTIONED IN THE INDICTMENT.

Q. THEY WERE ALL APPROACHED AND TOLD TO CURB THEIR TESTIMONY?

A. YES, SIR.

Q. WHO APPROACHED THEM?

A. SIDNEY AND DAVID ALWAIS.

Q. ARE YOU AWARE THAT THESE INDIVIDUALS WERE INTERVIEWED BY INVESTIGATORS FROM MY OFFICE?

A. I'M NOT CERTAIN OF THAT, SIR.

Q. YOU DIDN'T KNOW THAT?

A. NO.

Q. THEY DIDN'T TELL YOU?



A. NO. I DID NOT CONDUCT THE INTERVIEW.

Q. SO YOU DON'T KNOW SPECIFICALLY WHAT -- FROM THESE WITNESSES WHO SAID WHAT TO ANYONE, DO YOU?

A. NO, SIR.

Q. WHO CONDUCTED THE INTERVIEW OF THESE WITNESSES?

A. MEMBERS FROM MY OFFICE. I'M NOT CERTAIN EXACTLY WHAT VICTIMS WERE INTERVIEWED BY WHAT AGENTS.

Q. OKAY. THE SIX INTERVIEWED PEOPLE MENTIONED IN THE INDICTMENT, WHO INTERVIEWED THOSE SIX?

A. I CANNOT SAY FOR CERTAIN WHO INTERVIEWED WHO.

Q. HOW MANY AGENTS CONDUCTED THE INTERVIEWS?

MR. GENGE: OBJECTION, YOUR HONOR. THIS IS NOT A DISCOVERY PROCEEDING.

MR. SCHWARTZ: WELL, EXCEPT WE ARE DEALING IN TRIPLE HEARSAY, JUDGE. THEY ARE ASKING YOU TO RELY ON TRIPLE HEARSAY FROM THIS AGENT TO THAT -- MR. ALWAIS SOMEH ASKED THESE PEOPLE TO CHANGE THEIR STORY.

THE COURT: I AM NOT SURE FINDING OUT HOW MANY AGENTS CONDUCTED THE INTERVIEW IS GOING --

MR. SCHWARTZ: (INAUDIBLE) FIND OUT WHO THEY WERE SO THAT I CAN ACTUALLY -- I WILL DO IT AN EASIER WAY.

MR. SCHWARTZ: UNDER 806 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE, SINCE YOU ARE BEING ASKED TO RELY ON THIS HEARSAY FOR THE PURPOSE OF THIS HEARING AND SINCE JENCKS IS APPLICABLE TO THIS HEARING, I WOULD ASK THE THE

OR TWO REPORTS OF THOSE INTERVIEWS TO BE TURNED OVER.
MR. GENGE: AGAIN, YOUR HONOR, WE DON'T -- THE WITNESS HAS ALREADY TESTIFIED THAT SHE DID NOT CONDUCT THOSE INTERVIEWS.
MR. SCHWARTZ: BUT YOU ARE BEING ASKED TO RELY ON THE HEARSAY. 802 SAYS -- 806 --
THE COURT: WELL, IF I DON'T HEAR ANYMORE THAN WHAT I HAVE HEARD I WILL NOT CONSIDER THE TESTIMONY.
MR. SCHWARTZ: THAT'S FINE, THEN.
THE COURT: BECAUSE IT IS TOO VAGUE AT THIS POINT, AND SHE REALLY DOESN'T HAVE ANY SPECIFIC INFORMATION.
MR. SCHWARTZ: THEN I NEED NOT GO THERE, JUDGE.
THE COURT: UNLESS WE CAN DEVELOP SOME, BUT RIGHT NOW I REALLY CAN'T CONSIDER IT.
MR. SCHWARTZ: THANK YOU, YOUR HONOR.
MAY I HAVE A MOMENT, JUDGE?
THE COURT: YOU MAY.
MR. SCHWARTZ: (INAUDIBLE)
MR. SCHWARTZ: MR. RUBINO.
THE COURT: ALL RIGHT.

CROSS EXAMINATION

BY MR. RUBINO:
Q. GOOD MORNING.
A. GOOD MORNING.
Q. MR. SCHWARTZ ASKED YOU ABOUT THE CONFIDENTIAL INFORMANT

MR. LUIS -- IS IT PRONOUNCED MAIONE OR MAIONE?
A. MAIONE.
Q. MR. MAIONE YOU SAY WAS INVOLVED IN THIS INVESTIGATIO FOR APPROXIMATELY TWO YEARS, AM I CORRECT?
A. YES, SIR.
Q. NOW, ISN'T IT TRUE THAT HE MET MR. ALWAIS ONLY ONE Y AGO. IN FACT, HE MET HIM IN NOVEMBER OF '95.
THE COURT: WHICH ALWAIS, PLEASE?
BY MR. RUBINO:
Q. EXCUSE ME. MR. SIDNEY ALWAIS.
A. CORRECT.
Q. SO HE MAY HAVE BEEN INVOLVED IN THE CASE, HE BEING T CI FOR A TWO-YEAR PERIOD, BUT HE WAS ONLY INVOLVED WITH MR. SIDNEY ALWAIS FOR ONE YEAR, CORRECT?
A. CORRECT.
Q. NOW, DURING THAT YEAR PERIOD OF TIME MR. MAIONE WENT AND GOT MR. ALWAIS TO INVEST MONEY IN VARIOUS THINGS. YO ARE AWARE OF THAT, ARE YOU NOT?
A. YES, SIR.
Q. AND ONE OF THOSE INVESTMENTS WERE BRIEFLY ASKED ABOU WAS A PHONE CARD INVESTMENT TO BE PLACED IN PUBLIX SUPERMARKETS, AM I CORRECT?
A. YES, SIR.
Q. WAS THAT THE IDEA OF THE FBI TO HAVE MR. MAIONE GO GET MONEY FOR THE PHONE CARD THING OR WAS THAT HIS IDEA?



MR. GENGE: OBJECTION, YOUR HONOR.
THE COURT: OVERRULED.
THE WITNESS: I BELIEVE IT WAS A JOINT IDEA BETWEEN MR. MAIONE AND MR. ALWAIS.
BY MR. RUBINO:
Q. AND MR. MAIONE -- OH, MR. MAIONE AND MR. ALWAIS.
A. YES, SIR. THEY THOUGHT THAT THAT WAS A GOOD WAY TO MAKE A LOT OF MONEY.
Q. SO THIS WOULDN'T BE CHARACTERIZED THEN AS A STING OPERATION SET UP BY THE FBI, WOULD IT?
A. NO, SIR.
MR. GENGE: OBJECTION, YOUR HONOR.
THE COURT: OVERRULED. SHE KNOWS WHAT (INAUDIBLE)
THE WITNESS: NO, SIR. MR. MAIONE BROUGHT -- INFORMED AGENTS OF THE FBI THAT MR. SIDNEY ALWAIS WAS INTERESTED IN MAKING THIS TRANSACTION. COMING UP --
BY MR. RUBINO:
Q. BASICALLY WHAT HE WAS -- HE MEANING MR. ALWAIS, MR. ALWAIS WAS INVESTING MONEY, GIVING IT TO MR. MAIONE WITH THE BELIEF THAT MR. MAIONE WAS GOING TO DO A LEGITIMATE BUSINESS VENTURE, WASN'T HE?
MR. GENGE: OBJECTION, YOUR HONOR. THIS WITNESS CAN'T SPECULATE AS TO MR. ALWAIS' BELIEF.
THE COURT: SUSTAINED.
BY MR. RUBINO:

Q. DID MR. MAIONE TELL MR. ALWAIS THAT WHEN HE TOOK T MONEY FROM HIM HE WAS INTENDING TO DO A LEGITIMATE BUSI VENTURE?
A. I'M CERTAIN MR. ALWAIS WAS AWARE THAT MR. MAIONE CONSTANTLY INVOLVED IN CRIMINAL ACTIVITY SEEING HE WAS COLLECTING FOR HIM ON A DAILY BASIS.
Q. NOW WOULD YOU ANSWER MY QUESTION?
MR. GENGE: OBJECTION.
Q. IT WAS VERY SPECIFIC.
AT THE TIME THAT MR. MAIONE TOOK THE MONEY MR. ALWAIS FOR THE PHONE CARD INVESTMENT, DID MR. MAI TELL MR. ALWAIS THAT HE WAS GOING TO USE THE MONEY FC LEGITIMATE VENTURE?
A. I'M NOT CERTAIN IF HE TOLD MR. ALWAIS THAT IT WA LEGITIMATE OR NOT.
Q. DID HE TELL HIM HE WAS GOING TO USE IT FOR THE CARD INVESTMENT?
A. I BELIEVE SO, YES.
Q. DO YOU KNOW IF HE IN FACT -- HE MEANING THE CONFIDENTIAL INFORMANT, DO YOU KNOW IF HE IN FACT DI THAT MONEY FOR THE PURPOSE FOR WHICH IT WAS GIVEN T
A. I'M NOT CERTAIN.
Q. OR DO YOU KNOW IF HE COMMITTED FRAUD UPON MR. TAKING HIS MONEY AND NOT USING IT FOR THE INTENDED
MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: SUSTAINED. ARGUMENTATIVE.

BY MR. RUBINO:

Q. WITH RESPECT TO THE -- DO YOU KNOW THERE WAS AN OLIVE OIL AND WINE INVESTMENT THAT MR. ALWAIS ALSO MADE WITH MR. MAIONE, ARE YOU AWARE OF THAT?

A. NO, SIR.

Q. ARE YOU AWARE THAT MR. ALWAIS GAVE MR. MAIONE SEVEN -- IN EXCESS OF $17,000 FOR LICENSE RIGHTS TO IMPORT OLIVE OIL AND WINE FROM ITALY?

A. NO, SIR.

Q. SO THAT $17,000 OBVIOUSLY WOULD NEVER HAVE BEEN TURNED OVER TO THE FBI, WAS IT?

MR. GENGE: OBJECTION, YOUR HONOR. ARGUMENTATIVE.

MR. RUBINO: IT IS NOT ARGUMENTATIVE. I'M JUST ASKING A SIMPLE STRAIGHTFORWARD QUESTION.

BY MR. RUBINO:

Q. DID HE TURN $17,000 OVER TO THE FBI WITH RESPECT TO A VENTURE INVOLVING OLIVE OIL OR WINE, IF YOU KNOW?

A. HE DID NOT TURN IT OVER TO ME. HE MAY HAVE TURNED IT OVER TO THE FBI.

Q. HE MAY NOT HAVE, TOO, RIGHT?

A. I'M NOT CERTAIN.

MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: OVERRULED.

BY MR. RUBINO:



Q. ARE YOU AWARE THAT MR. MAIONE TOOK $3,000 FROM MR. SIDNEY ALWAIS FOR THE PURPOSE OF INVESTING IN AN ICE TEA -- HERBAL ICE TEA VENTURE?

A. I KNOW THAT THEY WERE INVOLVED IN A LOT OF DIFFERENT VENTURES. I'M NOT CERTAIN OF THE EXACT AMOUNTS OF MONEY THAT MR. MAIONE OBTAINED FROM MR. ALWAIS. THEY WERE ALWAIS ATTEMPTING TO BE INVOLVED IN SOME TYPE OF VENTURE.

Q. BUSINESS VENTURES, CORRECT?

A. CORRECT. WAYS TO MAKE MONEY. THAT'S THEIR OBJECTIVE.

Q. AND HE ALSO TOOK MONEY FROM MR. ALWAIS FOR PERSONAL REASONS. HE TOOK -- BORROWED $2,000 FROM HIM SO THAT HE COULD USE IT, OR ALLEGEDLY USE IT AS A DOWN PAYMENT ON A CONDO, DID HE NOT?

A. I KNOW THAT MR. MAIONE DID TAKE OUT A LOAN SHARK LOAN FROM MR. ALWAIS.

Q. THAT WASN'T MY QUESTION.

MY QUESTION WAS, DID HE BORROW $2,000 FROM HIM FOR A CONDO? YOU CAN CHARACTERIZE IT LATER WHAT SPIN YOU WANT TO PUT ON IT, BUT MY QUESTION IS, DID HE BORROW $2,000 FOR A CONDO?

A. YES, AT USURIOUS RATES.

Q. AND DID HE TURN THAT $2,000 OVER TO THE FBI?

A. I'M NOT CERTAIN.

Q. HOW MUCH MONEY DID THE FBI LET MR. MAIONE KEEP THAT HE EXTORTED FROM MR. ALWAIS?



MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: SUSTAINED AS TO THE FORM OF THE QUESTION, MR. RUBINO.

BY MR. RUBINO:

Q. HOW MUCH MONEY DID THE FBI ALLOW MR. MAIONE TO KEEP THAT HE TOOK FROM MR. ALWAIS?

MR. GENGE: OBJECTION.

BY MR. RUBINO:

Q. THAT HE ACQUIRED FROM HIM.

THE COURT: OVERRULED AS TO THE LAST PHRASEOLOGY.

MR. RUBINO: ACQUIRED FROM HIM?

THE COURT: YES.

THE WITNESS: COULD YOU REPEAT THE QUESTION, PLEASE?

BY MR. RUBINO:

Q. HOW MUCH MONEY DID THE FBI ALLOW MR. MAIONE TO KEEP THAT HE ACQUIRED FROM MR. SIDNEY ALWAIS?

A. I'M NOT CERTAIN.

Q. WELL, DO YOU HAVE ANY IDEA?

A. NO, SIR.

Q. NOT THE VAGUEST?

A. NOPE.

Q. DID THE FBI PAY MR. MAIONE ANY MONEY TO ACT AS A CONFIDENTIAL INFORMANT?

MR. GENGE: OBJECTION. IT IS GOING BEYOND THE SCOPE OF THIS PARTICULAR HEARING.

MR. RUBINO: IT WOULD GO TO HIS MOTIVATION.

THE COURT: OVERRULED. I ALWAYS ALLOW THAT.

THE WITNESS: YES, HE WAS PAID TO BE A CONFIDENTIAL INFORMANT.

BY MR. RUBINO:

Q. AND HOW MUCH WAS HE PAID?

MR. GENGE: OBJECTION.

THE COURT: OVERRULED.

THE WITNESS: I'M NOT CERTAIN.

BY MR. RUBINO:

Q. DO YOU HAVE ANY IDEA?

A. I'M NOT CERTAIN. I DON'T WANT TO SPECULATE. I DON'T WANT TO GIVE YOU EXACT FIGURES. I'M NOT CERTAIN.

Q. CAN YOU GIVE ME A GOOD ROUGH GUESS?

MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: SUSTAINED AS TO A GUESS.

BY MR. RUBINO:

Q. DID HE GIVE YOU A GOOD OPINION?

A. I KNOW THAT HE WAS PAID FOR HIS MONTHLY EXPENSES.

Q. WELL, DEPENDING ON HIS LIFE-STYLE THAT COULD BE ANYTHING, CORRECT?

A. CORRECT. I --

Q. HOW MUCH DID HE GET PAID FOR HIS MONTHLY EXPENSES?

A. I WILL ESTIMATE MAYBE $2,000 A MONTH.

Q. AND HE WAS ALLOWED TO KEEP SOME OF THE MONEY HE GOT FROM MR. ALWAIS, CORRECT?
A. I'M NOT CERTAIN ABOUT THAT.
Q. NOW, YOU DO NOT CHARACTERIZE MR. MAIONE AS, QUOTE, "A VICTIM," DO YOU?
A. HE DID TAKE OUT A LOAN SHARK LOAN FROM THE ALWAISES.
Q. $2,000?
A. I'M NOT CERTAIN OF THE EXACT AMOUNT, BUT I'M SURE --
Q. (INAUDIBLE)
A. YES.
Q. NOW, ALL OF THE REST OF THE MONEY, THE REMAINING OF APPROXIMATELY $78,000 THAT HE GOT FROM MR. ALWAIS THAT WAS NOT LOANS, WAS IT?
MR. GENGE: OBJECTION, YOUR HONOR. ASSUMES FACTS NOT IN EVIDENCE.
THE COURT: SUSTAINED AS TO THE FORM OF THE QUESTION.
BY MR. RUBINO:
Q. ALL OF THE FUNDS, NOTWITHSTANDING WHATEVER THE AMOUNTS MAY TOTAL UP TO BE, THAT MR. MAIONE GOT FROM MR. ALWAIS WITH THE EXCEPTION OF THE 2000 DOLLAR CONDO LOAN --
A. YES, SIR.
Q. -- THOSE FUNDS WERE FUNDS THAT MR. MAIONE TOOK FROM MR. ALWAIS FOR INVESTMENT PURPOSES, NOT FOR LOAN PURPOSES, CORRECT?



A. YES, FOR INVESTMENT IN SOME TYPE OF VENTURE.
Q. YES, AS WE HAVE DESCRIBED.
A. CORRECT.
Q. AND MR. MAIONE NEVER PAID BACK ANY OF THOSE FUNDS, DID HE?
A. I'M NOT CERTAIN. MR. ALWAIS WOULD HAVE TO TESTIFY TO THAT.
Q. DO YOU -- IN DEBRIEFING OR SPEAKING WITH YOUR CONFIDENTIAL INFORMANT, DO YOU KNOW IF HE PAID BACK ANY OF THAT MONEY?
A. I'M NOT CERTAIN.
MR. GENGE: OBJECTION, YOUR HONOR.
THE COURT: OVERRULED.
BY MR. RUBINO:
Q. YOU MAY ANSWER.
A. I KNOW THAT ARRANGEMENTS WERE BEING MADE TO -- FOR MR. MAIONE TO MAKE SOME PAYMENTS BACK TO MR. ALWAIS, AND THAT'S THE DAY THAT WE CONDUCTED THE SEARCH OF THE PREMISES.
Q. NOW, OBVIOUSLY THERE ARE PHONE CONVERSATIONS THAT WE'VE GOTTEN TRANSCRIPTS FOR THAT HAVE BEEN DISCUSSED EARLIER, AND WITHOUT GOING THROUGH THEM AND BELABORING THEM, MR. ALWAIS CLEARLY IN THOSE CONVERSATIONS CAN BE CHARACTERIZED AS BEING UPSET THAT MR. MAIONE DID NOT PAY HIM BACK THE MONEY HE TOOK FROM HIM, CORRECT?
MR. GENGE: OBJECTION. ARGUMENTATIVE.



HE IS TRYING TO CHARACTERIZE THIS, AND WE CAN PLAY THE TAPES, WE HAVE OTHER TAPES, THE COURT CAN LISTEN TO THOSE TAPES --
THE COURT: ALL RIGHT. BE A LITTLE --
MR. RUBINO: THE SPIN IS THAT MY CLIENT WAS UPSET.
THE COURT: I AM GOING TO SUSTAIN THE OBJECTION.
MR. RUBINO: IF THEY ACKNOWLEDGE THAT THEN I WILL CONCEDE THE POINT AND SIT DOWN.
THE COURT: WELL --
MR. GENGE: (INAUDIBLE)
THE COURT: WHY DON'T WE JUST TALK ABOUT WHAT WAS ACTUALLY SAID OR WHAT WAS EXPRESSED AS OPPOSED TO HIS STATE OF MIND.
BY MR. RUBINO:
Q. WELL, YOU TALKED ABOUT ONE PARTICULAR CONVERSATION WHERE A PERSON -- IN FACT, MR. SCHWARTZ READ THE CONVERSATION QUITE GRAPHICALLY FOR US AND ASKED YOU QUESTIONS ABOUT THAT CONVERSATION, CORRECT?
A. YES, SIR.
Q. BUT THAT CONVERSATION WAS NOT MY CLIENT, MR. SIDNEY ALWAIS, WITH ANY ALLEGED VICTIM, WAS IT?
A. NO, SIR, THIS WAS ONE WAS BETWEEN DAVID ALWAIS AND SAL PECCHIO.
Q. SO IT WAS -- ACTUALLY IT WAS TWO CODEFENDANTS TALKING AMONG THEMSELVES, NOT THREATENING ANYBODY, CORRECT?



A. IN THIS SPECIFIC CONVERSATION?
Q. YES.
A. THEY'RE -- MR. PECCHIO IS RELATING TO MR. ALWAIS WHAT HE PLANS TO DO WITH ONE OF THE LOAN SHARK VICTIMS.
Q. EVENTUAL CURRENT FUTURE (INAUDIBLE)
A. CORRECT, IF THE INDIVIDUAL DID NOT COME UP WITH THE MONEY THIS IS WHAT WAS GOING TO HAPPEN TO HIM.
Q. AND SIDNEY ALWAIS IS NOT EVEN A PARTY TO THIS CONVERSATION, IS HE?
A. BUT --
Q. YES OR NO. IS HE A PARTY OR ISN'T HE? IT'S REAL SIMPLE.
A. OF THIS CONVERSATION? NO, SIR.
Q. OKAY. NOW, MR. SCHWARTZ ASKED YOU, AND I WON'T BELA THE POINT BEYOND A QUESTION OR TWO.
MR. SCHWARTZ ASKED YOU, THERE ARE SIX VICTIMS ALLEGED IN THE INDICTMENT, CORRECT?
A. CORRECT.
Q. DO YOU HAVE ANY EVIDENCE THAT SIDNEY ALWAIS HURT OR INJURED ANY ONE OF THOSE SIX PEOPLE?
A. HE DIRECTED OTHERS TO HURT THEM.
Q. OKAY. WHO DID HE SPECIFICALLY DIRECT TO HURT WHO?
A. I CANNOT GIVE YOU THE SPECIFICS. THE INDIVIDUALS T WERE WORKING FOR HIM AS HIS COLLECTORS OVER THE YEARS INCLUDED MR. ROBERT ENGEL LOUIE MAIONE, AND THE LATEST W

SALVATORE PECCHIO.

Q. OKAY.

A. HE INSTRUCTED THESE INDIVIDUALS TO CAUSE HARM ON THE LOAN SHARK VICTIMS IF THEY DID NOT MAKE THEIR PAYMENTS.

Q. HERE IS MY QUESTION --

THE COURT: LET'S JUST MAKE THIS FASTER.

AS FAR AS YOU KNOW, OR YOU ARE NOT ABLE TO TESTIFY TO ANY SPECIFIC THREATS OR SPECIFIC DIRECTIONS GIVEN TO ANYBODY TO HARM THE PARTICULAR PEOPLE NAMED IN THIS INDICTMENT, IS THAT CORRECT? YOU ARE TALKING ABOUT THE GENERAL MANNER IN WHICH THE BUSINESS WAS CONDUCTED, IS THAT CORRECT?

THE WITNESS: YOUR HONOR, THERE WERE SEVERAL CONVERSATIONS THROUGHOUT THE TITLE THREE. DEPENDING ON WHAT VICTIM WAS LATE WITH HIS PAYMENTS, THAT'S THE ONE THEY WOULD TARGET ON THAT PARTICULAR DAY.

BUT THERE IS SEVERAL CONVERSATIONS WHERE MR. ALWAIS, EITHER MR. DAVID ALWAIS OR MR. SIDNEY ALWAIS, WOULD BE SPEAKING TO MR. PECCHIO AND BE SAYING, "WELL, TELL THEM THAT THEY ARE GOING TO GET HURT FOR THIS. AND IF THEY DON'T PAY THEY ARE GOING TO HAVE TO DEAL WITH NEW YORK AND THEY DON'T WANT TO HAVE TO DEAL WITH NEW YORK."

AND, AS A MATTER OF FACT OF FACT, I INTERCEPTED ONE CONVERSATION WHERE MR. DAVID ALWAIS WAS HE, HIMSELF, THREATENING ONE OF THE VICTIMS AND SAYING, "WELL, YOU DON'T



WANT TO MESS WITH THE FAMILY IN NEW YORK." AND THE OTHER PERSON WAS SAYING, "WELL, I'M CONNECTED WITH A FAMILY, TOO," AND CURSING BACK AND FORTH BASICALLY WHO WAS GOING TO GET HURT.

BY MR. RUBINO:

Q. LET'S GET BACK TO SIDNEY, BECAUSE THAT'S WHO I'M ASKING YOU QUESTIONS ABOUT NOT DAVID. OKAY?

A. YES, SIR.

Q. DO YOU HAVE ANY TAPE RECORDING WHEREIN SIDNEY ALWAIS IS ON ONE END OF THE PHONE AND MR. MCGRAPH, FOR EXAMPLE, IS ON THE OTHER END OF THE PHONE AND SIDNEY ALWAIS THREATENS MR. MCGRAPH?

A. NOT THAT I CAN RECALL.

Q. OKAY. DO YOU HAVE ANY CONVERSATION RECORDED WHEREIN SIDNEY ALWAIS IS ON ONE LINE OF THE PHONE AND MR. CRAIG BAGIN IS ON THE OTHER LINE OF THE PHONE AND MR. ALWAIS, SIDNEY ALWAIS, THREATENS MR. CRAIG BAGIN?

A. NOT THAT I CAN RECALL, BUT THERE WERE SEVERAL --

Q. WITH RESPECT TO MR. HOWARD STERN --

THE COURT: WAIT A MINUTE. SHE WANTS TO FINISH HER ANSWER AND I WILL ALLOW HER TO DO THAT.

THE WITNESS: BUT THERE WERE SEVERAL CONVERSATIONS WHERE HE INSTRUCTED MR. PECCHIO TO PLACE A CALL OR TO GO AND PAY A VISIT TO THE VICTIM, AND HE STATED THAT HE COULD NOT SAY OVER THE PHONE, THAT HE HAD TO BE VERY CAREFUL WHEN HE



SPOKE OVER THE PHONE WHAT NEEDED TO BE DONE.

BY MR. RUBINO:

Q. I APPRECIATE THE GRATUITOUS ANSWER TO THE QUESTION I DIDN'T ASK, BUT LET'S GET TO THE QUESTION I DID ASK. OKAY?

MR. GENGE: OBJECTION, YOUR HONOR.

THE COURT: SUSTAINED. WE DON'T NEED EDITORIAL COMMENTS, MR. RUBINO.

BY MR. RUBINO:

Q. MR. CRAIG -- MR. HOWARD STERN, DO YOU HAVE A CONVERSATION WHEREIN MR. SIDNEY ALWAIS IS ON ONE END OF THE PHONE, MR. HOWARD STERN IS ON THE OTHER?

A. I'M CERTAIN THERE IS.

Q. AND IN THAT CONVERSATION DOES MR. SIDNEY ALWAIS THREATEN MR. HOWARD STERN?

A. I CANNOT TELL YOU THE EXACT VERBIAGE, BUT I'M CERTAIN THERE IS CONVERSATION WHERE MR. ALWAIS IS STATING THAT HE WANTS HIS MONEY.

Q. OH, I DIDN'T ASK YOU -- MASTER CARD CALLS PEOPLE EVERY DAY WANTING THEIR MONEY. LOTS OF BANKS CALL PEOPLE EVERY DAY WANTING THEIR MONEY.

MR. GENGE: OBJECTION, YOUR HONOR.

BY MR. RUBINO:

Q. MY QUESTION TO YOU SIMPLY IS, CAN YOU PRODUCE FOR US --

THE COURT: OVERRULED.

BY MR. RUBINO:



Q. -- RIGHT NOW TODAY A TAPE RECORDING WHERE SIDNEY ALWAIS THREATENS THE LIFE OF HOWARD STERN?

A. I'M NOT CERTAIN.

Q. BASICALLY INSTEAD OF HAVING A MINI-TRIAL TRIAL LET ME ASK YOU THIS.

WE ARE HERE FOR A BOND HEARING. DO YOU HAVE ANY EVIDENCE THAT SIDNEY ALWAIS HAS ANY FAMILY MEMBERS, RELATIVES, OR CLOSE ASSOCIATES WHO LIVE IN FOREIGN COUNTRIES?

A. NO.

Q. DO YOU HAVE ANY EVIDENCE THAT SIDNEY ALWAIS HAS ATTEMPTED TO SECURE A PASSPORT UNDER ANY FICTITIOUS NAME TC FLEE THE COUNTRY WITH?

A. NO.

THE COURT: LET ME INTERRUPT FOR ONE SECOND.

IS THE GOVERNMENT PROCEEDING ON RISK OF FLIGHT?

MR. GENGE: AS TO -- NO.

MR. RUBINO: I WILL ELIMINATE THAT ENTIRE LINE EVER QUESTIONING THEN, YOUR HONOR. THANK YOU.

I HAVE NOTHING FURTHER OF THIS WITNESS.

THANK YOU, YOUR HONOR.

THE COURT: MR. GENGE, ANY REDIRECT -- WELL, BEFORE YOU DO THAT LET ME ASK YOU -- MA'AM, DID YOU INTERCEPT OR DID YOU LISTEN TO ANY OF THE CONVERSATIONS TI RELATE TO WHAT IS SET FORTH IN COUNT 20 OF THIS INDICTMEN

DEALING WITH EFFORTS TO, OR PLANS OR DIRECTIONS TO BURN DOWN A BUILDING LOCATED AT 211 SOUTH FEDERAL HIGHWAY IN BOYNTON BEACH?

THE WITNESS: YES, MA'AM.

THE COURT: CAN YOU TELL ME WHAT CONVERSATIONS YOU HEARD AND WHAT THEY SAID IN SUM AND SUBSTANCE.

THE WITNESS: YES, MA'AM.

IT WAS A RECORDED CONVERSATION WHERE -- BETWEEN MR. MAIONE AND MR. SIDNEY ALWAIS, WHERE MR. ALWAIS GOES THROUGH THE HISTORY OF WHAT OCCURRED WHEN HE HIRED -- BASICALLY HIRED MR. ROBERT ENGEL TO GO AND BURN DOWN THE PLACE, WHICH WAS HIS NEPHEW'S PLACE OF BUSINESS. HE WANTED AS RETALIATION AGAINST THE NEPHEW PROVIDING THE TESTIMONY AGAINST HIS SON.

HE --

THE COURT: WAS THIS A TELEPHONE CONVERSATION OR A SITUATION WHERE MR. MAIONE WAS WEARING A BODY WIRE?

THE WITNESS: IT WAS A BODY WIRE, MA'AM.

THE COURT: IS THE TAPE RECORDING AUDIBLE?

THE WITNESS: YES.

THE COURT: ALL RIGHT. GO AHEAD.

THE WITNESS: AND BASICALLY HE'S GOING THROUGH AND SAYING HOW MR. ENGEL MESSED UP. THAT AFTER HE HAD GIVEN HIM $4,000 DOWN PAYMENT TO GO AHEAD AND DO THIS ARSON MR. ENGLE HAD ONLY BEEN SUCCESSFUL IN BURNING DOWN THE METER ROOM OF



THAT STRIP OF -- OF THE STRIP SHOP WHERE THAT SHOP WAS LOCATED.

SO NOW IN THIS RECORDED CONVERSATION THAT WE HAVE, MR. ALWAIS IS HIRING NOW MR. MAIONE TO FINISH THE JOB. HE SAYS, "I WANT YOU TO DO THE JOB BETTER. YOU THINK IT IS POSSIBLE TO DO IT?" AND DURING THAT CONVERSATION MR. MAIONE SAYS, "YES, I VISITED THE PLACE," AND SHOWED MR. ALWAIS A BUSINESS CARD FROM THE ESTABLISHMENT AND DESCRIBED ALL THE INDIVIDUALS THAT WORKED IN THAT PLACE, INDICATING THAT HE HAD GONE IN AND SURVEYED THE PLACE IN ORDER TO COMMIT THE ARSON ON BEHALF OF MR. ALWAIS.

THE COURT: APPROXIMATELY HOW LONG IS THIS RECORDED CONVERSATION?

THE WITNESS: I WOULD SAY PROBABLY AN HOUR TOTAL. THE PERTINENT PORTION MAYBE 15 MINUTES, OR THE PORTION THAT RELATES TO THIS MATTER.

THE COURT: DO YOU WISH TO ASK ANY QUESTIONS BASED ON THAT, MR. RUBINO?

BY MR. RUBINO:

Q. WHEN DID THIS ALLEGE CONVERSATION OCCUR?

A. I DON'T HAVE THE EXACT DATE. THERE IS A TRANSCRIPT THAT I CAN -- USE TO REFRESH MY RECOLLECTION ON THE EXACT DATE.

Q. WOULD IT HAVE BEEN IN OR AROUND APRIL OF THIS YEAR?

A. I BELIEVE SO.



Q. AND IS THIS, IN FACT, THE CONVERSATION WHERE THE TAPE RAN OUT AND THE PERTINENT PARTS ARE NOT ON THE TAPE?

A. THERE ARE PERTINENT PARTS ON THE TAPE, SIR.

Q. IS THIS THE ONE WHERE THE TAPE RAN OUT?

A. I'M NOT CERTAIN.

MR. RUBINO: I HAVE NOTHING FURTHER.

THE COURT: WELL, WHAT YOU HAVE JUST DESCRIBED IS WHAT YOU HEARD, CORRECT?

THE WITNESS: YES, MA'AM.

THE COURT: OKAY. GO AHEAD.

REDIRECT?

MR. GENGE: YES, JUST BRIEFLY.

**REDIRECT EXAMINATION**

BY MR. GENGE:

Q. MISS ROBERT, ON THIS -- THESE CONVERSATIONS -- THIS CONVERSATION OR CONVERSATIONS RELATING TO THE ARSON?

A. YES, SIR.

Q. THE BUSINESS PREMISES.

IF YOU RECALL, WAS -- WAS THERE ANY CONVERSATION THAT WAS OVERHEARD BY FBI AGENTS BUT NOT RECORDED?

MR. SCHWARTZ: OBJECTION. LEADING.

THE WITNESS: I'M NOT --

THE COURT: OVERRULED. I WILL ALLOW THAT.

THE WITNESS: I'M NOT CERTAIN IF THE END OF THAT CONVERSATION. I LISTENED TO THE PERTINENT PARTS OF THAT



CONVERSATION AND THEY WERE RECORDED.

BY MR. GENGE:

Q. OKAY. BUT THE CONVERSATION YOU LISTENED TO, THAT WAS BETWEEN MR. SIDNEY ALWAIS AND THE COOPERATING WITNESS.

A. YES, SIR.

Q. AND DID THAT INVOLVE -- WAS THAT AT OR ABOUT A TIME WHEN THE COOPERATING WITNESS HAD RETURNED FROM THE PREMISE AND HAD -- AND HE AND MR. SIDNEY ALWAIS DISCUSS CERTAIN SECURITY?

A. CORRECT. AND THE CONCERN ABOUT THE MEDICAL CENTER NE DOOR, YES.

Q. AND THAT WAS THIS CONVERSATION YOU WERE REFERRING TO.

A. YES, SIR.

Q. MR. RUBINO JUST ASKED YOU ANY EXAMPLES, SPECIFIC EXAMPLES OF WHERE HIS CLIENT, SIDNEY ALWAIS, AS OPPOSED TC THE SON, MADE OR REFERRED TO SPECIFIC THREATS SO THAT HE I HAVE MADE TO SPECIFIC VICTIMS, IS THAT CORRECT?

A. YES, SIR.

MR. GENGE: IF I MAY APPROACH, YOUR HONOR.

BY MR. GENGE:

Q. NOW, YOU TESTIFIED YOU DIDN'T -- AS YOU SIT THERE NC YOU DIDN'T RECALL ANY SPECIFIC CONVERSATION OR WHAT, IF A SPECIFIC WORDS MR. SIDNEY ALWAIS HAD USED, IS THAT CORREC

A. CORRECT.

Q. IF YOU SAW ANY OF THE TRANSCRIPTS MIGHT THAT REFRESH

YOUR RECOLLECTION?

A. YES, SIR.

MR. GENGE: IF I MAY APPROACH THE WITNESS, YOUR HONOR?

THE COURT: YOU MAY.

MR. GENGE: FOR THE RECORD, YOUR HONOR, I AM HANDING MISS ROBERT A -- A TRANSCRIPT OF A CONVERSATION WHICH TOOK PLACE, THE DATE OF THE TAPE WAS AUGUST 27, 1990 (INAUDIBLE).

MR. SCHWARTZ: YOUR HONOR, I OBJECT.

THIS IS IMPROPER REDIRECT, BECAUSE MR. RUBINO'S QUESTION REFERRED, WAS THERE A CONVERSATION BETWEEN MR. ALWAIS AND A VICTIM. THIS IS A CONVERSATION, I BELIEVE, BETWEEN MR. ALWAIS AND ONE OF THE ALLEGED CO-CONSPIRATORS WHERE THEY ARE PUFFING. IT'S NOT WITH A VICTIM.

MR. GENGE: YOUR HONOR, YES, THIS A CONVERSATION BETWEEN SIDNEY ALWAIS AND ONE OF THE ALLEGED CO-CONSPIRATORS, DAVID ALWAIS, HIS SON, IN WHICH MR. SIDNEY ALWAIS SPECIFICALLY REFERS TO SOME OF THE THINGS THAT HE HAS BEEN TALKING ABOUT HERE. AND I THINK AT LEAST --

THE COURT: HE BEING WHO?

MR. GENGE: -- FOR PURPOSES OF COMPLETENESS --

THE COURT: HE BEING WHO? THEY REFER TO SOME OF THE THINGS THAT HE'S BEEN TALKING ABOUT, YOU JUST SAID. WHO DID YOU MEAN BY HE?



MR. GENGE: SIDNEY ALWAIS HAS BEEN TALKING ABOUT.

THE COURT: I'M LOST AS TO WHAT -- TELL ME AGAIN WHAT THIS TRANSCRIPT IS PURPORTING TO SHOW.

MR. GENGE: THIS IS A CONVERSATION BETWEEN THE TWO ALWAISES, A RECORDED CONVERSATION IN WHICH THERE ARE REFERENCES MADE TO MR. SIDNEY ALWAIS -- IT MIGHT BE EASIEST IF WE JUST READ IT, YOUR HONOR.

MR. RUBINO: I OBJECT TO IT.

THE QUESTION SPECIFICALLY STATED TO THE WITNESS WAS, IT WAS MR. ALWAIS ON ONE LINE OF THE PHONE AND ONE OF THE ALLEGED VICTIMS ON THE OTHER LINE.

THE COURT: WAIT A MINUTE. AT THE MOMENT --

MR. RUBINO: MR. ALWAIS IS TALKING TOGETHER --

THE COURT: WAIT. WAIT. WAIT. STOP EVERYBODY.

AT THIS POINT WHAT HE WANTS TO DO IS SHOW HER A TRANSCRIPT TO REFRESH HER RECOLLECTION. HE CAN DO THAT. IF THE QUESTION HE ASKS IN FOLLOW UP IS NOT PROPER, THEN, FINE.

HERE, SHOW HER THE CONVERSATION, TELL HER WHAT DATE IT IS, AND LET HER LOOK AT IT, AND WE WILL GO FROM THERE.

BY MR. GENGE:

Q. MISS ROBERT, I DIRECT YOUR ATTENTION, THIS IS A CONVERSATION OF AUGUST 27, 1996, IS THAT CORRECT?

A. YES.

Q. IT IS TYPED ON OR ABOUT DECEMBER (INAUDIBLE)



A. 27TH OF 1996.

Q. I DIRECT YOUR ATTENTION TO PAGE 18.

A. YES, SIR.

Q. DO YOU SEE THE INITIALS THERE B.A. AND S.A.?

WOULD YOU JUST READ TO YOURSELF --

MR. SCHWARTZ: YOUR HONOR, I HAVE TO OBJECT SINCE I HAVE NOT BEEN SUPPLIED WITH ANY TRANSCRIPT OF AUGUST 27TH.

MR. GENGE: WELL, YOUR HONOR --

MR. SCHWARTZ: I HAVE ONE FROM JULY 27TH IF THAT'S WHAT HE'S REFERRING TO.

MR. GENGE: YOUR HONOR, WE ARE PROFFERING THIS IN REBUTTAL IS SOME OF THE TESTIMONY ELICITED --

THE COURT: HAVE YOU MOVED --

THE WITNESS: THIS IS IN THE PACKET THAT YOU RECEIVED.

MR. SCHWARTZ: THE JULY 27TH OR AUGUST?

MR. RUBINO: IT CAN'T BE IN REBUTTAL BECAUSE I NEVER ASKED HER ABOUT CONVERSATIONS BETWEEN CODEFENDANTS.

THE WITNESS: AUGUST 27TH.

THE COURT: WELL, I WOULDN'T GO SO FAR AS TO SAY JUST BECAUSE YOU DIDN'T ASK ABOUT CONVERSATIONS BETWEEN CODEFENDANTS IT CAN'T BE PROPER REBUTTAL.

AT THE MOMENT ALL SHE IS DOING IS LOOKING AT IT, AM I CORRECT?

MR. GENGE: YES, YOUR HONOR.



THE COURT: HAVE YOU ASKED ANY QUESTION YET?

MR. GENGE: I ASKED HER TO READ THIS SECTION IN THE TRANSCRIPT.

THE COURT: IS THIS ONE OF THE ONES THAT WAS TURNED OVER TO ME AND TO MR. SCHWARTZ AND TO MR. RUBINO?

THE WITNESS: YES, MA'AM.

THE COURT: ALL RIGHT.

MR. SCHWARTZ: YOUR HONOR, I DON'T HAVE A CONVERSATION FOR AUGUST 27TH. I WILL (INAUDIBLE)

I DON'T KNOW IF YOU DID.

THE COURT: I THOUGHT I DID. WAIT A MINUTE.

THE WITNESS: IT IS TOWARD THE BACK.

THE COURT: ARE YOU READING FROM THIS?

MR. GENGE: IT IS THE SECOND TO THE LAST ONE, YOUR HONOR, IN THE PACKET. THERE IS ONE CALL -- THE FIRST CALL IS RALPH DAVINO AND DAVID ALWAIS THAT IS NOT INCLUDED IN YOUR PACKET. THIS REFERS TO THE SECOND CALL BETWEEN -- BETWEEN DAVID AND SIDNEY ALWAIS.

AND SPECIFICALLY -- I MEAN --

THE COURT: WHAT PAGE, MA'AM?

MR. GENGE: PAGE 18.

THE WITNESS: IT SAYS 18 ON THE BOTTOM.

THE COURT: ALL RIGHT. IT IS IN THIS PACKET, AND I HAVE PAGE 18. GO AHEAD.

MR. GENGE: COULD WE JUST ASK --

BY MR. GENGE:

Q. I WOULD ASK, MISS ROBERT, IF YOU WOULD JUST READ FOR THE RECORD THE COLLOQUY BEGINNING WITH -- WHERE DAVID SAYS -- OR S.A. SAYS, "HE SAYS YOU MEAN HE HASN'T "-- YOU SEE THAT?

MR. SCHWARTZ: IS SHE READING IT TO HERSELF TO REFRESH HER RECOLLECTION?

MR. GENGE: NO, SHE IS READING IT FOR THE RECORD, YOUR HONOR.

WE OFFER THE TAPE HERE. WE WILL OFFER THE TAPE IN EVIDENCE, WE WILL OFFER THE ENTIRE TRANSCRIPT IN EVIDENCE.

THE COURT: I WILL ALLOW HER TO READ IT INTO THE RECORD.

GO AHEAD.

THE WITNESS: YES, MA'AM.

SIDNEY ALWAIS SAYS, "HE SAYS YOU MEAN HE HASN'T CALLED YOU?" HE SAYS, "I SAID, SAL, THIS SHIT IS OVER TALKING TO HIM." HE SAID, "LEAVE IT TO ME, SID, OKAY? I'M GOING TO HANDLE IT MY FUCKING WAY NOW." DAVID SAYS, "THAT'S IT." SIDNEY SAYS, "OKAY. THAT'S IT. ENOUGH WITH THIS FUCKING YELLING AND SCREAMING AND ALL KINDS OF BULLSHIT. SO I SAID THE SAME WITH SHAB AND THE SAME THING WITH CRAIG.

BY MR. GENGE:

Q. IF YOU KNOW, WHO IS THE SHAB -- WOULD THAT BE ONE OF THE VICTIMS?



A. YES, SIR. AND CRAIG BAGIN IS ALSO ONE OF THE VICTIMS WHICH I WAS ASKED ABOUT PREVIOUSLY.

"I SAID CRAIG'S GOT TO GET SLAPPED A LITTLE BIT AROUND, BECAUSE THIS FUCKING GUY MAY BE GOING TO MYLES AND FIGURE -- BECAUSE THEY CUT A DEAL FOR HIM THAT MAYBE HE'S FEEDING THIS TO MYLES." DAVID SAYS, "YEP." SIDNEY SAYS, "SO HE'S GOING TO GRAB HIM AND TELL HIM TO FUCKING MIND HIS OWN FUCKING BUSINESS. OKAY? IN NO UNCERTAIN TERMS AND WHACK HIM A LITTLE. YOU KNOW? YOU KNOW WHAT I MEAN?"

Q. WHAT DO YOU UNDERSTAND OR REFERRING TO SAYING TO WHACK HIM A LITTLE BIT?

MR. RUBINO: OBJECTION, YOUR HONOR, TO THE CHARACTERIZATION OF WHAT SHE THINKS --

MR. GENGE: I WILL WITHDRAW THE QUESTION.

THE COURT: ALL RIGHT.

THE WITNESS: MAY I PROCEED?

THE COURT: DO YOU WANT HER TO READ ANYMORE?

MR. GENGE: I THINK WE HAVE COVERED THIS -- THAT CONVERSATION, YOUR HONOR, BETWEEN THE TWO CO-CONSPIRATORS.

THE WITNESS: YES, SIR.

THE COURT: ANY FURTHER REDIRECT, MR. GENGE?

MR. GENGE: I THINK JUST BRIEFLY, YOUR HONOR.

BY MR. GENGE:

Q. I THINK MR. SCHWARTZ TOUCHED ABOUT UPON THIS AREA OF WITNESSES AND WITNESS INTIMIDATION IN CONNECTION WITH THE



GRAND JURY INVESTIGATION?

A. YES, SIR.

Q. DO YOU RECALL ANY SPECIFIC WITNESS THAT INDICATED TO THE FBI THAT HE OR SHE WAS APPROACHED BY ANY OF THESE TWO DEFENDANTS AND ASKED TO TESTIFY OR -- IN A CERTAIN MANNER?

A. THERE WAS ONE VICTIM THAT I CANNOT RECALL THE NAME AT THIS MOMENT.

Q. WAS THAT LINDA FRASKA?

A. YEP.

(TAPE RAN OUT.)

MR. SCHWARTZ: (INAUDIBLE) AS TO THAT, THE GOVERNMENT MADE A PROFFER WHICH THIS WITNESS ADOPTED UNDER OATH THAT THE REASON THEY WERE LOOKING FOR THIS FELLOW LOUIE MAIONE, OR THE COOPERATING WITNESS, WAS BECAUSE HE HAD TAKEN 10 TO $20,000 OF THEIR LOAN SHARK COLLECTION. THOSE WERE MR. GENGE'S EXACT WORDS, I WROTE THEM DOWN.

WE NOW HAVE FOUND OUT TO SOME EXTENT THROUGH AN EXCELLENT JOB BY MR. RUBINO THAT THERE WAS A SIGNIFICANT AMOUNT OF MONEY TAKEN FROM MR. SIDNEY ALWAIS BY THIS INFORMANT, AND I WILL WANT TO ARGUE IN MY PROFFER, AND IN GOING FORWARD, THAT THE REASON THEY WERE LOOKING FOR THIS MAN WAS NOT TO KILL HIM, ALTHOUGH THEY MADE RASH STATEMENTS SUCH AS, "I WANT TO KILL THIS GUY," OR, "HE'S DEAD," OR SOMETHING LIKE THAT, BUT RATHER THEY WANTED TO TRY TO GET THEIR MONEY BACK.



SIDNEY WAS OWED A LOT OF MONEY BY THIS FELLOW LOUIE.

THE COURT: WHY CAN'T YOU ARGUE THAT WITHOUT CALLING THE CASE AGENT?

MR. SCHWARTZ: I CAN, BUT I ARGUE WITHOUT A SIGNIFICANT FACTUAL BASIS BECAUSE THE WITNESS THEY CHOSE TO PUT ON WASN'T THE CASE AGENT BUT RATHER SOMEBODY --

THE COURT: SO WHAT DO YOU WANT TO -- I MEAN, ACTUALLY YOU PROBABLY HAVE A BETTER FACTUAL BASIS THAN YOU ARE GOING TO HAVE AFTER YOU PUT THE AGENT ON BUT I'M NOT SURE.

MR. SCHWARTZ: WELL, I'M NOT SURE EITHER AND I GUESS I'M WILLING TO GAMBLE.

THE COURT: WELL --

MR. SCHWARTZ: I WANT TO KNOW HOW MUCH MONEY THEY ACTUALLY VOUCHERED EXIST, HOW MUCH MONEY WAS TURNED OVER TO THE FBI, HOW MUCH HE WAS LET KEEP -- LET TO KEEP, AND HOW MUCH THEY KNOW ABOUT HIS FRAUDULENT SCAMS, OR MAYBE THE GOVERNMENT SANCTIONS, QUOTE, "SHAMS," CLOSE QUOTE OF SIDNEY ALWAIS AND HIS SON DAVID THROUGH HIM IN ORDER TO ESTABLISH THE REAL REASON THEY WERE LOOKING FOR HIM.

UNLESS THE GOVERNMENT WANTS TO CONCEDE THAT THE REAL REASON THEY WERE LOOKING FOR HIM WAS THAT HE HAD TAKEN BETWEEN 80 AND $90,000 IN THESE VARIOUS, QUOTE, "INVESTMENT SCHEMES" INCLUDING 16,500 --

THE COURT: WAIT. WHY IS THIS IMPORTANT TO MY DETERMINATION ONE WAY OR THE OTHER?

MR. SCHWARTZ: WELL, MAYBE SOMEBODY RAN OFF WITH 10 OR $20,000 YOU MIGHT LOOK TO KILL HIM, I DOUBT IT. BUT MAYBE. BUT IF YOU WANT -- IF SOMEBODY OWES YOU $80,000 YOU WANT TO COLLECT YOUR MONEY BACK AND THAT'S WHY YOU ARE LOOKING FOR HIM.

IT IS NOT MONEY YOU ARE WRITING OFF AND SAY, "OH, WELL, I'LL SHOT THE GUY AND FORGET ABOUT IT." MAYBE THAT'S STRANGE LOGIC, JUDGE, BUT I SUGGEST TO YOU THAT THIS GENTLEMAN RIPPED THEM OFF.

THE COURT: WELL, I THINK -- I THINK THAT THE STATE OF THE RECORD RIGHT NOW IS THAT IT IS CERTAINLY SUBJECT TO INTERPRETATION WHY IT WAS THEY WANTED TO FIND HIM. AND I DON'T KNOW THAT IT IS GOING TO MAKE ANY DIFFERENCE TO MY RULING WHETHER -- YOU HAVE IN THE RECORD THAT THERE WAS SUBSTANTIAL AMOUNTS OF MONEY ADVANCED FOR, QUOTE, UNQUOTE, "INVESTMENT SCHEMES" THAT APPARENTLY DIDN'T HAPPEN, AND THAT IN ALL LIKELIHOOD SOME OF THAT MONEY WAS RETAINED BY THE INFORMANT. THIS IS NOT SOMETHING I HAVE NEVER HEARD OF HAPPENING EVER, EVER IN A CRIMINAL CASE.

SO OBVIOUSLY THE ALWAISES ARE GOING TO BE UNHAPPY ABOUT THAT. I THINK I CAN MAKE THAT INFERENCE AS WE STAND. I DON'T KNOW WHAT DIFFERENCE IT MAKES -- I MEAN, I THINK WHAT YOU ARE TRYING TO SAY IS THERE IS MORE GOOD TO HIM



ALIVE THAN DEAD UNDER THOSE CIRCUMSTANCES.

MR. SCHWARTZ: THAT'S A GOOD WAY OF SUMMING IT UP, JUDGE.

THE COURT: I DON'T HAVE ENOUGH BEFORE ME RIGHT NOW TO SAY THAT THERE WAS AN ACTUAL MURDER CONSPIRACY, BECAUSE THE TRANSCRIPTS OF THE TAPES THAT WERE PROVIDED TO ME DON'T DEAL WITH THAT.

SO IF THAT'S OF ANY HELP TO YOU THAT'S NOT GOING TO BE HOW THIS ORDER RISES OR FALLS.

MR. SCHWARTZ: WELL, THAT IS A LOT OF HELP TO ME AND I THANK YOU AND I THEN WITHDRAW MY REQUEST.

THE COURT: OKAY.

MR. SCHWARTZ: AND I (INAUDIBLE)

THE COURT: IT IS JUST TOO TANGENTIAL AT THIS POINT. I THINK BOTH INFERENCES ARE A POSSIBILITY FROM THE RECORD. CLEARLY THEY WERE LOOKING FOR HIM AND CLEARLY THEY WERE NOT HAPPY WITH HIM.

MR. SCHWARTZ: THEN I WILL PROCEED BY PROFFER, YOUR HONOR.

THE COURT: ALL RIGHT.

MR. SCHWARTZ: ASSUMING ARGUENDO FOR THE PURPOSE OF THIS HEARING THAT SIDNEY ALWAIS WAS INVOLVED IN AN EXTORTIONATE CREDIT TRANSACTION SCHEME, AND THAT DAVID ALWAIS WHO WORKED IN THE SHOP -- I'M PROFFERING THAT DAVID ALWAIS WHEN HE WAS RELEASED FROM JAIL IN 1994 WENT TO WORK



BASICALLY AS A CLERK AT HIS FATHER'S STORE.

AND MAYBE PEOPLE MIGHT HAVE MADE PAYMENTS, AGAIN ARGUENDO FOR THE PURPOSES OF THIS HEARING, TO DAVID AT THE SHOP, DROPPED OFF CASH FOR HIS FATHER SIDNEY.

ASSUMING THAT THESE GENTLEMEN MAY BE GUILTY, AT LEAST SIDNEY OF EXTORTION AND CREDIT TRANSACTIONS, I SUGGEST TO YOU THAT THE STATE OF THE RECORD IS THAT THERE IS NO EVIDENCE, OR NOT SUFFICIENT EVIDENCE TO KEEP ANYBODY IN JAIL FOR THE PRETRIAL DETENTION THAT THERE WAS A MURDER CONSPIRACY.

I PROFFER TO THE COURT THAT THIS GENTLEMAN, LOUIE MAIONE, I THINK IS THE RIGHT WAY TO PRONOUNCE IT, CONNED SIDNEY ALWAIS OUT OF APPROXIMATELY $80,000 IN VARIOUS INVESTMENT SCHEMES, SOME OF WHICH ALREADY MENTIONED BY MR. RUBINO, ANOTHER $3,500 TO OPEN A GAME ROOM WITH MR. ALWAIS THAT HE NEVER OPENED, THAT MAIONE NEVER OPENED, ANOTHER $16,500 TO INVEST IN SELLING GOODS IN ATLANTA AT THE OLYMPICS, WHICH HE NEVER DID, AND THAT MR. SIDNEY ALWAIS HAD BEEN INTRODUCED TO MR. MAIONE BY SOME FRIENDS OF HIS FROM NEW YORK, AND THAT HE ENLISTED THE AID OF THOSE FRIENDS TO TRY TO FIND MR. MAIONE IN ORDER TO COLLECT THE MONEY BACK FROM MR. MAIONE THAT WAS OWED TO HIM.

NO ONE KILLED ANYBODY. NO ONE INJURED ANYBODY. OTHER THAN WHAT I READ ON THE TAPES THAT WERE GIVEN TO ME, WHICH IS THE SAME PACKAGE THAT YOU GOT I GUESS BECAUSE I

DIDN'T FIND THAT TAPE FOR AUGUST 27TH, THERE WERE -- OTHE[R] THAN THE BOASTING THAT GOES ON WHEN GUYS ARE TRIAL TO SHO[W] EACH OTHER HOW MACHO THEY ARE, "I'M GOING TO KILL HIM. I[']M GOING TO DO THIS, I'M GOING TO DO THAT." NO ONE WENT OUT AND SAID, AS I HAVE SEEN ON TAPES, "GO BUY A .22 CALENDAR PER, GET A SILENCER, WE WILL PICK THEM UP AT SUCH-AND-SU[CH] PLACE. WE'LL SHOOT HIM, WE'LL DUMP HIS BODY SOMEWHERE."

THAT'S A MURDER CONSPIRACY. BUT THE INDICTMEN[T] CHARGES THIS AS A KIDNAP CONSPIRACY AND A MURDER CONSPIR[ACY] IN PREDICATE ACTS. THERE ARE PREDICATE ACTS IN THE RICO COUNT THAT TALK ABOUT A KIDNAP CONSPIRACY. THEY ARE LOO[KING] TO KIDNAP THE GUY, LOUIE MAIONE.

THERE ARE SECTIONS IN THERE THAT TALK ABOUT A MURDER CONSPIRACY, BOTH IN A SEPARATE -- IN PREDICATE AC[TS] IN THE INDICTMENT. I THINK PAGE 17 OF THE INDICTMENT TA[LKS] ABOUT THAT.

THESE ARE ACTS THAT I SUGGEST ARE NOT ESTABLI[SHED] BY THE TAPES THE GOVERNMENT GIVES US. AND I PROFFER TO [YOUR] HONOR THAT THE GOVERNMENT IS MISINTERPRETING THESE CONVERSATIONS FOR THEIR OWN PURPOSES. THEIR OWN PURPOS[E] BEING TO TRY TO KEEP THESE GENTLEMEN FROM GETTING BOND MAYBE TWO YEARS. IT DEPENDS ON WHAT JUDGE THE CASES AR[E] ASSIGNED TO, BUT I DON'T THINK IT IS UNREALISTIC TO SAY THIS CASE MIGHT GO TWO YEARS BEFORE IT GOES TO TRIAL WI[TH] NINE LAWYERS, MANY OF THEM FROM OUT OF TOWN, AND JUDGE

ROETTIGER HAVING A BUSY SCHEDULE, LIKE JUDGE ROETTIGER HAS, AND THESE TWO GENTLEMEN WILL SIT IN THE CUSTODY OF THE GOVERNMENT FOR TWO YEARS PERHAPS BEFORE THEY ACTUALLY GET TO TRIAL.

THE OTHER EVIDENCE THAT I WANTED TO PROFFER TO THE GOVERNMENT WAS EVIDENCE CONTAINED (INAUDIBLE) HERE TO DAVID ALWAIS, EVIDENCE CONTAINED IN THE PRESENTENCE REPORT. DAVID ALWAIS HAS LIVED IN FLORIDA ALL OF HIS 24 YEARS EXCEPT FOR THE TWO OCCASIONS WHERE UNFORTUNATELY HE HAS BEEN A GUEST OF THE FEDERAL GOVERNMENT.

DAVID ALWAIS HAS, SINCE HE WAS OUT OF JAIL, WORKED AT EASY CHECK CASHING. BEFORE HE WENT TO JAIL HE ALSO WORKED THERE -- BEFORE HE WENT TO JAIL THE SECOND TIME HE ALSO WORKED THERE. HE IS MARRIED. HE HAS -- HIS WIFE WHO IS PRESENT WITH HIM IN THE COURTROOM.

I WOULD ASK THE WIFE TAMMY TO STAND UP FOR A MOMENT ONLY TO ILLUSTRATE TO THE COURT THAT TAMMY IS IN HER EIGHTH MONTH OF A TYPICAL PREGNANCY.

I HAND UP TO THE COURT A COPY OF A LETTER FROM THE WOMAN'S HEALTH CARE ASSOCIATES, P.A., DR. SUSAN FEIL, F-E-I-L, AND (INAUDIBLE) THAT, "TAMMY IS A PATIENT UNDER MY CARE FOR PATERNITY TREATMENT. THE PATIENT IS A HIGH RISK PREGNANCY WITH TWINS AND (INAUDIBLE) SHE WAS SENT TO BED REST SINCE DECEMBER 4TH, 1996, HAS BEEN GETTING ASSISTANCE FROM HER HUSBAND."



I WOULD SUGGEST TO THE -- I WOULD ALSO PROFFER TO THE COURT THAT TAMMY AND DAVID WENT THROUGH IN VITRO FERTILIZATION IN ORDER TO BE BEGET THESE CHILDREN, AND SHE NEEDS HER HUSBAND AT HOME TO HELP HEREWITH THE PREGNANCY.

I CALL ON SOME PERSONAL EXPERIENCE TO SUGGEST THAT A HUSBAND CAN BE VERY SUPPORTIVE TO A WIFE WITH ONE CHILD, AND WITH TWO CHILDREN EXPECTED MUCH MORE SUPPORTIVE.

I ALSO SUGGEST TO THE COURT THAT PERHAPS IF YOUR HONOR WERE TO REQUIRE AS A CONDITION OF BOND HOUSE ARREST THAT YOU MIGHT BE PUNISHING DAVID MORE THAN IF YOU PUT HIM IN JAIL. BUT I WOULD ALSO PROFFER TO THE COURT THAT DAVID HAS ALWAYS WORKED. HE IS NOW WORKING IN THE COMPANY OF -- RUN BY HIS SISTER, WHICH HIS SISTER HAS RECENTLY STARTED. PRIOR TO THAT HE WORKED FOR HIS FATHER. FOR AN INTERIM BEFORE HIS SISTER STARTED THE BUSINESS AFTER HIS FATHER CLOSED DOWN AND SOLD EASY CHECK CASHING HE WORKED FOR A CAR DEALERSHIP.

I WOULD PROFFER TO THE COURT ALSO THAT PRESENT IN THE COURTROOM ARE HIS MOTHER, JOAN ALWAIS; HIS WIFE, TAMMY ALWAIS; HIS GRANDMOTHER, MARY ALWAIS WHO IS 88 AND WHO IS PRESENT HERE; HIS SISTER, LINDA ALWAIS; HIS OTHER SISTER, BARBARA BENEDICT; HIS COUSIN, ROBERT MONICO; HIS FRIEND, DOMINIC LAPOR; ANOTHER FRIEND, ELLEN -- ERIC GLENNA, ALL OF WHOM COME HERE TO TELL THE COURT THAT THEY DON'T FEEL HE IS A RISK OF FLIGHT, AND I GUESS THE GOVERNMENT IS NOT



PROCEEDING ON THAT, BUT ALSO THAT HE IS NOT A DANGER TO THE COMMUNITY.

I SUGGEST TO THE COURT THAT THE GOVERNMENT REALLY DOESN'T BELIEVE THAT DAVID ALWAIS IS A DANGER TO THE COMMUNITY. IF THEY HAD THESE WIRETAPS BACK IN JULY AND AUGUST, THEY HAD THE TESTIMONY OF LOUIE MAIONE ABOUT THE RELATIONSHIP AND WHAT WAS GOING ON SINCE, I GUESS, JANUARY OR FEBRUARY OF 1996, AT LEAST FROM THE AGENT'S TESTIMONY. THEY KNEW THAT DAVID WAS AWARE OF THE INVESTIGATION AT LEAST SINCE THE END OF AUGUST OF 1996, AND THEY LEFT HIM OUT IN THE COMMUNITY. NO ONE HAS BEEN INJURED, NO ONE HAS BEEN KILLED, THEY HAVE NO TESTIMONY HERE ABOUT DAVID THREATENING ANYBODY OR EVEN VISITING ANYBODY AND TELLING THEM TO CHANGE THEIR TESTIMONY.

ALL THEY HAVE, OTHER THAN A COUPLE OF REFERENCES TO SLAPS, SLAPPING SOMEBODY, THERE IS NO EVIDENCE THAT ANY, QUOTE, "LOAN SHARK VICTIM," WAS HURT. NO LEGS WERE BROKEN --

THE COURT: THE AGENT TESTIFIED THEY PAID.

MR. SCHWARTZ: I'M SORRY.

THE COURT: ACCORDING TO THE AGENT --

MR. SCHWARTZ: I'M SURE THERE HAVE BEEN TIMES WHEN PEOPLE HAVEN'T PAID, AND YET NO ONE WAS HURT, OR PEOPLE WERE LATE --

THE COURT: I DON'T KNOW THAT.



MR. SCHWARTZ: I PROFFER TO THE COURT THAT THE AGENT (INAUDIBLE) TESTIMONY, FOR INSTANCE, FAXES FROM SCOTT HICKIN, THE LAWYER, APOLOGIZING FOR BEING LATE AND THANKING -- LATE IN MONEY THAT HE OWED, AND I SUGGEST LEGITIMATELY OWED TO THE FATHER, AND THANKING HIM FOR WAITING FOR THE PAYMENT.

MR. GENGE, I SUGGEST MIGHT BE WRONG ON HIS FACTS IN HIS PROFFER, AND I WOULD PROFFER TO THE COURT THAT IN FACT MR. HICKIN BORROWED THE MONEY FROM SID ALWAIS TO REPA MONEY HE TOOK FROM CLIENTS' FUNDS. NOT THAT HE WAS SO AFRAID OF SID ALWAIS, THAT HE TOOK MONEY FROM CLIENTS' FUNDS. BUT I DON'T KNOW IF THAT'S SOMETHING THAT YOUR HO IS GOING TO CONSIDER --

THE COURT: NO.

MR. SCHWARTZ: -- IN THE QUESTION OF --

THE COURT: NO, BECAUSE I DON'T KNOW ENOUGH ABO THE DATES AND THE TIMES.

MR. SCHWARTZ: WELL, THAT'S A MATTER THAT WILL COME OUT PERHAPS AT TRIAL IF MR. GENGE CONTINUES ON THAT SUGGESTION.

I WOULD ALSO SUGGEST AND, YOU KNOW, ONE OF THE THINGS MR. GENGE SAID YOU HAVE TO CONSIDER IS THE STRENGT OF THE GOVERNMENT'S CASE. IN LOOKING AT THE INDICTMENT MORNING -- AND MAYBE THE LAW HAS CHANGED SINCE I HAVE LA LOOKED AT IT, BUT IT HAS ALWAIS BEEN MY KNOWLEDGE THAT T

TITLE 18 CRIME, AS OPPOSED TO TITLE 21 CRIME, IF YOU WERE CHARGING CONSPIRACY YOU HAVE TO ALLEGE OVERT ACTS. AND I THINK THE INDICTMENT IS DEFECTIVE ON ITS FACE IF YOU DON'T ALLEGE OVERT ACTS. YOU DON'T NECESSARILY HAVE TO PROVE ALL THE OVERT ACTS --

THE COURT: I DON'T THINK SECTION 371 WAS MENTIONED ON A COUPLE OF COUNTS, AND I GUESS I ASSUMED THAT THERE MIGHT HAVE BEEN A CONSPIRACY PROVISION IN THE STATUTE ITSELF.

MR. SCHWARTZ: WELL, THERE ISN'T A CONSPIRACY PROVISION, FOR INSTANCE, IN TITLE -- IN 1962(D), BUT I DON'T KNOW OF ANY SECTION -- AND, AGAIN, I CAN BE WRONG ON THE LAW. IF I'M MISSTATING IT -- I HAVEN'T RESEARCHED IT BECAUSE I JUST LOOKED AT IT THIS MORNING --

THE COURT: WELL, WHY DON'T WE JUST STOP THAT ARGUMENT BECAUSE WHETHER I DETAIN THEM OR NOT IS NOT GOING TO RISE OR FALL ON WHETHER HE NEEDED TO ALLEGE OVERT ACTS IN THE INDICTMENT ON A COUPLE OF COUNTS.

MR. SCHWARTZ: OKAY. BUT I WOULD JUST NOTE TO THE COURT THAT ONE, TWO, AND THREE COUNTS PLEAD NO OVERT ACTS.

FINALLY, JUDGE, I WOULD JUST ASK YOUR HONOR TO CONSIDER THIS. YES, DAVID ALWAIS IS CHARGED WITH A SERIOUS CRIME. YES, DAVID ALWAIS IS CHARGED REALLY, AND I SUGGEST THE EVIDENCE BEFORE YOUR HONOR IS THAT HE MAY HAVE BEEN INVOLVED IN EXTORTIONATE CREDIT TRANSACTION, BUT THAT

DOESN'T MEAN HE SHOULDN'T HAVE BOND.

HE DOES HAVE TWO PRIOR CRIMINAL ACTIVITIES --

THE COURT: HE WAS ON SUPERVISED RELEASE --

MR. SCHWARTZ: HE WAS ON SUPERVISED RELEASE.

THE COURT: -- WHEN ALL OF THIS HAPPENED.

MR. SCHWARTZ: AND I ACKNOWLEDGE ALL OF THAT. I ACKNOWLEDGE THAT THAT MAKES IT MORE DIFFICULT TO GET BOND. BUT I SUGGEST TO THE COURT THAT HE WAS ON SUPERVISED RELEA FROM JUDGE ZLOCH. JUDGE ZLOCH IS A VERY SERIOUS JUDGE AND TAKES SUPERVISED RELEASE SERIOUSLY. I WOULD ASK YOUR HONO TO GRANT HIM BOND ON THIS CASE. IF HIS PROBATION OFFICER SINCE HE WAS WITHIN 20 DAYS OF HAVING HIS SUPERVISED RELEA EXPIRE, IF HIS PROBATION OFFICER DECIDES TO FILE A DETAINE ON HIM --

THE COURT: WELL, EXCEPT THAT DOESN'T DEAL WITH 18, USC, 3141, WHICH SAYS I -- THAT'S A FACTOR THAT SHOULD WEIGH HEAVILY IN MY DECISION ON THIS ISSUE RIGHT HERE.

MR. SCHWARTZ: IT IS SOMETHING YOUR HONOR CERTAINLY SHOULD CONSIDER, AND THAT'S WHY I BRING IT UP. BUT IF HE -- IF HIS PROBATION OFFICER CHOOSES TO FILE A DETAINER, AND IF JUDGE ZLOCH CHOOSES NOT TO LET HIM OUT ON THAT BOND DETAINER, OR YOUR HONOR DOES AT THAT POINT THAT ANOTHER QUESTION.

BUT AS TO THIS CASE, I WOULD ASK YOUR HONOR IN LIGHT OF HIS -- IN LIGHT OF THE EVIDENCE BEFORE YOU THAT



EVEN THOUGH PERHAPS PEOPLE WERE GETTING LOANS AND PERHAPS THEY WERE BEING CHARGED EXTORTIONATE RATES, NO ONE WAS HURT. DAVID HURT NO ONE. MAYBE HE HAD A BIG MOUTH ON THE PHONE IN TALKING TO HIS FRIENDS, BUT I WOULD ASK YOUR HONOR TO CONSIDER GRANTING HIM A BOND.

NOW, THE QUESTION, AS I UNDERSTAND THE BOND REFORM ACT -- AND, BY THE WAY, I DO REMEMBER MR. KELLNER WHEN HE WAS A U. S. ATTORNEY WHEN THE BOND REFORM ACT BEING PASSED SAYING THAT PRETRIAL DETENTION WOULD ONLY BE USED WITH KINGPINS, AND I SUGGEST THAT MR. DAVID ALWAIS IS ANYTHING BUT A KINGPIN, BUT GIVEN THE EVOLUTION OF PRETRIAL DETENTION.

THE OTHER QUESTION THAT YOUR HONOR HAS TO CONSIDER IS WHETHER YOU CAN FASHION A BOND THAT WOULD DO TWO THINGS; ONE PROTECT THE COMMUNITY; AND, TWO, MAKE SURE HE APPEARS.

SINCE THE GOVERNMENT ISN'T PROCEEDING ON RISK OF FLIGHT CAN YOU FASHION A BOND THAT WILL PROTECT THE COMMUNITY AND WILL ALSO PUT HIM IN THE SITUATION WHERE HE CAN HELP CARE FOR HIS WIFE AND CHILD. AND WHILE I WAS A LITTLE FACETIOUS TALKING ABOUT THE EFFECT ON HIM ON HOUSE ARREST, I WOULD ASK YOUR HONOR TO CONSIDER A BOND WITH, FIRST OF ALL A HIGH, CORPORATE -- OR A CORPORATE SURETY SO THAT HIS HOME IS PLEDGED AS COLLATERAL FOR THAT BOND AND HE KNOWS THAT HIS WIFE AND FUTURE CHILDREN WILL LOSE HIS HOUSE IF HE VIOLATES THE BOND, AND SET IN TERMS OF THE BOND THAT

HE HAS NO CONTACT WITH ANY WITNESSES, OR POTENTIAL WITNE IN THE CASE, AND ALSO MAKING A HOUSE ARREST REQUIREMENT OTHER THAN FOR EMPLOYMENT OR TO MEET WITH HIS LAWYER HE LEAVE HIS HOUSE. HE WEAR AN ANKLE BRACELET OR (INAUDIB TO HIS WIFE'S DOCTOR WITH HER. THAT HE NOT LEAVE THE H FOR ANY PURPOSE OTHER THAN THOSE PURPOSES SPECIFIED, OR THOSE AGREED TO WITH HIS PRETRIAL RELEASE SUPERVISOR UN HOUSE ARREST PROGRAM.

I THINK IN THAT SITUATION, JUDGE, WE MAKE SU ONE, THAT HE DOESN'T COMMIT ANY OTHER CRIME, BECAUSE OBVIOUSLY A CONDITION OF BOND WILL BE THAT HE NOT COMM OTHER CRIMES; TWO --

THE COURT: IT PROBABLY WAS A CONDITION OF SUPERVISED RELEASE.

MR. SCHWARTZ: IT WAS. BUT HIS HOUSE AND H FAMILY -- YOU KNOW, THE HOUSE THAT HIS WIFE AND HIS ( LIVE IN WASN'T AT STAKE AT THAT POINT AND HE WASN'T MONITORED ON A DAILY BASIS. HE WAS FILING IN A MONT REPORT WITH HIS PROBATION OFFICER AFTER THE NUMBER C HE HAD BEEN ON RELEASE.

HE WOULD BE UNDER CLOSE SUPERVISION OF TH HE WOULD BE ABLE TO HAVE -- TO PARTICIPATE WITH HIS ASSIST HER WITH THE DIFFICULT PREGNANCY AND THE CHI AFTER THEY ARE BORN, THE TWINS. HE WILL BE ABLE TC SUPPORT HER, AND HE WON'T BE IN JAIL FOR APPROXIMAT

TWO YEARS BEFORE THIS CASE GOES TO TRIAL WHERE HE MAY, HE MAY BE FOUND INNOCENT.

SO FOR ALL OF THOSE REASONS, JUDGE, I WOULD ASK YOU TO FASHION A VERY STRICT BOND WITH HOUSE ARREST CONDITIONS, AND I THINK THAT THAT WOULD MEET THE PROVISIONS OF THE BAIL REFORM ACT WHICH ALLOW YOU, IF YOU CAN, TO LET A PERSON IN HIS SITUATION OUT IF YOU CAN FASHION SUCH A BOND.

THANK YOU, YOUR HONOR.

THE COURT: MR. RUBINO, BEFORE YOU GET STARTED I'M JUST GOING TO TAKE A COUPLE OF MINUTES. I HAVE SOMETHING I NEED TO GIVE TO MY SECRETARY.

I SEE YOU GOING THROUGH YOUR BOOK. KEEP IN MIND THAT I PRETTY WELL HAVE THE DETENTION STATUTE AND THE CASES UNDER IT COMMITTED TO MEMORY SO I DON'T NEED A LOT OF LEGAL ARGUMENT.

I WILL TAKE ABOUT FIVE MINUTES.

[WHEREUPON, THERE WAS A BRIEF RECESS]

THE COURT: ALL RIGHT, MR. RUBINO, YOU MAY PROCEED.

MR. RUBINO: YOUR HONOR, SIDNEY ALWAIS IS A 60 YEAR OLD MAN WHO HAS BEEN MARRIED TO THE SAME WOMAN NO LESS FOR 38 YEARS. HE HAS FIVE CHILDREN, HE IS A UNITED STATES CITIZEN, HE HAS RESIDED IN THIS COMMUNITY IN THE SAME HOME FOR 24 YEARS.

I THINK THERE IS OBVIOUSLY NO QUESTION THAT THIS



MAN IS NOT A RISK OF FLIGHT. I MUST TELL YOU HE PROBABLY ONE OF THE MOST STABLE, AS FAR AS TIES TO THE COMMUNITY PEOPLE I HAVE REPRESENTED IN OVER 24 YEARS IN PRACTICING LAW.

THE REAL ISSUE IS -- IS SIDNEY ALWAIS A DANGER TO THE COMMUNITY. I THINK THERE IS TWO AREAS THAT WE HAVE TO TAKE A LOOK AT. ONE, THE CHARGE ITSELF. THE CHARGE ITSELF NATURALLY IS LOAN SHARKING AND CLAIMS THAT THREATS OF VIOLENCE OR BODILY INJURED WERE USED TO ACHIEVE THAT LOAN SHARKING.

IF WE TAKE A LOOK AT THE GUIDELINES, AND THAT WAS THE BOOK I HAD OUT, BECAUSE THE GUIDELINES FOR THIS OFFENSE FOR A BASE OFFENSE LEVEL 18, A TWO POINT UPWARD ADJUSTMENT IF THE OFFENSE INVOLVED AN EXPRESSED OR IMPLIED THREAT OF BODILY INJURY, THEFT, KIDNAPPING INCREASE BY TWO LEVELS. IT IS A LEVEL 20.

NOT MINIMIZING IT, BUT A LEVEL 20, YOUR HONOR, IS 33 MONTHS IN JAIL. IF MR. ALWAIS PLED GUILTY IT WOULD BE 27 MONTHS WITH THE THREE POINTS FOR ACCEPTANCE, WHICH MEANS HE WOULD SERVE ABOUT 22. IF HE DOESN'T GET BOND IT IS THEORETICALLY POSSIBLE THAT HE WOULD SERVE HIS ENTIRE SENTENCE BEFORE HE WENT TO TRIAL. THAT JUST WOULDN'T BE FAIR.

NOW, WE GO TO TAKE A LOOK AT ANOTHER THING THAT SEEMS TO BE TROUBLING THE COURT MOST OF ALL, WHICH IS THE



ARSON, COUNT 20.

COUNT 20 IS FOUND UNDER GUIDELINE 2KL.4. THAT CARRIES A BASE OFFENSE LEVEL, YOUR HONOR, OF 20. IF THE OFFENSE CREATED A SUBSTANTIAL RISK OF DEATH OR SERIOUS BODILY INJURY IN ANY PERSON OTHER THAN A PARTICIPANT IN ANY OFFENSE, COMMA, WHICH I DON'T THINK IT DID, INVOLVED THE DESTRUCTION OR ATTEMPT OF DESTRUCTION OF A STRUCTURE OTHER THAN A DWELLING, WHICH IT CLEARLY DID, IS A LEVEL 20. AGAIN, A LEVEL 20 IS 33 MONTHS IN JAIL. I AM NOT MINIMIZING IT, BUT THIS IS NOT ONE OF THOSE -- THESE ARE NOT ONE OF THOSE ENUMERATED CRIMES WHERE THE PRESUMPTION IS NO BOND.

THIS DEFENDANT ON BOTH COUNTS OR BOTH CHARGES, IF YOU WILL, IS PRESUMED BONDABLE. ARSON IS PRESUMED A BONDABLE OFFENSES. SO WE HAVE TO TAKE A LOOK AND SEE UNDER RISK OR DANGER TO THE COMMUNITY --

THE COURT: I AM NOT SO SURE ABOUT THAT. THE STATUTE REFERS TO CRIMES OF VIOLENCE AND DRUG CRIMES, AND OVER THE YEARS THERE HAVE BEEN DIFFERING INTERPRETATIONS AS TO WHAT CONSTITUTES A CRIME OF VIOLENCE.

I WILL TELL YOU THAT OVER THE YEARS I HAVE PERSONALLY CONSTRUED A THREAT OF VIOLENCE TO CONSTITUTE A CRIME OF VIOLENCE. SO FAR I DON'T KNOW OF ANY CASE THAT TELLS ME I SHOULDN'T DO THAT, AND THAT'S WHAT I DO. SO AS FAR AS I'M CONCERNED THE PRESUMPTION APPLIES.

MR. RUBINO: GOING FROM THERE. THE REAL QUESTION



TO BE DECIDED IS, IF MR. ALWAIS IS RELEASED FROM JAIL WILL HE, NUMBER ONE, THE LAW SAYS, REENGAGE HIMSELF IN CRIMINAL ACTIVITY.

I DON'T THINK THE COURT HAS A CONCERN IF HE IS GOING TO GO -- GO INTO A LOAN SHARKING BUSINESS LOANING MONEY AND STRONG-ARMING PEOPLE TO COLLECT. I THINK WHAT T COURT MAY BE CONCERNED ABOUT IS WOULD THERE BE WITNESS INTIMIDATION.

I THINK THAT WE CAN CLEARLY -- WE KNOW WHO THE ALLEGED VICTIMS ARE. IT IS NO SECRET, THEY ARE NAMED IN T INDICTMENT.

THE COURT: SIX OF THEM ARE.

MR. RUBINO: AND THERE ARE 30-SOME MORE -- OR 3C TOTAL PEOPLE THAT HIS COMPANY HAS MADE LOANS TO.

I DON'T SEE WHY WE CAN HAVE -- WHY WE WILL HAVE PROBLEM FASHIONING A CONDITION, OR CONDITIONS WHERE HE IS GOING TO RUN AWAY. WE NEED TO FASHION CONDITIONS TO MAKE SURE THAT HE, NUMBER ONE, DOESN'T PICK UP THE PHONE AND C SOMEONE; HE, NUMBER TWO, DOESN'T ASK OR INDUCE A THIRD PA TO EITHER PICK UP THE PHONE AND CALL SOMEONE OR KNOCK ON SOMEONE'S DOOR. AND IF THAT'S THE HONEST -- OR SHOULD BE THE HONEST CONCERN THAT WE FACE WITH THIS CASE WITH THESE PROBLEMS.

WE ARE NOT WORRIED THAT HE IS GOING TO GET ON A PLANE AND HE IS GOING TO RUN SOME STRANGE FOREIGN COUNTRY

BE IT CENTRAL, SOUTH AMERICA, OR ANYWHERE ELSE HIDE THERE. THAT'S NOT GOING TO HAPPEN. I DON'T THINK THAT SEEMS TO BE THE ISSUE.

ALL WE'VE GOT HERE IF YOU TAKE A LOOK AT THE CASE, WE'VE GOT TO TAKE A LOOK AT SOME FACTS, TOO. WHAT HAPPENED. A SEARCH WARRANT WAS ISSUED AT MR. ALWAIS' PLACE OF BUSINESS IN AUGUST. AT THAT TIME HE KNEW SPECIFICALLY THAT HE WAS A SUBJECT OF A CRIMINAL INVESTIGATION.

IN FACT, MR. ALWAIS HIRED MR. SABROOK, MR. ALWAIS AND HIS SON HIRED FRED SCHWARTZ WHO MET WITH THE U. S. ATTORNEY'S OFFICE TO DISCUSS THE CASE, WHO MET WITH THE FBI AGENT TO DISCUSS THE SECURE OF DOCUMENTS AND GETTING BACK DOCUMENTS.

A RULE 41(E) WAS FILED BY MR. SCHWARTZ WITH RESPECT TO CERTAIN MONIES SEIZED FROM THE PLACE OF BUSINESS, OR PROPERTIES SEIZED FROM THE PLACE OF BUSINESS. SO IT IS NOT A MATTER OF, DID MR. ALWAIS NOT KNOW THAT HE WAS THE SUBJECT OF A CRIMINAL INVESTIGATION. FOR A MINIMUM THE LAST FOUR MONTHS HE HAS CLEARLY KNOWN AND DEALT WITH IT THROUGH AN ATTORNEY, MR. SCHWARTZ.

HE EVEN ATTEMPTED TO MAKE AN AGREEMENT WITH THE UNITED STATES ATTORNEY'S OFFICE THAT WHEN THE INDICTMENT -- WHEN THE INDICTMENT CAME DOWN THAT HE WOULD VOLUNTARILY SURRENDER. THERE WAS NO SUCH AGREEMENT MADE BECAUSE THE UNITED STATES ATTORNEY'S OFFICE WOULD NOT AGREE TO THAT.



THEY WANTED TO ARREST HIM.

THEY WENT OUT ATTEMPTED TO ARREST HIM, FORTUNATELY, UNFORTUNATELY HE WAS NOT AT HOME AT THE TIME. HE THEN CONTACTED MR. SCHWARTZ AND WENT TO THE UNITED STATES ATTORNEY'S OFFICE AND PERSONALLY SURRENDERED HIMSELF TO THE PROSECUTOR, MR. GENGE, IN THIS CASE. THIS IS CLEARLY A GOOD FAITH EFFORT ON THIS MAN'S PART TO DO THE RIGHT THING.

BACK TO CONDITIONS. WHY CAN'T WE PUT THE FEAR OF GOD INTO THIS MAN AND ADVISE HIM CLEARLY, INSTRUCT HIM AND ORDER HIM THAT HE IS TO HAVE CONTACT WITH ABSOLUTELY NO ONE OUTSIDE OF HIS NORMAL CIRCLE OF FRIENDS, HIS FAMILY, AND HI[S] ATTORNEYS.

OBVIOUSLY AS AN OFFICER OF THE COURT I INTEND TO INSTRUCT HIM HE IS NOT TO CONTACT ANY ALLEGED WITNESSES, AN[D] ALLEGED VICTIMS, ANY PEOPLE HAVING ANYTHING TO DO WITH THE CASE, THAT MIGHT EVEN TANGENTIALLY OR WILDLY THOUGHT TO BE [A] WITNESS. BUT THIS COURT COULD ORDER THAT. THIS COURT CAN MAKE -- THIS COURT CAN TELL THE FBI, INSTRUCT EACH ONE OF THESE ALLEGED VICTIMS THAT, "IF YOU AS MUCH AS HEAR THIRD PARTY, FOURTH PARTY, SOME REMARK THAT CAME FROM HIM "-- I'[M] NOT TALKING ABOUT IF HE KNOCKS ON YOUR DOOR. OF COURSE, THAT'S NOT GOING TO HAPPEN. IF HE PICKS UP THE PHONE, THAT'S NOT GOING TO HAPPEN. BUT ANY WAY, SHAPE OR FORM YO[U] IMMEDIATELY CALL THE FBI. YOU WILL IMMEDIATELY REPORT THI[S]

WE CAN -- YOU KNOW, IT IS NOT LIKE HE IS GOING T[O]



GO ANYWHERE. IT'S A MATTER OF, IF WE SEND HIM HOME TO GO TO WORK EACH DAY, HE IS NOW WORKING WITH HIS DAUGHTER (INAUDIBLE) BUSINESS AND HE GOES AND LEAVES THE HOUSE AND GOES TO WORK EVERY DAY. (INAUDIBLE) THAT HE MAY SOME WAY TRY TO CONTACT A WITNESS. OBVIOUSLY I THINK WE CLEARLY APPRECIATE IF YOU LET HIM OUT ON BOND HE IS NOT GOING TO GO AND ATTEMPT TO BURN DOWN THE (INAUDIBLE). I MEAN, THAT IS JUST NOT GOING TO HAPPEN.

HE IS CHARGED WITH THAT, AND THAT IS A MATTER TO BE DEALT WITH BY THE TRIAL COURT AT THE TIME. BUT IN DANGER TO THE COMMUNITY IT IS A FUTURE LOOK. WHAT WE ARE TRYING TO DO IS TAKE OUT OUR CRYSTAL BALL AND LOOK AT IT AND SAY, "CAN WE FASHION CONDITIONS, OR COMBINATIONS OF CONDITION TO NOT ABSOLUTELY POSITIVELY GUARANTEE NO ONE WILL EVEN GET OUT ON BOND." BUT AS THE WORDS GO, TO REASONABLY ASSURE THE COURT THAT THIS DEFENDANT WILL NOT REENGAGE IN CRIMINAL ACTIVITY, THREATEN WITNESSES, OR IN SOME OTHER WAY JEOPARDIZE THE CASE.

I DON'T SEE THAT THAT IS SUCH A BIG PROBLEM WITH THIS MAN WHO WORST CASE USED SOME FOWL LANGUAGE, YELLED AT, SCREAMED AT, A LOT OF FALSE (INAUDIBLE) AND IF YOU DON'T PAY THIS IS GOING TO HAPPEN AND THAT'S GOING TO HAPPEN. BUT NOTHING REALLY EVER DID HAPPEN.

NOW, WE ARE NOT MARCHING IN A HOST OF INJURED PEOPLE, A HOST OF PEOPLE WHO WERE BEATEN UP, A HOST OF

PEOPLE WITH GUNS PUT TO THEIR HEAD. BASICALLY IN EVERY W[AY] THE GOVERNMENT HAS PUT FORTH IF BELIEVED TO BE TRUTH, THE[Y] YELLED, THEY SCREAMED, THEY USED BAD LANGUAGE, AND THEY SAID, "IF YOU DON'T DO IT THIS IS GOING TO HAPPEN TO YOU. BUT THIS NEVER HAPPENED TO ANYBODY.

NOW, AT THIS POINT, AT THIS STAGE IN THE GAME WHERE HE IS CHARGED WITH A CRIMINAL OFFENSE, IS GOING TO TO TRIAL, IS HE NOW GOING TO DO SOMETHING FOOLISH TODAY TOMORROW OR THE NEXT DAY THAT HE DIDN'T DO FOR THE LAST THAT THIS INVESTIGATION HAS BEEN GOING ON?

NOW IS THE LAST TIME ON GOD'S EARTH WHEN HE W[OULD] PICK UP A PHONE, WHEN HE WOULD ASK SOMEONE TO CALL SOME[ONE] WHEN HE WOULD HAVE ANYTHING TO DO WITH ANYONE, ESPECIAL[LY] WHEN HE KNOWS, NUMBER ONE, IT WILL REVOKE HIS BOND; AND NUMBER TWO, IT WILL PROBABLY COME INTO EVIDENCE IN HIS AGAINST HIM. THERE IS NOTHING TO BE GAINED, EVERYTHIN[G] BE LOST, AND THAT THE BEST THING HE COULD DO IS GO OUT (INAUDIBLE) HIS LIFE GOING TO WORK AND MEETING WITH HI[S] LAWYERS PREPARING HIS CASE.

ONE OF THE OTHER THING THAT IS A CONCERN TO AND I THINK THE COURT SHOULD TAKE NOTICE OF, THAT MR. IS NOT A PARTICULARLY WELL MAN. HE SUFFERS FROM TWO [S] ILLNESSES. ONE HE HAS DIABETES, HE TAKES FIVE DIFFER[ENT] MEDICATIONS DAILY. RIGHT NOW HE IS HAVING SOME REAL PROBLEMS IN THE FORT LAUDERDALE CITY JAIL.

IF THE COURT WERE NOT INCLINED TO GIVE HIM BOND, OBVIOUSLY I WOULD ASK YOU TO SEND HIM TO EITHER NORTH DADE OR FDC WHERE HE IS UNDER FEDERAL CUSTODY AND WE CAN MAKE SURE THAT MEDICINE IS GIVEN TO HIM PROPERLY. THAT'S A PROBLEM WE ARE FACING. AND, SECONDLY, HE HAS HIGH BLOOD PRESSURE AND ASTHMA FOR WHICH HE ALSO NEEDS AN INHALER AND TAKES OTHER MEDICINE.

THIS IS NOT A PARTICULARLY WELL MAN. HE HAS DIABETES, ASTHMA, AND HIGH BLOOD PRESSURE REQUIRING PROBABLY AMPLE OF PILLS DAILY. WE ARE NOT TALKING ABOUT A PHYSICALLY BIG MAN. WE ARE NOT TALKING ABOUT SOMEONE WHO IS GOING TO GO OUT AND JUST BY LOOKING AT SOMEONE HIS SHEER SIZE WILL INTIMIDATE THEM.

I THINK YOU CAN FASHION CONDITIONS, YOU CAN PUT A CURFEW ON HIM, YOU CAN MAKE SURE AND INSTRUCT HIM NOT TO MEET WITH ANYBODY, NOT TO TALK WITH ANYBODY, NOT TO PHONE ANYBODY. I DON'T REALLY SEE THE NEED, BUT IF THE COURT SEES SO YOU COULD PUT AN ANKLE BRACELET ON HIM. WHETHER HE GOES TO WORK OR STAYS HOME ALL DAY THAT WON'T REALLY SOLVE THE PROBLEM. WHAT REALLY WILL SOLVE IT IS THE FEAR OF GOD IN HIM THAT HE CAN'T DO ANYTHING LIKE THIS, AND I THINK YOU CAN DO THAT, AND I THINK HE WILL ABIDE BY THAT.

THANK YOU, YOUR HONOR.

THE COURT: ALL RIGHT. MR. GENGE?

MR. GENGE: THANK YOU, YOUR HONOR.



YOUR HONOR, I THINK THAT OBVIOUSLY THERE ARE TWO ASPECTS THAT THE COURT IS GOING TO -- OR TWO MATERIAL ISSUES THAT THE COURT HAS TO CONSIDER HERE. ONE, OF COURSE, IS THE DANGER TO THE COMMUNITY, AND THE SECOND IS THE OBSTRUCTION OF JUSTICE, BOTH OF WHICH, OF COURSE, ARE THE APPROPRIATE PREDICATES FOR A PRETRIAL DETENTION HOLD.

NOW, AS FAR AS THE DANGER TO THE COMMUNITY IS CONCERNED. OF COURSE, WE HAVE HERE DAVID ALWAIS WHO GOES OUT AND COMMITS THESE CRIMES THAT -- AND I SUBMIT THE EVIDENCE WILL IN FACT PROVE THAT HE COMMITTED EACH AND EVERY ONE OF THOSE CRIMES, WHILE ON SUPERVISED RELEASE.

NOW, I THINK THAT IN AND OF ITSELF PROVES THAT BY HIS OWN PAST CONDUCT HE IS A DANGER TO THE COMMUNITY. WHEN PEOPLE GO OUT THAT ARE ON SUPERVISED RELEASE AND THEN ENGAGE IN THIS TYPE OF EXTORTIONATE ACTIVITY, I THINK THAT IPSO FACTO HE HAS PROVEN THAT HE IS A DANGER TO THE COMMUNITY. AND THIS IS THE THIRD CASE NOW WITHIN THE LAST 10 YEARS IN WHICH HE HAS BEEN INVOLVED WITH SERIOUS CONDUCT.

NOW, WITH RESPECT TO THE OBSTRUCTION OF JUSTICE ISSUE AND/OR THE THREAT TO THE JUDICIAL PROCESSES IN THIS CASE. OBVIOUSLY I AM NOW ADDRESSING MOSTLY THE SITUATION THAT MR. SIDNEY ALWAIS. BUT HERE, YOUR HONOR, I RESPECTFULLY SUBMIT THAT (INAUDIBLE) THE EVIDENCES ESTABLISHES THAT THERE EXISTS A SERIOUS THREAT THAT THE DEFENDANT WILL ATTEMPT TO OBSTRUCT JUSTICE, OR WILL ATTEMPT



TO THREATEN, INJURY OR INTIMIDATE THE PERSPECTIVE WITNESS, PRETRIAL DETENTION IS AUTHORIZED UNDER TITLE 18, UNITED STATES CODE, SECTION 3142(F)(2)(B).

WE RESPECTFULLY SUBMIT THAT IN THIS CASE, AND THE CASE AT BAR, YOUR HONOR, THE EVIDENCE ESTABLISHES THAT NOT ONLY DO WE HAVE A SERIOUS THREAT THAT MR. ALWAIS WOULD IN THE FUTURE IF HE WERE RELEASED ENGAGE IN THIS KIND OF CONDUCT, BUT WE HAVE EVIDENCE THAT HE IN FACT HAS ENGAGED IN THAT TYPE OF CONDUCT BY THREATENING OR INTIMIDATING --

MR. SCHWARTZ: I WILL OBJECT TO THIS ARGUMENT, BECAUSE YOUR HONOR IN MY CROSS-EXAMINATION OF THE AGENT SINCE WE WERE TALKING ABOUT THIRD-HAND HEARSAY SAID ON THE STATE OF THE RECORD YOU WEREN'T GOING TO CONSIDER IT.

MR. GENGE: YOUR HONOR --

THE COURT: I WASN'T GOING TO CONSIDER HER TESTIMONY THAT SPECIFIC THREATS WERE MADE TO THE SIX VICTIMS IN THIS CASE.

MR. SCHWARTZ: IF HE IS TALKING ABOUT THE ALLEGED ARSON, THAT'S APPROPRIATE FOR YOU TO CONSIDER AS CHARGED IN THE INDICTMENT. BUT IF HE IS TALKING NOW ABOUT THE ALLEGED THREATS OF THE SIX VICTIMS, ON THE STATE OF THE RECORD SINCE YOUR HONOR IS NOT CONSIDERING IT, IT IS INAPPROPRIATE FOR HIM TO ARGUE IT.

MR. GENGE: I THINK, AS I RECALL --

THE COURT: OVERRULED. THIS IS ARGUMENT.



YOU CAN ARGUE --

MR. GENGE: THE TESTIMONY OF MISS ROBERT IN ONE INSTANCE, AT LEAST, SHE TESTIFIED IN THE CASE OF LENARD FRASCO HE WAS TOLD BY SIDNEY ALWAIS TO, "IF YOU'RE INTERVIEWED BY THE FBI TELL HIM SUCH, THEY ARE PERSONAL LOANS," AND SO FORTH. THAT HE GAVE A FALSE STATEMENT TO TH FBI (INAUDIBLE) THEN HE RECANT AND, IN FACT, JUST BEFORE TH ACTUAL GRAND JURY APPEARANCE.

BUT I THINK -- AND I CAN CITE THE -- A NUMBER OF CASES TO YOUR HONOR. ONE IS THE SALARNO CASE. THAT'S --

THE COURT: I DON'T NEED CASES, MR. GENGE.

MR. GENGE: YOU HAVE THOSE?

THE COURT: I AM SURE I HAVE READ EVERY CASE ON PRETRIAL DETENTION.

MR. GENGE: IT IS OBVIOUSLY IN TRYING TO FORECAS THE DEFENDANT'S (INAUDIBLE) POTENTIAL CONDUCT IN THIS CASE WE LOOK AT, AND APPROPRIATELY SO, WHAT HAS HE DONE IN THIS CASE. HAS HE IN FACT OBSTRUCTED, OR ATTEMPTED TO OBSTRUCT THIS CASE ALREADY, AND IF HE HAS AND IF THERE IS CREDIBLE EVIDENCE TO SUPPORT THAT THEN OBVIOUSLY THAT IS SOMETHING THAT YOU SHOULD CONSIDER.

NOW, ALSO BOTH MR. SCHWARTZ AND MR. RUBINO, THEY REFER TO THEM AS JUST BOASTING GRANDIOSE, AND SO FORTH, AN THEY SAY THERE IS NO HARM WAS ACTUALLY DONE, NO VIOLENCE.

WELL, CERTAINLY WITH RESPECT TO THE ARSON OR THE

BURNING THAT WASN'T JUST BOASTING. I MEAN, I THINK THE EVIDENCE IS GOING TO ESTABLISH -- YOU KNOW, AT TRIAL WE ESTABLISHED IT HERE. I MEAN, MR. ALWAIS PAID ROBERT ENGEL $4,000 IN CASH IN 1995 TO BURN DOWN THIS PARTICULAR -- PART OF A STRIP SHOPPING CENTER. AND AT THE TRIAL WE ARE GOING TO INTRODUCE EVIDENCE, POLICE RECORD, PHOTOGRAPHS, AND SO FORTH OF THIS PARTICULAR ARSON.

AND HE INDICATED THAT -- AND WE WILL INTRODUCE, AND I THINK WE INTRODUCED AT THIS HEARING, THE FACT IT SAYS, "THIS IS IN RETALIATION FOR WHAT MY NEPHEW, MY BROTHER-IN-LAW'S SON DID." (INAUDIBLE) "I WAITED ALL THESE YEARS. I WAITED FROM THE WHEN THE INDICTMENT THAT WAS RETURNED," I BELIEVE THE ZLOCH INDICTMENT IN '88. HE WAITS UNTIL 1995 TO -- BUT TO GET EVEN.

AND THEN WHEN HE ISN'T SATISFIED WITH THAT BURNING, THAT CONDUCT, HE AGAIN IN 1996 (INAUDIBLE) THE COOPERATING WITNESS AND SEEKS TO HAVE HIM DO THIS -- ENGAGE IN THIS CONDUCT IN RETALIATION. CERTAINLY THAT ISN'T JUST BOASTING. HERE IS A MAN THAT ACTUALLY, WE SAY ACTIONS SPEAK LOUDER THAN WORDS. CERTAINLY IN THIS CASE HE ACTED.

NOW, AS FAR AS THE -- IN THAT REGARD I WANT TO ADDRESS JUST BRIEFLY THE EVIDENCE. AND I AGREE WITH THE COURT HAS INDICATED THAT AS FAR AS THE STATE OF THE RECORD AT THIS MOMENT IS CONCERNED, AS FAR AS THE MURDER CONSPIRACY IS CONCERNED, I THINK YOU (INAUDIBLE) PREPARED TO FIND, IF I



READ THE COURT CORRECT, THAT THE RECORD HAS MADE THIS OUT, THE STATE OF THE RECORD AT THIS POINT. BUT I THINK --

THE COURT: WELL, I HAVE AN INDICTMENT BEFORE ME.

WHAT I'M SAYING IS, I HAVE HEARD SUFFICIENT EVIDENCE SO THAT AT LEAST THERE IS AN ARGUMENT THEY CAN MAKE AS TO WHAT IT WAS THEY WERE TRYING TO COLLECT AND WHY. THAT DOES NOT MEAN I AM GOING TO DISREGARD THE INDICTMENT.

MR. GENGE: BUT IN THAT REGARD ALSO, I MEAN, AS FAR AS WHETHER OR NOT -- ARE WE TALKING ABOUT INDIVIDUALS HERE THAT ARE JUST BOASTING (INAUDIBLE) JUST ENGAGING IN SOME KIND OF IDLE CHATTER OR SO FORTH. ARE WE TALKING ABOUT AN INDIVIDUAL HERE AND HIS ASSOCIATES THAT ACTUALLY WILL CARRY OUT THEIR SO-CALLED (INAUDIBLE)

I THINK WHAT THE RECORD SHOWS HERE IS THAT MR. SIDNEY ALWAIS -- I MEAN, HE IS PREPARED TO BURN DOWN THE PREMISES OF AN INLAW-JUST -- TO RETALIATE FOR TESTIMONY GIVEN FIVE OR SIX YEARS PREVIOUSLY. NOW WE HAVE MR. LOUIE MAIONE WHO APPARENTLY TOOK SOME MONEY, SOME OF IT, WHETHER IT IS INVESTMENT MONEY (INAUDIBLE) AND SO FORTH, FROM THE DEFENDANTS.

NOW, THE ATTORNEYS SUGGEST THAT, "WELL, ALL THEY WANTED WAS TO GET MR. MAIONE TO COME BACK AND JUST -- IF IN HE FACT OWED THE $80,000, THAT'S ALL THEY WERE INTERESTED IN." BUT I RESPECTFULLY SUBMIT TO YOUR HONOR THAT THAT IS NOT WHAT THIS CASE WAS ALL ABOUT.



I MEAN, A FAIR READING OF JUST NOT JUST THE TRANSCRIPT, BUT YOU HAVE SEEN (INAUDIBLE) AND, OF COURSE, WE HAVE MANY OTHERS, THAT CLEARLY THIS WAS A REQUEST, DISCUSSIONS BY THE ALWAISES WITH THE OTHER GAMBINO MEMBERS AND FAMILIES AND THIS GOES ALL THE WAY UP (INAUDIBLE) THEY WANTED LOUIE MAIONE KILLED. NUMEROUS REFERENCES THROUGHOUT.

THEY DIDN'T WANT HIM TO JUST COME BACK TO THE STORE SO THAT THEY COULD POSSIBLY GET BACK THEIR INVESTMENT MONIES. AND, IN FACT, I THINK THERE IS ONE -- JUST ONE QUOTE IN WHICH MR. SIDNEY ALWAIS SPECIFICALLY REFERS TO HIMSELF, HIS VIOLENCE AGAINST MR. MAIONE. THIS IS -- THIS IS ONE OF THE TAPES -- ONE OF THE TRANSCRIPTS THAT YOU HAVE. THIS IS AGAIN THE AUGUST 27TH TRANSCRIPT.

AT PAGE 16 WHERE THIS IS DAVID ALWAIS SPEAKING HE THINKS IT MIGHT BE A SETUP. HE SAYS, "BUT -- HE SAYS THERE IS NO WAY WE CAN ALLOW HIM TO COME." .

NOW SIDNEY ALWAIS, "I'M TELLING -- I'M TELLING YOU I -- I TOLD HIM. I SAID IF HE COMES TO THAT FUCKING STORE DAVID AND I ARE GOING TO FUCKING WORK ON THIS GUY WITH BATS. I'M TELLING YOU NOW, BECAUSE THIS COCK SUCKER DESERVES IT. IF HE THINKS THAT 10 OR 12 THAT HE'S BRINGING (INAUDIBLE) HE'S GOING TO GET HIM A "(INAUDIBLE) ET CETERA. ET CETERA.

AGAIN, THIS IS AN INDIVIDUAL, HE'S ALREADY BURNT DOWN, OR CAUSED THE STORE TO BE BURNT DOWN, AND NOW HE'S TALKING WITH HIS SON AND THE GAMBINO ASSOCIATES AND MEMBERS



HE WANTS THIS INDIVIDUAL KILLED.

SO I THINK IN THE CONTEXT -- YOU KNOW, SEEN IN THAT CONTEXT I THINK THAT THE SERIOUS NATURE OF THESE DISCUSSIONS, I THINK -- YOU KNOW, SHOWS. I MEAN, YOU DON'T ENGAGE IN IDLE TALK OR IN THIS KIND OF STUFF WITH INDIVIDUALS ASSOCIATED WITH THE HEAD OF THE -- PRESENT HEAD OF THE GAMBINO FAMILY. YOU DON'T SAY, "YEAH, HAVE HIM KILLED," AND SO FORTH. AND THEN IF IN FACT HE IS TAKEN OUT OR KILLED OR MURDER, "OH, I WAS JUST BOASTING."

THESE WEREN'T BOASTS. I MEAN, THE TAPES -- I DON'T KNOW IF YOUR HONOR HAS LISTENED TO THE TAPES THEMSELVES. BUT JUST FROM THE TONE OF IT, THESE INDIVIDUALS WEREN'T PLAYING AROUND. THEY WERE GOING TO FIND LOUIE, THEY TRIED TO FIND HIM IN SYRACUSE, THEY TRIED TO FIND HIM IN ATLANTA, AND THEN --

THE COURT: I DON'T THINK THAT --

MR. GENGE: (INAUDIBLE) COMING BACK TO THE STORE AND THERE THEY HAD THE BATS WAITING TO USE THE BATS ON THIS INDIVIDUAL.

THE COURT: I THINK THE TAPES ABOUT SYRACUSE AND ATLANTA ARE THE ONES THAT ARE NOT -- THEY ARE PART OF THAT LIST THAT I GAVE YOU THAT --

MR. GENGE: NO, I THINK MOST RESPECTFULLY I THINK SYRACUSE -- I KNOW SYRACUSE WAS MENTIONED --

THE COURT: JUST GIVE ME THE PAGE THEN.

MR. SCHWARTZ: YOUR HONOR, WE WILL STIPULATE THAT SYRACUSE (INAUDIBLE)

THE COURT: OKAY. I THOUGHT THEY WERE IN THE TWO -- ALL RIGHT. GO AHEAD.

MR. GENGE: NO. AS FAR AS MR. SCHWARTZ'S UNDERSTANDING OF THE RICO STATUTE, THAT'S NOT THE LAW.

THE COURT: I THINK HE MIGHT HAVE BEEN REFERRING TO 894, AND I DON'T THINK THERE IS ANY LAW IN THAT. I DON'T KNOW IF THERE IS ANY REQUIREMENT THAT AN OVERT ACT BE ALLEGED. THE CASE LAW UNDER 371 SAYS THAT. BUT IT DOESN'T SAY THAT ON THESE, BUT I'M NOT REAL CONCERNED ABOUT THAT.

MR. GENGE: I THINK, YOUR HONOR, THAT WE HAVE MORE THAN MET THE RECORD, MORE THAN WARRANTS A FINDING THAT BOTH OF THESE DEFENDANTS POSES A DANGER TO THE COMMUNITY.

DAVID ALWAIS, HE HAS A TRACK RECORD. AND SIDNEY ALWAIS' PAST HISTORY, HIS OWN WORDS, THE INDIVIDUALS HE WAS PLAYING WITH, HIS ACTUAL ENDEAVOR TO OBSTRUCT THIS GRAND JURY PROCEEDING WHICH RESULTED IN THE INDICTMENT WHICH WAS RETURNED BEFORE YOUR HONOR.

I THINK GIVEN THAT TRACK RECORD, AND THE GOVERNMENT'S CASE HERE IS NOT -- YOU KNOW, ONE THAT IS NOT GOING TO WASH OR HOLD UP. AND I THINK THEY BOTH DO POSE AN ACTUAL DANGER TO THE COMMUNITY, AND I THINK THAT THE COURT IN ITS WISDOM SHOULD DETAIN BOTH OF THESE DEFENDANTS.

THANK YOU.



THE COURT: ALL RIGHT.

AS I HAVE ALREADY STATED, IT IS THIS COURT'S INTERPRETATION OF THE EXTORTION STATUTES THAT THREATS CONNECTED WITH AN EXTORTIONATE --

(TAPE RAN OUT).

- - -



C E R T I F I C A T E

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF FLORIDA

I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING 104 PAGES CONSTITUTE A TRUE TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN THE CITY OF FORT LAUDERDALE, FLORIDA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS 20TH DAY OF MAY, 2001.

CARL SCHANZLEH, RPR-CM
OFFICIAL FEDERAL COURT REPORTER
299 EAST BROWARD BLVD., 202B
FORT LAUDERDALE, FL 33301
TELEPHONE 954/769-5488