

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-CR-6088-UNGARO-BENAGES



UNITED STATES OF AMERICA,

   Plaintiff,

v.

MARCO MINUTO,

   Defendant.

## MARCO MINUTO'S MOTION TO SUPPRESS FRUITS OF WIRETAPS

Defendant MARCO MINUTO, through undersigned counsel and pursuant to the Fourth Amendment to the United States Constitution and 18 U.S.C. §2518, moves this Court to suppress all communications intercepted pursuant to three orders of interception dated September 8, October 13, and November 16, 1998. Suppression is required because the government's application to intercept telephone lines (954) 782-3172, (954) 562-0082, (561) 417-7981, and (914) 523-4166, failed to recite "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," as required by 18 U.S.C. §2518(1)(c). This is commonly known as the "necessity" requirement. Accordingly, all intercepted communications, as well as all evidence derived from those interceptions, must be suppressed. Wong Sun v. United States, 371 U.S. 471 (1963); United States v. Giordano, 416 U.S. 505, 527 (1974).

Three applications for interception, each supported by an affidavit of FBI S/A Darrin Sachs, and three corresponding orders, are at issue in this case. The first application was filed and granted by Judge Ferguson on September 8, 1998. On October 13, 1998, the government moved for a 30-day extension of the initial interception period. That motion was granted by order of same date. On November 16, 1998, the government moved for an additional 30-day extension of the interception period. The motion was granted, again by order of same date. Four telephone lines were intercepted over a span of ninety days: (954) 782-3172, (954) 562-0082, (561) 417-7981, and (914) 523-4166.

### STANDING

Mr. Minuto is an "aggrieved person" as defined by 18 U.S.C. §2510(11) because he was "a party to intercepted oral communications" and he was also "a person against whom the interceptions were directed." Accordingly, Mr. Minuto has standing to move to suppress the fruits of the government's interceptions.

### NECESSITY REQUIREMENT

"Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." Berger v. New York, 388 U.S. 41, 63 (1967). Heeding this warning, Congress enacted Title III of the Omnibus Control and Safe Streets Act of 1968, which strictly limits the government's right to intercept and disclose oral communications. Codified at 18 U.S.C. §2510 et seq., the Act provides that all applications to intercept telephone conversations must include "a *full and complete statement* as to whether or not other investigative procedures have been tried and failed or why they reasonably appear

to be unlikely to succeed if tried or be too dangerous." 18 U.S.C. § 2518(1)(c) (emphasis added); see also United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987) ("the sovereign should make a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls").

Suppression is required when the government fails to comply with any statutory mandate that "directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." Giordano, 416 U.S. at 527. Agent Sachs's affidavits supporting the government's applications to intercept do not contain facts from which the court could conclude that normal investigative techniques had failed, or that those techniques were unlikely to succeed or were too dangerous.

"Generally, the government must overcome the statutory presumption against granting a wiretap application by showing necessity." United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1995). The statutory presumption ensures that wiretapping is not used as a matter of course in every criminal investigation simply because the government believes that it is easy and effective. Indeed, the Fourth Circuit has expressly recognized that "[s]ections 2518(1)(c) and (3)(c) are designed to ensure that the relatively intrusive device of wiretapping is neither routinely employed as the initial step in criminal investigation, nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Smith, 31 F.3d 1294, 1297 (4th Cir. 1994) (quoting Giordano, 416 U.S. at 515; United States v. Kahn, 415 U.S. 143, 153, n. 12 (1974)).

In this case, Agent Sachs indicates that "authorization for wire interception is necessary because, as discussed above, *many of these normal investigative techniques have been tried or reasonably appear to be unlikely to succeed if tried or are too dangerous.*" Sachs Affidavit of September 8, 1998, ¶ 109 (emphasis added). Contrary to this statement, investigative techniques which had been tried had *not* failed, and techniques which had not been tried did *not* reasonably appear to be unlikely to succeed. Indeed, Agent Sachs's affidavit of September 8, 1998, is replete with details of how the use of confidential sources, a normal investigative technique, was consistently producing tangible results. See Sachs Affidavit of September 8, 1998, ¶¶ 33-41, 43A-48, 49A-C, 50-61, 63-64.1, 66-66.2.

In seeking the intercept orders, the government admitted that "surveillance ha[d] been conducted in this investigation and [had] assisted in disclosing some of the associations and places of meetings by participants." Sachs Affidavit of September 8, 1998, ¶ 113. The government dismissed the value of surveillance, however, and simply concluded, without factual support, that "[a]lthough useful as an investigative tool, such surveillance will not, in and of themselves, supply sufficient evidence to establish guilt beyond a reasonable doubt." Id. at ¶ 114.

Similarly, the government claimed that toll records of telephones used by the targets of the investigation had been "useful in revealing some of the associations and frequency of contact of the other known participants." Id. at ¶ 120. In assessing the value of this investigative technique, however, Agent Sachs again concluded without factual support that the information from toll records "in themselves," did not provide enough evidence. Id.

BLACK, SREBNICK & KORNSPAN, P.A.. 201 S. BISCAYNE BLVD. SUITE 1300. MIAMI, FL 33131• (305) 371-6421

In considering the possibility that undercover agents could infiltrate the "criminal group" under investigation, Agent Sachs stated that

> CS-1, CS-2, and CS-3 have indicated that they would be unwilling to introduce an FBI Undercover Agent (UCA) to the subjects of this investigation. Based upon the close-knit nature of this criminal group, your affiant does not believe it would be possible for an UCA to independently infiltrate this group.

Id. at ¶ 109. Yet, judging by the extensive use of confidential sources in this investigation, the "criminal group" under investigation was indeed penetrable. David Alwais, a cooperating government witness, is expected to testify that he "penetrated" this "close-knit" "criminal group" at the direction of Agent Sachs. David Alwais will also testify that he was wearing a body wire and that he recorded his conversations with some of the defendants in this case.

According to the government, this case involves a gambling or bookmaking operation operated by Mr. Minuto. A gambling business cannot operate without bettors. Agent Sachs or any other FBI agent could have "infiltrated" the gambling business by posing as an enthusiastic sports bettor. Apparently, this normal investigative technique was never attempted.

To establish necessity for wiretaps, "the government cannot discharge its burden with 'bare conclusory statements that normal techniques would be unproductive . . .' or with 'mere boilerplate recitation of the difficulties of gathering usable evidence.'" Smith, 31 F.3d at 1297; see also United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983) ("[l]ike other courts, we reject generalized and conclusory statements that other investigative procedures would prove unsuccessful"). In keeping with the requirements of the Fourth Amendment, the government must allege "specific factual information . . . that it has

encountered difficulties in penetrating [the] criminal enterprise." Smith, 31 F.3d at 1298.

A judicial finding that a wiretap is "necessary" must be particular to the specific application under consideration. This means that every *application*, and not simply an investigation in generic terms (i.e. "a gambling investigation"), must establish need. "*Each wiretap application, standing alone, must satisfy the necessity requirement.*" United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir. 1988) (emphasis in original).

In United States v. Kalustian, 529 F.2d 585 (9th Cir. 1976), the Ninth Circuit held that generalizations in a wiretap affidavit based on "knowledge and experience" gained in other gambling cases was insufficient to establish need in that particular investigation. Addressing the investigative value of a search warrant, the FBI agent in Kalustian claimed that his

> experience, and the experience of other Agents, has shown that gambling raids and searches of gamblers and gambling establishments have not, *in the past*, resulted in the gathering of physical or other evidence to prove all elements of the offense. I have found through my experience and the experience of other Special Agents who have worked on gambling cases, that gamblers *frequently* do not keep permanent records.

Id. at 588 (emphasis added). Essentially, "the Government's position [was] that all gambling conspiracies are tough to crack, so the government need show only the probability that illegal gambling is afoot to justify electronic surveillance." Id. at 590. The court rejected the government's position and reversed the trial court's order denying the defendant's motion to suppress. Id. The wiretap application, the court wrote, "did not show why traditional investigative techniques were not sufficient *in this particular case*." Id. (emphasis added). A judge reviewing a wiretap application under these circumstances is "handicapped without such a showing." Id.

Like the FBI Agent in Kalustian, Agent Sachs in this case rejected the value of

interviews as a normal investigative technique because,

> From *prior* investigations and reports of other Agents, your affiant *knows* that the Luchese LCN Crime Family is extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of little value.

Sachs Affidavit of September 8, 1998, ¶ 118 (emphasis added). The conclusion is unsupported by factual allegations. The judge reviewing this affidavit had no option but to accept Agent Sachs's conclusions at face value. There are no facts indicating what happened in prior investigations, how that may be relevant to this investigation, or why the government believes that the same thing will happen here.

Similarly, in dismissing the value of confidential informants, Agent Sachs complained that "[c]onfidential informants *normally* have only limited information either furnished by a subject or learned second hand from others." Id. at ¶ 107 (emphasis added). Whether confidential informants "normally" have only limited information is of no real consequence to this case. What matters is whether the confidential informants in this case had valuable information. They did. Agent Sachs's affidavits are replete with mentions of information that confidential sources provided regarding the targets of the investigation.

The possibility that alleged co-conspirators may cooperate and testify at trial was also dismissed without explanation. The government simply claimed that "co-conspirators, in addition to being afraid of physical retaliation, are *often* themselves prior participants or currently involved in illegal activity, and as such, refuse to cooperate with law enforcement to any significant degree." Id. at ¶ 117 (emphasis added). Whether co-conspirators "often" refuse to cooperate is irrelevant. The focus of the affidavit should be on the alleged co-conspirators in this case and whether they had refused or were likely to refuse to

cooperate. Given the present state of our sentencing laws, and the fact that three co-defendants have agreed to cooperate in this case in exchange for reduced sentences, it seems more than just disingenuous to state under oath that co-conspirators will not cooperate.

Search warrants, too, were dismissed as invaluable. According to Agent Sachs,

> It is my *belief* that the use of search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are *not normally* kept and the *only evidence* of a meeting *would be* the conversation.

Id. at ¶ 121 (emphasis added). This is simply not true. A search warrant executed in this case yielded documents the government claims are betting slips, audiotapes of conversations in which the government claims people are placing bets, and documents with words and numbers the government claims are in fact the names of bettors and the amounts of their bets.

All traditional investigative techniques were available to the government in this case. Yet the government dismissed their value, not because they had been tried <u>in this case</u> and had failed, or were reasonably likely to fail <u>in this case</u>, but because they had been tried in other undisclosed cases, in undisclosed ways, and had failed in undisclosed manners. Unknown to us and to the judge reviewing the government's applications is whether the cases in which investigative techniques had allegedly failed bore any resemblance to the facts and circumstances of this case.

The government claimed an "overwhelming need" for interception because confidential sources were scared to testify. According to Agent Sachs,

> Confidential Sources CS-1, CS-2, and CS-3, referred to herein have told

> Special Agents of the FBI that they would be *fearful for their lives* .... CS-1, CS-2, and CS-3, have advised that even if immunized and given protective custody, they would be *unwilling to testify* at any proceeding for *fear of their safety*.

Sachs Affidavit of September 8, 1998, ¶ 107 (emphasis added).

Agent Sachs's claim that his confidential informants were scared to testify is insufficient to justify the interceptions authorized in this case. The consensus in this and other judicial contexts is that fear for personal safety or the safety of others "would not provide a legal basis for a refusal to testify." In re Grand Jury Proceedings, 922 F.2d 1266, 1272 (6th Cir. 1991) (citing Piemonte v. United States, 361 U.S. 556, 559 n.2 (1961)); see also Roberts v. United States, 445 U.S. 552 (1980) (a defendant who receives immunity from prosecution is obliged, like all other citizens, to assist the authorities in the investigation of crime). If witnesses were permitted to withhold testimony because of a generalized, undefined fear of retaliation, then "any person involved in a criminal enterprise could point to the possible danger that comes from giving testimony[,]" In Re Grand Jury Proceedings, 914 F.2d 1372, 1375 (9th Cir. 1990), and refuse to testify.

"[F]ear for personal and family safety is not a defense to a charge arising from refusal of a witness to testify." In Re Grand Jury Proceedings, 605 F.2d 750, 752 (5th Cir. 1979). Indeed,

> [n]o federal court in a reported decision has held that fear of retaliation is sufficient reason to refuse to testify. To do so in this case would mean that virtually every prisoner in the United States, and millions of people at large, would be freed of *the duty to appear and testify* before a grand jury.

Dupuy v. United States, 518 F.2d 1295 (9th Cir. 1975) (emphasis added). Thus, Agent Sachs's claim that confidential sources would be "unwilling to testify" at any proceeding for "fear of their safety" is insufficient to justify a wiretap.

-9-

Importantly, other witnesses in this case who were reluctant to testify because of fear of retaliation were essentially <u>ordered</u> by the government to testify before the grand jury. Indeed, Agent Sachs makes specific reference to this in his affidavit:

> Victims of the extortion described in paragraph 49 were subpoenaed to appear before the grand jury. Both *victims were reluctant to testify* and *expressed great fear for their well being* and *asked to be excused* from testifying. When informed that *they would not be excused*, they testified before the grand jury.

Sachs Affidavit of September 8, 1998, ¶ 116 (emphasis added). Clearly, the government was aware that a witness's "great fear" for his "well being" does not excuse his testimony, whether before the grand jury or at trial. To now claim that there is an "overwhelming need" for a wiretap because confidential sources are scared to testify is, at best, hypocritical.

The fruits of all wiretaps in this case must be suppressed. The government's failure even to attempt less intrusive investigative means before seeking to eavesdrop on Mr. Minuto's telephone conversations is inexcusable. The government did use an undercover agent to place bets with the suspected gambling operation. The government did not seek the contempt powers of this Court to obtain testimony from cooperating sources. The government did seek search warrants until after interception had taken place. The government did not approach an alleged co-conspirator and offer him immunity or some other form of leniency or inducement to obtain his cooperation. Abstract, boiler-plate allegations that these techniques would have failed simply because they allegedly failed in other cases unrelated to this investigation are insufficient. More is required before big brother is permitted to tap into our telephone lines and listen to our telephone conversations.

Communications intercepted during the initial 30-day interception, as well as those intercepted during the two subsequent 30-day extensions, and all derivative evidence, must be suppressed. 18 U.S.C. §2515 & 2518(10)(a); Giordano, 416 U.S. at 533 ("in our view, the results of the conversations overheard under the initial order were essential, both in fact and in law, to any extension of the intercept authority"); Wong Sun v. United States, 371 U.S. 471 (1963).

    Respectfully submitted,

**BLACK, SREBNICK & KORNSPAN, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

By: _____
For **HOWARD M. SREBNICK, ESQ**
Florida Bar Number 919063
Attorney for Marco Minuto

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 4, 2001 a true and correct copy of the foregoing was furnished by mail to:

Michael J. Dittoe, Esq.
Assistant United States Attorney
500 East Broward Boulevard
7th Floor
Fort Lauderdale, Florida 33394-3002

Bruce A. Zimet, Esq.
Counsel for Nicolo Mariani
One Financial Plaza
Suite 2612
Fort Lauderdale, Florida 33394

William J. Hunt, Esq.
Counsel for Joseph Minuto
William J. Hunt & Associates
155 Polifly Road
Suite 200
Hackensack, New Jersey 07601

Kerry A. Lawrence, Esq.
Counsel for Chris Greco
Briccetti, Calhoun & Lawrence, L.L.P.
81 Main Street
Suite 450
White Plains, New York 10601

By: /s/ for HOWARD M. SREBNICK, ESQ.
Attorney for Marco Minuto

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD. SUITE 1300, MIAMI, FL 33131• (305) 371-6421