UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-CR-6088-UNGARO-BENAGES



UNITED STATES OF AMERICA,                    :

    Plaintiff,                                       :

                                                              :

v.                                                           :

MARCO MINUTO,                                      :

    Defendant.                                       :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

## MARCO MINUTO'S PROFFER RE: PRETRIAL MOTION PERTAINING TO NEW YORK INDICTMENT

The Court has denied Marco Minuto's motion seeking until June 22, 2001 to file pretrial motions pertaining to a forty-five page RICO indictment returned in New York just five days before expiration of the pretrial motions deadline in this case. In order to preserve his rights, Mr. Minuto hereby proffers the issues that he would have raised regarding the New York indictment and how that indictment affects the present case pending against Mr. Minuto in the Southern District of Florida.

Count I of the indictment in this case, charging Mr. Minuto with RICO conspiracy, must be dismissed because it charges Mr. Minuto with the same RICO conspiracy charged against him in Count II of the superseding indictment in the New York case of <u>United States v. Alex Lukov & Marco Minuto</u>, Case No. 00-1197 (Eastern District of New York). This New York case was first indicted in the year 2000; a superseding indictment, charging Mr. Minuto for the first time, was returned on May 29, 2001. A copy of the superseding indictment is attached as Exhibit A.

-1-

1.     **The Florida Case**:  Count I of the indictment in the Florida case pending before this Court charges that from 1992 until the return of the indictment in the year 2000, Mr. Minuto was a member of a racketeering conspiracy (RICO conspiracy) in violation of 18 U.S.C. § 1962(c).  The Florida case essentially charges that Mr. Minuto and his co-defendants were involved in a gambling business and were using extortionate means to collect gambling debts.  The Florida indictment alleges that "[i]t was part of the [RICO] conspiracy that defendant Marco Minuto would organize a criminal enterprise that would operate in **South Florida, New York, and elsewhere,** which enterprise would engage in various criminal activities, including extortion, illegal gambling, the theft of goods, money laundering, fraud, counterfeiting, and obstruction of justice, among other crimes."  (Florida Indictment [FI] at ¶ 5) (emphasis added).

The Florida indictment alleges that Mr. Minuto entered into an agreement with his RICO conspiracy co-defendants to "explore the possibility of forming strategic alliances with members and associates of other La Cosa Nostra families for their mutual and illegal benefit and profit." (FI at ¶ 22).  The "Manner and Means of the Conspiracy" section of the indictment charges that "Marco Minuto would use his criminal association and reputation with the Luchese Organized Crime Family as a soldier to generate illegal income for members of the enterprise through the use of force, violence, and threats."  (FI at ¶ 7).

On September 8, 1998, FBI Special Agent Darren Sachs filed an affidavit in support of the government's application to intercept telephone conversations allegedly involving Mr. Minuto.  A copy of that affidavit is attached as Exhibit B.  In his affidavit, Special Agent Sachs states that Mr. Minuto is a member of the Luchese Organized Crime Family.  (Sachs Affidavit of 09/08/98 at ¶ 33).  According to Agent Sachs, the Luchese Organized Crime Family is one of the La Cosa Nostra (LCN) families operating in New York.  (Id. at ¶25(D)).

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

Specifically, Agent Sachs states as follows:

FACTS AND CIRCUMSTANCES
ESTABLISHING PROBABLE CAUSE

Structure of the LCN and the Luchese Family

25.    Based on my investigative training and experience, and the sources described below, I have learned the following information about the LCN, a nationwide secret criminal association, and the Luchese Crime Family:

A.    The LCN is one of the most powerful and sophisticated organized crime groups in the United States.

B.    The LCN consists of approximately twenty-four separate organizational units known as families functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss and the second-in-command is the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo" or "skipper." Caporegimes are supervisors over "crews", i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have non-member associates under their direction.

D.    There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino, Genovese, and Luchese LCN families. Each of these families is involved in a wide variety of criminal activities including murder, arson, **gambling**, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking. The Miami/Fort Lauderdale area is considered an "open city" in which any LCN family may operate without paying tribute to any other LCN family. Each of the five New York families has representatives in South Florida.

26.    The Luchese LCN family, with approximately 110 active and inactive members, is one of the largest and most powerful LCN families in the United States. **The Luchese LCN family is presently involved in the gas distribution business,** control of restaurant and hotel industries, shipping

-3-

and related marine services, as well as aspects of the pornography business. The family also engages in drug trafficking and is involved in traditional racketeering activities, such as, murder, **gambling**, loansharking, public corruption and obstruction of justice among other racketeering offenses.

*    *    *    *    *

33.    On July 11, 1995, CS-4 advised the FBI that he had learned from members of the Luchese Organized Crime Family, including a Capo in the Family, that Marco Minuto and eight (8) other individuals were recently inducted as soldiers into the Luchese Organized Crime Family. I am aware that the induction ceremony is an established ritual, whereby the newly inducted member pledges loyalty and allegiance to the organized crime family. **This new member agrees to conduct criminal activities for the mutual benefit of the crime family.**

(Id. at ¶¶ 25-26, 33) (emphasis added).

Essentially, the government's allegations against Mr. Minuto in this Florida case is that Mr. Minuto was a member of the Luchese family, that this family was part of the La Cosa Nostra aggregation of families, and that through his membership in the Luchese family and La Cosa Nostra, Mr. Minuto conspired to engage in racketeering activities involving gambling and the collection of gambling debts. According to the indictment, Mr. Minuto and his co-defendants engaged in these activities in Florida and in New York, and did so for their benefit as well as for the benefit of the Luchese family and the LCN.

2.    **The New York Case:** Count I of the New York indictment charges Mr. Minuto with racketeering in violation of 18 U.S.C. §§ 1961(1) & (5). Count II charges Mr. Minuto with RICO conspiracy in violation of 18 U.S.C. § 1962(c). The racketeering activities and the racketeering conspiracy allegedly date back to 1990 and continued through the return of the superseding indictment in the year 2001. (New York Indictment [NYI] at ¶ 1, 57).

According to the New York indictment, Mr. Minuto's co-defendant, Alex Lukov,

headed a racketeering enterprise in New York identified in the indictment as the "Lukov Organization." (NYI at ¶ 1). Mr. Minuto was supposedly a member of the Lukov Organization. (Id.). Generally speaking, Mr. Minuto and other alleged members of the Lukov Organization are accused of participating in a scheme to defraud New York and New Jersey of state gasoline taxes.

The New York indictment alleges that "the Lukov Organization was affiliated with, and operated under the protections of, the Luchese Organized Crime Family of La Cosa Nostra (the "Luchese Family"), an organized criminal group that operated in the Eastern District of New York and elsewhere." (Id. at ¶ 2). According to the indictment, "[i]n or about and between 1995 and the filing of the superseding indictment [in 2000]," Mr. Minuto "was a made member of the Luchese family and a member of the Lukov Organization." (Id. at ¶ 7). Also according to the indictment, "[i]n or about and between 1995 and the filing of the superseding indictment [in 2000], Minuto supervised and protected the Lukov Organization and resolved disputes related to the illegal activities of the organization." (Id.) The indictment alleges that "[i]n return for such supervision and protection, Minuto received regular payments from the illegal earnings generated by the criminal activity of the Lukov Organization." (Id. at ¶ 7). According to the government, Mr. Minuto and his co-defendants engaged in these activities for their benefit and for the benefit of the Luchese family and the LCN.

3.    **A Single RICO Conspiracy:** Count I of the Florida indictment and Count II of the New York indictment purport to charge two separate RICO conspiracies where in reality only a single conspiracy can be charged under the facts alleged in these

indictments.  Both indictments charge a RICO conspiracy under the same statute, 18

U.S.C. § 1962(C).  Both indictments claim that Mr. Minuto was a member of the Luchese

family and the La Cosa Nostra.  Both indictments allege that as a member of the Luchese

family and the LCN, Mr. Minuto agreed to and in fact engaged in various criminal acts for

the purpose of furthering the interests of these families.

The purpose of the racketeering conspiracy is the same in both indictments: to

make money.  In New York, the alleged purpose of the racketeering conspiracy was "to

generate money for its members through the planning and execution of fraudulent

schemes."  (NYI  at ¶ 3).  In Florida, the alleged purpose of the racketeering conspiracy

was to make money and "explore the possibility of forming strategic alliances with

members and associates of other LCN families for their mutual and illegal benefit and

profit."  (FI at ¶ 22).  Both indictments allege that Mr. Minuto engaged in extortionate

extensions and collections of credit in violation of 18 U.S.C. §§ 892 & 894.  (FI at ¶ 3(C);

NYI at ¶ 55).  In addition, both indictments allege falsification of records, as well as mail

fraud in violation of 18 U.S.C. § 1341 (FI at ¶ 3(G) & (F); NYI at ¶  22, 24, 29, & 30).

In determining whether a single conspiracy exists, this Court looks to "(1) whether

a common goal existed, (2) the nature of the scheme underlying the crimes charged, and

(3) the overlap of participants."  United States v. Coy, 19 F.3d 629, 633 (11th Cir. 1994).

For purposes of this analysis, "a common goal" means "'similar' or 'substantially the same'

rather than 'shared' or coordinate.'"  Id.  In the context of a RICO conspiracy, a single

conspiracy exists where "a number of otherwise diverse activities were performed to

achieve a single goal . . . ."  United States v. Elliott, 571 F.2d 880, 901 (5th Cir. 1978).

Indeed, the former Fifth Circuit and the Eleventh Circuit have recognized that the purpose

of RICO is to provide for a single prosecution of what could otherwise be considered various multi-faceted, diversified conspiracies. Id. at 902; United States v. Pepe, 747 F.2d 632, 659-60 (11th Cir. 1984).   Thus, a single RICO conspiracy exists even when RICO defendants agree to participate (or actually participate) in different crimes, as long as each agreement or the commission of each crime was intended to further the affairs of the racketeering enterprise. Elliott, 571 F.2d at 902-03; Pepe, 747 F.2d at 660. "To find a single conspiracy, we still must look for an agreement on an overall objective.  What Congress did [by enacting RICO] was to define that objective through the substantive provisions of the [RICO] Act." Elliott at 903. Thus, in Elliott, the Fifth Circuit held that a single conspiracy existed when "the essential nature of the plan [underlying the RICO conspiracy] was to associate for the purpose of making money from repeated criminal activity." Id. at 904.

Count I of the Florida indictment charging Mr. Minuto with a RICO conspiracy separate from the New York RICO conspiracy must be dismissed, or the government must be forced to elect which RICO conspiracy it wishes to prosecute.  The allegations in the Florida and New York indictment do not establish two distinct RICO conspiracies.  On the contrary, the indictments allege that both RICO conspiracies shared the common goal of making money for the Luchese family and the LCN through racketeering activities.  In Florida, the Luchese family and the LCN made money by engaging in gambling and extortion; in New York, they made money by engaging in gasoline fraud and extortion.

As described earlier, both indictments claim that Mr. Minuto was a member of the Luchese family and the La Cosa Nostra.  Both indictments allege that as a member of the Luchese family and the LCN, Mr. Minuto agreed to, and in fact engaged in, various criminal

-7-

acts for the purpose of furthering the interests of these families. The fact that the Florida indictment deals with gambling and the New York indictment deals with gasoline tax does not divide one racketeering conspiracy into two. The allegations in both indictments indicate that one racketeering conspiracy existed, and that the purpose of that conspiracy was to engage in various criminal acts – gambling, extortion, gasoline and tax fraud, mail fraud, and money laundering – to accomplish the objective of making money for the Luchese family and the LCN regardless of geographic location.

The nature of a conspiracy "must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy . . . ." Elliott, 571 F.2d at 902 (quoting Braverman v. United States, 317 U.S. 49, 53 (1942)). The object of the RICO conspiracies charged in Florida and New York is the same: to make money for, and further the interests of, the Luchese family and the LCN. Mr. Minuto is a defendant common to both indictments. The fact that the RICO agreement allegedly contemplated committing various crimes in different jurisdictions does not split the agreement into two. The government may not proceed against Mr. Minuto under Count I of the Florida indictment, charging a RICO conspiracy, and also under Count II of the New York indictment, which charges the same RICO conspiracy. Such prosecution would violate Mr. Minuto's Sixth

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

Amendment right not to be prosecuted twice for the same offense.  Mr. Minuto respectfully

proffers that this is the argument he would have raised had the Court granted his motion

to file pretrial motions pertaining to the New York indictment by June 22, 2001.

Respectfully submitted,

**BLACK, SREBNICK & KORNSPAN, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

By: _____ FOR
**HOWARD M. SREBNICK, ESQ**
Florida Bar Number 919063
Attorney for Marco Minuto

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on ___June 22___ , 2001 a true and correct copy of the

foregoing was  furnished by mail to:

William J. Hunt, Esq.
Counsel for Joseph Minuto
William J. Hunt & Associates
155 Polifly Road
Suite 200
Hackensack, New Jersey 07601

Michael J. Dittoe, Esq.
Assistant United States Attorney
500 East Broward Boulevard
7th Floor
Fort Lauderdale, Florida 33394-3002

Bruce A. Zimet, Esq.
Counsel for Nicolo Mariani
One Financial Plaza
Suite 2612
Fort Lauderdale, Florida 33394

Kerry A. Lawrence, Esq.
Counsel for Chris Greco
Briccetti, Calhoun & Lawrence, LLP
81 Main Street
Suite 450
White Plaines, New York 10601

By: _____ FOR
HOWARD M. SREBNICK, ESQ.
Attorney for Marco Minuto

-10-

BR:TAF  :  2173
F. # 1999R02713
Lukov.Indictment1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      -against-

ALEX LUKOV, also known as
    "Oleg Lukov,"
    "Oleg Lukovos,"
    "Alex Lukovos,"
    "Yakov Mogilevich,"
    "Alex Romeo,"
    "Alex the Russian," and
    "Edward Gershovich,"
MARCO MINUTO, also known as
    "The Old Man" and
    "The Other Guy,"
JOHN ROMEO,
JOSEPH CASSESE, also known as
    "Little Joe,"
BORIS KERZHNER, also known as
    "Borya,"
GIOVANNI LUBRANO, also known as
    "Joseph,"
    "Giovi,"
    "Young Joe," and
    "John," and
IRINA KERZHNER,

      Defendants.

- - - - - - - - - - - - - - - X

SUPERSEDING
INDICTMENT

Cr. No. 00-1197 (S-1)(SJ)
(T. 18, U.S.C., §§ 371,
1341, 1343, 1951,
1956(h), 1959(a)(3),
1621(1), 1962(c),
1962(d), 1963, 982, 2
and 3551 et seq; T. 21,
U.S.C., § 853(p))

THE GRAND JURY CHARGES:

## INTRODUCTION TO ALL COUNTS

    1.  In or about and between 1990 and the filing of this Superseding Indictment, the defendants ALEX LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian," and "Edward

P.02

05-29-2001 04:47PM          718 254 6478

2

Gershovich," MARCO MINUTO, also known as "The Old Man" and "The Other Guy," JOHN ROMBO, JOSEPH CASSESE, also known as "Little Joe," and BORIS KERZHNER, also known as "Borys," operated an organization (hereinafter referred to as the "Lukov Organization"). These defendants, along with others, were members and associates of the Lukov Organization, an "enterprise" as that term is defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact. The criminal schemes engaged in by the Lukov Organization were originated by the defendant ALEX LUKOV, who also oversaw the Organization's day-to-day operations. The Lukov Organization operated primarily in the Eastern District of New York.

2.  At all times relevant to this indictment, the Lukov Organization was affiliated with, and operated under the protection of, the Luchese Organized Crime Family of La Cosa Nostra (the "Luchese Family"), an organized criminal group that operated in the Eastern District of New York and elsewhere.

The Purposes, Methods and Means of the Enterprise

3.  The principal purpose of the Lukov Organization was to generate money for its members through the planning and execution of fraudulent schemes.

4.  These schemes included, but were not limited to, a scheme to defraud New York State of gasoline excise taxes and a

3

scheme to defraud Citgo Petroleum Corporation ("Citgo") of
petroleum products.

5.    In order to maintain its operations and collect
its illegal proceeds, members of the Lukov Organization resorted
to the actual and threatened use of force, violence and fear.
The Lukov Organization Defendants

6.    The defendant ALEX LUKOV was the manager and
operator of various companies (hereinafter referred to as the
"Lukov Companies") involved in the purchase, sale and
distribution of gasoline and other petroleum products.  The Lukov
Companies regularly distributed "bootleg" gasoline, that is,
gasoline imported into New York State without payment of all
applicable New York State taxes.  The Lukov Companies, which were
nominally owned and operated by front men installed by LUKOV in
an effort to shield himself and others from criminal and civil
liability, included Panther Oil Corporation ("Panther"), Dye-
Wrecked Petroleum ("Dye-Wrecked"), Nevada Enterprises ("Nevada"),
Express I Transportation, Inc. ("Express I"), P.R. Best ("Best"),
Firm International ("FIRM"), and Prestige International
("Prestige"), all of which had offices in the Eastern District of
New York.  LUKOV was also an undisclosed partner in AOB Medical
Supply, Inc. ("AOB"), a medical supply company incorporated in
June 2000.

7. In or about and between 1995 and the filing of this Superseding Indictment, the defendant MARCO MINUTO was a made member of the Luchese Family and a member of the Lukov Organization. In or about and between 1995 and the filing of this Superseding Indictment, MINUTO supervised and protected the Lukov Organization and resolved disputes related to the illegal activities of the Organization. In return for such supervision and protection, MINUTO received regular payments from the illegal earnings generated by the criminal activity of the Lukov Organization.

8. The defendant JOHN ROMEO was an associate of the Luchese Family and a member of the Lukov Organization. ROMEO was the defendant ALEX LUKOV's partner in many of the Lukov Companies and, as such, received a portion of the Lukov Organization's profits from its fraudulent schemes, including its scheme to defraud New York State of gasoline excise taxes.

9. The defendant JOSEPH CASSESE was a member of the Lukov Organization and was the President of Whirled-Wide Petroleum ("Whirled-Wide"), a wholesaler and distributor of gasoline and petroleum products, which, in or about and between 1997 and 2000, sold bootleg gasoline to Dye-Wrecked.

10. The defendant BORIS KERZHNER was a member of the Lukov Organization and a partner in AOB. He took part in

managing the illegal operations of the Lukov Organization and collecting the Lukov Organization's illegal profits.

COUNT ONE
(Racketeering)

11.  The allegations contained in paragraphs 1 through 10 are hereby realleged and incorporated as if fully set forth herein.

12.  In or about and between April 1990 and November 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ALEX LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian" and "Edward Gershovich," MARCO MINUTO, also known as "The Old Man" and "The Other Guy," JOHN ROMEO, JOSEPH CASSESE, also known as "Little Joe," and BORIS KERZHNER, also known as "Borya," being persons employed by and associated with the Lukov Organization, which enterprise engaged in, and the activities of which affected, interstate commerce, knowingly and intentionally conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of the racketeering acts set forth below:

6

## RACKETEERING ACT ONE
### (Mail and Wire Fraud - Bootleg Gasoline)

**Motor Fuel Distribution**

13. A substantial portion of the illegal income of the LUKOV Organization was derived from the illegal distribution of automotive fuel.

14. Automotive fuel distributors and transporters obtained automotive fuel from terminals and then delivered it to retail filling stations and other outlets. Most terminals in the New York metropolitan area were located in New Jersey, including but not limited to, Sewaren, Linden, Perth Amboy, and Newark.

15. Licensed motor fuel distributors contracted with account holders at terminals to purchase bulk quantities of motor fuel and then contracted with transporters to bring this fuel from the terminal to retail filling stations.

16. Most New Jersey terminals were computerized and issued to drivers employed by automotive fuel transportation companies entry/access cards similar to automated teller cards or credit cards. In order to obtain entry/access cards, transportation companies entered into "Carrier Card Agreements" with suppliers. Drivers used entry/access cards to gain access to terminal loading stations and fill their trailers with the particular type of automotive fuel desired. At the terminal, drivers identified the destination of the automotive fuel. After the truck was loaded with automotive fuel, the driver received a

7

bill of lading which indicated the type of product that had been received, the quantity of the product, the purchaser, the seller and the destination state.

New York State Excise Taxes on Motor Fuel ° ° °

17.   New York State Tax Law Art. 37 § 1812 required any person who imported or caused the importation of 2900 gallons or more of motor fuel into the State of New York within a 90 day period to be registered with the New York State Tax Department (the "Tax Department") as a "distributor of motor fuel."  In addition, New York State Tax Law Art. 37 § 1812-b required any person who imported motor fuel or caused the importation of motor fuel in any quantity into the state of New York State for use, distribution, storage or sale to be licensed by the State of New York as an "importing transporter."  Accordingly, only licensed distributors and transporters were permitted to import gasoline in bulk from outside the State of New York.

18.   New York State Tax Law Art. 12-A required all persons involved in the distribution of motor fuel in the State of New York to maintain Tax Department documents (a) specifying the quantities of motor fuel that had come into their possession and the disposition of such motor fuel, and (b) certifying that taxes had been paid on such motor fuel.

19.   With regard to the payment of state taxes, transporters of motor fuel within the State of New York were

taxes were paid at the time that gasoline was obtained at the
terminal.

    23.  The tax imposed by the State of New York on
wholesale shipments of gasoline imported into the state was
substantially higher than the tax imposed by the State of New
Jersey on wholesale shipments of gasoline obtained and delivered
within the State of New Jersey.  Because of the differential
between New York and New Jersey state gasoline taxes, a gasoline
transporter, distributor or wholesaler who imported gasoline from
the State of New Jersey to the State of New York but fraudulently
indicated that the gasoline was being delivered in the State of
New Jersey would substantially reduce the taxes paid on each
shipment.  In this manner, a gasoline transporter, distributor or
wholesaler would avoid paying New York State taxes and thereby
earn illegal profits on each gallon of gasoline so imported.

Mail and Wire Fraud Scheme

    24.  In or about and between January 1996 and October
30, 2000, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, MARCO MINUTO, JOHN ROMEO, JOSEPH CASSESE, and BORIS
KEREHNER did knowingly and intentionally devise a scheme and
artifice to defraud New York State and to obtain money by means
of materially false and fraudulent pretenses, representations and
promises and, for the purpose of executing this scheme and

8

required to complete a "Diesel Motor Fuel and Motor Fuel
Transporter's Monthly Report" and to file this report with the
Tax Department. This report called for transporters to provide
information regarding, among other items, the date of shipment,
manifest number, place of origin, name and registration number of
the distributor, the product type and the number of gallons
transported.

20.     The State of New York also required transporters
to maintain a "Uniform Manifest for Interstate Movements of
Automotive Fuel," Tax Department Form Number FT-960, for each
shipment of motor fuel imported into the State of New York. This
document required the transporter to issue a manifest number for
each particular shipment and to identify the terminal from which
the fuel was drawn, the name and the Tax Department
identification number for the distributor, and the number of
gallons of each type of motor fuel loaded and unloaded.

21.     Tax on motor fuel imported into the State of New
York was due when the fuel was first imported into the state and
was required to be remitted to the Tax Department on the 20th day
of the month after the month in which the motor fuel was imported
into the State of New York.

New Jersey Excise Taxes

22.     The State of New Jersey also imposed state excise
taxes on gasoline obtained and delivered within New Jersey. Such

10

artifice and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate commerce signs, signals and sounds and placed and caused to be placed mail matter in authorized depositories for mail matter to be delivered by the United States Postal Service, according to the directions thereon, in violation of Title 18, United States Code, Sections 1341, 1343 and 2.

25. It was part of this scheme and artifice that the defendant ALEX LUKOV and others caused the Lukov Companies to fail to pay all applicable New York State taxes on gasoline imported into New York.

26. It was further part of this scheme and artifice that the Lukov Companies purchased gasoline stored in New Jersey terminals from licensed wholesalers and distributors and misrepresented to the terminals the destination of the gasoline being purchased as being the State of New Jersey.

27. It was further part of this scheme and artifice that the defendant JOSEPH CASSESE, through Whirled-Wide, sold gasoline stored in New Jersey terminals to the Lukov Companies knowing that that gasoline was being sold by LUKOV to retail filling stations in New York in violation of applicable New York State tax regulations.

28. It was further part of this scheme and artifice that the defendant ALEX LUKOV hired drivers to transport gasoline

11

from New Jersey terminals into New York for sale at retail
filling stations located in New York.

29. It was further part of this scheme and artifice
that the defendant ALEX LUKOV caused drivers to indicate falsely
to the terminals that the destination of gasoline being acquired
at the terminals was the State of New Jersey, when, in fact, as
ALEX LUKOV knew and believed, the destination was the State of
New York. As a result of this deception, the terminals generated
bills of lading and other documents indicating that the gasoline
was being delivered to retail filling stations in New Jersey
rather than New York.

30. It was further part of this scheme and artifice
that the defendant ALEX LUKOV caused the Lukov Companies and
drivers employed by the Lukov Companies to maintain
documentation, including bills of lading, designed to mislead the
Tax Department and other law enforcement authorities into
believing that all applicable state taxes had been paid on the
gasoline being transported.

31. It was further part of this scheme and artifice
that the defendant ALEX LUKOV arranged for the sale of gasoline
imported into New York from New Jersey to retail filling stations
located in New York at discount prices.

32. It was further part of this scheme and artifice
that the Lukov Companies received substantial amounts of illegal

12.

cash income through the transportation and distribution of "bootleg" gasoline and used that income, in part, to finance the purchase of additional gasoline at New Jersey terminals.

33.    It was further part of this scheme and artifice that the defendant BORIS KERZHNER regularly collected the cash income of this scheme and artifice from the retail filling stations that purchased bootleg gasoline from the Lukov Companies.

34.    It was further part of this scheme and artifice that the defendant ALEX LUKOV destroyed documents and caused the destruction of documents revealing bootlegging by the Lukov Companies in order to conceal the bootlegging activities of the Lukov Organization from law enforcement.

35.    It was part of this scheme and artifice that the defendant JOHN ROMEO provided operating capital to the Lukov Companies and received a substantial portion of the illegal profits of the Lukov Companies.

36.    It was further part of this scheme and artifice that the defendant MARCO MINUTO supervised and protected the Lukov Organization and resolved disputes related to the illegal activities of the Organization.  In return for such supervision and protection, MINUTO received regular payments from the illegal earnings generated by the criminal activity of the Lukov Organization.

Case 0:00-cr-00232-UU   Document 217   Entered on FLSD Docket 06/25/2001   Page 23 of 109

13

The Use of the Mails and Interstate Wires in the Scheme

37.   For the purpose of executing and attempting to execute this scheme and artifice, the defendants charged in this racketeering act, together with others, caused to be placed mail matter in authorized depositories for mail matter to be delivered by the United States Postal Service on or about the dates set forth below:

| RA | Date | From | To | Nature of Transmission |
|---|---|---|---|---|
| 1(a) | 6/6/96 | Panther | Citgo | Financial Statement of Gary Furman |
| 1(b) | 9/15/00 | Express I | Citgo | Carrier Card Agreements |

38.   For the purpose of executing and attempting to execute this scheme and artifice, the defendants charged in this racketeering act, together with others, caused the transmission by means of wire communication in interstate commerce signs, signals and sounds on or about the dates set forth below:

| RA | Date | From | To | Transmission |
|---|---|---|---|---|
| 1(c) | 5/12/00 | Whirled-Wide Marathon Acct. (Queens, New York) | Rio Energy (Texas) | $128,462.27 Electronic Funds Transfer |
| 1(d) | 7/3/00 | Whirled-Wide Marathon Acct. (Queens, New York) | Rio Energy (Texas) | $144,400.56 Electronic Funds Transfer |
| 1(e) | 7/12/00 | Whirled-Wide Marathon Acct. (Queens, New York) | Rio Energy (Texas) | $137,822.24 Electronic Funds Transfer |

14

1(f) 10/22/00  ALEX LUKOV        MARCO MINUTO  Telephone Call
               (Brooklyn,        (New Jersey)
               New York)

1(g) 10/22/00  ALEX LUKOV        MARCO MINUTO  Telephone Call
               (Brooklyn,        (New Jersey)
               New York)                       • • •

## RACKETEERING ACT TWO
(Mail Fraud - Citgo)

39.    In or about and between January 1996 and February
1997, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, JOHN ROMEO and MARCO MINUTO, together with others, did
knowingly and intentionally devise a scheme and artifice to
defraud Citgo and to obtain money and property from Citgo by
means of materially false and fraudulent pretenses,
representations and promises and, for the purpose of executing
this scheme and artifice and attempting to do so, placed and
caused to be placed mail matter in authorized depositories for
mail matter to be delivered by the United States Postal Service,
according to the directions thereon, including the mailing
described in paragraph 44, in violation of Title 18, United
States Code, Sections 1341 and 2.

40.    It was part of this scheme and artifice that the
defendant ALEX LUKOV caused Panther to obtain over
$2,000,000 worth of gasoline and petroleum products from Citgo
that were not paid for by Panther.

25

41.  It was further part of this scheme and artifice that the defendant ALEX LUKOV caused Panther to obtain a line of credit with Citgo, thereby permitting Panther to purchase gasoline and other petroleum products from Citgo without paying for those products immediately.

42.  It was further part of this scheme and artifice that, in order to establish this line of credit, in or about June 1996, the defendant ALEX LUKOV caused a personal financial statement of Panther's President, who acted as personal guarantor of this line of credit, to be mailed from Panther to Citgo, which financial statement LUKOV knew falsely represented the personal assets of Panther's President.

43.  It was further part of this scheme and artifice that, in or about and between February 1996 and September 1996, the defendant ALEX LUKOV caused to be submitted to Citgo financial statements that falsely represented Panther's assets and working capital.

44.  It was further part of this scheme and artifice that, on or about February 13, 1997, at a time when Panther had a balance of approximately $61,000.00 in its bank account, the defendant ALEX LUKOV misrepresented to a Citgo credit manager that Panther had sufficient funds in its bank account to cover an Electronic Funds Transfer of $490,280.57 to Citgo, and on the

16

basis of this misrepresentation, obtained Citgo's authorization for the delivery of 430,000 gallons of petroleum to Panther Oil.

45.    It was further part of this scheme and artifice that, on or about February 14, 1997, the defendant ALEX LUKOV misrepresented to a Citgo credit manager that a check for $70,000 would be mailed to Citgo that day and further misrepresented that Panther would cover an Electronic Funds Transfer of $490,280.67 to Citgo.

46.    It was further part of this scheme and artifice that, on or about February 18, 1997, the defendant ALEX LUKOV misrepresented to a Citgo credit manager that a check for $70,000 had been mailed to Citgo on February 14, 1997, and that another check for $70,000 would be mailed to Citgo by overnight courier on February 18, 1997, and on the basis of these misrepresentations, obtained Citgo's authorization for the delivery of 167,400 gallons of petroleum to Panther.

47.    It was further part of this scheme and artifice that the defendants ALEX LUKOV, JOHN ROMEO and MARCO MINUTO, together with others, caused Panther to sell the petroleum products obtained from Citgo and thereafter allocated the profits among themselves and others.

## RACKETEERING ACT THREE
(Money Laundering Conspiracy - AOB Medical Supply)

48.    In or about and between June 2000 and November 2000, both dates being approximate and inclusive, within the

17

Eastern District of New York and elsewhere, the defendants ALEX
LUKOV and BORIS KERZHNER, together with others, did knowingly and
intentionally conspire to conduct financial transactions, knowing
that the property involved in such financial transactions
represented the proceeds of some form of unlawful activity, and
which property did in fact involve the proceeds of specified
unlawful activity, to wit: mail fraud and wire fraud in violation
of Title 18, United States Code, Sections 1341 and 1343 as
described in Racketeering Act One, with the intent to promote the
carrying on of specified unlawful activity, to wit: mail fraud,
in violation of Title 18, United States Code, Section 1956(h).

49.  It was part of this conspiracy that, in or about
June 2000, the defendants ALEX LUKOV and BORIS KERZHNER
established AOB, a medical supply company with an office on
Rockaway Boulevard in Queens, New York.

50.  It was a further part of this conspiracy that the
defendant ALEX LUKOV invested in AOB proceeds of specified
unlawful activity to wit: mail fraud and wire fraud in violation
of Title 18, United States Code, Sections 1341 and 1343, to wit:
the fraudulent activity described in Racketeering Act One.

51.  It was a further part of this conspiracy that the
defendants established AOB, in part, for the purpose of
submitting fraudulent claims to insurance companies seeking

19

reimbursement for medical supplies allegedly provided by ACB to
ACB patients and customers.

### RACKETEERING ACT FOUR
#### (Extortion of John Doe #1)

52.   The defendants named below committed the following
acts, either one of which alone constitutes the commission of
Racketeering Act Four:

A.   Conspiracy to Extort

53.   On or about and between August 1, 2000 and
October 4, 2000, both dates being approximate and inclusive,
within the Eastern District of New York and elsewhere, the
defendants ALEX LUKOV, MARCO MINUTO and JOSEPH CASSESE, together
with others, knowingly and intentionally conspired to obstruct,
delay and affect commerce, and the movement of articles and
commodities in commerce, by extortion, in that these defendants
and others conspired to obtain property, to wit: money belonging
to John Doe #1, whose identity is known to the grand jury, with
the consent of John Doe #1, which consent was to be induced
through wrongful use of actual and threatened force, violence and
fear, in violation of Title 18, United States Code, Section 1951.

B.   Attempt to Extort

54.   On or about and between August 1, 2000 and August
30, 2000, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, MARCO MINUTO and JOSEPH CASSESE, together with others,

05/30/2001  08:05  2018845457        TO         12015291870  P.28

Case 0:00-cr-06088-UU  Document 242   Entered on FLSD Docket 06/25/2001   Page 29 of 109
05-29-2001 05:06PM FROM IANNUZZIandIANNUZZI-

knowingly and intentionally attempted to obstruct, delay and
affect commerce, and the movement of articles and commodities in
commerce, by extortion, in that the defendants and others
attempted to obtain property, to wit: money belonging to John Doe
#1, with the consent of John Doe #1, which consent was to be
induced through wrongful use of actual and threatened force,
violence and fear, in violation of Title 18, United States Code,
Sections 1951 and 2.

<u>RACKETEERING ACT FIVE</u>
(Extortionate Extension of Credit: John Doe #2)

55.   On or about and between April 1, 1990 and January
1, 1995, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant JOHN
ROMEO, together with others, knowingly and intentionally made an
extortionate extension of credit to John Doe #2, whose identity
is known to the grand jury, in violation of Title 18, United
States Code, Sections 892 and 2.

(Title 18, United States Code, Sections 1962(c), 1963
and 3551 <u>et seq.</u>)

<u>COUNT TWO</u>
(Racketeering Conspiracy)

56.   The allegations contained in paragraphs 1 through
10 are hereby realleged and incorporated as if fully set forth
herein.

20

57.    In or about and between April 1990 and November 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ALEX LUKOV, also known as "Oleg Lukov," "Oleg Lukevos," "Alex Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian," and "Edward Gershovich," MARCO MINOTO, also known as "The Old Man" and "The Other Guy," JOHN ROMEO, JOSEPH CASSESE, also known as "Little Joe," and BORIS KERZHNER, also known as "Borya," together with others, being persons employed by and associated with the Lukov Organization, which enterprise engaged in, and the activities of which affected, interstate commerce, knowingly and intentionally conspired to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), in violation of Title 18, United States Code, Section 1962(c).

58.    The pattern of racketeering activity through which the above-named defendants agreed to conduct the affairs of the Lukov Organization consisted of the racketeering acts set forth in paragraphs 13 through 55 above as racksteering acts one through five of this Superseding Indictment, which are hereby realleged and incorporated as if fully set forth herein.   It was part of the racketeering conspiracy that the defendants agreed

21

that at least two acts of racketeering would be committed by a
coconspirator in the conduct of the affairs of the
enterprise.

(Title 18, United States Code, Sections 1962(d), 1963
and 3551 et seq.)

### COUNT THREE
(Mail and Wire Fraud Conspiracy - Bootleg Gasoline)

59.  The allegations contained in paragraphs 1 through
10 and 13 through 38 are hereby realleged and incorporated as if
fully set forth herein.

60.  In or about and between January 1996 and October
30, 2000, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex
Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian,"
and "Edward Gershovich," MARCO MINUTO, also known as "The Old
Man" and "The Other Guy," JOHN ROMEO, JOSEPH CASSESE, also known
as "Little Joe," BORIS KERZHNER, also known as "Borya," and IRINA
KERZHNER, together with others, did knowingly and intentionally
conspire to devise a scheme and artifice to defraud the State of
New York and to obtain money from it by means of materially false
and fraudulent pretenses, representations and promises and, for
the purpose of executing the aforementioned scheme and artifice,
to transmit and cause to be transmitted by means of wire
communication in interstate commerce signs, signals and sounds,

in violation of Title 18, United States Code, Section 1343, and to place and to cause to be placed mail matter in authorized depositories for mail matter to be delivered by the United States Postal Service, according to the directions thereon, in violation of Title 18, United States Code, Section 1341.

61. In furtherance of the conspiracy and to effect the objects thereof, within the Eastern District of New York and elsewhere, the above-named defendants and their coconspirators committed and caused to be committed, among others, the following:

<u>OVERT ACTS</u>

a. On June 11, 2000, the defendant ALEX LUKOV had a telephone conversation in which he negotiated to sell gasoline to the operator of a retail filling station in New York.

b. On June 12, 2000, the defendant ALEX LUKOV had a telephone conversation in which he negotiated to sell gasoline to the operator of a retail filling station in New York.

c. On June 13, 2000, the defendant ALEX LUKOV had a telephone conversation in which he negotiated to sell gasoline to the operator of a retail filling station in New York.

d. On July 16, 2000, the defendant ALEX LUKOV had a telephone conversation in which he negotiated to sell gasoline to the operator of a retail filling station in New York.

e.      On August 13, 2000, the defendant ALEX LUKOV had
a telephone conversation in which he negotiated to sell gasoline
to the operator of a retail filling station in New York.

f.      On or about June 6, 1996, the defendant ALEX
LUKOV caused to be mailed to Citgo a personal financial statement
of Gary Furman.

g.      On or about September 15, 2000, the defendants
ALEX LUKOV and IRINA KERZHNER caused to be mailed to Citgo
Carrier Card Agreements.

(Title 18, United States Code, Sections 371 and 3551 et
seq.)

## COUNTS FOUR AND FIVE
### (Mail Fraud - Bootleg Gasoline)

62.     The allegations contained in paragraphs one
through ten and 13 through 38 are hereby realleged and
incorporated as if fully set forth herein.

63.     In or about and between January 1996 and October
30, 2000, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex
Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian,"
and "Edward Gershovich," MARCO MINUTO, also known as "The Old
Man" and "The Other Guy," JOHN ROMEO, JOSEPH CASSESE, also known
as "Little Joe," BORIS KERZHNER, also known as "Borya," and IRINA
KERZHNER, together with others, did knowingly and intentionally

28

devise a scheme and artifice to defraud the State of New York and
to obtain money from it by means of materially false and
fraudulent pretenses, representations and promises and, for the
purpose of executing the aforementioned scheme and artifice,
placed and caused to be placed the following mail matter in
authorized depositories for mail matter to be delivered by the
United States Postal Service, according to the directions thereon
on or about the dates indicated:

| Count | Date | From | To | Nature of Transmission |
|-------|------|------|------|----------------------|
| 4 | 6/6/96 | Panther (Merrick, New York) | Citgo | Financial Statement of Gary Furman |
| 5 | 9/15/00 | Express I (Queens, New York) | Citgo | Carrier Card Agreements |

(Title 18, United States Code, Sections 1341, 2 and
3551 et seq.)

## COUNTS SIX THROUGH TEN
### (Wire Fraud - Bootleg Gasoline)

64. The allegations contained in paragraphs one
through ten and 13 through 38 are hereby realleged and
incorporated as if fully set forth herein.

65. In or about and between January 1996 and October
30, 2000, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex
Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian,"

25

and "Edward Gershovich," MARCO MINUTO, also known as "The Old
Man" and "The Other Guy," JOHN ROMEO, JOSEPH CASSESE, also known
as "Little Joe," BORIS KERZHNER, also known as "Borya," and IRINA
KERZHNER, together with others, did knowingly and intentionally
devise a scheme and artifice to defraud the State of New York and
to obtain money from it by means of materially false and
fraudulent pretenses, representations and promises and, for the
purpose of executing the aforementioned scheme and artifice,
transmitted and caused to be transmitted by means of wire
communication in interstate commerce the following signs, signals
and sounds on or about the dates indicated:

| Count | Date | From | To | Transmission |
|---|---|---|---|---|
| 6 | 6/12/00 | Whirled-Wide Marathon Acct. (Queens, New York) | Rio Energy (Texas) | $128,462.27 Electronic Funds Transfer |
| 7 | 7/3/00 | Whirled-Wide Marathon Acct. (Queens, New York) | Rio Energy (Texas) | $144,400.46 Electronic Funds Transfer |
| 8 | 7/12/00 | Whirled-Wide Marathon Acct. (Queens, New York) | Rio Energy (Texas) | $137,822.24 Electronic Funds Transfer |
| 9 | 9/22/00 | ALEX LUKOV (Brooklyn, New York) | MARCO MINUTO (New Jersey) | Telephone Call |
| 10 | 9/22/00 | ALEX LUKOV (Brooklyn, New York) | MARCO MINUTO (New Jersey) | Telephone Call |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

<u>COUNT ELEVEN</u>
(Mail Fraud Conspiracy - Citgo)

66.    The allegations contained in paragraphs one through ten and 39 through 47 are hereby realleged and incorporated as if fully set forth herein.

67.    In or about and between January 1996 and February 1997, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ALEX LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian," and "Edward Gershovich," and JOHN ROMEO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Citgo and to obtain money and property of Citgo by means of materially false and fraudulent pretenses, representations and promises and, for the purpose of executing this scheme and artifice, to place and cause to be placed mail matter in authorized depositories for mail matter to be delivered by the United States Postal Service, according to the directions thereon, in violation of Title 18, United States Code, Sections 1341 and 2.

68.    In furtherance of the conspiracy and to effect the objects thereof, within the Eastern District of New York and elsewhere, the above-named defendants and their co-conspirators

27

committed and caused to be committed, among others, the
following:

OVERT ACTS

    a.    On or about February 13, 1997, the defendant ALEX
LUKOV spoke by telephone with a Citgo credit manager.

    b.    On or about February 14, 1997, the defendant ALEX
LUKOV spoke by telephone with a Citgo credit manager.

    c.    On or about February 18, 1997, the defendant ALEX
LUKOV spoke by telephone with a Citgo credit manager.

    (Title 18, United States Code, Sections 371 and 3551 et
seq.)

COUNT TWELVE<br>(Mail Fraud - Citgo)

    69.    The allegations contained in paragraphs 1 through
10 and 39 through 47 are hereby realleged and incorporated as if
fully set forth herein.

    70.    In or about and between January 1996 and February
1997, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV also known as "Oleg Lukov," "Oleg Lukovos," "Alex Lukovos,"
"Yakov Mogilevich," "Alex Romac," "Alex the Russian," and "Edward
Gershovich," and JOHN ROMEO, together with others, did knowingly
and intentionally devise a scheme and artifice to defraud Citgo
and to obtain money and property of Citgo by means of false and
fraudulent pretenses, representations and promises and, for the

purpose of executing this scheme and artifice and attempting to
do so, placed and caused to be placed mail matter in authorized
depositories for mail matter to be delivered by the United States
Postal Service, according to the directions thereon, to wit: a
personal financial statement of Gary Furman dated June 6, 1996.

(Title 18, United States Code, Sections 1341, 2 and
3551 et seq.)

## COUNT THIRTEEN
(Money Laundering Conspiracy - Bootleg Gasoline)

71.   The allegations contained in paragraphs 1 through
10 and 13 through 38 are hereby realleged and incorporated as if
fully set forth herein.

72.   In or about and between January 1996 and November
2000, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex
Lukovos," "Yakov Mogilavich," "Alex Romeo,""Alex the Russian,"
and "Edward Gershovich," MARCO MINUTO, also known as "The Old
Man" and "The Other Guy," JOHN ROMBO, JOSEPH CASSESE, also known
as "Little Joe," BORIS KERZHNER, also known as "Borya," and IRINA
KERZHNER, together with others, did knowingly and intentionally
conspire to conduct financial transactions, knowing that the
property involved in such financial transactions represented the
proceeds of some form of unlawful activity, and which property
did in fact involve the proceeds of specified unlawful activity,

29

to wit: mail fraud and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343 as described in Counts Four through Eleven with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

73. It was a part of this conspiracy that the defendants arranged for payment for the sale of gasoline to retail filling stations to be made to the Lukov Companies in cash in order to avoid creating a documentary record of such transactions.

74. It was a further part of this conspiracy that the defendants arranged for the transfer of cash from the Lukov Companies to Whirled-Wide, which money was used to purchase more gasoline that was, in turn, transported into, and sold in, the State of New York without payment of all applicable New York State taxes.

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT FOURTEEN
(Money Laundering Conspiracy-Concealment of Assets)

75. The allegations contained in paragraphs 1 through 47 are hereby realleged and incorporated as if fully set forth herein.

76. In or about and between January 1996 and November 2000, both dates being approximate and inclusive, within the

30

Eastern District of New York and elsewhere, the defendants ALEX
LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex
Lukovos," "Yakov Mogilevich," "Alex Romeo,""Alex the Russian,"
and "Edward Gershovich," MARCO MINUTO, also known as "The Old
Man" and "The Other Guy." and JOHN ROMEO, together with others,
did knowingly and intentionally conspire to conduct financial
transactions, knowing that the property involved in such
financial transactions represented the proceeds of some form of
unlawful activity, and which property did in fact involve the
proceeds of specified unlawful activity, to wit: mail fraud and
wire fraud in violation of Title 18, United States Code, Sections
1341 and 1343, as described in Racketeering Acts One and Two and
Counts Three through Twelve of this Superseding Indictment,
knowing that the transactions were designed in whole or in part
to conceal and disguise the nature, location, source, ownership
and control of such proceeds, in violation of Title 18, United
States Code, Section 1956(a)(1)(B)(i).

77.   It was further part of this conspiracy that the
defendants ALEX LUKOV, MARCO MINUTO and JOHN ROMEO, together with
others, received thousands of dollars in proceeds from the
fraudulent schemes described in Racketeering Acts One and Two and
Counts Three through Twelve of this Superseding Indictment, and
attempted to conceal, and did conceal, the nature, location,
source, ownership and control of such proceeds by, among other

31

things, concealing their roles as undisclosed partners in the
Lukov Companies, receiving and distributing their illegal
proceeds in cash in order to avoid creating a documentary record
of such transactions, and acquiring properties for the benefit of
themselves and others in the names of others.

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

## COUNT FIFTEEN
### (Money Laundering Conspiracy - AOB)

78. The allegations contained in paragraphs 1 through
10 and 48 through 51 are hereby realleged and incorporated as if
fully set forth herein.

79. In or about and between June 2000 and November
2000, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ALEX
LUKOV the defendants ALEX LUKOV, also known as "Oleg Lukov,"
"Oleg Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex
Romeo,""Alex the Russian," and "Edward Gershovich," and BORIS
KERZHNER, also known as "Borya," together with others, did
knowingly and intentionally conspire to conduct financial
transactions, knowing that the property involved in such
financial transactions represented the proceeds of some form of
unlawful activity, and which property did in fact involve the
proceeds of specified unlawful activity, to wit: mail fraud and
wire fraud in violation of Title 18, United States Code, Sections

32

1341 and 1343 as described in Racketeering Acts One and Two and
Counts Three through Eleven of this Superseding Indictment, with
the intent to promote the carrying on of specified unlawful
activity, to wit: mail fraud, in violation of Title 18, United
States Code, Section 1341, as described in paragraph 67, in
violation of Title 18, United States Code, Section
1956(a)(1)(A)(i).

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

## COUNT SIXTEEN
(Extortion Conspiracy)

80.   The allegations contained in paragraphs 1 through
10 and 13 through 38 are hereby realleged and incorporated as if
fully set forth herein.

81.   On or about and between August 1, 2000 and
November 1, 2000, both dates being approximate and inclusive,
within the Eastern District of New York and elsewhere, the
defendants ALEX LUKOV, also known as "Oleg Lukov," "Oleg
Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex
the Russian," and "Edward Garshovich," MARCO MINUTO, also known
as "The Old Man" and "The Other Guy," JOSEPH CASSESE, also known
as "Little Joe," and GIOVANNI LUBRANO, also known as "Joseph,"
"Giovi," "Young Joe," and "John," together with others, knowingly
and intentionally conspired to obstruct, delay and affect
commerce, and the movement of articles and commodities in

commerce, by extortion, in that the defendants and their
coconspirators conspired to obtain property, to wit: money
belonging to John Doe #1, whose identity is known to the grand
jury, with the consent of John Doe #1, which consent was to be
induced through wrongful use of actual and threatened force,
violence and fear.

(Title 18, United States Code, Sections 1951 and 3551
et seq.)

### COUNT SEVENTEEN
### (Attempt to Extort)

82.   The allegations contained in paragraphs 1 through
10 and 13 through 38 are hereby realleged and incorporated as if
fully set forth herein.

83.   On or about and between August 1, 2000 and
November 1, 2000, both dates being approximate and inclusive,
within the Eastern District of New York and elsewhere, the
defendants ALEX LUKOV, also known as "Oleg Lukov," "Oleg
Lukovos," "Alex Lukovos," "Yekov Mogilevich," "Alex Romeo," "Alex
the Russian," and "Edward Gershovich," MARCO MINUTO, also known
as "The Old Man" and "The Other Guy," JOSEPH CASSESE, also known
as "Little Joe," and GIOVANNI LUBRANO, also known as "Joseph,"
"Giovi," "Young Joe," and "John," together with others, knowingly
and intentionally attempted to obstruct, delay and affect
commerce, and the movement of articles and commodities in
commerce, by extortion, in that the defendants and others

attempted to obtain property, to wit: money belonging to John Doe
#1, whose identity is known to the grand jury, with the consent
of John Doe #1, which consent was to be induced through wrongful
use of actual and threatened force, violence and fear.

(Title 18, United States Code, Sections 1951, 2 and
3551 et seq.)

## COUNT EIGHTEEN
### (Assault in Aid of Racketeering)

84.   The allegations contained in paragraphs 1 through
10 and 13 through 38 are hereby realleged and incorporated as if
fully set forth herein.

85.   On or about August 13, 2000, the defendant ALEX
LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex
Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian,"
and "Edward Garshovich," for the purpose of maintaining and
increasing position within the Lukov Organization, an enterprise
engaged in racketeering activity, did knowingly and intentionally
assault John Doe #3, whose identity is known to the Grand Jury,
which assault resulted in serious bodily injury to John Doe # 3,
in violation of Section 120.05(1) of the New York Penal Law.

(Title 18, United States Code, Sections 1959(a)(3) and
3551 et seq.)

## COUNT NINETEEN
(Perjury)

86.  The allegations contained in paragraphs 1 through 10 and 39 through 47 are hereby realleged and incorporated as if fully set forth herein.

87.  On or about March 19, 1997, within the Eastern District of New York, the defendant ALEX LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian," and "Edward Gershovich," having taken an oath before a competent tribunal and officer that he would testify truthfully in response to deposition questions by attorneys representing Citgo in a case in which a law of the United States authorized such an oath to be administered, did knowingly, willfully and contrary to such oath make material declarations in his testimony, to wit: representations that Panther did not maintain a business ledger, as set forth below in the underscored portions of the deposition transcript pages, which he did not then and there believe to be true:

March 19, 1997 Deposition Transcript, page 45:

Q: There was no separate ledger?

A: No

Q: There were only the business records themselves, the original records?

A: Yes

March 19, 1997 Deposition Transcript, page 52:

36

Q: He didn't keep paying the balance. He kept paying part of the balance?

A: That is why I said there is a remaining balance on him.

Q: Where was that reported?

A: Whatever he holds, I have it. I know the number. I have the amount.

Q: Where is that?

A: I have it on a small piece of paper. It says the amount and that is it.

　　　　(Title 18, United States Code, Sections 1621(1) and 3551 et seq.)

　　　　　　MONEY LAUNDERING FORFEITURE ALLEGATION

　　88.　The allegations contained in Counts Thirteen through Fifteen are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 982.

　　89.　Pursuant to Title 18, United States Code, Section 982(a)(1), upon the conviction of any of the offenses set forth in Counts Thirteen through Fifteen of this Superseding Indictment, the defendants ALEX LUKOV, also known as "Oleg Lukov," "Oleg Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex Romeo," "Alex the Russian," and "Edward Gershovich," MARCO MINUTO, also known as "The Old Man" and "The Other Guy," JOHN ROMEO, JOSEPH CABSESE, also known as "Little Joe," BORIS

37

KERZHNER, also known as "Borya," and IRINA KERZHNER shall forfeit
to the United States all right, title and interest in any and all
property, real or personal, involved in such offenses, or
traceable to such property, which amounts to the sum of about
$1,500,000.00. Such forfeitable property includes, but is not
limited to:

(a) all funds held in Lantern Investments, formerly
known as Vision Securities, account number 537-20540 and all
proceeds traceable thereto;

(b) all funds held in Merrill Lynch account number 741-
10R30 and all proceeds traceable thereto;

(c) the real property located at 10185 Collins Avenue,
Unit 814, Bal Harbour, Florida, described in the land records of
Dade County, Florida as recorded in the Official Records Book,
12490, Page 2354 of the Public Records of Dade County, Florida,
Folio Number, 12-2226-029-1720;

(d) the real property located at 65 Nearing Road, Lake
Huntington, New York, described in the land records of Sullivan
County, New York as Section 10, Block 2, Lots 10.3 and 19.2;

(e) the real property located at 839 Cliffside Avenue,
North Woodmere, New York, described in the land records of Nassau
County, New York as Section 39, Block 599, Lot 9;

38

(f) the real property located at 18 Willow Hill, Upper Saddle River, New Jersey, described in the land records of Bergen County, New Jersey, as Block 1204, Lot 1.02;

(g) a red 1993 Cadillac, VIN 1G6CD53BXP4219260, New York License Plate No. CB144G, registered to Whirled-Wide; and

(h) the vessel known as the "Marlin", Vessel Registration number 678830.

90.    Any of the defendants named in Count Thirteen who are convicted of that Count shall be jointly and severally liable for forfeiture of all property involved in the offense or traceable thereto.  Such property is valued at approximately $1,500,000.00.

91.    Any of the defendants named in Count Fourteen who are convicted of that Count shall be jointly and severally liable for forfeiture of all property involved in the offense or traceable thereto.  Such property is valued at approximately $1,500,000.00.

92.    Any of the defendants named in Count Fifteen who are convicted of that Count shall be jointly and severally liable for all property involved in the offense or traceable thereto. Such property is valued at approximately $1,500,000.00.

93.    If, as a result of any act or omission of any of the defendants named in Counts Thirteen through Fifteen, any of

05/30/2001  08:05  2016849437                     TO      12015291670    P.04

Case 0:00-cr-06088-UU    Document 242    Entered on FLSD Docket 06/25/2001    Page 49 of 109
05-29-2001 05:44PM    FROM DONNU22H-GIANNUZZI

39

the property forfeitable pursuant to Title 18, United States

Code, Section 982, or any portion thereof:

> (a)  cannot be located upon the exercise of due
>       diligence;
>
> (b)  has been transferred or sold to, or deposited
>       with, a third party;
>
> (c)  has been placed beyond the jurisdiction of the
>       Court;
>
> (d)  has been substantially diminished in value; or
>
> (e)  has been commingled with other property which
>       cannot be divided without difficulty;

the defendants ALEX LUKOV, MARCO MINUTO, JOHN ROMEO, JOSEPH

CASSESE, BORIS KERZHNER and IRINA KERZHNER shall forfeit

substitute property, up to the value of the property described in

subparagraphs 93(a) through 93(e) above, pursuant to Title 21,

United States Code, Section 853(p), as incorporated by Title 18,

United States Code, Section 982(b), including, but not limited

to, the following:

a.    all right, title and interest in the lot or parcel

of land, together with its buildings, appurtenances,

improvements, fixtures, attachments and easements, located at 11

Marton Place, Garden City, New York, described in the land

records of Nassau County, New York as Section 34, Block 576, Lot

11; and

40

b.    all funds held in Merrill Lynch account numbers
831-36125, 831-36126, 831-35866, and 831-36118, and all proceeds
traceable thereto.

(Title 18, United States Code, Section 982; Title 21,
United States Code, Section 853(p))

## RICO FORFEITURE ALLEGATION

94.   The allegations contained in Counts One and Two
are hereby realleged and incorporated by reference for the
purpose of alleging forfeitures pursuant to the provisions of
Title 18, United States Code, Section 1963.

95.   As a result of the offenses set forth in Counts
One and Two, the defendants ALEX LUKOV, also known as "Oleg
Lukov," "Oleg Lukovos," "Alex Lukovos," "Yakov Mogilevich," "Alex
Romeo," "Alex the Russian," and "Edward Gershovich," MARCO
MINUTO, also known as "The Old Man" and "The Other Guy," JOHN
ROMEO, JOSEPH CASSESE, also known as "Little Joe," and BORIS
KERZHNER, also known as "Borya":

a.    have interests which they acquired or maintained
in violation of Title 18, United States Code, Section 1962, which
interests are subject to forfeiture to the United States of
America pursuant to Title 18, United States Code, Sections
1963(a)(1);

b.    have an interest in, security of, claim against or
property or contractual right affording them a source of

41

influence over the enterprise said defendants have established, operated, controlled, conducted and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture pursuant to Title 18, United States Code, Section 1963(a)(2); and

c. have property constituting or derived from proceeds which they obtained directly or indirectly from racketeering activity in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture pursuant to Title 18, United States Code, Section 1963(a)(3).

96. The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1)-1963(a)(3), include but are not limited to at least $1,300,000.00, which includes, but is not limited to, the following:

a. All right, title and interest of any defendant in all funds held in Lantern Investments, formerly known as Vision Securities, account number 557-20540, and all proceeds traceable thereto;

b. All right, title and interest of any defendant in all funds held in Merrill Lynch account number 741-10R30, and all proceeds traceable thereto;

c. All right, title and interest of any defendant in the real property located at 10185 Collins Avenue, Unit 814, Bal

05/30/2001  08:05  2016849437  PAGE 43
Case 0:00-cr-06088-UU   Document 242   Entered on FLSD Docket 06/25/2001   Page 52 of 109
05-29-2001 05:45PM  FROM  INN221 24ANN22  TO  12015291670  P.07

Harbour, Florida, described in the land records of Dade County,
Florida as recorded in the Official Records Book, 12490, Page
2354 of the Public Records of Dade County, Florida, Folio Number,
12-2226-029-1720;

      d.  All right, title and interest of any defendant in
the real property located at 65 Nearing Road, Lake Huntington,
New York described in the land records of Sullivan County, New
York as Section 10, Block 2, Lots 10.3 and 19.2;

      e.  All right, title and interest of any defendant in
the real property located at 839 Cliffside Avenue, North
Woodmere, New York, described in the land records of Nassau
County, New York as Section 39, Block 598, Lot 9;

      f.  All right, title and interest of any defendant in
the real property located at 19 Willow Hill, Upper Saddle River,
New Jersey, described in the land records of Bergen County, New
Jersey as Block 1204, Lot 1.02;

      g.  All right, title and interest of any defendants in
any and all motor vehicles, including, but not limited to
all right, title and interest of any defendant in a red 1993
Cadillac, VIN 1G6CD53BXP4219260, New York License Plate No.
C8144G, registered to Whirled-Wide; and

      h.  All right, title and interest of any defendant in
the vessel known as the "Marlin", Vessel Registration number
678830.

43

97. Any of the defendants named in Count One who are convicted of that Count shall be jointly and severally liable for the forfeiture obligations set forth in paragraphs 94 through 96. The property interests subject to forfeiture amount to approximately $1,500,000.00.

98. Any of the defendants named in Count Two who are convicted of that Count shall be jointly and severally liable for the forfeiture obligations set forth in paragraphs 94 through 96. The property interests subject to forfeiture amount to approximately $ 1,500,000.00.

99. If, as a result of any act or omission of any of the defendants named in Counts One and Two, any of the property forfeitable pursuant to Title 18, United States Code, Section 1963(a), or any portion thereof:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

the defendants ALEX ZUKOV, MARCO MINUTO, JOHN ROMEO, JOSEPH CASSESE and BORIS KERZHNER shall forfeit substitute property, up to the value of the property described in subparagraphs 99(a)

through 99(w) above, pursuant to Title 18, United States Code, Section 1963(m), including, but not limited to, the following:

a.    all right, title and interest in the lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 11 Warton Place, Garden City, New York, described in the land records of Nassau County, New York as Section 34, Block 576, Lot 11; and

b.    all funds held in Merrill Lynch account numbers 831-36125, 831-36126, 831-35866, and 831-36118, and all proceeds traceable thereto.

(Title 18, United States Code, Section 1963)

A TRUE BILL

_____
FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.131

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )    MISC. NO. 9℔-12
FOR AN ORDER AUTHORIZING THE        )
INTERCEPTION OF WIRE COMMUNICATIONS )    UNDER SEAL
_____)

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Darrin S. Sachs, Special Agent, Federal Bureau of
Investigation, Miami, Florida, being duly sworn, depose and say:

1.    I am a Special Agent of the Federal Bureau of
Investigation (FBI).  As such, I am an "investigative or law
enforcement officer of the United States" within the meaning of
Title 18, United States Code (U.S.C.), Section 2510 (7), that is,
an officer of the United States, who is empowered by law to conduct
investigations of and to make arrests for offenses enumerated in
Title 18, U.S.C., Section 2516.

2.    I have been employed as a Special Agent of the FBI for
over two years.  Prior to my employment with the FBI, I was
employed as a Deputy United States Marshal for approximately five
and a half years.  For the past year and a half, I have been
assigned primarily to investigations of organized crime, including
investigations of an organized criminal enterprise known as the La
Cosa Nostra (LCN).  As a result of my participation in these
investigations, conversations with other FBI Agents familiar with
the criminal activities of the LCN, review of reports concerning

LCN activities, members and associates, and reliable informant information, I know that the criminal activities of the LCN include, but are not limited to, gambling, loansharking, money laundering, extortion, labor racketeering, drug trafficking, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3. This Affidavit is being submitted in support of an application which seeks an order authorizing the interception of the wire communications of MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI, and others as yet unknown over assigned telephone numbers (954) 782-3172 (target residential telephone), subscribed to by MARCELLO GRASSO, 740 South Federal Highway #515, Pompano Beach, Florida and (954) 562-0082 (target cellular telephone), and bearing electronic serial number (ESN)15705204363, subscribed to by Alison Heller (the girlfriend of MARCELLO GRASSO and used by MARCELLO GRASSO) billed to 740 South Federal Highway #515, Pompano Beach, Florida (hereafter referred to as target telephones) for a period of thirty (30) days[1].

4. The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning

---

[1] Although the cellular telephone is subscribed to by Alison Heller, your affiant has no basis to believe that she will be using it in furtherance of the criminal activities set forth herein.

offenses enumerated in Title 18, United States Code, Section 2516, in particular, the following offenses:

A.   Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4) (The Luchese Organized Crime Family), the activities of which affect interstate and foreign commerce through a pattern of racketeering activity consisting of the offenses set forth in paragraphs 4(B)- 4(H), below, and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962,(c) and (d);

B.   Transporting stolen goods, securities or money, in and affecting interstate commerce, in violation of Title 18, United States Code, Section 2314;

C.   Receiving and selling stolen goods, securities or money, in violation of Title 18, United States Code, Section 2315;

D.   Transmitting gambling information in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1084;

E. Conducting an illegal gambling business in violation of Title 18, United States Code, Section 1955;

F. Collecting extensions of credit by extortionate means, in violation of Title 18, United States Code, Section 894.

G.   Distributing controlled substances, using a communication facility to facilitate the distribution of a controlled substance, and conspiracy to distribute controlled

3

JM 0085

substances, in violation of Title 21, United States Code, Sections 841, 843(b) and 846.

H. Stealing goods from interstate shipments, in violation of Title 18, United States Code, Section 659.[2]

5.    Your affiant has personally participated in the investigation of the offenses referred to in paragraph 4 of this affidavit, and from that personal participation in this investigation and reports (oral and written) made to me by other agents of the FBI and other federal, state, and local law enforcement agencies, I am familiar with the facts and circumstances of this investigation.

6.    Prior to setting forth the facts and circumstances constituting probable cause, I have reviewed numerous FBI reports concerning information provided by four confidential informants of known reliability and other sources of information set forth below.

7.    The facts and circumstances set forth below demonstrate that:

A.    There is probable cause to believe that MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI, and others as yet

---

[2] In addition, based on the information set forth in the affidavit, it is possible that criminal conversations will be intercepted involving the interference with interstate and foreign commerce through robbery or extortion, in violation of Title 18, United States Code, Section 1951.

4

JM 0086

unknown, have committed, are committing, and will continue to commit the offenses enumerated in paragraphs 4(A) through 4(H), above.

B.   There is probable cause to believe that MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI, and others as yet unknown, have used, are using and will continue to use telephone numbers (954) 782-3172 (target residential telephone), subscribed to by MARCELLO GRASSO, 740 South Federal Highway #515, Pompano Beach, Florida and (954) 562-0082 (target cellular telephone), and bearing electronic serial number (ESN) 15705204363, subscribed to by Alison Heller (girlfriend of MARCELLO GRASSO and used by MARCELLO GRASSO), 740 South Federal Highway #515, Pompano Beach, Florida; for the purpose of discussing and executing the offenses enumerated in paragraphs 4(A) through 4(H), above.

8.   In particular, I believe that wire communications will occur over (954) 782-3172 (target residential telephone), and (954) 562-0082 (target cellular telephone), which will disclose:

A.   The precise nature and scope of the illegal activities;

B.   The disposition of monies obtained as a result of these illegal activities;

5

JM 0087

C.  The location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth in paragraph 4, above;

D.  In addition, the communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

9.  The statements contained in this affidavit are based on your Affiant's experience and background as a Special Agent of the FBI, and conversations with other law enforcement officials, information from confidential sources, and analysis of pen register activity.

10. Normal investigative procedures have been used and have not succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.  These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES
## TO BE INTERCEPTED

11.  According to subpoenaed Bell South Telecommunications records, (954) 782-3172 (target residential telephone) is subscribed to by MARCELLO GRASSO, 740 South Federal Highway #515, Pompano Beach, Florida.

6

JM 0088

12. According to subpoenaed Bell South Mobility records, cellular telephone (954) 562-0082 (target cellular telephone), and bearing electronic serial number (ESN) 15705204363 is subscribed to by Alison Heller (girlfriend of MARCELLO GRASSO and used by MARCELLO GRASSO), 740 South Federal Highway #515, Pompano Beach, Florida.

## BACKGROUND OF THE PRINCIPALS

13. MARCELLO GRASSO was born on October 22, 1947, and resides at 740 South Federal Highway #515, Pompano Beach, Florida. GRASSO is the nephew of Luchese Solider MARCO MINUTO and is presently involved in recruiting South Florida gamblers and collecting outstanding gambling debts on behalf of MINUTO. As described below, MINUTO conducts a bookmaking operation on behalf of the Luchese Organized Crime Family. GRASSO is employed at a business called Miron Lumber, located in Pompano Beach, Florida. GRASSO was arrested on May 29, 1985, in Jacksonville, Florida and was subsequently convicted for possession of counterfeit currency. GRASSO was arrested on February 3, 1989, and was subsequently convicted in Atlanta, Georgia, for conspiracy to import marijuana. GRASSO received a sentence of forty eight (48) months of incarceration. In addition to illegal bookmaking activities, GRASSO is involved in the distribution of cocaine, marijuana and the interstate transportation of stolen property.

7

14.  MARCO MINUTO  was born on March 23, 1936, and resides at 18 Willow Hill, Saddle River, New Jersey.  In 1995, MINUTO was inducted into the Luchese Organized Crime Family as a soldier. MINUTO was arrested on May 14, 1970, in New York and was subsequently convicted of grand larceny.  MINUTO was arrested on November 14, 1970, in New York and was subsequently convicted for promoting gambling. MINUTO was arrested on May 29, 1980, in New York and was subsequently convicted of failure to file a corporate tax return.  MINUTO was arrested on January 8, 1991, in New York and was subsequently convicted for possession of gambling records.

15.  JOSEPH MINUTO, was born on January 22, 1962, and resides at 751 Orangeburgh Road, Riverbrook, New Jersey.  JOSEPH MINUTO is the son of Luchese Solider MARCO MINUTO and operates a bookmaking operation on behalf of MARCO MINUTO. JOSEPH MINUTO was arrested on April 13, 1984, in New York and was subsequently convicted for a gambling offense.

16.  CHRIS GRECO, was born on July 7, 1965, and resides at 250 E. Crescent Avenue, Mahwah, New Jersey.  CHRIS GRECO is the son-in-law of Luchese Solider MARCO MINUTO and works directly with MARCO MINUTO and JOSEPH MINUTO in bookmaking operations.  GRECO was arrested on August 4, 1985, in New Jersey and was subsequently convicted of assault with intent to cause physical injury.

17.  DOMINICK MEMOLI, was born on February 13, 1966, and resides at 432 Riverdale Avenue, Yonkers, New York.  MEMOLI is an

8

JM 0090

"enforcer" for Luchese Solider MARCO MINUTO. MEMOLI was arrested on March 23, 1987, in New York and was subsequently convicted of criminal possession of a controlled substance. MEMOLI was arrested on March 17, 1990, in New York and was subsequently convicted of criminal possession of a weapon. MEMOLI was arrested on November 6, 1990, in New York and was subsequently convicted of burglary. MEMOLI was arrested on December 7, 1992, in New York and was subsequently convicted of burglary. MEMOLI is currently on New York state probation, and according to his probation officer, was arrested on June 12, 1998, in New York for reckless endangerment and resisting arrest.

18.    JAMES MANCUSO was born on March 24, 1964, and recently resided at 2404 Crotona Avenue, Bronx, New York. MANCUSO is an "enforcer" for Luchese Solider MARCO MINUTO. JAMES MANCUSO was arrested on September 26, 1985, in New York and was subsequently convicted of grand larceny and the possession of stolen property. MANCUSO was arrested on November 2, 1987, in New York for murder, and was subsequently convicted of first degree manslaughter. MANCUSO served an eight (8) year prison sentence and has been on conditional release since 1997. MANCUSO's term of conditional release is due to expire on February 23, 2001.

19.    ALEX TORRENTE was born on August 8, 1963 and resides at 1421 San Marcos Ave., Coral Gables, Florida. TORRENTE is associated with Miami Express Courier & Trial Exhibits, located in

9

JM 0091

Miami. TORRENTE is operating a large bookmaking operation that is associated with MARCO MINUTO and MARCELLO GRASSO from within Miami Express Courier & Trial Exhibits. TORRENTE is presently involved with MARCELLO GRASSO in the weekly thefts of Federal Express packages containing jewelry. TORRENTE was arrested on August 20, 1986, in Miami, Florida and was subsequently convicted for the unauthorized use of credit card access devices. TORRENTE was arrested on September 20, 1990, in Miami, Florida for a probation violation and was subsequently sentenced to one year incarceration.

20. HERNANDO HERNANDEZ was born on May 15, 1953, and resides at 2955 SW 25th Terrace, Miami, Florida. HERNANDEZ has previously supplied MARCELLO GRASSO with kilogram quantities of cocaine. HERNANDEZ was arrested on February 5, 1988, in Miami, Florida and was subsequently convicted for possession of marijuana. HERNANDEZ was arrested on June 23, 1988, by the Drug Enforcement Administration (DEA), Miami, Florida for conspiracy and possession with intent to distribute cocaine. HERNANDEZ was subsequently convicted and received a sentence of five (5) years' incarceration. HERNANDEZ was arrested on February 25, 1994, in Miami, Florida for a probation violation and was subsequently sentenced to sixteen (16) months' incarceration.

21. BRUCE SAMUELS was born on April 4, 1958, and resides at 923 NE 26th Avenue, Hallandale, Florida. SAMUELS, a disbarred attorney, operates a large South Florida bookmaking operation that

10

JM 0092

is associated with MARCO MINUTO and MARCELLO GRASSO. Based on information from the Florida Bar Association, SAMUELS was disbarred on February 7, 1991. SAMUELS was arrested on March 30, 1989, in Miami, Florida and was subsequently convicted of possession of counterfeit currency and dealing in counterfeit currency. SAMUELS was arrested on August 31, 1989, by DEA and was subsequently convicted of possession with intent to distribute cocaine. SAMUELS was sentenced to sixty (60) months incarceration.

22. GIUSEPPE ANDRE VON BERGER was born on December 3, 1939, and resides in Italy, but has a South Florida address of 151 Crandon Blvd. #202, Key Biscayne, Florida. VON BERGER was involved with HERNANDO HERNANDEZ in negotiations with MARCELLO GRASSO to purchase stolen bearer bonds.

23. NICOLO MARIANI was born on April 4, 1965, and is presently incarcerated at the Madison Correctional Institution, Madison, Florida. MARIANI is a criminal associate and confidant of Luchese Soldier MARCO MINUTO. MARIANI was arrested on June 8, 1990, by the Bureau of Alcohol, Tobacco, and Firearms (ATF) in New York and was subsequently convicted of arson and sentenced to forty six (46) months incarceration. MARIANI was arrested on October 4, 1996, in Florida for violation of probation and was subsequently sentenced to twenty one (21) months incarceration. MARIANI was arrested on June 23, 1994, in Orlando, Florida and was subsequently convicted of fraud. MARIANI was arrested on August

11

JM 0093

14, 1995, in Pompano Beach, Florida and was subsequently convicted of aggravated battery.

PREVIOUS APPLICATIONS

24. I caused a search to be made of the Electronic Surveillance Indices of the FBI and DEA during the weeks of July 13, 1998 and July 27, 1998, to determine whether previous applications have been made to intercept electronic communications of MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI, and the facilities named in this Affidavit. The search did not reveal any other applications to intercept wire, oral or electronic communications of these interceptees or facilities named in this Affidavit.

FACTS AND CIRCUMSTANCES
ESTABLISHING PROBABLE CAUSE

Structure of the LCN and the Luchese Family

25. Based on my investigative training and experience, and the sources described below, I have learned the following information about the LCN, a nationwide secret criminal association, and the Luchese Crime Family:

A.    The LCN is one of the most powerful and sophisticated organized crime groups in the United States.

12

B. The LCN consists of approximately twenty-four separate organizational units known as families functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss and the second-in-command is the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo" or "skipper." Caporegimes are supervisors over "crews", i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have non-member associates under their direction.

D.    There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino, Genovese, and Luchese LCN families. Each of these families is involved in a wide variety of criminal activities including murder, arson, gambling, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking. The Miami/Fort Lauderdale area is considered an "open city" in which any LCN family may operate without paying tribute to any other LCN family. Each of the five New York families has representatives in South Florida.

26. The Luchese LCN family, with approximately 110 active and inactive members, is one of the largest and most powerful LCN

13

JM 0095

families in the United States.  The Luchese LCN family is presently involved in the  gas distribution business, control of restaurant and hotel industries, shipping and related marine services, as well as aspects of the pornography business.  The family also engages in drug trafficking and is involved in traditional racketeering activities, such as, murder, gambling, loansharking, public corruption and obstruction of justice among other racketeering offenses.

27.  As a result of my training and experience, your Affiant has knowledge of the following methods and operations of illegal interstate gambling businesses operated by the LCN, including the Luchese family:

A.  The use of telephonic communications is essential to the furtherance of a gambling operation.

B.  The "line" is a group of point-spreads which show relative strengths of two opposing teams in an athletic contest, for example, football and basketball contests.  The "line" for a particular game is then used as a handicap for wagering purposes. The "handicap" is added to the underdog's final score or subtracted from the winner's final score to determine the winner of the wager. While "lines" for a game are supposed to balance the two teams, bookmakers require a bettor to risk ten (10) to twenty (20) percent more than the bookmaker risks as a fee for the privilege of wagering.  This ten (10) or twenty (20) percent charge, commonly referred to as "vigorish" or "juice," enables the bookmaker to make

14

JM 0096

a profit if the bookmaker accepts an even, or substantially even, amount of wagers on both teams in the contest, regardless of who wins the contest. In this way, the bookmaker operates on a profit margin and does not gamble on the outcome of the event.

C. It is common for illegal sports bookmakers to obtain current "line" information by telephone. A bookmaker must know the opening "line" and obtain frequent updates on the "line." A bookmaker residing in the Fort Lauderdale, Florida area would have to use a telephone or other telecommunications device to expeditiously obtain the current "line" information before it becomes outdated. After receiving the "line" information, the bookmaker would furnish the "line" to his customers, who would in turn study it, compare it with other "lines", and make wagers. In order for a bookmaker to balance, or nearly balance his books, it is typical for him to have another bookmaker with whom to re-bet the wagers. The other bookmaker is, in effect, acting as the primary bookmaker's insurer. The second bookmaker is known as a "lay-off bookmaker," and the aforementioned re-betting or balancing process is known as "laying off." In this way, the bookmaker does not gamble on the outcome of the event and simply operates on a profit margin.

D. Bookmakers frequently obtain unpublished telephone numbers in fictitious names or in names other than their own, for use at their place of operation.

15

JM 0097

E.    Bookmakers will often utilize "commission men" to accept and accumulate wages from bettors.    These wagers are thereafter relayed to the main gambling office.    The bookmaker will compensate the commission man for this service by paying either a percentage of the commission man's gross wagers or profits.

27.1.    Florida state statute 849.25 provides that it is a felony offense to engage in bookmaking as defined by Florida statute 849.25.

## SOURCES OF INFORMATION

### Confidential Source One

28. Confidential Source One (hereinafter referred to as "CS-1") has been providing information to Agents of the FBI concerning criminal activities in excess of eight (8) years. CS-1 has provided information concerning members of organized crime and organized crime activities such as narcotics, extortion, bookmaking, and the interstate theft of stolen property.  All information provided by CS-1 has been shown to be extremely reliable and  has been consistently corroborated by  information obtained from other confidential sources and from independent investigations conducted by law enforcement agencies.  None of the information furnished by CS-1 has been shown to be false or misleading.  In addition to the criminal activity set forth in this affidavit, information provided by CS-1 has resulted in the opening of 7 other FBI investigations, and the identification of criminal activity committed by 22 other

16

JM 0098

persons. Information supplied by CS-1 has resulted in the arrest and conviction of four persons in four separate criminal prosecutions. One of these defendants was the President of a federally insured financial institution. CS-1 was also instrumental in providing timely information that enabled authorities to prevent and thwart an ongoing fraud.

29. The information provided by CS-1 in this affidavit is based on CS-1's direct conversations and associations with MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI, and others.

### Confidential Source Two

30. Confidential Source Two (hereinafter referred to as "CS-2") has provided information to Agents of the FBI concerning criminal activities in the South Florida area since September, 1997. CS-2 has provided information pertinent to FBI investigations on approximately twenty occasions. CS-2 has provided information concerning members of organized crime and organized crime activities, such as, the distribution of cocaine and marijuana, kidnaping, extortion, credit card fraud, and attempted arson. All information provided by CS-2 has been shown to be reliable and where possible has been corroborated by information obtained from other confidential sources and from independent investigations conducted by law enforcement agencies. None of the information

17

furnished by CS-2 has been shown to be false or misleading. Information provided by CS-2 has been utilized in the arrest of four individuals.

## Confidential Source Three

31.   Confidential Source Three (hereinafter referred to as "CS-3") has provided information to Agents of the FBI concerning criminal activities in South Florida for over two months. CS-3 has provided information concerning members of organized crime  and organized crime activities, such as, bookmaking and  the interstate transportation of stolen property. All information provided by CS-3 has been shown to be reliable and where possible has been corroborated by information obtained from other confidential sources and from independent investigations conducted by law enforcement agencies.

## Confidential Source Four

32.  Confidential Source Four (hereinafter referred to as "CS-4") has provided information to Agents of the FBI  for approximately ten (10) years.  CS-4 has provided information to the New York Division of the FBI that was used in obtaining at least two court authorized electronic surveillance orders.   All information provided by CS-4 has been shown to be reliable and where possible has been corroborated by information obtained from other confidential sources, and from independent investigations

18

JM 0100

conducted by law enforcement agencies. None of the information furnished by CS-4 has been shown to be false or misleading.

## CHRONOLOGICAL NARRATION OF CRIMINAL ACTIVITY

33.  On July 11, 1995, CS-4 advised the FBI that he had learned from members of the Luchese Organized Crime Family, including a Capo in the Family, that MARCO MINUTO and eight (8) other individuals were recently inducted as soldiers into the Luchese Organized Crime Family. I am aware that the induction ceremony is an established ritual, whereby the newly inducted member pledges loyalty and allegiance to the organized crime family. This new member agrees to conduct criminal activities for the mutual benefit of the crime family.

34.  In or about July of 1996, prior to CS-2 becoming a confidential source for the FBI, MARCELLO GRASSO approached CS-2 with the opportunity to purchase cocaine. CS-2 agreed to purchase the  cocaine from GRASSO and was provided with a beeper number by GRASSO, so that CS-2 could contact him (GRASSO) and coordinate the purchase of cocaine with GRASSO. CS-2 purchased personal use quantities of cocaine from GRASSO.  GRASSO and CS-2 made the arrangements for these cocaine purchases over the telephone in coded language. CS-2 does not recall what specific telephone numbers were used by GRASSO.

34.1. CS-2 has observed GRASSO in the possession of a case that contained cocaine.  GRASSO also offered CS-2 an opportunity to

19

sell marijuana on behalf of GRASSO. CS-2 asked GRASSO how much marijuana GRASSO could provide to CS-2. GRASSO advised that he could provide as much marijuana as CS-2 wanted. CS-2 later turned down GRASSO's offer to sell marijuana.

35. On January 6, 1997, CS-1 advised the FBI that JOSEPH MINUTO and CHRIS GRECO traveled to South Florida to collect a gambling debt. MARCELLO GRASSO introduced JOSEPH MINUTO and CHRIS GRECO to some unidentified South Florida bookmakers. These bookmakers advised GRASSO that they had no one to collect gambling debts for them and were interested in obtaining the services of MARCO MINUTO. CS-1 later advised that MARCO MINUTO had authorized MARCELLO GRASSO to provide enforcement for the South Florida bookmakers.

36. On January 6, 1997, CS-1 advised the FBI that MARCELLO GRASSO was distributing kilogram quantities of cocaine, through a "contact" in Miami. CS-1 identified this person as HERNANDO HERNANDEZ.

A. As set forth below, in paragraphs 78 & 91, pen register information shows contact between the target cellular telephone and HERNANDO HERNANDEZ.

37. On January 13, 1997, CS-1 advised the FBI that MARCO MINUTO intended to organize South Florida and New York bookmakers, particularly in the area of sports betting.

20

JM 0102

38. On January 24, 1997, CS-1 advised the FBI that CHRIS GRECO was in the South Florida area on behalf of MARCO MINUTO to see John Norwicki, who had opened Roxanne's, a "strip club" in South Florida. GRECO was instructed to "get an envelope every week" from Norwicki, who was paying for the protection of Norwicki's club. MARCO MINUTO expressed interest in obtaining a 50% ownership of this club.

39. On February 10, 1997, CS-1 advised the FBI that MARCELLO GRASSO knows of an individual who had access to stolen bearer bonds and could provide GRASSO with such bonds.

40. On March 12, 1997, CS-1 advised the FBI that John Norwicki, the then owner of the "strip club" Roxanne's, advised MARCELLO GRASSO that he had been having some "real problems." The Disc Jockey at Roxanne's called Norwicki and told Norwicki that he had received a telephone call from an unknown individual, who had threatened to kill the disc jockey's family and cut the faces of any girls who showed up at Roxanne's. As a result, Norwicki advised GRASSO that the disc jockey and the dancers did not go to work. CS-1 advised the FBI that MARCO MINUTO intended to exploit the situation, and thereby assume control of Roxanne's.

41. On March 12, 1997, CS-1 advised the FBI of an upcoming meeting MARCELLO GRASSO was scheduled to have with an unknown individual, later identified through surveillance as GIUSEPPE ANDRE VON BERGER. VON BERGER, who was arriving from Italy, was scheduled

21

to meet with GRASSO and HERNANDO HERNANDEZ. The purpose of this meeting was for VON BERGER to be given details on the purchase of the stolen bearer bonds. The bearer bonds were to come from a bank in New York, and GRASSO believed that they could sell VON BERGER up to fifty (50) million dollars worth of stolen bearer bonds for ten (10) cents on the dollar. VON BERGER indicated that he wished to use the bonds in order to launder money on behalf of South American drug cartels.

42. On March 20, 1997, FBI agents observed VON BERGER, GRASSO, HERNANDEZ and other unknown individuals meeting at Victors Café, a restaurant, located at the corner of SW 32nd Avenue and SW 27th Street in Coral Gables, Florida.

43. On May 24, 1997, a telephone conversation between NICOLO MARIANI and MARCO MINUTO was recorded while MARIANI was incarcerated at the Federal Detention Center, Miami, Florida. A tape recording of this conversation was obtained pursuant to a subpoena. In the conversation, MINUTO and MARIANI discussed their intention to control a South Florida strip club through an undisclosed interest in the club. In context, this conversation concerned the strip club named Roxanne's. MINUTO and MARIANI discussed the poor financial condition of the club, and their intention to seek an alliance with others to control the club and to improve profits. Based on the conversation, and your affiant's training and experience, this alliance was to be formed with

22

another LCN family. MARIANI stated that the current legal owner of the strip club had formerly owned a gym in Ohio and had no experience in the operation of a strip club. For this reason, MINUTO and MARIANI agreed that an alliance with others more experienced in the strip club business would be in their interest.

A. On August 18, 1998, CS-1 reported to the FBI that the Luchese Organize Crime Family no longer had an interest in the strip club.

44. On July 7, 1997, CS-1 advised the FBI that MARCO MINUTO traveled from New York to South Florida to begin working on a South Florida bookmaking operation. CHRIS GRECO was also to travel to South Florida, along with two other unknown persons, in order to take over a bookmaking operation.

45. On August 20, 1997, CS-1 advised the FBI that MARCELLO GRASSO had received at least one kilogram of cocaine from HERNANDO HERNANDEZ. CS-1, further advised the FBI that GRASSO had in his possession both cocaine and the type of scales used by narcotics traffickers for weighing controlled substances.

46. On August 20, 1997, CS-1 advised the FBI that MARCELLO GRASSO had been having problems obtaining the stolen bearer bonds.

47. On October 13, 1997, CS-1 advised the FBI, based on CS-1's association with GRASSO, and others, that GRASSO uses target telephone numbers (954) 782-3172 (target residential telephone) and (954) 562-0082 (target cellular telephone) to carry on bookmaking

23

operations. Specifically, CS-1 stated that GRASSO uses the target telephones to obtain line information, transmit line information to others and collect debts owed by gamblers.

48. On October 13, 1997, CS-1 advised the FBI that during this time period, MARCELLO GRASSO had discussions with others concerning a problem with a bookmaker who failed to deliver money to GRASSO. If the bookmaker failed to pay, it was MARCO MINUTO's intention to send someone to Florida to "break his legs."

49. On November 1, 1997, a South Florida automobile dealer was the object of a violent physical assault by two individuals at his South Florida business. As a result of the physical assault, the victim was lying unconscious in a pool of his own blood in the lot of his car dealership. The automobile dealer had been the subject of previous verbal threats and a physical assault from a former business associate who had demanded that the automobile dealer close his business. As a result of the prior verbal threats and the assaults, the automobile dealer ceased to be involved in the retail sale of automobiles.

A. On January 6, 1998, CS-1 advised the FBI that MARCELLO GRASSO had recently picked up "Dominick and Jimmy" from the airport and that "Dominick and Jimmy" had beaten a general manager of a car lot. CS-1 further stated that the former supervisor of the victim had paid for the beating and for the closure of the business.

24

B.  CS-1 identified the two individuals responsible for the beating as DOMINICK MEMOLI and JAMES MANCUSO. The physical descriptions of both MEMOLI and MANCUSO closely resembled the physical descriptions provided by two witnesses to the physical assault against the automobile dealer.

C.  CS-1 advised the FBI that both DOMINICK MEMOLI and JAMES MANCUSO, who reside in New York, are "enforcers" for Luchese Solider MARCO MINUTO.

D.  Following the beating, a witness was approached by one of the two men who had beaten the victim. This individual said to the witness, "you didn't fuckin see nothing, right."

50.  On November 24, 1997, CS-1 advised the FBI that MARCELLO GRASSO continues to use target telephones (954) 782-3172 (target residential telephone) and (954) 562-0082 (target cellular telephone) to discuss bookmaking activities, specifically, obtaining line information, transmitting line information, and collecting gambling debts.

51.  On December 15, 1997, CS-1 advised the FBI that DOMINICK MEMOLI and JAMES MANCUSO often travel from New York to South Florida in the company of MARCO MINUTO, JOSEPH MINUTO, or CHRIS GRECO.

52.  In or about February, 1998, CS-3 began making bets with MARCELLO GRASSO. Based on conversations with GRASSO, CS-3 learned that MARCO MINUTO is the person behind GRASSO's South Florida

25

JM 0107

bookmaking operation.   As discussed above, MINUTO is a soldier in the Luchese Organized Crime Family.   CS-3 met two gamblers through GRASSO, named David Klein and Jordon Broad. CS-3 stated that CS-3 frequently contacted GRASSO at telephone numbers **(954) 782-3172 (target residential telephone)** and **(954) 562-0082 (target cellular telephone)** concerning bookmaking and the collection of bookmaking debts.

53. MARCELLO GRASSO supplied CS-3 with two out of state telephone numbers, specifically, (718) 561-7621 and (201) 679-7547. GRASSO instructed CS-3 that these numbers should be called to place bets on sporting events.   CS-3 began calling (718) 561-7621 and placed numerous bets with an individual known only as "Uncle Joe" and other unknown individuals. When CS-3 would lose the bets made through the above listed telephone numbers, GRASSO would collect the outstanding gambling debts.   When CS-3 would win bets, CS-3 would receive a cashier's check that was sent from New York and delivered to CS-3 by a courier from Miami Express Courier & Trial Exhibits.

A. As set forth in paragraphs 73, 74 and 95 Pen Register information from the target telephones shows frequent contact between the target telephones and telephone numbers (718) 561-7621, (201) 679-7547.

B.   As set forth in paragraphs 70, 71, 81, 83, 84, and 105, Pen Register information from the target telephones shows frequent

JM 0108

contact between the target telephones and Miami Express Courier &
Trial Exhibits.

C. Based on information and records from the Florida Secretary
of State, Miami Express Courier & Trial Exhibits is the fictitious
name for Miami Express Services, Inc. 10421 NW 28th Street, Unit
115, Miami, Fl. This business provides courier services as well as
the preparation of exhibits for use in court proceedings.

D. Andy Alvarez is the Director and Vice President of Miami
Express. Based on the investigation, your affiant concludes that
Andy Alvarez is probably the same person as Andres Alvarez. As
noted below in paragraph 85 and 104, both target telephones are in
frequent contact with a cellular telephone subscribed to by Andres
Alvarez.

54. On January 25, 1998, CS-1 advised the FBI that MARCELLO
GRASSO continues to use telephone numbers (954) 782-3172 (target
residential telephone) and (954) 562-0082 (target cellular
telephone) on a daily basis to obtain the betting line from New
York. GRASSO places these calls between 6:00 p.m. and 7:30 p.m.

A. As set forth in paragraphs 73 and 95, this information is
corroborated by Pen Register records.

55. On February 9, 1998, CS-1 advised the FBI that MARCELLO
GRASSO is steadily increasing the number of his bettors. Although
the revenues from GRASSO's bookmaking were less than he had

27

anticipated, GRASSO expected to "make a killing" next year --
meaning a large profit.

A.  In context, the term "next year" refers to the upcoming
regular football season that will begin in the first week of
September, 1998.

56.  On February 16, 1998, CS-1 advised the FBI that recently
MARCELLO GRASSO had obtained additional heavy bettors. CS-1 also
advised the FBI that GRASSO anticipates making as much as $10,000
per week with the gambling operation. CS-1 further advised the FBI
that GRASSO is using  telephones numbers (954) 782-3172 (target
residential telephone) and (954) 562-0082 (target cellular
telephone) to communicate with bettors, acquire "lines" on sporting
events, and pass the "lines" out to his bettors.

57.  On February 22, 1998, CS-1 advised the FBI that one of
MARCELLO GRASSO 's largest bettors is David Klein.

A. As set forth in paragraphs 79 and 96, Pen Register
information from the target telephones shows frequent contact
between the target telephones and the telephone number subscribed
to by Rebecca Klein, the mother of David Klein. [3]

58.  In the beginning of April of 1998, CS-3 was informed
that telephone numbers (718) 561-7621 and (201) 679-7547 were no
longer in use because the National Basketball Association (NBA)

---

[3]  David Klein and the other bettors are not listed as either
violators or named interceptees because the mere placing of a wager
is not, in and of itself, a violation of 18 U.S.C. 1955.

JM 0110

regular season had ended.    MARCELLO GRASSO provided CS-3 with telephone number 1-800-811-3742 and advised CS-3 that CS-3 could place bets on baseball and hockey games over that telephone number. CS-3 later learned that BRUCE SAMUELS (a disbarred attorney) was responsible for operating this particular bookmaking operation.

A. As set forth in paragraphs 90, 102, and 103, Pen Register records show frequent contact between the both the target residential telephone and the target cellular telephone with a telephone used by BRUCE SAMUELS.

59. In the beginning of April 1998, MARCELLO GRASSO referred CS-3 to make bets with an individual named ALEX TORRENTE. CS-3 described to your affiant how he would typically place bets with TORRENTE. In general, CS-3 would call the main telephone number for Miami Express Courier & Trial Exhibits (Miami Express) and ask to speak directly with TORRENTE. A Miami Express employee would put TORRENTE on the phone and CS-3 would proceed to make bets on baseball games with TORRENTE. TORRENTE would send Miami Express couriers to visit CS-3, for the purpose of paying off and collecting monies earned or lost through CS-3's bets with TORRENTE. The Miami Express couriers would use Miami Express paperwork to document both the collection and delivery of monies associated with TORRENTE's bookmaking operation.    TORRENTE would also use Miami Express telephones for acquiring "betting lines" and taking bets from unknown bettors.

29

JM 0111

A. Based on CS-3's association with TORRENTE, CS-3 concluded that TORRENTE occupied a position of authority at Miami Express. CS-3 stated that employees of the business answered to TORRENTE. CS-3 stated that TORRENTE was involved with other unknown individuals in this large bookmaking operation, operated from Miami Express.

B. CS-3 advised that TORRENTE would "layoff" bets to MARCO MINUTO's New York bookmaking operation. CS-3 stated that MARCELLO GRASSO was associated with and was profiting from TORRENTE's bookmaking operation. CS-3 stated that MARCO MINUTO, known to your affiant to be a Luchese LCN Soldier, is the person behind all of GRASSO's South Florida bookmaking operations. During 1998, GRASSO regularly used the target cellular telephone (954) 562-0082 to discuss bookmaking activities with individuals both in New York and in South Florida.

C. As set forth in paragraphs 69, 86, and 106, Pen Register records show frequent contact between the target residential and cellular telephones and ALEX TORRENTE.

60. On April 29, 1998, CS-1 advised the FBI that MARCELLO GRASSO made a telephone call to an unknown individual in New York and discussed a future armed robbery of a South Florida check cashing store. DOMINICK MEMOLI, JAMES MANCUSO, and MARCELLO GRASSO were to be involved in the robbery, which was expected to yield approximately $100,000 in cash.

30

A. Later, on August 4, 1998, CS-1 advised the FBI that it was CS-1's impression that this robbery would not be occurring.

61.    In the end of April 1998, CS-3 stated that he learned from ALEX TORRENTE that TORRENTE had recently attempted to sell MARCELLO GRASSO jewelry that had been stolen from a Federal Express shipment. GRASSO was fully aware that the jewelry was stolen from a Federal Express shipment.

62.    On July 6, 1998, Rick Blanscet from Federal Express Security was contacted. Blanscet advised that approximately one hundred to two hundred  thousand dollars in jewelry was recently stolen from Federal Express in a series of thefts. Blanscet added that the jewelry thefts were taking place on a weekly basis from the Seybold building located in downtown Miami.   The Seybold building houses a large number of jewelry stores.

63.    On July 6, 1998, CS-1 advised the FBI that MARCELLO GRASSO  is involved with an individual named Alex Last Name Unknown (LNU) in the weekly theft of Federal Express packages, many of which contain jewelry.    CS-1 later  identified  this  person  as ALEX TORRENTE.

64.    On August 4, 1998, CS-1 advised the FBI that MARCELLO GRASSO and ALEX TORRENTE, along with a Federal Express employee, are involved in the theft of jewelry from Federal Express. The thefts generally take place on Fridays. The Federal Express employee will typically take one package that contains jewelry and

31

JM 0113

later give the stolen package to either **GRASSO** or **TORRENTE**. The Federal Express employee will report the stolen package as lost. Following the theft of the jewelry, **GRASSO** and **TORRENTE** "fence" the stolen jewelry for cash.

A. The term "fence" means to sell or broker stolen property to businesses and individuals. The fence normally takes steps to hide the stolen nature of the property.

64.1 On August 4, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** continues to use target telephones (954) 782-3172 (target residential telephone) and (954)562-0082 (target cellular telephone) in furtherance of bookmaking and distributing stolen property. Specifically, **GRASSO** uses both target telephones to discuss the acquisition and disposition of stolen property, to obtain "line information" and collect gambling debts.

65. On August 5, 1998, Rick Blanscet from Federal Express Security was again contacted. Blanscet advised that Federal Express is experiencing frequent thefts of interstate shipments containing jewelry. These thefts generally occur on Fridays. The stolen packages are tracked as being picked up by Federal Express, but later disappear on the way to a Federal Express loading ramp. The missing package is later reported as being lost. Blanscet concluded that since the packages never arrive at the loading ramp, the individual responsible for the thefts is a Federal Express employee. From January 1998 - July 1998, Federal Express has lost

32

JM 0114

approximately $187,000 in stolen packages that contained jewelry. The latest theft occurred on July 31, 1998. The majority of these shipments were destined for locations outside the state of Florida and, consequently, are thefts from interstate commerce.

66. According to CS-3, the above described New York bookmaking operations involving MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, and CHRIS GRECO have been closed for business since the end of the NBA regular season in April 1998. The New York bookmaking operations is expected to resume with the start of the upcoming football season, set to resume in the first week of September, 1998. Based on my training and experience, and the pattern of criminal activity describe above, criminal conversations are now occurring over telephone numbers (954)782-3172 (target residential telephone) and (954)562-0082 (target cellular telephone).

66.1 On August 17, 1998, CS-1 told FBI agents that MARCO MINUTO and MARCELLO GRASSO are making the final arrangements to consolidate and continue their illegal bookmaking activities in South Florida. CS-1 further stated that GRASSO continues to use both residential target telephone number (954) 782-3172 and cellular target telephone number (954) 562-0082 to acquire and distribute stolen property and prepare for the resumption of the illegal gambling business associated with the start of the regular football season in the first week of September, 1998. These

33

criminal activities are undertaken on behalf of Luchese Organized
Crime Soldier **MARCO MINUTO**.

A. This information is corroborated, _inter alia_, by pen
register information showing recent contact between the target
telephones and telephones used by MARCO MINUTO and Miami Express.
See, e.g., paragraphs 83, 86, 99.

66.2. On August 24, 1998, CS-1 confirmed to FBI agents that
the bookmaking operation will begin in earnest the first week in
September 1998. CS-1 stated that, although preparations are on
going for the illegal bookmaking operation, the actual betting will
not begin until the start of regular football season in the first
week of September. CS-1 further stated that although the South
Florida bookmaking operation will be operated by MARCELLO GRASSO in
South Florida, the operation will be  controlled from New York by
MARCO MINUTO--known by your affiant to be a Luchese soldier.

A. Based on the information in this affidavit, my training and
experience and the manner in which the LCN conducts its bookmaking
operations, your affiant concludes that: I) the gambling operation
is in violation of Florida Statute 849.25 which prohibits
bookmaking; ii) will involve five or more persons who conduct
manage or supervise the gambling business; iii) will remain in
substantial continuous operation for a period of 30 days or will
have a gross revenue of $2,000 in any single day.

34

JM 0116

67. Based on the information set forth in this affidavit, coupled with the manner and method by which the LCN and the Luchese Organized Crime Family operate, it is the affiant's conclusion that MARCO MINUTO and MARCELLO GRASSO are conducting the criminal activity set forth in this affidavit on behalf of the Luchese Organized Crime Family. It is the Affiant's further conclusion that evidence concerning all the criminal activities engaged in by the Luchese Organized Crime family, as set forth in paragraph four above, will be disclosed through the electronic surveillance orders applied for herein.

### PEN REGISTER AND TRAP AND TRACE ANALYSIS

### TARGET CELLULAR TELEPHONE NUMBER (954) 562-0082

68. A Court Order (Order # 97-4811-Snow) authorizing the installation and use of a pen register, a trap and trace device, and enhanced caller identification on target cellular telephone (954) 562-0082 for a period of sixty days was issued by the Honorable Lurana S. Snow, United States Magistrate Judge, on September 18, 1997.

69. Pen Register records indicate that between September 18, 1997 - November 16, 1997, (at the height of football season) seventy (70) telephone calls were registered between the target cellular telephone and (305) 408-4200, subscribed to by ALEX TORRENTE.

35

JM 0117

70.  Pen Register records indicate that between September 18, 1997 - November 16, 1997, fifty one (51) telephone calls were registered between the target cellular telephone and (305) 599-7197, subscribed to by Miami Express Courier & Trial Exhibits.

71.  Pen Register records indicate that between September 18, 1997 - November 16, 1997, thirty one (31) telephone calls were registered between the target cellular telephone and (305) 997-0177, a Page Net pager, subscribed to by Miami Express Courier & Trial Exhibits.

72.  A Court Order (Order #98-4601-Snow) authorizing the continued installation and use of a pen register, a trap and trace device, and enhanced caller identification of target cellular telephone (954) 562-0082 for a period of sixty days was issued by the Honorable Lurana Snow on January 12, 1998.

73.  Pen Register records indicate that from January 12, 1998-March 12, 1998, one hundred and forty seven (147) telephone calls were made from the target cellular telephone to (718) 561-7621, subscribed to Joe Bialko/Sports Club, 2384 Hughes Ave, Bronx, New York.  CS-3 was provided with this telephone number by MARCELLO GRASSO for the purpose of making bets on sporting events.  CS-3 stated that the bets could only be placed with this bookmaking operation up until the end of the National Basketball Association (NBA) regular season (beginning of April 1998).  Of the 147 registered telephone calls made from the target cellular telephone,

36

JM 0118

to Sports Club, one hundred and fifteen (115) were made between 6:00 p.m.-7:30 p.m.   CS-1 advised the FBI that MARCELLO GRASSO called a telephone number in New York between 6:00 p.m.-7:30 p.m. for the purpose of acquiring the "lines" on sporting events.

74. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty seven (27) telephone calls were registered between the target cellular telephone and (201) 679-7547, a cellular telephone subscribed to by Minuto Sisters Corp. CS-3 was provided with this telephone number by MARCELLO GRASSO for the purpose of making bets on sporting events.

75. Pen Register records indicate that between January 12, 1998 - March 12, 1998, thirty two (32) telephone calls were registered between the target cellular telephone and (516) 984-1076 subscribed to by Arthur Fuzailov.  Although this telephone is in the name of Fuzailov, CS-1 has provided information that MARCO MINUTO used this particular cellular telephone.  However, CS-1 stated in August 1998 that MINUTO had recently stopped using the telephone.

76.  Pen Register records indicate that between January 12, 1998 - March 12, 1998, four (4) telephone calls were registered from the target cellular telephone to (201) 818-7292, subscribed to by Margaret Minuto, the wife of MARCO MINUTO, 18 Willow Hill, Saddle River, New Jersey. Public records indicate that MARCO MINUTO resides at 18 Willow Hill, Saddle River, New Jersey.

37

JM 0119

77. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty one (21) telephone calls were registered between the target cellular telephone number and (973) 772-5772, subscribed to by JOSEPH MINUTO and Big Daddy's Pizza and Grill--a business owned by JOSEPH MINUTO.

78. Pen Register records indicate that between January 12, 1998 - March 12, 1998, four (4) telephone calls were registered between the target cellular telephone and (305) 444-4296, subscribed to by Zenobio Hernandez, the father of HERNANDO HERNANDEZ. As noted above, GRASSO and HERNANDEZ are involved in the distribution of controlled substances.

79. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty seven (27) telephone calls were registered between the target cellular telephone number and (954) 725-4446, subscribed to Rebecca Klein. Rebecca Klein is the mother of David Klein. Based on information from the apartment manager, Klein resided with his mother. As noted above, both CS-1 and CS-3 stated to the FBI that Klein is a gambler associated with MARCELLO GRASSO.

80. Pen Register records indicate that between January 12, 1998 - March 12, 1998, ten (10) telephone calls were registered between the target cellular telephone and (561) 498-1099, the business telephone of Jordan Broad. CS-3 advised that Broad is a gambler associated with MARCELLO GRASSO.

38

81. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty one (21) telephone calls were registered between the target cellular telephone and (305) 599-7197, subscribed to by Miami Express Courier & Trial Exhibits (Miami Express). As noted above, CS-3 has stated that he called Miami Express to place bets on sporting events.

82. A Court Order (Order # 98-4725-BSS) authorizing the installation and use of a pen register, a trap and trace device, and enhanced caller identification on target telephone 954 562-0082 for a period of sixty days was issued by the Honorable Barry Seltzer, United States Magistrate Judge, on June 11, 1998. This order was renewed on August 6, 1998, and authorized an additional 60 days of pen register and trap and trace information.

83. Pen Register records indicate that from June 17, 1998 - September 3, 1998, forty six (46) telephone calls, with the last call occurring on August 31, 1998, were registered between the target cellular telephone and (305) 599-7197, subscribed to by Miami Express Courier & Trial Exhibits.

A. As discussed above, **TORRENTE** is employed by Miami Express Courier & Trial Exhibits.

84. Pen Register records indicate that from June 17, 1998 to September 3, 1998, four (4) telephone calls, with the last call occurring on June 27, 1998, were registered between the target

39

cellular telephone and (305) 599-1999, subscribed to by Miami Express Courier & Trial Exhibits.

85.  Pen Register records indicate that from June 17, 1998 - September 3, 1998, twenty three (23) telephone calls, with the last call occurring on July 23, 1998, were registered between the target cellular telephone and (305) 785-3704, a cellular telephone subscribed to by Andres Alvarez, listed as an employee of Miami Express Courier & Trial Exhibits.

86.  Pen Register records indicate that from June 17, 1998 - September 3, 1998, two (2) telephone calls, with the last call occurring on June 27, 1998 were registered between the target cellular telephone and (305) 408-4200, subscribed to by **ALEX TORRENTE**.

87.  Pen Register records indicate that from June 17, 1998  - September 3, 1998, three (3) telephone calls, with the last call occurring on June 30, 1998, were registered between the target cellular telephone and (516) 984-1076, subscribed to by Arthur Fuzailov.  Although this telephone is in the name of Fuzailov, CS-1 has provided information that **MARCO MINUTO** has used this particular cellular telephone, but has recently stopped using it.

88.  Pen Register records indicate that from June 17, 1998 - September 3, 1998, three (3) telephone calls, with the last call occurring on August 13, 1998, were registered between the target

40

cellular telephone and (201) 818-7292, subscribed to by Margaret
Minuto, the wife of MARCO MINUTO.

89. Pen Register records indicate that on July 23, 1998, one
(1) telephone call was registered between the target cellular
telephone and (201) 818-4331, subscribed to by CHRIS GRECO.

90. Pen Register records indicate that from June 17, 1998 –
September 3, 1998, thirteen (13) telephone calls, with the last
call occurring on August 14, 1998, were registered between the
target cellular telephone and (305) 992-0287, a cellular telephone
subscribed to by BRUCE SAMUELS.

91. Pen Register records indicate that from June 17, 1998 –
September 3, 1998, six (6) telephone calls, with the last call
occurring on August 4, 1998, were registered between the target
cellular telephone and (305) 444-4296, subscribed to the home of
HERNANDO HERNANDEZ. As discussed above, according to CS-1, GRASSO
is involved with HERNANDEZ in the distribution of cocaine.

TARGET RESIDENTIAL TELEPHONE NUMBER (954) 782-3172

92. A Court Order (Order # 98-4601-Snow) authorizing the
installation and use of a pen register, a trap and trace device,
and enhanced caller identification on target telephone (954) 782-
3172 for a period of sixty days was issued by the Honorable Lurana
S. Snow, United States Magistrate Judge, on January 12, 1998.

93. Pen Register and trap and trace records indicate that
between January 12, 1998 – March 12, 1998, twenty nine (29)

41

JM 0123

telephone calls were registered between the target residential telephone and (516) 984-1076, a cellular telephone that was used by MARCO MINUTO.

94.  Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, seven (7) telephone calls were registered between the target residential telephone and (201) 818-7292, subscribed by Margaret Minuto, the wife of MARCO MINUTO.

95.  Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, twenty five (25) telephone calls were registered between target residential telephone and (718) 561-7621, subscribed to Joe Bialko/Sports Club, Bronx, New York.  MARCELLO GRASSO provided CS-3 with this telephone number for the purpose of CS-3 making bets on sporting events.  Of the 25 registered calls from the target telephone to the Sports Club, nineteen (19) were made between 6:00 p.m. and 7:30 p.m. CS-1 stated that MARCELLO GRASSO calls a telephone number in New York between 6:00 p.m. and 7:30 p.m. to acquire the "lines" on sporting events.

96.  Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, twenty four (24) telephone calls were registered between the target residential telephone and (954) 725-4446, subscribed to by Rebecca Klein, the

42

mother of David Klein. As discussed above, Klein is a gambler who is associated with GRASSO.

97.  Pen Register and trap and trace records indicate that between January 12, 1998 – March 12, 1998, eight (8) telephone calls were registered between the target residential telephone and (561) 477-3664, subscribed to by Jordan Broad--a gambler associated with GRASSO.

98.  A Court Order (Order # 98-4725 BSS) authorizing the installation and use of a pen register, a trap and trace device, and enhanced caller identification on target telephone (954) 782-3172 for a period of sixty days was issued by the Honorable Barry Seltzer, United States Magistrate Judge, on June 11, 1998. This order was renewed on August 6, 1998, for a period of 60 additional days.

A.  However, because of technical problems, there is no pen register information available from August 10, 1998 – August 19, 1998, although, there is some trap and trace information available for this period. Moreover, it is possible that the pen register failed to record all outgoing calls from August 20, 1998 through September 2, 1998, when the old pen register device was replaced.

99.  Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, seventeen (17) telephone calls, with the last call occurring on August 29, 1998, were

43

registered between the target residential telephone and (201) 818-7292, subscribed to by Margaret Minuto, the wife of MARCO MINUTO.

100. Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, three (3) telephone calls, with the last call occurring on June 29, 1998, were registered between the target residential telephone and (516) 984-1076, a cellular telephone that had been used by MARCO MINUTO.

101. Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, twelve (12) telephone calls, with the last call occurring on August 13, 1998, were registered between the target residential telephone and (201) 818-4331, subscribed to by CHRIS GRECO.

102. Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, two (2) telephone calls, with the last call occurring on July 4, 1998, were registered between the target residential telephone and (305) 992-0287, a cellular telephone subscribed to by BRUCE SAMUELS.

103. Pen Register and trap and trace records indicate that on July 4, 1998, one telephone call was registered between the target residential telephone and (954) 457-8682, subscribed to by BRUCE SAMUELS.

104. Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, thirteen (13) telephone calls, with the last call occurring on July 30, 1998, were

44

registered between the target residential telephone and (305) 785-3704, a cellular telephone subscribed to Andres Alvarez, an employee of Miami Express Courier & Trial Exhibits.

105.  Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, four (4) telephone calls, with the last call occurring on July 4, 1998, were registered between the target residential telephone and (305) 997-0177, a Page Net pager subscribed to by Miami Express Courier & Trial Exhibits.

106.  Pen Register and trap and trace records indicate that on July 4, 1998, one (1) telephone call was registered between the target residential telephone and (305) 408-4200, subscribed to by ALEX TORRENTE.

## NORMAL INVESTIGATIVE TECHNIQUES

107.  Confidential Sources CS-1, CS-2, and CS-3, referred to herein have told Special Agents of the FBI that they would be fearful for their lives and most certainly be in a position of jeopardy if their involvement with law enforcement authorities was known to individuals mentioned herein.  As discussed above, the conspirators are involved in violent criminal activity. Furthermore, JAMES MANCUSO was arrested for murder and was subsequently convicted for manslaughter.  In addition, other conspirators have criminal records for violent crimes.  CS-1, CS-2, and CS-3, have advised that even if immunized and given protective

45

JM 0127

custody they would be unwilling to testify at any proceeding for fear of their safety. Even if the informants were to testify, none of then is able to furnish information which would fully identify all members of this on-going criminal conspiracy or which would define the roles of the conspirators sufficiently for prosecution. Confidential informants normally have only limited information either furnished by a subject or learned second hand from others.

108. In additional to being unwilling to testify, CS-1, CS-2, and CS-3, have indicated that they would be unwilling to introduce an FBI Undercover Agent (UCA) to the subjects of this investigation. Based upon the close-knit nature of this criminal group, your affiant does not believe it would be possible for a UCA to independently infiltrate this group.

109. Your affiant is aware that an investigation consists of a number of techniques being used in conjunction with each other to develop enough evidence to establish a prosecutable case against those being investigated. These techniques include the use of undercover agents, confidential sources, the testimony of witnesses before the Federal Grand Jury, surveillance, analysis of toll and pen register data and the execution of search warrants. The requested authorization for wire interception is necessary because, as discussed above, many of these normal investigative techniques have been tried or reasonably appear to be unlikely to succeed if tried or are too dangerous.

46

JM 0128

110. Your affiant is aware that MARCO MINUTO is a solider in the Luchese LCN crime family. Your affiant is also aware from prior investigations and reports of other agents that "made" members of LCN Crime families, such as MARCO MINUTO, typically use LCN associates, such as MARCELLO GRASSO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, and JAMES MANCUSO as insulation between themselves and outsiders. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

111. Your affiant believes that there are no undercover agents who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

112.   Although the confidential sources have considerable knowledge of the criminal activity of the conspirators, it is not sufficiently complete to expose the full nature and scope of the criminal enterprise involved in this case.

113. Conducting physical surveillance of participants is a commonly used investigative technique. Surveillances have been conducted in this investigation and they have assisted in disclosing some of the associations and places of meetings by the participants. However, this technique has failed to reveal the identity of all the participants and has failed to provide admissible evidence of specific criminal activities.   Without

47

knowledge of the content of these meetings, surveillance alone is of limited value. MARCELLO GRASSO has advised CS-3 of his belief that he was at one time or another the subject of a physical surveillance, conducted by a law enforcement agency.

114. FBI agents have conducted physical surveillance of the conspirators. Specifically, surveillances were conducted on March 20, 1997, May 23, 1997, November 18, 1997, February 17, 1998, and June 3, 1998.  In addition, FBI agents have conducted numerous spot checks of various conspirators with most recent checks occurring on August 20, 1998 and September 3, 1998. The surveillances revealed that GRASSO and MARCO MINUTO associated with each other. For example, on May 23, 1997, surveillance agents observed GRASSO and MARCO MINUTO meeting together in Ft. Lauderdale, Florida at the restaurant "Cafe Italia."   Furthermore, on February 17, 1998, agents observed MARCO MINUTO in the company of a person resembling CHRIS GRECO at the Ft. Lauderdale International Airport. Although useful as an investigative tool, such surveillances will not, in and of themselves, supply sufficient evidence to establish guilt beyond a reasonable doubt.

115. Your affiant also is aware, that any extensive surveillance risks exposure of the investigation and can compromise the covert nature of the investigation, thereby causing MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS,

48

JM 0130

GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance in the location of MARCELLO GRASSO's residence would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. Indeed, as noted above, GRASSO has stated he believes that he is under surveillance. Consequently, increased surveillance could well compromise the investigation. However, surveillance, in conjunction with electronic surveillance, will provide valuable evidence regarding the activities of this criminal enterprise.

116. A Federal Grand Jury investigation has been initiated into the illegal activities of the conspirators. For example, the victims of the extortion described in paragraph 49 were subpoenaed to appear before the grand jury. Both victims were reluctant to testify and expressed great fear for their well being and asked to be excused from testifying. When informed that they would not be excused, they testified before the grand jury. However, they possessed only limited information about those involved in the extortion. In addition, many of the possible witnesses are conspirators themselves and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized

49

crime families often invoke their Fifth Amendment testimonial privilege and, even under a grant of immunity, have been known to risk and accept contempt charges rather than testify. A grand jury appearance of co-conspirators would most likely result in their invoking Fifth Amendment rights and possibly risking contempt charges. Finally, from your affiant's experience, as well as the experience of other FBI Agents familiar with organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

117. Consideration has been given to interviewing co-conspirators and associates of the principal subjects. Specifically, your affiant has considered interviewing David Klein and Jordon Broad, who are associated with the conspiracy. These persons, however, would not have knowledge of the full nature and scope of the criminal activity of the conspirators. Moreover, individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and therefore, unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop admissible evidence relating to the full scope of the federal violations set forth in this affidavit. The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such

50

refuse to cooperate with law enforcement to any significant degree.

118. From prior investigations and reports of other Agents, your affiant knows that the Luchese LCN Crime family is extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of little value.

119. Based upon your affiant's experience and the experience of fellow agents, who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

120. Although not set forth in the probable cause section of this affidavit, telephone toll records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed

51

JM 0133

telephonic contact between MARCELLO GRASSO and a known LCN member and LCN associates. However, like toll record information these records do not provide proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

121. Based upon my experience and the experience of other law enforcement agents, it is my belief that use of search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept and the only evidence of a meeting would be the conversations. To date, there is no corroborated information concerning the existence or location of any such records.

122. Due to the fact that sufficient evidence is not available through other investigative techniques, as set forth above, your affiant believes there is an overwhelming need for electronic surveillance in this matter to fully reveal the manner and scope in which MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI, the named interceptees, and others as yet unknown, are involved in the

52

violations of federal statutes as set forth in paragraph 4 of this affidavit. Specifically, electronic surveillance is needed to reveal the manner and means by which the Luchese organized crime family is conducting its operations in South Florida.

## MINIMIZATION

123. All interception will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interception will be immediately suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the name interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is criminal in nature. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-criminal in nature. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become criminal in nature.

124. Although it is not anticipated that interceptions in a foreign language will occur it is possible. In the event that such conversations occur, and an expert in that language is not reasonably available, it is requested that the Court authorize that the minimization may be conducted as soon as practicable after such interception occurs.

53

## PERIOD OF INTERCEPTION

125. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI, and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, and the full nature of the criminal conspiracies involved therein, or for a period not to exceed thirty (30) days, such thirty-day period to begin on the day on which the investigative or law enforcement officer first begins

54

JM 0136

to conduct an interception under the Order, or, ten (10) days after the Order is entered, whichever is earlier.

Darrin S. Sachs
Special Agent
Federal Bureau of Investigation

Sworn to before me this_____ day of September 1998

WILKIE D. FERGUSON
UNITED STATES DISTRICT JUDGE
Southern District of Florida

Certified to be a true and
correct copy of the original
Carlos Juenke, Clerk
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk

Date 9-8-98

55

JM 0137