UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6088-CR-UNGARO-BENAGES

NIGHT BOX
FILED

JUL - 5 2(

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA,

       Plaintiff,

v.

MARCO MINUTO, et al.,

       Defendant.

_____/

## GOVERNMENT'S RESPONSE TO MARCO MINUTO'S MOTION TO SUPPRESS FRUITS OF WIRETAPS

Comes now the United States, and hereby files its response to the Defendant Marco Minuto's Motion to Suppress Wiretap Evidence.

I.   Charges Against Minuto

This prosecution of the Defendant Marco Minuto is the culmination of a lengthy investigation involving the use of court authorized electronic surveillance into the racketeering activity of Marco Minuto, a made member of, and soldier in, the Luchese Organized Crime Family.  Minuto is charged with, inter alia, violations of the Racketeer Influenced and Corrupt Organization Statute (RICO).  Specifically, Minuto is charged with conspiracy to violate RICO, 18 U.S.C. § 1962(d), with the underlying pattern of racketeering activity consisting of multiple violations involving the following crimes: illegal gambling, 18 U.S.C. § 1955; money laundering, 18 U.S.C. § 1956; collecting extensions

of credit by extortionate means, 18 U.S.C. § 894; the sale and receipt of stolen property, 18 U.S.C. § 659; bank fraud, 18 U.S.C. § 1344; fraud in connection with identification documents, 18 U.S.C. § 1028; mail fraud, 18 U.S.C. § 1341; the transmission of wagering information, 18 U.S.C. § 1084; obstruction of justice, 18 U.S.C. § 1503; and interference with commerce by extortion, 18 U.S.C. § 1951. These criminal acts arise out of an illegal sports bookmaking operation conducted by members and associates of the Luchese organized crime family in South Florida and New York.

II.   The Court Properly Authorized Electronic Surveillance

A.   General Legal Principles Concerning Necessity

Defendant Minuto requests that the wiretap evidence in this case be suppressed based upon his claim that the wiretap affidavit failed to establish that other investigative procedures had been tried and they had failed, or that such other investigative procedures were reasonably unlikely to succeed if tried, or that such other investigative procedures were too dangerous. Defendant Minuto claims that other investigative procedures were being used successfully and that there was no need for a wiretap. This claim has no merit.

2

Title 18, United States Code, Section 2518(1)(c), requires each application for a wiretap to include information concerning the use of investigative procedures, other than a wiretap. That section provides as follows:

> a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous; . . .

Section 2518(1)(c) does not require that "the application provide a 'comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'" United States v. Nixon, 918 F.2d 895, 901 (11th Cir. 1990) (citation omitted).[1] Indeed, the Eleventh Circuit has consistently held that the United States need not "show a comprehensive exhaustion of all possible techniques, but must

---

[1]   In United States v. Nixon, 918 F.2d 895 (11th Cir. 1990), the government applied for and received permission to place a wiretap on a telephone to gather more information in a drug investigation. The defendant in Nixon argued that the government had already gathered enough evidence by less intrusive investigative techniques. The defendant claimed that the evidence was sufficient to prosecute and convict those involved in a drug conspiracy. The court stated "[w]hat amount of evidence will be sufficient to obtain a conviction is an imprecise concept." Id., 918 F.2d at 901. After reviewing the record, the court in Nixon could not say the magistrate erred in his conclusion that the alternative investigative techniques "neither had succeeded, nor would succeed, in providing enough evidence to prove the conspirators' guilt beyond a reasonable doubt." Id., 918 F.2d at 901. The court affirmed the district court's denial of the defendant's motion to suppress the wiretap evidence.

simply explain the retroactive or prospective failure of several
investigative techniques that reasonably suggest themselves."
United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir.), cert.
denied, 479 U.S. 854 (1986).  See also, United States v. Dennis,
786 F.2d 1029, 1035 (11th Cir. 1986). Moreover, the Eleventh
Circuit has recognized that on important function of electronic
surveillance is its unique ability to reveal the full scope and
nature of a criminal conspiracy of which an informant may only
have partial knowledge. United States v. Van Horn, 789 F.2d at
1497.

This view of necessity as enunciated by the Eleventh Circuit
in Nixon and Van Horn is also held by the other Circuits.  See,
e.g. United States v. Landmesser, 553 F.2d 17, 20 (6th Cir.),
cert. denied, 434 U.S. 855 (1977) (government not required to
prove that every conceivable method has been tried and failed, or
that all avenues of investigation have been exhausted); United
States v. Clerkley, 556 F.2d 709, 715 (4th Cir. 1977), cert.
denied, 436 U.S. 930 (1978) (government not required to "exhaust
every conceivable technique before making application for a
wiretap," and therefore electronic surveillance need not be used
only as a last resort).

In making its determination under 18 U.S.C. § 2518(3)(c),
the court considers the entire application, not just those
paragraphs specifically discussing need.  United States v.

4

Landmesser, 553 F.2d at 20-21.  The standard has been clearly
established throughout the federal courts that what is required
is information about particular facts of the case at hand that
would indicate that wiretaps are not being "routinely employed as
the initial step in criminal investigation."  United States v.
Giordano, 416 U.S. 505, 515 (1974).  See also, United States v.
Vento, 533 F.2d 838, 850 n.19 (3rd Cir. 1976).

> B.  The Affidavit Demonstrated Specific Facts Showing
> the Need For Court Authorized Electronic
> Surveillance

Unlike the Affidavit that was at issue in United States v.
Kalustian, 529 F.2d 585, 588 (9th Cir. 1976), which is relied on
by the Defendant, the Affidavit of Agent Sachs (attached as
Attachment 1) contained detailed information about the particular
facts of the case at hand and was not a mere recitation of
generalized past experience.  The Affidavit of Agent Sachs
demonstrated that the wiretap was not employed as the initial
step in the criminal investigation, that serious consideration
had been given to the use of non-wiretap techniques beforehand,
and that the use of those non-wiretap techniques that reasonably
suggested themselves would in all likelihood have been inadequate
in achieving the goals of the investigation, including the
disclosure of the full nature and extent of the criminal
conspiracy.  This is all that the law requires.

For example, Agent Sachs's Affidavit discussed the danger posed to the particular confidential informants by members of the conspiracy that were under investigation. (Affidavit of Agent Sachs at ¶ 107). This danger was based on the violent nature of the criminal organization that was under investigation. One of the targets of the investigation was Marco Minuto, who had been inducted into the Luchese Organized Crime Family in 1995. As set forth in the Affidavit, the criminal conspiracy under investigation was involved in a wide variety of violent acts. (Affidavit at ¶¶ 48, 49, 49A, 49B, 49C, 49D). Based on the violent nature of the criminal organization under investigation, Confidential Sources 1, 2 and 3 informed Agent Sachs that they were not willing to testify and that they were fearful of being killed by members of the conspiracy. Indeed, these informants even stated that if they were immunized they would not be willing to testify because of the grave danger to their safety posed by the members of this violent criminal conspiracy. (Affidavit at ¶ 107). The Affidavit also disclosed the fact that the extortion victims themselves were very reluctant to testify because of their fear of the violent criminal conspiracy. (Affidavit at ¶ 116).

Although it is true, as noted in Minuto's Memorandum, that fear of testifying is not a basis on which a witness may legally refuse to testify, See e.g., Matter of Grand Jury Investigation,

922 F.2d 1267, 1272-1273 (6th Cir. 1991), it is equally true that danger to witnesses is one of the grounds that demonstrates the need for the type of electronic surveillance authorized in this case. Indeed, the danger to potential witnesses is specifically set forth in the electronic surveillance statute as one of the reasons to justify the use of electronic surveillance. 18 U.S.C. § 2818(1)(c). This specific statutory admonition has been consistently applied by the courts to authorize the use of electronic surveillance in connection with the type of investigation into a violent criminal organization that was conducted in this case. See e.g., United States v. Scott, 94 F.3d 438, 441 (8th Cir. 1996); United States v. Smith, 31 F.3d 1294, 1299 (4th Cir. 1994). Thus, the United States clearly demonstrated to United States District Judge Wilkie D. Ferguson that traditional investigative techniques were too dangerous to be employed.

Moreover, the Affidavit set forth in detail the particular investigative techniques that had been employed or which were carefully evaluated for possible use. Although the prior experience of the Affiant was discussed, the focus was on the particular case under investigation and the investigative measures that were either used or considered in this case before making the decision to seek authorization to conduct electronic surveillance.

The informants in the case did not have sufficient
information to identify the full scope and nature of the criminal
activities undertaken by the conspiracy (Affidavit at ¶ 108).
Moreover, the sources were not willing to introduce an undercover
law enforcement officer, because such introduction could expose
them as informants.  Furthermore, because of the close-knit
nature of the organization under investigation, the introduction
of an undercover agent would not have been possible. (Affidavit
at ¶ 108).

Agent Sachs also described the manner in which Minuto, as a
"made" or inducted member of the Luchese Organized Crime Family
used his position to insulate himself from some of the day to day
operations of the criminal conspiracy.  This fact significantly
impaired the effectiveness of traditional investigative
techniques and justified the use of court authorized electronic
surveillance. (Affidavit at ¶ 110).  Further, Agent Sachs
discussed how neither an undercover agent nor a confidential
source would be in a position to learn the full nature and scope
of the criminal enterprise. (Affidavit at ¶¶ 111 and 112).

The use and the limitations of physical surveillance were
discussed in detail by Agent Sachs.  In particular, Agent Sachs
noted that CS-3 advised that Marcello Grasso, one of the named
interceptees, thought he was under physical surveillance.  Agent
Sachs described how extensive physical surveillance risks the

8

exposure of the investigation, thereby allowing the members of
the conspiracy to alter their criminal operations in such a
manner as to make their criminal acts even more difficult to
detect.  Moreover, Agent Sachs described some of the physical
surveillances that were conducted during the course of the
investigation and discussed both the usefulness and the
limitations of those surveillances. (Affidavit ¶¶ 113-115).

    The use of the grand jury and traditional law enforcement
interviews were discussed in detail by Agent Sachs.  As noted
above, victims of the extortion were reluctant to testify because
of their fear of the conspirators. Any attempt to interview co-
conspirators would not likely result in admissible evidence and
would only serve to warn the conspirators of the existence of the
criminal investigation. (Affidavit ¶¶ 117-119).   Similarly,
consideration was given to the use of search warrants, but this
technique would not have disclosed the full nature and extent of
the criminal activity and would have alerted the members of the
conspiracy to the existence of the investigation, thereby,
allowing the conspirators to further hide their criminal acts.
(Affidavit ¶ 121).

    The wiretap Affidavit established a sufficient basis for the
issuing judge to properly conclude that the wiretap was not being
routinely employed as the initial step in the criminal
investigation, and that other investigative procedures had been

9

tried and had failed, or reasonably appeared unlikely to succeed if tried, or were too dangerous.  Consequently, defendant Minuto's motion to suppress should be denied without a hearing.

III. <u>Conclusion</u>

Defendant Minuto's motion to Suppress the Electronic Surveillance is without merit and should be denied.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____

MICHAEL J. DITTOE
ASSISTANT UNITED STATES ATTORNEY
Court ID #A5500209
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, FL 33394
Telephone: (954) 356-7255
Fax: (954) 356-7230

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed, this _5ᵗ_ day of July, 2001, to:


Howard M. Srebnick, Esq.
Black, Srebnick & Kornspan, P.A.
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
Counsel for Marco Minuto

Bruce A. Zimet, Esq.
One Financial Plaza
Suite 2612
Fort Lauderdale, Florida 33394
Counsel for Nicolo Mariani

William J. Hunt, Esq.
William J. Hunt & Associates
155 Polifly Road
Suite 200
Hackensack, New Jersey 07601
Counsel for Joseph Minuto

Kerry A. Lawrence, Esq.
Briccetti, Calhoun & Lawrence, LLP
81 Main Street
Suite 450
White Plains, New York 10601
Counsel for Chris Greco


MICHAEL J. DITTOE
ASSISTANT UNITED STATES ATTORNEY


11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )     MISC. NO. _98-12_
FOR AN ORDER AUTHORIZING THE )
INTERCEPTION OF WIRE COMMUNICATIONS )   **UNDER SEAL**
_____)

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Darrin S. Sachs, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI). As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code (U.S.C.), Section 2510 (7), that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, U.S.C., Section 2516.

2.   I have been employed as a Special Agent of the FBI for over two years. Prior to my employment with the FBI, I was employed as a Deputy United States Marshal for approximately five and a half years. For the past year and a half, I have been assigned primarily to investigations of organized crime, including investigations of an organized criminal enterprise known as the La Cosa Nostra (LCN). As a result of my participation in these investigations, conversations with other FBI Agents familiar with the criminal activities of the LCN, review of reports concerning

ATTACHMENT 1

LCN activities, members and associates, and reliable informant information, I know that the criminal activities of the LCN include, but are not limited to, gambling, loansharking, money laundering, extortion, labor racketeering, drug trafficking, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3.   This Affidavit is being submitted in support of an application which seeks an order authorizing the interception of the wire communications of **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI**, and others as yet unknown over assigned telephone numbers **(954) 782-3172 (target residential telephone)**, subscribed to by **MARCELLO GRASSO**, 740 South Federal Highway #515, Pompano Beach, Florida and **(954) 562-0082 (target cellular telephone)**, and bearing electronic serial number (ESN) 15705204363, subscribed to by Alison Heller (the girlfriend of **MARCELLO GRASSO** and used by **MARCELLO GRASSO**) billed to 740 South Federal Highway #515, Pompano Beach, Florida (hereafter referred to as target telephones) for a period of thirty (30) days[1].

4.   The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning

---

[1] Although the cellular telephone is subscribed to by Alison Heller, your affiant has no basis to believe that she will be using it in furtherance of the criminal activities set forth herein.

2

offenses enumerated in Title 18, United States Code, Section 2516, in particular, the following offenses:

A.   Conspiracy to participate and participating directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4) (The Luchese Organized Crime Family), the activities of which affect interstate and foreign commerce through a pattern of racketeering activity consisting of the offenses set forth in paragraphs 4(B)- 4(H), below, and the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962,(c) and (d);

B.   Transporting stolen goods, securities or money, in and affecting interstate commerce, in violation of Title 18, United States Code, Section 2314;

C.   Receiving and selling stolen goods, securities or money, in violation of Title 18, United States Code, Section 2315;

D.   Transmitting gambling information in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1084;

E. Conducting an illegal gambling business in violation of Title 18, United States Code, Section 1955;

F. Collecting extensions of credit by extortionate means, in violation of Title 18, United States Code, Section 894.

G.   Distributing controlled substances, using a communication facility to facilitate the distribution of a controlled substance, and conspiracy to distribute controlled

3

substances, in violation of Title 21, United States Code, Sections 841, 843(b) and 846.

H. Stealing goods from interstate shipments, in violation of Title 18, United States Code, Section 659.[2]

5.    Your affiant has personally participated in the investigation of the offenses referred to in paragraph 4 of this affidavit, and from that personal participation in this investigation and reports (oral and written) made to me by other agents of the FBI and other federal, state, and local law enforcement agencies, I am familiar with the facts and circumstances of this investigation.

6.    Prior to setting forth the facts and circumstances constituting probable cause, I have reviewed numerous FBI reports concerning information provided by four confidential informants of known reliability and other sources of information set forth below.

7.    The facts and circumstances set forth below demonstrate that:

A.    There is probable cause to believe that **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI,** and others as yet

---

[2] In addition, based on the information set forth in the affidavit, it is possible that criminal conversations will be intercepted involving the interference with interstate and foreign commerce through robbery or extortion, in violation of Title 18, United States Code, Section 1951.

4

unknown, have committed, are committing, and will continue to commit the offenses enumerated in paragraphs 4(A) through 4(H), above.

B.    There is probable cause to believe that **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI,** and others as yet unknown, have used, are using and will continue to use telephone numbers **(954) 782-3172 (target residential telephone)**, subscribed to by **MARCELLO GRASSO**, 740 South Federal Highway #515, Pompano Beach, Florida and **(954) 562-0082 (target cellular telephone)**, and bearing electronic serial number (ESN) 15705204363, subscribed to by Alison Heller (girlfriend of **MARCELLO GRASSO** and used by **MARCELLO GRASSO**), 740 South Federal Highway #515, Pompano Beach, Florida; for the purpose of discussing and executing the offenses enumerated in paragraphs 4(A) through 4(H), above.

8.    In particular, I believe that wire communications will occur over **(954) 782-3172 (target residential telephone)**, and **(954) 562-0082 (target cellular telephone)**, which will disclose:

A.    The precise nature and scope of the illegal activities;

B.    The disposition of monies obtained as a result of these illegal activities;

5

C.   The location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracy and in the substantive violations set forth in paragraph 4, above;

D.   In addition, the communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

9.   The statements contained in this affidavit are based on your Affiant's experience and background as a Special Agent of the FBI, and conversations with other law enforcement officials, information from confidential sources, and analysis of pen register activity.

10. Normal investigative procedures have been used and have not succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.  These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES
## TO BE INTERCEPTED

11.   According to subpoenaed Bell South Telecommunications records,   **(954)   782-3172   (target   residential   telephone)**   is subscribed to by **MARCELLO GRASSO,** 740 South Federal Highway #515, Pompano Beach, Florida.

6

12. According to subpoenaed Bell South Mobility records, cellular telephone **(954) 562-0082 (target cellular telephone)**, and bearing electronic serial number (ESN) 15705204363 is subscribed to by Alison Heller (girlfriend of **MARCELLO GRASSO** and used by **MARCELLO GRASSO**), 740 South Federal Highway #515, Pompano Beach, Florida.

## BACKGROUND OF THE PRINCIPALS

13. **MARCELLO GRASSO** was born on October 22, 1947, and resides at 740 South Federal Highway #515, Pompano Beach, Florida. **GRASSO** is the nephew of Luchese Solider **MARCO MINUTO** and is presently involved in recruiting South Florida gamblers and collecting outstanding gambling debts on behalf of **MINUTO**. As described below, **MINUTO** conducts a bookmaking operation on behalf of the Luchese Organized Crime Family. **GRASSO** is employed at a business called Miron Lumber, located in Pompano Beach, Florida. **GRASSO** was arrested on May 29, 1985, in Jacksonville, Florida and was subsequently convicted for possession of counterfeit currency. **GRASSO** was arrested on February 3, 1989, and was subsequently convicted in Atlanta, Georgia, for conspiracy to import marijuana. **GRASSO** received a sentence of forty eight (48) months of incarceration. In addition to illegal bookmaking activities, **GRASSO** is involved in the distribution of cocaine, marijuana and the interstate transportation of stolen property.

14.  **MARCO MINUTO** was born on March 23, 1936, and resides at 18 Willow Hill, Saddle River, New Jersey.  In 1995, **MINUTO** was inducted into the Luchese Organized Crime Family as a soldier. **MINUTO** was arrested on May 14, 1970, in New York and was subsequently convicted of grand larceny.  **MINUTO** was arrested on November 14, 1970, in New York and was subsequently convicted for promoting gambling.  **MINUTO** was arrested on May 29, 1980, in New York and was subsequently convicted of failure to file a corporate tax return.  **MINUTO** was arrested on January 8, 1991, in New York and was subsequently convicted for possession of gambling records.

15.  **JOSEPH MINUTO**, was born on January 22, 1962, and resides at 751 Orangeburgh Road, Riverbrook, New Jersey.  **JOSEPH MINUTO** is the son of Luchese Solider **MARCO MINUTO** and operates a bookmaking operation on behalf of **MARCO MINUTO**. **JOSEPH MINUTO** was arrested on April 13, 1984, in New York and was subsequently convicted for a gambling offense.

16.  **CHRIS GRECO**, was born on July 7, 1965, and resides at 250 E. Crescent Avenue, Mahwah, New Jersey.  **CHRIS GRECO** is the son-in-law of Luchese Solider **MARCO MINUTO** and works directly with **MARCO MINUTO** and **JOSEPH MINUTO** in bookmaking operations.  **GRECO** was arrested on August 4, 1985, in New Jersey and was subsequently convicted of assault with intent to cause physical injury.

17.  **DOMINICK MEMOLI**, was born on February 13, 1966, and resides at 432 Riverdale Avenue, Yonkers, New York.  **MEMOLI** is an

8

"enforcer" for Luchese Solider **MARCO MINUTO**. **MEMOLI** was arrested on March 23, 1987, in New York and was subsequently convicted of criminal possession of a controlled substance. **MEMOLI** was arrested on March 17, 1990, in New York and was subsequently convicted of criminal possession of a weapon. **MEMOLI** was arrested on November 6, 1990, in New York and was subsequently convicted of burglary. **MEMOLI** was arrested on December 7, 1992, in New York and was subsequently convicted of burglary. **MEMOLI** is currently on New York state probation, and according to his probation officer, was arrested on June 12, 1998, in New York for reckless endangerment and resisting arrest.

18. **JAMES MANCUSO** was born on March 24, 1964, and recently resided at 2404 Crotona Avenue, Bronx, New York. **MANCUSO** is an "enforcer" for Luchese Solider **MARCO MINUTO**. **JAMES MANCUSO** was arrested on September 26, 1985, in New York and was subsequently convicted of grand larceny and the possession of stolen property. **MANCUSO** was arrested on November 2, 1987, in New York for murder, and was subsequently convicted of first degree manslaughter. **MANCUSO** served an eight (8) year prison sentence and has been on conditional release since 1997. **MANCUSO**'s term of conditional release is due to expire on February 23, 2001.

19. **ALEX TORRENTE** was born on August 8, 1963 and resides at 1421 San Marcos Ave., Coral Gables, Florida. **TORRENTE** is associated with Miami Express Courier & Trial Exhibits, located in

Miami.  **TORRENTE** is operating a large bookmaking operation that is associated with **MARCO MINUTO** and **MARCELLO GRASSO** from within Miami Express Courier & Trial Exhibits.  **TORRENTE** is presently involved with **MARCELLO GRASSO** in the weekly thefts of Federal Express packages containing jewelry.  **TORRENTE** was arrested on August 20, 1986, in Miami, Florida and was subsequently convicted for the unauthorized use of credit card access devices.  **TORRENTE** was arrested on September 20, 1990, in Miami, Florida for a probation violation and was subsequently sentenced to one year incarceration.

20.  **HERNANDO HERNANDEZ** was born on May 15, 1953, and resides at 2955 SW 25th Terrace, Miami, Florida.  **HERNANDEZ** has previously supplied **MARCELLO GRASSO** with kilogram quantities of cocaine. **HERNANDEZ** was arrested on February 5, 1988, in Miami, Florida and was subsequently convicted  for possession of marijuana.  **HERNANDEZ** was  arrested  on  June  23,  1988,  by  the  Drug  Enforcement Administration (DEA), Miami, Florida  for conspiracy and possession with intent to distribute cocaine.  **HERNANDEZ** was subsequently convicted and received a sentence of five (5) years' incarceration. **HERNANDEZ** was arrested on February 25, 1994, in Miami, Florida for a probation violation and was subsequently sentenced to sixteen (16) months' incarceration.

21.  **BRUCE SAMUELS** was born on April 4, 1958, and resides at 923 NE 26th Avenue, Hallandale, Florida. **SAMUELS**, a  disbarred attorney, operates a large South Florida bookmaking operation that

10

is associated with **MARCO MINUTO** and **MARCELLO GRASSO**. Based on information from the Florida Bar Association, **SAMUELS** was disbarred on February 7, 1991. **SAMUELS** was arrested on March 30, 1989, in Miami, Florida and was subsequently convicted of possession of counterfeit currency and dealing in counterfeit currency. **SAMUELS** was arrested on August 31, 1989, by DEA and was subsequently convicted of possession with intent to distribute cocaine. **SAMUELS** was sentenced to sixty (60) months incarceration.

22. **GIUSEPPE ANDRE VON BERGER** was born on December 3, 1939, and resides in Italy, but has a South Florida address of 151 Crandon Blvd. #202, Key Biscayne, Florida. **VON BERGER** was involved with **HERNANDO HERNANDEZ** in negotiations with **MARCELLO GRASSO** to purchase stolen bearer bonds.

23. **NICOLO MARIANI** was born on April 4, 1965, and is presently incarcerated at the Madison Correctional Institution, Madison, Florida. **MARIANI** is a criminal associate and confidant of Luchese Soldier **MARCO MINUTO**. **MARIANI** was arrested on June 8, 1990, by the Bureau of Alcohol, Tobacco, and Firearms (ATF) in New York and was subsequently convicted of arson and sentenced to forty six (46) months incarceration. **MARIANI** was arrested on October 4, 1996, in Florida for violation of probation and was subsequently sentenced to twenty one (21) months incarceration. **MARIANI** was arrested on June 23, 1994, in Orlando, Florida and was subsequently convicted of fraud. **MARIANI** was arrested on August

11

14, 1995, in Pompano Beach, Florida and was subsequently convicted of aggravated battery.

## PREVIOUS APPLICATIONS

24. I caused a search to be made of the Electronic Surveillance Indices of the FBI and DEA during the weeks of July 13, 1998 and July 27, 1998, to determine whether previous applications have been made to intercept electronic communications of **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI,** and the facilities named in this Affidavit. The search did not reveal any other applications to intercept wire, oral or electronic communications of these interceptees or facilities named in this Affidavit.

## FACTS AND CIRCUMSTANCES
## ESTABLISHING PROBABLE CAUSE

### Structure of the LCN and the Luchese Family

25. Based on my investigative training and experience, and the sources described below, I have learned the following information about the LCN, a nationwide secret criminal association, and the Luchese Crime Family:

      A.      The LCN is one of the most powerful and sophisticated organized crime groups in the United States.

12

B. The LCN consists of approximately twenty-four separate organizational units known as families functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss and the second-in-command is the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo" or "skipper." Caporegimes are supervisors over "crews", i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have non-member associates under their direction.

D.    There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino, Genovese, and Luchese LCN families. Each of these families is involved in a wide variety of criminal activities including murder, arson, gambling, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking. The Miami/Fort Lauderdale area is considered an "open city" in which any LCN family may operate without paying tribute to any other LCN family. Each of the five New York families has representatives in South Florida.

26. The Luchese LCN family, with approximately 110 active and inactive members, is one of the largest and most powerful LCN

13

families in the United States.  The Luchese LCN family is presently
involved in the  gas distribution business, control of restaurant
and hotel industries, shipping and related marine services, as well
as aspects of the pornography business.  The family also engages in
drug trafficking and is involved in traditional racketeering
activities, such as, murder, gambling, loansharking, public
corruption and obstruction of justice among other racketeering
offenses.

27.  As a result of my training and experience, your Affiant
has knowledge of the following methods and operations of illegal
interstate gambling businesses operated by the LCN, including the
Luchese family:

A.  The use of telephonic communications is essential to
the furtherance of a gambling operation.

B.  The "line" is a group of point-spreads which show
relative strengths of two opposing teams in an athletic contest,
for example, football and basketball contests.  The "line" for a
particular game is then used as a handicap for wagering purposes.
The "handicap" is added to the underdog's final score or subtracted
from the winner's final score to determine the winner of the wager.
While "lines" for a game are supposed to balance the two teams,
bookmakers require a bettor to risk ten (10) to twenty (20) percent
more than the bookmaker risks as a fee for the privilege of
wagering.  This ten (10) or twenty (20) percent charge, commonly
referred to as "vigorish" or "juice," enables the bookmaker to make

14

a profit if the bookmaker accepts an even, or substantially even, amount of wagers on both teams in the contest, regardless of who wins the contest. In this way, the bookmaker operates on a profit margin and does not gamble on the outcome of the event.

C. It is common for illegal sports bookmakers to obtain current "line" information by telephone. A bookmaker must know the opening "line" and obtain frequent updates on the "line." A bookmaker residing in the Fort Lauderdale, Florida area would have to use a telephone or other telecommunications device to expeditiously obtain the current "line" information before it becomes outdated. After receiving the "line" information, the bookmaker would furnish the "line" to his customers, who would in turn study it, compare it with other "lines", and make wagers. In order for a bookmaker to balance, or nearly balance his books, it is typical for him to have another bookmaker with whom to re-bet the wagers. The other bookmaker is, in effect, acting as the primary bookmaker's insurer. The second bookmaker is known as a "lay-off bookmaker," and the aforementioned re-betting or balancing process is known as "laying off." In this way, the bookmaker does not gamble on the outcome of the event and simply operates on a profit margin.

D. Bookmakers frequently obtain unpublished telephone numbers in fictitious names or in names other than their own, for use at their place of operation.

15

E.   Bookmakers will often utilize "commission men" to accept and accumulate wages from bettors.   These wagers are thereafter relayed to the main gambling office.   The bookmaker will compensate the commission man for this service by paying either a percentage of the commission man's gross wagers or profits.

27.1.   Florida state statute 849.25 provides that it is a felony offense to engage in bookmaking as defined by Florida statute 849.25.

## SOURCES OF INFORMATION

### Confidential Source One

28. Confidential Source One (hereinafter referred to as "CS-1") has been providing information to Agents of the FBI concerning criminal activities in excess of eight (8) years. CS-1 has provided information concerning members of organized crime and organized crime activities such as narcotics, extortion, bookmaking, and the interstate theft of stolen property.  All information provided by CS-1 has been shown to be extremely reliable and  has been consistently corroborated by  information obtained from other confidential sources and from independent investigations conducted by law enforcement agencies.  None of the information furnished by CS-1 has been shown to be false or misleading.  In addition to the criminal activity set forth in this affidavit, information provided by CS-1 has resulted in the opening of 7 other FBI investigations, and the identification of criminal activity committed by 22 other

16

persons. Information supplied by CS-1 has resulted in the arrest and conviction of four persons in four separate criminal prosecutions. One of these defendants was the President of a federally insured financial institution. CS-1 was also instrumental in providing timely information that enabled authorities to prevent and thwart an ongoing fraud.

29. The information provided by CS-1 in this affidavit is based on CS-1's direct conversations and associations with **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI,** and others.

### Confidential Source Two

30. Confidential Source Two (hereinafter referred to as "CS-2") has provided information to Agents of the FBI concerning criminal activities in the South Florida area since September, 1997. CS-2 has provided information pertinent to FBI investigations on approximately twenty occasions. CS-2 has provided information concerning members of organized crime and organized crime activities, such as, the distribution of cocaine and marijuana, kidnaping, extortion, credit card fraud, and attempted arson. All information provided by CS-2 has been shown to be reliable and where possible has been corroborated by information obtained from other confidential sources and from independent investigations conducted by law enforcement agencies. None of the information

17

furnished by CS-2 has been shown to be false or misleading. Information provided by CS-2 has been utilized in the arrest of four individuals.

### Confidential Source Three

31. Confidential Source Three (hereinafter referred to as "CS-3") has provided information to Agents of the FBI concerning criminal activities in South Florida for over two months. CS-3 has provided information concerning members of organized crime and organized crime activities, such as, bookmaking and the interstate transportation of stolen property. All information provided by CS-3 has been shown to be reliable and where possible has been corroborated by information obtained from other confidential sources and from independent investigations conducted by law enforcement agencies.

### Confidential Source Four

32. Confidential Source Four (hereinafter referred to as "CS-4") has provided information to Agents of the FBI for approximately ten (10) years. CS-4 has provided information to the New York Division of the FBI that was used in obtaining at least two court authorized electronic surveillance orders. All information provided by CS-4 has been shown to be reliable and where possible has been corroborated by information obtained from other confidential sources, and from independent investigations

18

conducted by law enforcement agencies.   None of the information furnished by CS-4 has been shown to be false or misleading.

## CHRONOLOGICAL NARRATION OF CRIMINAL ACTIVITY

33.    On July 11, 1995, CS-4 advised the FBI that he had learned from members of the Luchese Organized Crime Family, including a Capo in the Family, that **MARCO MINUTO** and eight (8) other individuals were recently inducted as soldiers into the Luchese Organized Crime Family. I am aware that the induction ceremony is an established ritual, whereby the newly inducted member pledges loyalty and allegiance to the organized crime family.  This new member agrees to conduct criminal activities for the mutual benefit of the crime family.

34.    In or about July of 1996, prior to CS-2 becoming a confidential source for the FBI,  **MARCELLO GRASSO** approached CS-2 with the opportunity to purchase cocaine.  CS-2 agreed to purchase the  cocaine from **GRASSO** and was provided with a beeper number by **GRASSO**, so that CS-2 could contact him (**GRASSO**) and coordinate the purchase of cocaine with **GRASSO**. CS-2 purchased personal use quantities of cocaine from **GRASSO**.   **GRASSO** and CS-2 made the arrangements for these cocaine purchases over the telephone in coded language. CS-2 does not recall what specific telephone numbers were used by **GRASSO**.

34.1. CS-2 has observed **GRASSO** in the possession of a case that contained cocaine.  **GRASSO** also offered CS-2 an opportunity to

19

sell marijuana on behalf of **GRASSO**. CS-2 asked **GRASSO** how much marijuana **GRASSO** could provide to CS-2. **GRASSO** advised that he could provide as much marijuana as CS-2 wanted. CS-2 later turned down **GRASSO's** offer to sell marijuana.

35. On January 6, 1997, CS-1 advised the FBI that **JOSEPH MINUTO** and **CHRIS GRECO** traveled to South Florida to collect a gambling debt. **MARCELLO GRASSO** introduced **JOSEPH MINUTO** and **CHRIS GRECO** to some unidentified South Florida bookmakers. These bookmakers advised **GRASSO** that they had no one to collect gambling debts for them and were interested in obtaining the services of **MARCO MINUTO**. CS-1 later advised that **MARCO MINUTO** had authorized **MARCELLO GRASSO** to provide enforcement for the South Florida bookmakers.

36. On January 6, 1997, CS-1 advised the FBI that **MARCELLO GRASSO** was distributing kilogram quantities of cocaine, through a "contact" in Miami. CS-1 identified this person as **HERNANDO HERNANDEZ.**

A. As set forth below, in paragraphs 78 & 91, pen register information shows contact between the target cellular telephone and **HERNANDO HERNANDEZ.**

37. On January 13, 1997, CS-1 advised the FBI that **MARCO MINUTO** intended to organize South Florida and New York bookmakers, particularly in the area of sports betting.

20

38.    On January 24, 1997, CS-1 advised the FBI that **CHRIS GRECO** was in the South Florida area on behalf of **MARCO MINUTO** to see John Norwicki, who had opened Roxanne's, a "strip club" in South Florida.    **GRECO** was instructed to "get an envelope every week" from Norwicki, who was paying for the protection of Norwicki's club.  **MARCO MINUTO** expressed interest in obtaining a 50% ownership of this club.

39.  On February 10, 1997, CS-1 advised the FBI that **MARCELLO GRASSO**  knows of an individual who had access to stolen bearer bonds and could provide **GRASSO** with such bonds.

40.  On March 12, 1997, CS-1 advised the FBI that John Norwicki, the then owner of the "strip club" Roxanne's, advised **MARCELLO GRASSO** that he had been having some "real problems."  The Disc Jockey at Roxanne's called Norwicki and told Norwicki that he had received a telephone call from an unknown individual, who had threatened to kill the disc jockey's family and cut the faces of any girls who showed up at Roxanne's.  As a result, Norwicki advised **GRASSO** that the disc jockey and the dancers did not go to work.  CS-1 advised the FBI that **MARCO MINUTO** intended to exploit the situation, and thereby assume control of Roxanne's.

41.  On March 12, 1997, CS-1 advised the FBI of an upcoming meeting **MARCELLO GRASSO** was scheduled to have with an unknown individual, later identified through surveillance as **GIUSEPPE ANDRE VON BERGER.**  **VON BERGER,** who was arriving from Italy, was scheduled

21

to meet with **GRASSO** and **HERNANDO HERNANDEZ**. The purpose of this meeting was for **VON BERGER** to be given details on the purchase of the stolen bearer bonds. The bearer bonds were to come from a bank in New York, and **GRASSO** believed that they could sell **VON BERGER** up to fifty (50) million dollars worth of stolen bearer bonds for ten (10) cents on the dollar. **VON BERGER** indicated that he wished to use the bonds in order to launder money on behalf of South American drug cartels.

42. On March 20, 1997, FBI agents observed **VON BERGER, GRASSO,** **HERNANDEZ** and other unknown individuals meeting at Victors Cafe, a restaurant, located at the corner of SW 32nd Avenue and SW 27th Street in Coral Gables, Florida.

43. On May 24, 1997, a telephone conversation between **NICOLO** **MARIANI** and **MARCO MINUTO** was recorded while **MARIANI** was incarcerated at the Federal Detention Center, Miami, Florida. A tape recording of this conversation was obtained pursuant to a subpoena. In the conversation, **MINUTO** and **MARIANI** discussed their intention to control a South Florida strip club through an undisclosed interest in the club. In context, this conversation concerned the strip club named Roxanne's. **MINUTO** and **MARIANI** discussed the poor financial condition of the club, and their intention to seek an alliance with others to control the club and to improve profits. Based on the conversation, and your affiant's training and experience, this alliance was to be formed with

another LCN family. **MARIANI** stated that the current legal owner of the strip club had formerly owned a gym in Ohio and had no experience in the operation of a strip club. For this reason, **MINUTO** and **MARIANI** agreed that an alliance with others more experienced in the strip club business would be in their interest.

A. On August 18, 1998, CS-1 reported to the FBI that the Luchese Organize Crime Family no longer had an interest in the strip club.

44. On July 7, 1997, CS-1 advised the FBI that **MARCO MINUTO** traveled from New York to South Florida to begin working on a South Florida bookmaking operation. **CHRIS GRECO** was also to travel to South Florida, along with two other unknown persons, in order to take over a bookmaking operation.

45. On August 20, 1997, CS-1 advised the FBI that **MARCELLO GRASSO** had received at least one kilogram of cocaine from **HERNANDO HERNANDEZ**. CS-1, further advised the FBI that **GRASSO** had in his possession both cocaine and the type of scales used by narcotics traffickers for weighing controlled substances.

46. On August 20, 1997, CS-1 advised the FBI that **MARCELLO GRASSO** had been having problems obtaining the stolen bearer bonds.

47. On October 13, 1997, CS-1 advised the FBI, based on CS-1's association with **GRASSO**, and others, that **GRASSO** uses target telephone numbers **(954) 782-3172(target residential telephone)** and **(954) 562-0082 (target cellular telephone)** to carry on bookmaking

23

operations. Specifically, CS-1 stated that **GRASSO** uses the target telephones to obtain line information, transmit line information to others and collect debts owed by gamblers.

48. On October 13, 1997, CS-1 advised the FBI that during this time period, **MARCELLO GRASSO** had discussions with others concerning a problem with a bookmaker who failed to deliver money to **GRASSO**. If the bookmaker failed to pay, it was **MARCO MINUTO**'s intention to send someone to Florida to "break his legs."

49. On November 1, 1997, a South Florida automobile dealer was the object of a violent physical assault by two individuals at his South Florida business. As a result of the physical assault, the victim was lying unconscious in a pool of his own blood in the lot of his car dealership. The automobile dealer had been the subject of previous verbal threats and a physical assault from a former business associate who had demanded that the automobile dealer close his business. As a result of the prior verbal threats and the assaults, the automobile dealer ceased to be involved in the retail sale of automobiles.

A. On January 6, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** had recently picked up "Dominick and Jimmy" from the airport and that "Dominick and Jimmy" had beaten a general manager of a car lot. CS-1 further stated that the former supervisor of the victim had paid for the beating and for the closure of the business.

24

B.  CS-1 identified the two individuals responsible for the beating as **DOMINICK MEMOLI** and **JAMES MANCUSO**. The physical descriptions of both **MEMOLI** and **MANCUSO** closely resembled the physical descriptions provided by two witnesses to the physical assault against the automobile dealer.

C.  CS-1 advised the FBI that both **DOMINICK MEMOLI** and **JAMES MANCUSO**, who reside in New York, are "enforcers" for Luchese Solider **MARCO MINUTO**.

D.  Following the beating, a witness was approached by one of the two men who had beaten the victim.  This individual said to the witness, "you didn't fuckin see nothing, right."

50.  On November 24, 1997, CS-1 advised the FBI that **MARCELLO GRASSO** continues to use target telephones **(954) 782-3172 (target residential telephone)** and **(954) 562-0082 (target cellular telephone)** to discuss bookmaking activities, specifically, obtaining line information, transmitting line information, and collecting gambling debts.

51.  On December 15, 1997, CS-1 advised the FBI that **DOMINICK MEMOLI** and **JAMES MANCUSO** often travel from New York to South Florida in the company of **MARCO MINUTO, JOSEPH MINUTO**, or **CHRIS GRECO**.

52.  In or about February, 1998, CS-3 began making bets with **MARCELLO GRASSO**. Based on conversations with **GRASSO**, CS-3 learned that **MARCO MINUTO** is the person behind **GRASSO's** South Florida

25

bookmaking operation. As discussed above, **MINUTO** is a soldier in the Luchese Organized Crime Family. CS-3 met two gamblers through **GRASSO**, named David Klein and Jordon Broad. CS-3 stated that CS-3 frequently contacted **GRASSO** at telephone numbers **(954) 782-3172 (target residential telephone)** and **(954) 562-0082 (target cellular telephone)** concerning bookmaking and the collection of bookmaking debts.

53. **MARCELLO GRASSO** supplied CS-3 with two out of state telephone numbers, specifically, (718) 561-7621 and (201) 679-7547. **GRASSO** instructed CS-3 that these numbers should be called to place bets on sporting events. CS-3 began calling (718) 561-7621 and placed numerous bets with an individual known only as "Uncle Joe" and other unknown individuals. When CS-3 would lose the bets made through the above listed telephone numbers, **GRASSO** would collect the outstanding gambling debts. When CS-3 would win bets, CS-3 would receive a cashier's check that was sent from New York and delivered to CS-3 by a courier from Miami Express Courier & Trial Exhibits.

A. As set forth in paragraphs 73, 74 and 95 Pen Register information from the target telephones shows frequent contact between the target telephones and telephone numbers (718) 561-7621, (201) 679-7547.

B. As set forth in paragraphs 70, 71, 81, 83, 84, and 105, Pen Register information from the target telephones shows frequent

contact between the target telephones and Miami Express Courier & Trial Exhibits.

C. Based on information and records from the Florida Secretary of State, Miami Express Courier & Trial Exhibits is the fictitious name for Miami Express Services, Inc. 10421 NW 28th Street, Unit 115, Miami, Fl. This business provides courier services as well as the preparation of exhibits for use in court proceedings.

D. Andy Alvarez is the Director and Vice President of Miami Express. Based on the investigation, your affiant concludes that Andy Alvarez is probably the same person as Andres Alvarez. As noted below in paragraph 85 and 104, both target telephones are in frequent contact with a cellular telephone subscribed to by Andres Alvarez.

54. On January 25, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** continues to use telephone numbers **(954) 782-3172 (target residential telephone)** and **(954) 562-0082 (target cellular telephone)** on a daily basis to obtain the betting line from New York. **GRASSO** places these calls between 6:00 p.m. and 7:30 p.m.

A. As set forth in paragraphs 73 and 95, this information is corroborated by Pen Register records.

55. On February 9, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** is steadily increasing the number of his bettors. Although the revenues from **GRASSO's** bookmaking were less than he had

27

anticipated, **GRASSO** expected to "make a killing" next year --
meaning a large profit.

A.    In context, the term "next year" refers to the upcoming
regular football season that will begin in the first week of
September, 1998.

56.    On February 16, 1998, CS-1 advised the FBI that recently
**MARCELLO GRASSO** had obtained additional heavy bettors. CS-1 also
advised the FBI that **GRASSO** anticipates making as much as $10,000
per week with the gambling operation. CS-1 further advised the FBI
that **GRASSO** is using telephones numbers **(954) 782-3172 (target
residential telephone)** and **(954) 562-0082 (target cellular
telephone)** to communicate with bettors, acquire "lines" on sporting
events, and pass the "lines" out to his bettors.

57.    On February 22, 1998, CS-1 advised the FBI that one of
**MARCELLO GRASSO** 's largest bettors is David Klein.

A. As set forth in paragraphs 79 and 96, Pen Register
information from the target telephones shows frequent contact
between the target telephones and the telephone number subscribed
to by Rebecca Klein, the mother of David Klein. [3]

58.    In the beginning of April of 1998, CS-3 was informed
that telephone numbers (718) 561-7621 and (201) 679-7547 were no
longer in use because the National Basketball Association (NBA)

---

[3] David Klein and the other bettors are not listed as either
violators or named interceptees because the mere placing of a wager
is not, in and of itself, a violation of 18 U.S.C. 1955.

regular season had ended. **MARCELLO GRASSO** provided CS-3 with telephone number 1-800-811-3742 and advised CS-3 that CS-3 could place bets on baseball and hockey games over that telephone number. CS-3 later learned that **BRUCE SAMUELS** (a disbarred attorney) was responsible for operating this particular bookmaking operation.

A. As set forth in paragraphs 90, 102, and 103, Pen Register records show frequent contact between the both the target residential telephone and the target cellular telephone with a telephone used by **BRUCE SAMUELS**.

59. In the beginning of April 1998, **MARCELLO GRASSO** referred CS-3 to make bets with an individual named **ALEX TORRENTE**. CS-3 described to your affiant how he would typically place bets with **TORRENTE**. In general, CS-3 would call the main telephone number for Miami Express Courier & Trial Exhibits (Miami Express) and ask to speak directly with **TORRENTE**. A Miami Express employee would put **TORRENTE** on the phone and CS-3 would proceed to make bets on baseball games with **TORRENTE**. **TORRENTE** would send Miami Express couriers to visit CS-3, for the purpose of paying off and collecting monies earned or lost through CS-3's bets with **TORRENTE**. The Miami Express couriers would use Miami Express paperwork to document both the collection and delivery of monies associated with **TORRENTE**'s bookmaking operation. **TORRENTE** would also use Miami Express telephones for acquiring "betting lines" and taking bets from unknown bettors.

29

A. Based on CS-3's association with **TORRENTE**, CS-3 concluded that **TORRENTE** occupied a position of authority at Miami Express. CS-3 stated that employees of the business answered to **TORRENTE**. CS-3 stated that **TORRENTE** was involved with other unknown individuals in this large bookmaking operation, operated from Miami Express.

B. CS-3 advised that **TORRENTE** would "layoff" bets to **MARCO MINUTO**'s New York bookmaking operation. CS-3 stated that **MARCELLO GRASSO** was associated with and was profiting from **TORRENTE**'s bookmaking operation. CS-3 stated that **MARCO MINUTO**, known to your affiant to be a Luchese LCN Soldier, is the person behind all of **GRASSO**'s South Florida bookmaking operations. During 1998, **GRASSO** regularly used the target cellular telephone **(954) 562-0082** to discuss bookmaking activities with individuals both in New York and in South Florida.

C. As set forth in paragraphs 69, 86, and 106, Pen Register records show frequent contact between the target residential and cellular telephones and **ALEX TORRENTE**.

60. On April 29, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** made a telephone call to an unknown individual in New York and discussed a future armed robbery of a South Florida check cashing store. **DOMINICK MEMOLI**, **JAMES MANCUSO**, and **MARCELLO GRASSO** were to be involved in the robbery, which was expected to yield approximately $100,000 in cash.

30

A. Later, on August 4, 1998, CS-1 advised the FBI that it was CS-1's impression that this robbery would not be occurring.

61. In the end of April 1998, CS-3 stated that he learned from **ALEX TORRENTE** that **TORRENTE** had recently attempted to sell **MARCELLO GRASSO** jewelry that had been stolen from a Federal Express shipment. **GRASSO** was fully aware that the jewelry was stolen from a Federal Express shipment.

62. On July 6, 1998, Rick Blanscet from Federal Express Security was contacted. Blanscet advised that approximately one hundred to two hundred thousand dollars in jewelry was recently stolen from Federal Express in a series of thefts. Blanscet added that the jewelry thefts were taking place on a weekly basis from the Seybold building located in downtown Miami. The Seybold building houses a large number of jewelry stores.

63. On July 6, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** is involved with an individual named Alex Last Name Unknown (LNU) in the weekly theft of Federal Express packages, many of which contain jewelry. CS-1 later identified this person as **ALEX TORRENTE**.

64. On August 4, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** and **ALEX TORRENTE**, along with a Federal Express employee, are involved in the theft of jewelry from Federal Express. The thefts generally take place on Fridays. The Federal Express employee will typically take one package that contains jewelry and

31

approximately $187,000 in stolen packages that contained jewelry. The latest theft occurred on July 31, 1998. The majority of these shipments were destined for locations outside the state of Florida and, consequently, are thefts from interstate commerce.

66.    According to CS-3, the above described New York bookmaking operations involving **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO,** and **CHRIS GRECO** have been closed for business since the end of the NBA regular season in April 1998.  The New York bookmaking operations is expected to resume with the start of the upcoming football season, set to resume in the first week of September, 1998.   Based on my training and experience, and the pattern of criminal activity describe above, criminal conversations are now occurring  over telephone numbers **(954)782-3172** (target residential   telephone)   and   **(954)562-0082**   (target   cellular telephone).

66.1  On August 17, 1998, CS-1 told FBI agents that **MARCO MINUTO** and **MARCELLO GRASSO** are making the final arrangements to consolidate and continue their illegal bookmaking activities in South Florida.   CS-1 further stated that **GRASSO** continues to use both  residential  target  telephone  number  **(954) 782-3172** and cellular target telephone number **(954) 562-0082** to acquire and distribute stolen property and  prepare for the resumption of the illegal gambling business associated with the start of the regular football season in the first week of September, 1998.   These

33

criminal activities are undertaken on behalf of Luchese Organized Crime Soldier **MARCO MINUTO**.

A. This information is corroborated, _inter alia_, by pen register information showing recent contact between the target telephones and telephones used by **MARCO MINUTO** and Miami Express. See, e.g., paragraphs 83, 86, 99.

66.2. On August 24, 1998, CS-1 confirmed to FBI agents that the bookmaking operation will begin in earnest the first week in September 1998. CS-1 stated that, although preparations are on going for the illegal bookmaking operation, the actual betting will not begin until the start of regular football season in the first week of September. CS-1 further stated that although the South Florida bookmaking operation will be operated by **MARCELLO GRASSO** in South Florida, the operation will be controlled from New York by **MARCO MINUTO**--known by your affiant to be a Luchese soldier.

A. Based on the information in this affidavit, my training and experience and the manner in which the LCN conducts its bookmaking operations, your affiant concludes that: I) the gambling operation is in violation of Florida Statute 849.25 which prohibits bookmaking; ii) will involve five or more persons who conduct manage or supervise the gambling business; iii) will remain in substantial continuous operation for a period of 30 days or will have a gross revenue of $2,000 in any single day.

67.   Based on the information set forth in this affidavit, coupled with the manner and method by which the LCN and the Luchese Organized Crime Family operate, it is the affiant's conclusion that **MARCO MINUTO** and **MARCELLO GRASSO** are conducting the criminal activity set forth in this affidavit on behalf of the Luchese Organized Crime Family.   It is the Affiant's further conclusion that evidence concerning all the criminal activities engaged in by the Luchese Organized Crime family, as set forth in paragraph four above, will be disclosed through the electronic surveillance orders applied for herein.

### PEN REGISTER AND TRAP AND TRACE ANALYSIS

### TARGET CELLULAR TELEPHONE NUMBER (954) 562-0082

68.   A Court Order (Order # 97-4811-Snow) authorizing the installation and use of a pen register, a trap and trace device, and enhanced caller identification on target cellular telephone (954) 562-0082 for a period of sixty days was issued by the Honorable Lurana S. Snow, United States Magistrate Judge, on September 18, 1997.

69.   Pen Register records indicate that between September 18, 1997 - November 16, 1997, (at the height of football season) seventy (70) telephone calls were registered between the target cellular telephone and (305) 408-4200, subscribed to by **ALEX TORRENTE**.

70. Pen Register records indicate that between September 18, 1997 - November 16, 1997, fifty one (51) telephone calls were registered between the target cellular telephone and (305) 599-7197, subscribed to by Miami Express Courier & Trial Exhibits.

71. Pen Register records indicate that between September 18, 1997 - November 16, 1997, thirty one (31) telephone calls were registered between the target cellular telephone and (305) 997-0177, a Page Net pager, subscribed to by Miami Express Courier & Trial Exhibits.

72. A Court Order (Order #98-4601-Snow) authorizing the continued installation and use of a pen register, a trap and trace device, and enhanced caller identification of target cellular telephone (954) 562-0082 for a period of sixty days was issued by the Honorable Lurana Snow on January 12, 1998.

73. Pen Register records indicate that from January 12, 1998-March 12, 1998, one hundred and forty seven (147) telephone calls were made from the target cellular telephone to (718) 561-7621, subscribed to Joe Bialko/Sports Club, 2384 Hughes Ave, Bronx, New York. CS-3 was provided with this telephone number by **MARCELLO GRASSO** for the purpose of making bets on sporting events. CS-3 stated that the bets could only be placed with this bookmaking operation up until the end of the National Basketball Association (NBA) regular season (beginning of April 1998). Of the 147 registered telephone calls made from the target cellular telephone,

36

to Sports Club, one hundred and fifteen (115) were made between 6:00 p.m.-7:30 p.m.    CS-1 advised the FBI that **MARCELLO GRASSO** called a telephone number in New York between 6:00 p.m.-7:30 p.m. for the purpose of acquiring the "lines" on sporting events.

74. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty seven (27) telephone calls were registered between the target cellular telephone and (201) 679-7547, a cellular telephone subscribed to by Minuto Sisters Corp. CS-3 was provided with this telephone number by **MARCELLO GRASSO** for the purpose of making bets on sporting events.

75. Pen Register records indicate that between January 12, 1998 - March 12, 1998, thirty two (32) telephone calls were registered between the target cellular telephone and (516) 984-1076 subscribed to by Arthur Fuzailov.  Although this telephone is in the name of Fuzailov, CS-1 has provided information that **MARCO MINUTO** used this particular cellular telephone. However, CS-1 stated in August 1998 that **MINUTO** had recently stopped using the telephone.

76. Pen Register records indicate that between January 12, 1998 - March 12, 1998, four (4) telephone calls were registered from the target cellular telephone to (201) 818-7292, subscribed to by Margaret Minuto, the wife of **MARCO MINUTO**, 18 Willow Hill, Saddle River, New Jersey. Public records indicate that **MARCO MINUTO** resides at 18 Willow Hill, Saddle River, New Jersey.

77. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty one (21) telephone calls were registered between the target cellular telephone number and (973) 772-5772, subscribed to by **JOSEPH MINUTO** and Big Daddy's Pizza and Grill--a business owned by **JOSEPH MINUTO**.

78. Pen Register records indicate that between January 12, 1998 - March 12, 1998, four (4) telephone calls were registered between the target cellular telephone and (305) 444-4296, subscribed to by Zenobio Hernandez, the father of **HERNANDO HERNANDEZ**. As noted above, **GRASSO** and **HERNANDEZ** are involved in the distribution of controlled substances.

79. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty seven (27) telephone calls were registered between the target cellular telephone number and (954) 725-4446, subscribed to Rebecca Klein. Rebecca Klein is the mother of David Klein. Based on information from the apartment manager, Klein resided with his mother. As noted above, both CS-1 and CS-3 stated to the FBI that Klein is a gambler associated with **MARCELLO GRASSO**.

80. Pen Register records indicate that between January 12, 1998 - March 12, 1998, ten (10) telephone calls were registered between the target cellular telephone and (561) 498-1099, the business telephone of Jordan Broad. CS-3 advised that Broad is a gambler associated with **MARCELLO GRASSO**.

81. Pen Register records indicate that between January 12, 1998 - March 12, 1998, twenty one (21) telephone calls were registered between the target cellular telephone and (305) 599-7197, subscribed to by Miami Express Courier & Trial Exhibits (Miami Express). As noted above, CS-3 has stated that he called Miami Express to place bets on sporting events.

82. A Court Order (Order # 98-4725-BSS) authorizing the installation and use of a pen register, a trap and trace device, and enhanced caller identification on target telephone 954 562-0082 for a period of sixty days was issued by the Honorable Barry Seltzer, United States Magistrate Judge, on June 11, 1998. This order was renewed on August 6, 1998, and authorized an additional 60 days of pen register and trap and trace information.

83. Pen Register records indicate that from June 17, 1998 - September 3, 1998, forty six (46) telephone calls, with the last call occurring on August 31, 1998, were registered between the target cellular telephone and (305) 599-7197, subscribed to by Miami Express Courier & Trial Exhibits.

A. As discussed above, **TORRENTE** is employed by Miami Express Courier & Trial Exhibits.

84. Pen Register records indicate that from June 17, 1998 to September 3, 1998, four (4) telephone calls, with the last call occurring on June 27, 1998, were registered between the target

39

cellular telephone and (305) 599-1999, subscribed to by Miami
Express Courier & Trial Exhibits.

85. Pen Register records indicate that from June 17, 1998 -
September 3, 1998, twenty three (23) telephone calls, with the last
call occurring on July 23, 1998, were registered between the target
cellular telephone and (305) 785-3704, a cellular telephone
subscribed to by Andres Alvarez, listed as an employee of Miami
Express Courier & Trial Exhibits.

86. Pen Register records indicate that from June 17, 1998 -
September 3, 1998, two (2) telephone calls, with the last call
occurring on June 27, 1998 were registered between the target
cellular telephone and (305) 408-4200, subscribed to by **ALEX
TORRENTE**.

87. Pen Register records indicate that from June 17, 1998  -
September 3, 1998, three (3) telephone calls, with the last call
occurring on June 30, 1998, were registered between the target
cellular telephone and (516) 984-1076, subscribed to by Arthur
Fuzailov. Although this telephone is in the name of Fuzailov, CS-1
has provided information that **MARCO MINUTO** has used this particular
cellular telephone, but has recently stopped using it.

88. Pen Register records indicate that from June 17, 1998 -
September 3, 1998, three (3) telephone calls, with the last call
occurring on August 13, 1998, were registered between the target

40

cellular telephone and (201) 818-7292, subscribed to by Margaret Minuto, the wife of **MARCO MINUTO**.

89. Pen Register records indicate that on July 23, 1998, one (1) telephone call was registered between the target cellular telephone and (201) 818-4331, subscribed to by **CHRIS GRECO**.

90. Pen Register records indicate that from June 17, 1998 - September 3, 1998, thirteen (13) telephone calls, with the last call occurring on August 14, 1998, were registered between the target cellular telephone and (305) 992-0287, a cellular telephone subscribed to by **BRUCE SAMUELS**.

91. Pen Register records indicate that from June 17, 1998 - September 3, 1998, six (6) telephone calls, with the last call occurring on August 4, 1998, were registered between the target cellular telephone and (305) 444-4296, subscribed to the home of **HERNANDO HERNANDEZ**. As discussed above, according to CS-1, **GRASSO** is involved with **HERNANDEZ** in the distribution of cocaine.

### TARGET RESIDENTIAL TELEPHONE NUMBER (954) 782-3172

92. A Court Order (Order # 98-4601-Snow) authorizing the installation and use of a pen register, a trap and trace device, and enhanced caller identification on target telephone (954) 782-3172 for a period of sixty days was issued by the Honorable Lurana S. Snow, United States Magistrate Judge, on January 12, 1998.

93. Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, twenty nine (29)

41

telephone calls were registered between the target residential telephone and (516) 984-1076, a cellular telephone that was used by **MARCO MINUTO**.

94.   Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, seven (7) telephone calls were registered between the target residential telephone and (201) 818-7292, subscribed by Margaret Minuto, the wife of **MARCO MINUTO**.

95.   Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, twenty five (25) telephone calls were registered between target residential telephone and (718) 561-7621, subscribed to Joe Bialko/Sports Club, Bronx, New York.  **MARCELLO GRASSO** provided CS-3 with this telephone number for the purpose of CS-3 making bets on sporting events.  Of the 25 registered calls from the target telephone to the Sports Club, nineteen (19) were made between 6:00 p.m. and 7:30 p.m. CS-1 stated that **MARCELLO GRASSO** calls a telephone number in New York between 6:00 p.m. and 7:30 p.m. to acquire the "lines" on sporting events.

96.   Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, twenty four (24) telephone calls were registered between the target residential telephone and (954) 725-4446, subscribed to by Rebecca Klein, the

42

later give the stolen package to either **GRASSO** or **TORRENTE**. The Federal Express employee will report the stolen package as lost. Following the theft of the jewelry, **GRASSO** and **TORRENTE** "fence" the stolen jewelry for cash.

A. The term "fence" means to sell or broker stolen property to businesses and individuals. The fence normally takes steps to hide the stolen nature of the property.

64.1 On August 4, 1998, CS-1 advised the FBI that **MARCELLO GRASSO** continues to use target telephones **(954) 782-3172** (target residential telephone) and **(954)562-0082** (target cellular telephone) in furtherance of bookmaking and distributing stolen property. Specifically, **GRASSO** uses both target telephones to discuss the acquisition and disposition of stolen property, to obtain "line information" and collect gambling debts.

65. On August 5, 1998, Rick Blanscet from Federal Express Security was again contacted. Blanscet advised that Federal Express is experiencing frequent thefts of interstate shipments containing jewelry. These thefts generally occur on Fridays. The stolen packages are tracked as being picked up by Federal Express, but later disappear on the way to a Federal Express loading ramp. The missing package is later reported as being lost. Blanscet concluded that since the packages never arrive at the loading ramp, the individual responsible for the thefts is a Federal Express employee. From January 1998 - July 1998, Federal Express has lost

32

mother of David Klein. As discussed above, Klein is a gambler who is associated with **GRASSO**.

97. Pen Register and trap and trace records indicate that between January 12, 1998 - March 12, 1998, eight (8) telephone calls were registered between the target residential telephone and (561) 477-3664, subscribed to by Jordan Broad--a gambler associated with **GRASSO**.

98. A Court Order (Order # 98-4725 BSS) authorizing the installation and use of a pen register, a trap and trace device, and enhanced caller identification on target telephone (954) 782-3172 for a period of sixty days was issued by the Honorable Barry Seltzer, United States Magistrate Judge, on June 11, 1998. This order was renewed on August 6, 1998, for a period of 60 additional days.

A. However, because of technical problems, there is no pen register information available from August 10, 1998 - August 19, 1998, although, there is some trap and trace information available for this period. Moreover, it is possible that the pen register failed to record all outgoing calls from August 20, 1998 through September 2, 1998, when the old pen register device was replaced.

99. Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, seventeen (17) telephone calls, with the last call occurring on August 29, 1998, were

43

registered between the target residential telephone and (201) 818-7292, subscribed to by Margaret Minuto, the wife of **MARCO MINUTO**.

100.   Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, three (3) telephone calls, with the last call occurring on June 29, 1998, were registered between the target residential telephone and (516) 984-1076, a cellular telephone that had been used by **MARCO MINUTO**.

101.   Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, twelve (12) telephone calls, with the last call occurring on August 13, 1998, were registered between the target residential telephone and (201) 818-4331, subscribed to by **CHRIS GRECO**.

102.   Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, two (2) telephone calls, with the last call occurring on July 4, 1998, were registered between the target residential telephone and (305) 992-0287, a cellular telephone subscribed to by **BRUCE SAMUELS**.

103. Pen Register and trap and trace records indicate that on July 4, 1998, one telephone call was registered between the target residential telephone and (954) 457-8682, subscribed to by **BRUCE SAMUELS**.

104.   Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, thirteen (13) telephone calls, with the last call occurring on July 30, 1998, were

**44**

registered between the target residential telephone and (305) 785-3704, a cellular telephone subscribed to Andres Alvarez, an employee of Miami Express Courier & Trial Exhibits.

105. Pen Register and trap and trace records indicate that between June 19, 1998 - September 3, 1998, four (4) telephone calls, with the last call occurring on July 4, 1998, were registered between the target residential telephone and (305) 997-0177, a Page Net pager subscribed to by Miami Express Courier & Trial Exhibits.

106. Pen Register and trap and trace records indicate that on July 4, 1998, one (1) telephone call was registered between the target residential telephone and (305) 408-4200, subscribed to by **ALEX TORRENTE**.

## NORMAL INVESTIGATIVE TECHNIQUES

107. Confidential Sources CS-1, CS-2, and CS-3, referred to herein have told Special Agents of the FBI that they would be fearful for their lives and most certainly be in a position of jeopardy if their involvement with law enforcement authorities was known to individuals mentioned herein. As discussed above, the conspirators are involved in violent criminal activity. Furthermore, **JAMES MANCUSO** was arrested for murder and was subsequently convicted for manslaughter. In addition, other conspirators have criminal records for violent crimes. CS-1, CS-2, and CS-3, have advised that even if immunized and given protective

custody they would be unwilling to testify at any proceeding for fear of their safety. Even if the informants were to testify, none of then is able to furnish information which would fully identify all members of this on-going criminal conspiracy or which would define the roles of the conspirators sufficiently for prosecution. Confidential informants normally have only limited information either furnished by a subject or learned second hand from others.

108. In additional to being unwilling to testify, CS-1, CS-2, and CS-3, have indicated that they would be unwilling to introduce an FBI Undercover Agent (UCA) to the subjects of this investigation. Based upon the close-knit nature of this criminal group, your affiant does not believe it would be possible for a UCA to independently infiltrate this group.

109. Your affiant is aware that an investigation consists of a number of techniques being used in conjunction with each other to develop enough evidence to establish a prosecutable case against those being investigated. These techniques include the use of undercover agents, confidential sources, the testimony of witnesses before the Federal Grand Jury, surveillance, analysis of toll and pen register data and the execution of search warrants. The requested authorization for wire interception is necessary because, as discussed above, many of these normal investigative techniques have been tried or reasonably appear to be unlikely to succeed if tried or are too dangerous.

**46**

110. Your affiant is aware that **MARCO MINUTO** is a solider in the Luchese LCN crime family. Your affiant is also aware from prior investigations and reports of other agents that "made" members of LCN Crime families, such as **MARCO MINUTO**, typically use LCN associates, such as **MARCELLO GRASSO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI**, and **JAMES MANCUSO** as insulation between themselves and outsiders. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

111. Your affiant believes that there are no undercover agents who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

112. Although the confidential sources have considerable knowledge of the criminal activity of the conspirators, it is not sufficiently complete to expose the full nature and scope of the criminal enterprise involved in this case.

113. Conducting physical surveillance of participants is a commonly used investigative technique. Surveillances have been conducted in this investigation and they have assisted in disclosing some of the associations and places of meetings by the participants. However, this technique has failed to reveal the identity of all the participants and has failed to provide admissible evidence of specific criminal activities. Without

47

knowledge of the content of these meetings, surveillance alone is of limited value. **MARCELLO GRASSO** has advised CS-3 of his belief that he was at one time or another the subject of a physical surveillance, conducted by a law enforcement agency.

114. FBI agents have conducted physical surveillance of the conspirators. Specifically, surveillances were conducted on March 20, 1997, May 23, 1997, November 18, 1997, February 17, 1998, and June 3, 1998. In addition, FBI agents have conducted numerous spot checks of various conspirators with most recent checks occurring on August 20, 1998 and September 3, 1998. The surveillances revealed that **GRASSO** and **MARCO MINUTO** associated with each other. For example, on May 23, 1997, surveillance agents observed **GRASSO** and **MARCO MINUTO** meeting together in Ft. Lauderdale, Florida at the restaurant "Cafe Italia." Furthermore, on February 17, 1998, agents observed **MARCO MINUTO** in the company of a person resembling **CHRIS GRECO** at the Ft. Lauderdale International Airport. Although useful as an investigative tool, such surveillances will not, in and of themselves, supply sufficient evidence to establish guilt beyond a reasonable doubt.

115. Your affiant also is aware, that any extensive surveillance risks exposure of the investigation and can compromise the covert nature of the investigation, thereby causing **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS,**

48

**GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI** and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance in the location of **MARCELLO GRASSO**'s residence would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. Indeed, as noted above, **GRASSO** has stated he believes that he is under surveillance. Consequently, increased surveillance could well compromise the investigation. However, surveillance, in conjunction with electronic surveillance, will provide valuable evidence regarding the activities of this criminal enterprise.

116. A Federal Grand Jury investigation has been initiated into the illegal activities of the conspirators. For example, the victims of the extortion described in paragraph 49 were subpoenaed to appear before the grand jury. Both victims were reluctant to testify and expressed great fear for their well being and asked to be excused from testifying. When informed that they would not be excused, they testified before the grand jury. However, they possessed only limited information about those involved in the extortion. In addition, many of the possible witnesses are conspirators themselves and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized

49

crime families often invoke their Fifth Amendment testimonial privilege and, even under a grant of immunity, have been known to risk and accept contempt charges rather than testify. A grand jury appearance of co-conspirators would most likely result in their invoking Fifth Amendment rights and possibly risking contempt charges. Finally, from your affiant's experience, as well as the experience of other FBI Agents familiar with organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

117. Consideration has been given to interviewing co-conspirators and associates of the principal subjects. Specifically, your affiant has considered interviewing David Klein and Jordon Broad, who are associated with the conspiracy. These persons, however, would not have knowledge of the full nature and scope of the criminal activity of the conspirators. Moreover, individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and therefore, unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop admissible evidence relating to the full scope of the federal violations set forth in this affidavit. The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such

50

refuse to cooperate with law enforcement to any significant degree.

118. From prior investigations and reports of other Agents, your affiant knows that the Luchese LCN Crime family is extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of little value.

119. Based upon your affiant's experience and the experience of fellow agents, who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

120. Although not set forth in the probable cause section of this affidavit, telephone toll records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed

51

telephonic contact between **MARCELLO GRASSO** and a known LCN member and LCN associates. However, like toll record information these records do not provide proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

121. Based upon my experience and the experience of other law enforcement agents, it is my belief that use of search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept and the only evidence of a meeting would be the conversations. To date, there is no corroborated information concerning the existence or location of any such records.

122. Due to the fact that sufficient evidence is not available through other investigative techniques, as set forth above, your affiant believes there is an overwhelming need for electronic surveillance in this matter to fully reveal the manner and scope in which **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, BRUCE SAMUELS, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI**, the named interceptees, and others as yet unknown, are involved in the

violations of federal statutes as set forth in paragraph 4 of this affidavit. Specifically, electronic surveillance is needed to reveal the manner and means by which the Luchese organized crime family is conducting its operations in South Florida.

## MINIMIZATION

123. All interception will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interception will be immediately suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the name interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is criminal in nature. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-criminal in nature. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become criminal in nature.

124. Although it is not anticipated that interceptions in a foreign language will occur it is possible. In the event that such conversations occur, and an expert in that language is not reasonably available, it is requested that the Court authorize that the minimization may be conducted as soon as practicable after such interception occurs.

## PERIOD OF INTERCEPTION

125. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which **MARCELLO GRASSO, MARCO MINUTO, JOSEPH MINUTO, CHRIS GRECO, DOMINICK MEMOLI, JAMES MANCUSO, ALEX TORRENTE, HERNANDO HERNANDEZ, GIUSEPPE ANDRE VON BERGER, NICOLO MARIANI,** and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, and the full nature of the criminal conspiracies involved therein, or for a period not to exceed thirty (30) days, such thirty-day period to begin on the day on which the investigative or law enforcement officer first begins

54

to conduct an interception under the Order, or, ten (10) days after

the Order is entered, whichever is earlier.

Darrin S. Sachs
Special Agent
Federal Bureau of Investigation

Sworn to before me this_____8th_____ day of September 1998

WILKIE D. FERGUSON
UNITED STATES DISTRICT JUDGE
Southern District of Florida

Certified to be a true and
correct copy of the original;
Carlos Juenke, Clerk
U.S. District Court
Southern District of Florida

By _____
Deputy Clerk

Date  9-8-98

55