UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-CR-6088-UNGARO-BENAGES

UNITED STATES OF AMERICA,    :

    Plaintiff,    :

                  :

v.    :

                  :

MARCO MINUTO,    :

    Defendant.    :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION DENYING MARCO MINUTO'S MOTION TO SUPPRESS FRUITS OF WIRETAP AND SUPPLEMENTAL MOTION TO DISMISS THE INDICTMENT

On August 24, 1998, the FBI allegedly learned that a bookmaking operation was about to begin and that bets would be accepted starting the first week of September. Two weeks later, on September 8, 1998, FBI Special Agent Sachs swore in an affidavit that he needed a wiretap to gather evidence of the bookmaking operation because traditional forms of investigation had been tried and had failed. Without taking testimony, the Magistrate Judge found that the wiretap had been properly authorized only after "the more traditional forms of investigation that had been tried and failed." [Magistrate's Report and Recommendation at 6]. Yet traditional forms of investigation could not have "been tried and failed" when the government applied for the wiretap, because the alleged bookmaking operation had barely begun. Marco Minuto objects to the findings of the Magistrate's Report and Recommendation denying Mr. Minuto's Motion to Suppress Fruits of Wiretap.

During a hearing on August 9, 2001, the Court instructed Mr. Minuto to address in

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

these objections the implications of a lawyer being "CS-1," the confidential informant referenced in Agent Sachs's September 8, 1998 affidavit in support of the wiretap application.[1] This lawyer represented defendants Marco Minuto, Joseph Minuto, Chris Greco, and Nicolo Mariani at various times since 1997. This lawyer's representation of Marco Minuto involved the negotiation of contracts, incorporation of businesses, mortgage negotiations, and environmental matters. This lawyer was privy to information protected by the attorney-client privilege. As the FDC-Miami visitor logs show, this lawyer continued to meet with Mr. Minuto at FDC-Miami after Mr. Minuto was indicted.[2] The government's use of information provided by CS-1 to secure the wiretap and the indictment against Mr. Minuto violated Mr. Minuto's attorney-client privilege and intruded into Mr. Minuto's attorney-client relationship.

In his sworn wiretap affidavit, Agent Sachs failed to inform Judge Ferguson, the judge who authorized the wiretap, about CS-1's relationship to the targets of the investigation. Instead, Agent Sachs swore that "based upon the close-knit nature of this criminal group, your affiant does not believe it would be possible for an [undercover agent] to independently infiltrate this group." [Sachs Affidavit of September 8, 1998 at ¶ 109]. Given CS-1's relationship to Mr. Minuto, this statement was a material misrepresentation that mislead the judge into issuing the wiretap. Additionally, the government's failure to disclose CS-1's relationship to Mr. Minuto constituted an intentional and material omission of fact.

_____

[1] For the purposes of this motion, we assume that CS-1 is the lawyer identified at sidebar.

[2] At the government's request, the FDC-Miami visitor logs have been filed under seal to protect the privacy of CS-1.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

Even after Mr. Minuto was indicted, CS-1, in his capacity as an attorney, continued meeting with Mr. Minuto. In violation of the Sixth Amendment right to counsel, CS-1 met with Mr. Minuto at FDC-Miami and discussed defense strategy. Through the use of CS-1, the government learned of attorney-client privileged communications concerning Mr. Minuto's defense. The government permitted one of its agents, masquerading as conflict-free counsel, to sabotage defense strategies. CS-1 was violating the duties of loyalty and confidentiality of The Florida Bar and the government knew it. See Rules Regulating The Florida Bar 4-1.4(b), 4-1.6, 4-1.7, 4-4.2, 4-4.3. Despite CS-1's obvious conflict of interest, the government lulled Mr. Minuto into confiding in CS-1 and accepting CS-1's legal advice.

The government's outrageous conduct in directing the use of CS-1 violated Mr. Minuto's attorney-client privilege, attorney-client relationship and constitutional rights. As a result, the wiretap, the indictment, and the prosecution team are all tainted. The wiretap should be suppressed, the prosecution team disqualified, and the indictment against Marco Minuto dismissed. At a minimum, Mr. Minuto requests a hearing to prove that the government violated his constitutional rights by seeking an indictment and prosecuting him based on evidence obtained in violation of the attorney-client privilege and the Fifth and Sixth Amendments to the United States Constitution. See generally Kastigar v. United States, 406 U.S. 441 (1972).

## OBJECTIONS TO THE MAGISTRATE'S FINDINGS

The Magistrate Judge found that Agent Sachs's affidavit established that "the more traditional forms of investigation had been tried and failed," such that the affidavit satisfied the necessity requirement of 18 U.S.C. § 2518. [Magistrate's Report and Recommendation,

at p.6.]  This finding is unsupported by the facts of the case.  There was simply not time for traditional forms of investigation to have "been tried and failed" prior to the government seeking a wiretap.  On August 24, 1998, the FBI learned that an alleged bookmaking operation was about to begin and bets would be accepted starting the first week of September. The government applied for a wiretap during the first week of September.

The government was obligated to "make a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987).  In our case, the government resorted to electronic interception almost immediately on September 8, 1998.

The use of confidential informants was consistently producing tangible results regarding the targets of the investigation, according to Agent Sachs's own affidavit. [Sachs Affidavit of September 8, 1998,  ¶¶ 33-41, 43A-48, 49A-C, 50-61, 63-64.1, 66-66.2].  In addition to providing the start date for betting, a confidential informant had also identified potential bettors.  See id. at ¶ 57.  Agent Sachs had also obtained valuable information from traditional forms of investigation, including physical surveillance, pen registers, and trap and trace records.  See id. at ¶ 113 ("Surveillances ha[d] been conducted in this investigation and [had] assisted in disclosing some of the associations and places of meetings by participants."); id. at ¶ 120 ("These records have been useful in revealing some of the associations and frequency of contact of the other known participants."). Before the alleged bookmaking operation had even begun, Agent Sachs's use of traditional forms of investigation was succeeding and there was no indication that these techniques would fail once the betting got underway.

-4-

Mr. Minuto has challenged the government's failure to utilize a basic investigative technique to infiltrate the bookmaking operation: send a wired undercover agent to place a bet and record the transaction. The government argued that this technique "would not disclose the full nature and extent of the criminal enterprise under investigation." [Government's Surreply p. 10.] Yet, according to Agent Sachs's own time line, this technique was not even considered, since the government resorted to wiretaps during the first week of the betting. Additionally, the government has not explained why this undercover work would not disclose the nature of the crime under investigation.

Agent Sachs dismissed normal investigative techniques by relying on his and other agents' experience with the Luchese Crime Family. See Sachs Affidavit of September 8, 1998, ¶ 118 ("[Y]our affiant knows that the Luchese LCN Crime Family is extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of little value"). Similarly, Agent Sachs used generalizations to reject the value of search warrants and cooperation of co-conspirators. See id. at ¶ 121 ("[I]t is my belief that the use of search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept and the only evidence of a meeting would be the conversation"); id. at ¶ 117("[C]o-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such, refuse to cooperate with law enforcement to any significant degree."). Agent Sachs even used generalizations to downplay the use of confidential informants. Id. at ¶ 107 ("Confidential

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

informants normally have only limited information either furnished by a subject or learned second hand from others."). Nevertheless, in the very same affidavit, Agent Sachs relied upon extensive information provided confidential informants.

Despite the infiltration achieved by the confidential informants, the Magistrate Judge found "merit" in the government's position that "the 'close knit' nature of the organization under investigation made the successful introduction of an undercover agent unlikely." [Magistrate's Report and Recommendation, at p. 5.] In addition to the four confidential informants who were providing inner-circle information prior to the wiretap applications, the government has conceded that cooperating witness David Alwais began providing valuable information in December 1998, only a month after the last of the three wiretaps was approved. Without taking any evidence, the Magistrate Judge also concluded that undercover agents posing as bettors "would be of minimal assistance" to this investigation. [Magistrate's Report and Recommendation, n.1.] While the use of undercover agents may not be as efficient as wiretapping, wiretapping may not be used as a matter of course in every criminal investigation simply because it is easy or more effective. See United States v. Smith, 31 F.3d 1294, 1297 (4th Cir. 1994) (quoting Giordano, 416 U.S. at 515; United States v. Kahn, 415 U.S. 143, 153, n. 12 (1974)) ("Sections 2518(1)(c) and (3)(c) are designed to ensure that the relatively intrusive device of wiretapping is neither routinely employed as the initial step in criminal investigation, nor resorted to in situations where traditional investigative techniques would suffice to expose the crime").

The Magistrate also agreed that the defendants' alleged connection to the Lucheses was justified the agent's conclusions and generalizations in his wiretap. See Magistrate's Report and Recommendation, p. 4 ("Agent Sachs stated that he had specific experience

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131* (305) 371-6421

with the Luchese LCN Crime Family and was aware of its techniques, rather than general experience with bookmaking operations."). In <u>United States v. Kalustian</u>, 529 F.2d 585, 590 (9th Cir. 1976), the court held that generalizations in a wiretap affidavit based on "knowledge and experience" gained in other cases are insufficient. A wiretap affidavit must show why "traditional investigative techniques were not sufficient in this particular case." <u>Id.</u> The Magistrate Judge relied on Sachs's "experience" with the Lucheses to distinguish our case from <u>Kalustian</u>. The implication of the Magistrate Judge's Report and Recommendation is that any agent who claims "experience" with the Lucheses and alleges that an investigation includes members of the Luchese Crime Family may dispense with statutory requirements for wiretaps.

The government failed to satisfy te necessity requirement for obtaining a wiretap. Within days of the start of the betting, the government sought the easy and effective means of wiretapping instead of relying upon traditional forms of investigation that had been producing tangible results and valuable information. Agent Sachs's affidavit failed to account for the continued use of traditional investigative techniques, such as confidential informants and undercover agents, and also failed to particularize the government's need in this investigation allegedly connected to the Luchese Crime Family.

For these reasons, and for the reasons stated in Marco Minuto's Motion to Suppress Fruits of Wiretaps, and in Marco Minuto's Reply Memorandum, and to preserve this issue for appellate review, Mr. Minuto objects to the findings of the Magistrate's Report and Recommendation denying Mr. Minuto's Motion to Suppress Fruits of Wiretaps.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

## IMPLICATIONS OF CS-1 BEING THE LAWYER
## IDENTIFIED AT THE AUGUST 9, 2001 HEARING

CS-1 represented defendants Marco Minuto, Joseph Minuto, Chris Greco, and Nicolo Mariani at various times since 1997. In his representation of Marco Minuto, CS-1 was involved in the negotiation of contracts, incorporation of businesses, mortgage negotiations, and environmental testing. Mr. Minuto spoke to CS-1 with the understanding that the communications were confidential pursuant to the attorney-client privilege.

Agent Sachs swore in his wiretap affidavit that "[t]he information provided by CS-1 . . . is based on CS-1's direct conversations and associations with . . . Marco Minuto, Joseph Minuto, Chris Greco, [and] Nicolo Mariani." [Sachs Affidavit of September 8, 1998, ¶ 29]. Using information obtained from his attorney-client relationship with Marco Minuto, CS-1 allegedly told the government that Marco Minuto *had* authorized Marcello Grasso to provide enforcement for bookmakers; *had* assumed control of a strip club; *had* traveled to Florida to work on a bookmaking operation; and *had* used Dominick Memoli and James Mancuso as enforcers. [Sachs Affidavit of September 8, 1998, ¶¶ 35, 38, 44, 49C]. The government's use of CS-1 has serious and alarming implications.

### 1.      Violation of Attorney-Client Privilege:

It is "axiomatic that the attorney-client privilege confers upon the client an expectation of privacy in his or her confidential communications with the attorney." DeMassa v. Nunez, 770 F.2d 1505, 1506 (9th Cir. 1985). The attorney-client privilege ensures that a client fells "free to make full disclosure to their attorneys of past wrongdoings, in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice." In Re Grand Jury Subpoena, 223 F.3d 213 (3d Cir.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

2000) (citing United States v. Zolin, 491 U.S. 54 (1989)).  Communications between attorney and client that are privileged are inadmissible at grand jury proceedings.  In re Grand Jury Subpoena, 926 F.2d 1423, 1431-32 (5th Cir. 1991).

## 2.    Violation of Attorney-Client Relationship:

The government's secret use of CS-1 tainted grand jury proceedings and prejudiced Mr. Minuto.  The Due Process Clause of the Fifth Amendment provides a defendant the right to an unimpaired relationship with his counsel at the investigatory stage of a case. See United States v. Marshank, 777 F. Supp. 1507, 1518 (N.D. Cal. 1991) (citing United States v. Marion, 404 U.S. 307, 315 (1971); United States v. Simpson, 536 F. 2d 827, 830 n.9 (9th Cir. 1976)).  In order for prosecutorial misconduct to constitute a due process violation, courts require that the defendant show prejudice.  United States v. Irwin, 612 F.2d 1182, 1187 (9th Cir. 1980).  Prejudice includes use of evidence gained through the interference and destruction of the attorney-client relationship.  Marshank, 777 F. Supp. at 1521 (citing Irwin, 612 F.2d at 1187).[3]

In United States v. Sabri, the government used a defendant's attorney as an informant. 973 F.Supp. 134, 147 (W.D.N.Y. 1996).  The Court held that "the government's manipulation of the attorney-client relationship . . . [was] offensive to the principles which underlie our criminal justice system," and warranted dismissal of the charge.  Id.

The attorney-informant in Sabri had been representing the defendant in an on-going civil matter.  Id. at 138.  According to the attorney, Sabri threatened violence during one

---

[3] Because specifying prejudice requires disclosure of work product and privileged communications, Mr. Minuto would like an opportunity to address the prejudice issue in camera.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

of their telephone conversations.  Specifically, the attorney claimed that Sabri had "a focused plan that is going to cause change . . . .  Killing 50 to 100 people."  Id.  Sabri's attorney informed the judge and opposing counsel of her client's threat.  Id.  The FBI asked Sabri's attorney to become an informant and tape a subsequent telephone conversation with her client, "direct[ing] the conversation back to the violence topic,"  while continuing to represent Sabri in the civil proceeding.  Id.  Sabri's attorney, acting as a government agent and unbeknownst to her client, recorded a conversation with Sabri in which he made further threats toward government officials.  Sabri, 973 F.Supp. at 139.  The attorney also testified against Sabri at grand jury proceedings.  Id. at 138.

Sabri was indicted in a two count indictment, one count for each of the conversations with his civil attorney.  Sabri sought dismissal of the indictment or in the alternative, suppression of the tainted evidence.  Id. at 139.  The court dismissed Count II of the indictment, which was based on the attorney-informant's recorded conversation, on the grounds that Sabri's attorney, at the government's instigation, "used the [attorney-client] relationship to initiate communications with the defendant, exhort him to be frank and not hold back . . . and then directed the conversation to the topic of his previous comments about violence."  Id. at 147.  The court found that Sabri was "clearly prejudiced by the manipulation of the attorney-client relationship," and that this mandated dismissal of the charge obtained through the use of the attorney-informant.  Id. at 148.

Because the defendant's  attorney worked with the prosecutor to obtain an indictment, the court in United States v. Marshank, 777 F. Supp. 1507, 1521 (N.D.Cal. 1991), held that the defendant's right to due process under the Fifth Amendment was violated.  In Marshank, the defendant had an ongoing attorney-client relationship with the

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

attorney-informant. Id. The attorney-informant also represented Marshank after Marshank was indicted.  The court found that "absent the government's improper interference between Milkin and his clients, there would not have been any indictments against Marshank." Id.

While suppression of the evidence is an appropriate remedy for a Fifth Amendment violation, dismissal of the indictment is appropriate where continuing prejudice cannot be remedied by suppression alone. Marshank, 777 F. Supp. at 1521-22 (citing United States v. Morrison, 449 U.S. 361, 365-66, n. 2 (1981);  United States v. Rogers, 751 F.2d 1074, 1078 (9th Cir. 1985)).  Thus, in Marshank, the court found that the "fruit of the prosecutor's transgression" was the indictment itself. Id. at 1523.  In such a situation, it was "simply impossible" to remove the taint of the government's constitutional transgressions, as the taint "infected" every part of the investigation and prosecution of the defendant. Id. The Marshank court found that the government's violation of the defendant's due process rights under the Fifth Amendment warranted dismissal of the indictment.

The facts in Mr. Minuto's case mirror Sabri and Marshank.  CS-1 had an ongoing attorney-client relationship with Mr. Minuto.   The government violated Mr. Minuto's attorney-client relationship.  CS-1's cooperation with the government against Mr. Minuto continued throughout the investigation and prosecution.  Not only was CS-1's information essential in securing the wiretap, but evidence from the wiretap was critical in securing the indictment against Mr. Minuto. Also, the case agent, Darrin Sachs, testified before the grand jury, disclosing privileged information provided by CS-1.  Mr. Minuto has been prejudiced by the government's use of CS-1 in obtaining the wiretap and in returning the indictment. As in Sabri and Marshank, dismissal of Mr. Minuto's indictment is the proper

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

remedy because it is impossible to isolate the evidence obtained as a result of the government's violation of Mr. Minuto's attorney-client privilege and attorney-client relationship. The taint in this case has "infected" every part of the investigation and prosecution of Marco Minuto.

3.    **At a Minimum, Mr. Minuto is Entitled to a Kastigar Hearing:**

At the very least, this court must conduct a hearing regarding the prejudice suffered by Mr. Minuto as a result of the breach of the attorney-client privilege.[4] When prosecutorial

---

[4] In order to show prejudice, all a defendant need show is that the privileged information was used "in any . . . way" to his "substantial detriment." Weatherford v. Bursey, 429 U.S. 545, 554 (1977). The requirement of "substantial detriment" encompasses far more than simply the introduction of evidence at trial:

> The threat of significant harm required by Weatherford does not . . . have to amount to "prejudice" in the sense of altering the actual outcome of the trial. Although the Sixth Amendment is concerned primarily with fairness at trial, it is not limited to that function. The right to counsel protects the whole range of the accused's interests implicated by a criminal prosecution. These interests may extend beyond the wish for exoneration to include, for example, the possibilities of a lesser charge, a lighter sentence, or the alleviation of "the practical burdens of a trial."

> Moreover, the appellants need not prove that the prosecution actually used the information obtained. The prosecution makes a host of discretionary and judgmental decisions in preparing its case. It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions. Mere possession by the prosecution of otherwise confidential knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant. Such information is "inherently detrimental, * * * unfairly advantage[s] the prosecution, and threaten[s] to subvert the adversary system of justice."

Briggs v. Goodwin, 698 F.2d 486, 494-95 (quoting Weatherford, 429 U.S. at 556), vacated, 712 F.2d 1444, on reh'g, 712 F.2d 1444 (D.C. Cir. 1983), cert. denied, 464 U.S. 1040 (1984).

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

taint arises out of the government's possession and use of material covered by a defendant's attorney-client privilege, the government "must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources." United States v. Schwimmer, 924 F.2d 443, 446 (C.A. 2, 1991). The analysis is the same as that employed in Kastigar v. United States, 406 U.S. 441 (1972), the seminal case explaining the scope and effect of "use and derivative use" immunity under the Fifth Amendment. Schwimmer, 924 F.2d at 446.

Kastigar imposes a "total prohibition" on the state's use of testimony compelled from a defendant who has invoked his Fifth Amendment privilege against self-incrimination. The government may not make any direct or derivative use of the "privileged" testimony, thus "barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." Kastigar, 406 U.S. at 460. As the Supreme Court reiterated in the highly publicized prosecution of former assistant attorney general Webster Hubbell:

> [A] person who is prosecuted for matters related to testimony he gave under a grant of immunity does not have the burden of proving that his testimony was improperly used. Instead, we held that the statute imposes an affirmative duty on the prosecution, not merely to show that its evidence is not tainted by the prior testimony, but "to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." Requiring the prosecution to shoulder this burden ensures that the grant of immunity has "le[ft] the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a grant of immunity."

United States v. Hubbell, 120 S.Ct. 2037, 2045 (2000). In reversing Hubbell's conviction, the Court rejected the government's assertion "that its prosecution . . . must be considered proper unless someone – presumably [the defendant] – shows that 'there is some substantial relation between the compelled testimonial communications implicit in the act

-13-

of production (as opposed to the act of production standing alone) and some aspect of the information used in the investigation or the evidence presented at trial.'"    The Court concluded:

> Kastigar requires that respondent's motion to dismiss the indictment on immunity grounds be granted unless *the Government proves that the evidence it used in obtaining the indictment and proposed to use at trial was derived from legitimate sources "wholly independent" of the testimonial aspect of respondent's immunized conduct* in assembling and producing the documents described in the subpoena.

Id. at 2048.

The government's burden is a "heavy one," and is "not limited to such 'negation of taint'; rather, the government must go further and affirmatively prove legitimate independent sources for its evidence and affirmatively establish that none of the evidence presented to the grand jury was derived *directly or indirectly* from the immunized testimony." United States v. Hampton, 775 F.2d 1479, 1485-86 (11th Cir. 1985) (requiring "that all of the evidence presented to the grand jury (and ultimately all of the evidence to be utilized at trial) was derived from legitimate, independent sources").  To discharge its "heavy burden," the government must prove that "the [prosecution team] . . . did not use [privileged information] in some significant way short of introducing tainted evidence.  Such use could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." United States v. McDaniel, 482 F.2d 305, 311 (8th Cir. 1973) (reversing conviction).

In Hampton, a defendant testified under a state grant of immunity.  When the defendant was prosecuted by the federal government, he moved to dismiss the indictment on the ground that his immunized (*i.e.* privileged) testimony had been used directly and

-14-

indirectly against him. The trial court held a <u>Kastigar</u> hearing and denied the motion. The

court of appeals reversed, concluding that the prosecution had not carried its burden:

> [I]t was incumbent upon the appellee in this case to demonstrate not only that Hampton's immunized testimony was not used by federal officials either directly or as an investigatory lead, but that any other information or materials conveyed by state officials and utilized either directly or indirectly by federal officials was not derived in whole or in part, directly or indirectly, from Hampton's immunized testimony.
>
> *   *   *
>
> The appellee in this case did not meet its burden. Indeed, aside from conclusory allegations of reliance upon the unimmunized statements of March 1979 and conclusory denials of use or derivative use by various state and federal officials, *the government made little effort to affirmatively trace each item of evidence that may have been considered by the indicting grand jury to legitimate, wholly independent sources.* Obviously, the government's conclusory denials of direct or derivative use are insufficient even to "negate taint," much less to carry the government's affirmative burden of tracing all evidence presented to wholly independent sources. And while the government did establish that state investigators knew certain aspects of some of the real estate transactions prior to any immunized testimony from Hampton, there was no attempt to systematically establish an independent source for each and every item of evidence which may have been considered by the indicting grand jury . . . The government never attempted to trace step by step the manner in which Hampton's unimmunized statements supposedly led to such additional information.

<u>Hampton</u>, 775 F.2d at 1487-88 (emphasis added).

In <u>United States v. Mapelli</u>, the court emphasized that "[t]he statute expressly

proscribes use of information indirectly derived from immunized testimony, not just direct

use of the immunized testimony itself." 971 F.2d 284, 287 (9th Cir. 1992). The prohibited

indirect use includes "planning trial strategy." <u>Id.</u> In <u>Mapelli</u>, the defendant moved to

disqualify the two prosecutors who had prosecuted another target of the investigation on

the ground that prosecutors might use against Mapelli what they learned from Mapelli's

immunized testimony. Reversing the trial court's denial of the motion, the Ninth Circuit

held:

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

Our review of the record does not show that the government made no indirect use of her testimony. We cannot tell. Nor could the district judge have ascertained prior to trial whether indirect use would be made. The decision to present or not present certain witnesses and exhibits, for example, might well have been affected by analysis of Velda Mapelli's compelled testimony. The government prosecutors knew what her story would be.

Id. at 288.

Simply put, insofar as the government intends to proceed to trial against Mr. Minuto, this court must conduct a pre-trial evidentiary hearing where the government is required to "affirmatively trace each item of evidence that may have been considered by the indicting grand jury to legitimate, wholly independent sources." Hampton, 775 F.2d at 1487-88.


**4.    Material Misrepresentations and Omissions in the Wiretap Affidavit:**

Assuming that the court finds, over our objection, that it was appropriate for the government to use an attorney as an informant, the wiretap application was defective because the government never disclosed to the judge who approved the wiretap that the informant was the defendant's attorney. In a wiretap application, the government is required by 18 U.S.C. § 2518(1)(c) to present a "a full and complete statement" as to other investigative procedures available to the government in order to show necessity for the wiretap. The government may not resort to wiretaps "in situations where traditional investigative techniques would suffice to expose the crime." United States v. Smith, 31 F.3d 1294, 1297 (4th Cir. 1994) (quoting United States v. Kahn, 415 U.S. 143, 153, n. 12 (1974)).

In our case, Agent Sachs swore that "based upon the close-knit nature of this

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

criminal group," Agent Sachs did "not believe it would be possible for an [undercover agent] to independently infiltrate this group." [Sachs Affidavit of September 8, 1998 at ¶ 109]. Yet CS-1 had already "infiltrated" the organization and had the trust of the targets of the investigation. Assuming the propriety of using an attorney as an informant, with CS-1 on the government's team, there was simply no necessity for a wiretap.

Agent Sachs's statement that "infiltration" was impossible was a material misrepresentation that misled Judge Ferguson into issuing the wiretap. Additionally, Agent Sachs's failure to disclose that CS-1 was an attorney was a material omission which, if disclosed, would have made it clear to Judge Ferguson that there was no necessity for the wiretap. Under Franks v. Delaware, 438 U.S. 154 (1978), all evidence derived from the wiretap must be suppressed.[5]

## 5.    Post-Indictment conduct and Sixth Amendment violation:

The government's continued use of CS-1 post-indictment constitutes a violation of Minuto's right to counsel under the Sixth Amendment. "[T]he Sixth Amendment is violated whenever a government informant actively engages a defendant in conversation that is likely to elicit incriminating statements about the defendant's upcoming trial." United States v. Terzado-Madruga, 897 F.2d 1099, 1110 (11th Cir. 1990). After Mr. Minuto was indicted, CS-1 met with Mr. Minuto in order to discuss defense strategy, including planned investigations, possible motions, and potential witnesses.

The government, through the use of CS-1, was not only privy to attorney-client

---

[5] Franks applies to false necessity showings in wiretap applications. United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir. 1985).

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

privileged communications concerning Mr. Minuto's defense, but also permitted a government agent to sabotage defense strategies. CS-1 invaded the defense camp. Not only did CS-1 mislead Mr. Minuto, but CS-1 also misled Mr. Minuto's counsel into thinking that he was an asset to the defense. In truth, CS-1 was providing tainted and conflict-laden advice.

"Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." <u>Massiah v. United States</u>, 377 U.S. 201, 205 (1964). The Sixth Amendment right to counsel is "indispensable to the fair administration of our adversarial system of criminal justice," <u>Maine v. Moulton</u>, 474 U.S. 159, 168-69 (1985). The Supreme Court has expressly recognized the government's affirmative obligation not "act in any manner that circumvents and thereby dilutes the protection afforded by the right to counsel." <u>Marshank</u>, 777 F. Supp. at 1525 (<u>citing</u> <u>Maine v. Moulton</u>, 474 U.S. at 176). As is true for the Fifth Amendment violation, dismissal of the indictment is an appropriate remedy for a Sixth Amendment violation where continuing prejudice cannot be remedied by suppression alone. <u>Marshank</u>, 777 F. Supp. at 1525 (<u>citing</u> <u>Morrison</u>, 449 U.S. at 365-66 n.3; <u>Rogers</u>, 751 F.2d at 1078).

Mr. Minuto was never informed that CS-1 was cooperating with the government or obtaining evidence for the government during these post-indictment meetings. Mr. Minuto has been prejudiced by the government's violation of his Sixth Amendment rights via the post-indictment use of CS-1. Dismissal of Mr. Minuto's indictment is the appropriate remedy.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

The Eleventh Circuit expressed uncategorical disapproval of the use of an attorney-informant in <u>United States v. Ofshe</u>, 817 F.2d 150 (11th Cir. 1990). In <u>Ofshe</u>, the court explicitly criticized the government's use of an attorney as an informant against his client. <u>Id.</u> The court found that this conduct was not only unethical but also "reprehensible." <u>Id.</u> at 1516 & n.6. In <u>Ofshe</u>, the cooperating attorney was providing information to the U.S. Attorney's Office in Chicago regarding suspected drug traffickers, while representing defendant Ofshe in a Florida drug trafficking case. The cooperating attorney did not begin to cooperate with the government until after Ofshe had been indicted. The government maintained that none of the information given to the U.S. Attorney's Office in Chicago by Ofshe's informant-attorney was provided to the Florida prosecution team. <u>Id.</u> at 1515. While the <u>Ofshe</u> court declined to find reversible error due to lack of evidence of prejudice, the Eleventh Circuit made clear and gave notice of its disapproval of the use of an attorney-informant post-indictment.

**6.    Prosecution Team is Tainted:**

The government's intentional intrusion into Mr. Minuto's attorney-client privilege and attorney-client relationship requires disqualification of the prosecution team in order to restore the playing field to level. As the United States Court of Appeals for the Tenth Circuit explained:

> Because we believe that a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed.

* * *

[E]vidence obtained through an intentional and improper intrusion into a defendant's relationship with his attorney, as well as any "fruits of [the prosecution's] transgression," must be suppressed in proceedings against him.

At the same time, *such an intrusion could so pervasively taint the entire proceeding that a district court might find it necessary to take greater steps to purge the taint. The court may, for instance, require retrial by a new prosecutor.*

Shillinger v. Haworth, 70 F.3d 1132, 1142-43 (10th Cir. 1996) (granting the petition for habeas relief and remanding for a determination of whether prosecutor should be disqualified).

In the case of In re Grand Jury Proceedings John Doe, 757 F.2d 600 (4th Cir. 1985), a prosecutor had access to several documents containing privileged communications between the defendants and their defense counsel. The trial court ruled that, due to the possible benefits to the prosecution from insights gained as a result of such access, the prosecutor should be disqualified. In Mr. Minuto's case, the government had access to something even more valuable than documents containing privileged communications: the government had CS-1 on their team, not only discussing but also influencing Mr. Minuto's defense strategy. As a result of the government's conduct, the prosecution team should be disqualified.

Rule DR 7-104(A)(1) of the American Bar Association's Model Code of Professional Responsibility, and Rule 4-4.2 of the Rules Regulating The Florida Bar, prohibit an attorney or his agents from communicating with a party he knows to be represented by counsel about a matter in controversy between them. The government knew post-indictment that

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

CS-1 was acting as a government agent and that Mr. Minuto was represented by "legitimate" counsel.   Nevertheless, the government authorized CS-1 to meet with a represented defendant and intrude into Mr. Minuto's attorney-client relationship.

By the government's post-indictment use of CS-1, the prosecution team fraudulently infiltrated the defense camp and participated in interviews and meetings about the facts of the case and defense strategy.   Plainly stated, a lawyer who acquires privileged communications is bound by ethical and constitutional constraints not to switch sides and turn on his client.[6]  The government's conduct requires disqualification of the prosecution team.


## CONCLUSION

The outrageous conduct of the government in directing the use of CS-1 violated Mr. Minuto's attorney-client privilege, attorney-client relationship, and constitutional rights.  As a result, the prosecution team, the wiretap, and the indictment are tainted.

Mr. Minuto moves this Court for an order disqualifying the prosecution team.   By intentionally intruding on privileged communications between Mr. Minuto and his attorneys,

---

[6] Case law is abound holding that a lawyer who previously received privileged communications from the defendant in the course of an attorney-client relationship is disqualified from participating in the prosecution of that defendant.  See United States v. Goot, 894 F.2d 231, 235 (7th Cir. 1990) (once defendant's lawyer joined the U.S. Attorney's Office, the government erected "Chinese walls" between that lawyer and the prosecution team to insure that "no secrets were disclosed."); In the Matter of the Grand Jury Investigation of Targets, 918 F.Supp. 1374 (S.D.Cal. 1996) ("It is undisputed that Dowd and Frega shared privileged attorney-client conversations during this representation, and all parties agree that Dowd is disqualified from participating in the federal investigation of the targets"); United States v. Stubbs, 23 M.J. 188, 192 (U.S. Court of Military Appeals 1987) ("Robb was disqualified from prosecuting the appellant in view of the nexus between her discussions with the appellant and the charges in this case").

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD., SUITE 1300, MIAMI, FL 33131• (305) 371-6421

members of the current prosecution team, including the lead investigator, have been constructively vested with an ethical and legal obligation to preserve Mr. Minuto's confidences. Given such obligations, the current prosecutor and the agents are precluded from participating in Mr. Minuto's prosecution.

As in Marshank, the taint of the government's transgressions have "infected every part of the investigation and prosecution" of Mr. Minuto. Marshank, 777 F Supp. at 1523 (citing Morrison, 449 U.S. 361, 365-66, n. 2 (1981)). There is no means other than dismissal of the indictment to remedy the violations that have occurred. Marco Minuto has been prejudiced by the government's conduct and the indictment should be dismissed.

At a minimum, pursuant to Kastigar v. United States, 406 U.S. 441 (1972), Mr. Minuto requests a hearing to determine whether the government violated Mr. Minuto's constitutional rights by seeking an indictment and prosecuting him based on evidence obtained in violation of the attorney-client privilege, and the Fifth and Sixth Amendments to the United States Constitutions.

Respectfully submitted,

**BLACK, SREBNICK & KORNSPAN, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

By: _____
**HOWARD M. SREBNICK, ESQ**
Florida Bar Number 919063
Attorney for Marco Minuto

-22-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on *Aug 17* , 2001 a true and correct copy of the

foregoing was  furnished by mail to:

Michael J. Dittoe, Esq.
Assistant United States Attorney
500 East Broward Boulevard
7th Floor
Fort Lauderdale, Florida 33394-3002

Bruce A. Zimet, Esq.
Counsel for Nicolo Mariani
One Financial Plaza
Suite 2612
Fort Lauderdale, Florida 33394

William J. Hunt, Esq.
Counsel for Joseph Minuto
William J. Hunt & Associates
155 Polifly Road
Suite 200
Hackensack, New Jersey 07601

Kerry A. Lawrence, Esq.
Counsel for Chris Greco
Briccetti, Calhoun & Lawrence, LLP
81 Main Street
Suite 450
White Plains, New York 10601

By: _____

**HOWARD M. SREBNICK, ESQ.**
Attorney for Marco Minuto

-23-